UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                        CASE NO.: 17-24842-BKC-RAM
                                              Chapter 11
SKYPATROL, LLC

        Debtor-In-Possession.

_____/

**DEBTOR'S EMERGENCY MOTION FOR ORDER
(1) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL
ON AN INTERIM BASIS AND (2) SETTING FINAL HEARING**

***(Emergency Hearing Requested on or before December 22, 2017)***

> **Debtor seeks the entry of an order granting the
> requested relief on an expedited basis in order to allow
> the Debtor to proceed with its regular business
> operations. The requested use of cash collateral will
> permit the Debtor to pay for necessary operational
> expenses. Absent the entry of an expedited order, the
> Debtor may not have a viable opportunity to reorganize
> as it will be deprived of the cash necessary to continue
> its operations.**

Skypatrol, LLC ("Skypatrol" or the "Debtor"), through undersigned counsel, hereby

moves on an emergency basis for entry of interim and final orders pursuant to 11 U.S.C.

§§ 105(a), and 361 and 363, Rule 4001, 6003 and 9014 of the Federal Rules of

Bankruptcy Procedure and Local Rule 4001-2 and 9013-1 (F) and (G), authorizing the

Debtor's use of cash collateral as defined in 11 U.S.C. §§ 363(a) and determining

adequate protection under 11 U.S.C. § 363(e).  In support of this Motion, the Debtor

respectfully represents as follows:

## Jurisdiction

        1.        This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b)

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a

core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief requested herein are Sections 361,
363 and 364 of the Bankruptcy Code and Rule 2002 and 4001 of the Federal Rules of
Bankruptcy Procedure.

## Statement Required by Bankruptcy Rules and Local Rules

3.      The Debtor provides the following disclosures in conformity with the
requirements of Bankruptcy Rule 4001(b), Local Rule 9013-1(G) and this Court's
"Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking
Approval of Postpetition Financing":

     a.  <u>Parties With an Interest in Cash Collateral</u>: As further detailed in paragraphs
9 through 23 below, (i) the Trust for Trebuchet Corp., Isabel Catherine
Leeds Trust, and Oliver Williams Leeds Trust (collectively, the "Lenders
Trust"), (ii) Platinum Financial Trust, LLC ("Platinum"), and (iii) the Debtor's
CEO, Robert Rubin ("Rubin," and together with Lenders Trust and
Platinum, the "Lenders"), have a security interest in substantially all assets
of the Debtor.

     b.  <u>Proposed Use of Cash Collateral</u>: The Debtor proposes to use any
collateral constituting "Cash Collateral," as that term is defined in 11 U.S.C.
§ 363(a) to pay all ordinary and necessary expenses in the ordinary course
of its business for the purposes and in the amounts set forth in the budget
attached hereto as Exhibit "A" (the "Budget") provided, however, that the
Debtor may: (i) exceed any line item on the Budget by an amount equal to
ten percent (10%) of each such line item; or (ii) exceed any line item by

more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.  Any deviation of more than ten percent (10%) on any line item or in the overall Budget shall require the Lenders or Court approval.

c.  <u>Duration of the Use of Cash Collateral</u>: The Debtor seeks authority to continue to use Cash Collateral during the pendency of this chapter 11 case.

d.  <u>Adequate Protection</u>: As adequate protection for the Debtor's use of Cash Collateral, the Debtor shall grant Lenders Trust, Platinum and Rubin replacement liens on all property that is of the same nature and type as their prepetition collateral, in the same priority as the liens existed as of the Petition Date (as defined below)(the "Replacement Liens"); provided, however, that the Replacement Liens shall not attach to Avoidance Actions (as defined below) or their proceeds

e.  <u>Cash Collateral Order</u>: The proposed form of the Cash Collateral Order will be in substantially the same form as is attached hereto as Exhibit "B."

## **Background**

4.    On December 13, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

5.    Pursuant to 11 U.S.C. §§ 1107 and 1108, the Debtor is operating its business and manages its financial affairs as a debtor-in-possession.  No trustee, examiner, or official committee of unsecured creditors has been appointed to date.

6.      Skypatrol is a Delaware limited liability company, doing business in Florida, and providing GPS tracking software and hardware solutions to, among other businesses, to fleet, power sports and law enforcement.

7.      The Debtor receives substantially all of its income from selling GPS tracking devices domestically and internationally to various customers.   In addition, the Debtor is owed approximately $1,500,000.00 from the sale of certain assets to VBI Group, LLC ("VBI"), and prior to the Petition Date, the Debtor commenced litigation against VBI in order to collect said amount.

8.      As set forth above, the Debtor seeks use of Cash Collateral and a determination of adequate protection.   The emergency nature of this Motion is that absent the interim and final relief sought, the Debtor will be unable to pay ordinary and necessary expenses associated with the continued daily operation of its business. Further, absent the ability to use the daily cash receipts to pay the ordinary and necessary expenses associated with its business, the Debtor could be forced to discontinue operations.

## Parties with an Asserted Interest in Cash Collateral

**Lenders Trust**

9.      Prior to the Petition Date, the Debtor executed and delivered to Lenders Trust a Convertible Note bearing an issuance date of December 31, 2015, in the principal amount of $1,000,000.00 (the "2015 Convertible Note"), of which only $500,000.00 was funded.   The 2015 Convertible Note provided Skypatrol with working capital to operate its business.   A true and correct copy of the 2015 Convertible Note is attached hereto as Exhibit "C," and incorporated by reference.

10.     On or around December 1, 2016, the Debtor executed and delivered a Security Agreement (the "Security Agreement"), which provided Lenders Trust with a security interest in and lien against all of the Debtor's assets (the "Collateral").   A true and correct copy of the Security Agreement is attached hereto as Exhibit "D," and incorporated by reference.

11.     On or around December 9, 2016, due to the Debtor's failure to satisfy the obligations under the 2015 Convertible Note, which resulted in a default and an outstanding principal balance of $500,000.00, the Debtor and Lenders Trust entered into a Reaffirmation Agreement (the "Reaffirmation Agreement"), which, among other things, acknowledge, ratified, reaffirmed, granted, conveyed and re-granted to Lenders Trust a first-lien and security interest in the Collateral.   A true and correct copy of the Reaffirmation Agreement is attached hereto as Exhibit "E," and incorporated by reference.

12.     On or about December 27, 2016, the Debtor executed and delivered to Lenders Trust a Second Reaffirmation Agreement and Amendment/Supplement (the "Second Reaffirmation Agreement"), which Reaffirmed the obligations set forth in the 2015 Convertible Note and Reaffirmation Agreement and also provided for the delivery of a new promissory note in the principal amount of $200,000.00 (the "$200K Note").   True and correct copies of the Second Reaffirmation Agreement and the $200K Note are attached hereto as Composite Exhibit "F," and incorporated by reference.

13.     In connection with the security interest granted by the Debtor in the Collateral,    Lenders    Trust    filed    UCC-1    Financing    Statements,    and addendums/amendments thereto, with the Delaware Department of State and the Florida

Secured Transaction Registry. Copies of the UCC-1 Financing Statements, and the addendums/amendments thereto, filed in Florida and Delaware are attached hereto as Composite Exhibit "G," and are incorporated by reference.

14.     Pursuant to the amended UCC-1 Financing Statements filed with the State of Delaware and the State of Florida Lenders Trust hold a lien on substantially all of the Debtor's assets, specifically the following property:

> **All of Skypatrol, LLC's (the "Company") assets, whether owned on December 31, 2015 or thereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owning to the Company or in which the Company may have any interest, however created or arising and whether or not earned by performance, including without limitation the following: (1) The Company's "Excluded Assets," as that term is defined in the Asset Purchase Agreement ("APA") dated May 1, 2017 by and between Skypatrol, LLC a Delaware limited liability company, VBI Group, LLC, a Delaware limited liability company d/b/a Skypatrol USA, and Sam K. Mahrouq as guarantor; (2) the Company's security interest(s) in all "Purchased Assets" as such term is defined in the APA.**

15.     Prior to the Petition Date, Skypatrol paid down a portion of the obligations due on the 2015 Convertible Note, the Reaffirmation Agreement and Second Reaffirmation Agreement.   In addition, Skypatrol fully satisfied the obligations due on the $200K Note.   Accordingly, as of the Petition Date, the Debtor was indebted to Lenders Trust solely under the 2015 Convertible Note (and the Reaffirmation Agreement and Second Reaffirmation Agreement thereto) in the approximate amount of **$192,000.00**.

**Platinum Lender**

16.     On or around May 1, 2017, the Debtor entered into an Asset Purchase Agreement (the "Purchase Agreement") with VBI, which provides for, among other things, the Debtor's sale of certain assets to VBI in exchange for, *inter alia*, a $2,500,000.00 purchase price paid over a period of time.

17.     Due to the need for immediate capital, on or around June 16, 2017, the Debtor executed and delivered to Platinum a Partial Assignment of Rights and Interest (the "Partial Assignment").   Pursuant to the Partial Assignment, Platinum provided the Debtor with $125,000.00 in exchange for seventeen (17) equal monthly payments in the amount of $10,000.00 beginning on July 16, 2017. Further, under the terms of the Partial Assignment, Platinum shall have the right to pursue and assert rights to any and all assets of the Debtor, including the Debtor's rights of under the Purchase Agreement, in the event of default.   A true and correct copy of the Partial Assignment is attached hereto as Exhibit "H," and incorporated by reference.

18.     In connection with the security interest granted by the Partial Assignment in the Collateral, Platinum filed a UCC-1 Financing Statement with the Delaware Department of State.   A true and correct copy of the UCC-1 Financing Statement filed in Delaware is attached hereto as Exhibit "I," and are incorporated by reference.

19.     Pursuant to the UCC-1 Financing Statement filed with the State of Delaware, Platinum holds a lien on substantially all of the Debtor's assets, specifically the following property:

> **All assets of Debtor, both tangible and intangible, in accordance with the terms of that certain Partial Assignment of Rights and Interest executed by Debtor in favor of Secured Party.**

20.    Prior to the Petition Date, Skypatrol paid down a portion of the obligation due under the Partial Assignment.   Accordingly, as of the Petition Date, the Debtor was indebted to Platinum under the Partial Assignment in the approximate amount of **$140,000.00**.

**Rubin Lender**

21.    On or around May 3, 2017, the Debtor's CEO, Rubin, loaned the Debtor $50,000.00 in order for the Debtor to meet its working capital requirements (the "$50k Loan").   In connection therewith, the Debtor entered into a Secured Promissory Note with Rubin for the repayment of the $50,000.00 (the "Rubin Note") and executed and delivered a Security Agreement (the "Rubin Security Agreement") which provided Rubin with a security interest in and lien against all of the Debtor's assets.   A true and correct copy of the Rubin Note and Rubin Security Agreement are attached hereto as Composite Exhibit "J," and incorporated by reference.

22.    Shortly thereafter, Rubin filed a UCC-1 Financing Statement with the State of Delaware, which provides Rubin with a lien on all of the Debtor's assets, specifically the following property:

> **All of the Debtor's assets, whether now owned or hereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Debtor or in which the Debtor may have an interest, however created or arising and whether or not earned by performance.**

A true and correct copy of the UCC-1 Financing Statement filed in Delaware is attached hereto as Exhibit "K," and are incorporated by reference.

23.     No payments have been made to Rubin on account of the $50k Loan to date. Accordingly, as of the Petition Date, the Debtor was indebted to Rubin in the approximate amount of **$50,000.00**, plus outstanding interest.

## Relief Requested and Basis Therefor

## Use of Cash Collateral

24.     All cash and cash equivalent, funds and proceeds generated by the sale of the Debtor's services and inventory may constitute the Cash Collateral of the Lenders within the meaning of 11 U.S.C. § 363(A).   However, in order to operate its business, preserve and maintain its going concern value, and, ultimately, effectuate a successful reorganization, the Debtor must be able to continue to use the Cash Collateral in order to pay its regular operating expenses. But pursuant to 11 U.S.C. § 363(c)(2), the Debtor may not use the Cash Collateral unless each of the Lenders consent or such use is authorized by the Court after notice and hearing.   Accordingly, because the Cash Collateral is necessary for a viable reorganization and the continued operation of the Debtor, the Debtor proposes to operate pursuant to the Budget attached hereto as Exhibit "A," which indicates the Debtor's proposed use of Cash Collateral based on the Debtor's anticipated income and expenses.

25.     Further, the Debtor requests that it be authorized: (i) to exceed any line item on the Budget by an amount equal to ten percent (10%) of such line item; or (ii) to exceed any line item by more than ten percent (10%) so long as the total amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total

Budget.   Lastly, the Debtor requests that any unused budgeted amounts for any month shall roll over to the next month.

**The Adequate Protection**

26.     11 U.S.C. § 361 (1)-(3) delineates certain forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.    However, what constitutes adequate protection must be decided on a case by case basis. *See In re O'Connor*, 808 F.2d 1393, 1396-1397 (10th Cir. 1987); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985).

27.     In addition to the estimated $1,500,000.00 due to the Debtor from the sale of assets to VBI, the Debtor's Schedule "A/B" [ECF 1], lists the Debtor's interest in, among other things: (i) a City National Bank checking account with a scheduled value of $70,000.00; (ii) miscellaneous inventory with an aggregate scheduled value of $300,000.00; and (iii) non-VBI accounts receivable with an aggregate scheduled value of $485,000.00.    Accordingly, the aggregate value of the Collateral securing the indebtedness to the Lenders greatly exceeds the collective amount of the Lenders' claims, and as a result, the Lenders are adequately protected by a substantial equity cushion in the Collateral.   *See In re Llewellyn*, 27 B.R. 481 (Bankr. M.D. Pa. 1983) (stating "case law indicates that a secured creditor is adequately protected if the value of the encumbered property is sufficiently in excess of the secured indebtedness"); *In re Potvin Lumber Company, Inc.*, 24 B.R. 54 (Bankr. D. Vt. 1982) (finding that secured creditor was adequately protected because the total value of the personal property which the creditor had a security interest in exceeded the total indebtedness to the creditor); *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 23 (Bankr.

E.D. Pa. 1987) (ordering that Debtor is authorized to use cash collateral and finding that bank was "well-protected" by an equity cushion since the value of the Debtor's assets was at least $482,500 and the bank's debt was only $225,000); *In re Boulders on the River, Inc.*, 164 B.R. 99, 104 (9th Cir. BAP 1994) (finding that secured creditor was adequately protected with a 11.45% equity cushion).

28.     However, notwithstanding the substantial equity cushion, the Debtor acknowledges that Lenders Trust, Platinum and Rubin may seek additional adequate protection of their security interests in and liens on the Cash Collateral in accordance with 11 U.S.C. §§ 361 and 363.

29.     Accordingly, in connection with the Debtor's use of Cash Collateral and in order to provide additional adequate protection in respect to the Debtor's use of such Cash Collateral, the Debtor shall, subject to approval of this Court, grant a replacement lien on and in all property acquired or generated post-petition by the Debtor's continued operations to the same extent and priority and of the same kind and nature as Lenders Trust, Platinum and Rubin would have had prior to the filing of this bankruptcy case and subject to all objections and avoidance claims[1]; but excluding all causes of action or proceeds of property recovered or transfers avoided by or on behalf of the Debtor, its estate or any subsequently appointed trustee under Sections 542 through 550 of the Bankruptcy Code (the "Post-Petition Collateral").

30.     The Debtor proposes that unless modified by the Court this replacement lien in the Post-Petition Collateral shall be valid and perfected only to the same extent as

---

[1] The filing of this Motion does not constitute an admission by the Debtor that Lenders Trust, Platinum, Rubin or any other party which may claim a lien on assets of the estate, holds valid liens on the Debtor's cash or cash equivalents or any other assets.  The Debtor reserves the right to challenge the validity, priority and extent of any alleged secured creditors' liens against the Debtor's assets.

and subject to the same objections and avoidance claims, without the need for the execution, filing or recording of any further documents or instruments, otherwise required to be executed or filed under non-bankruptcy law.

31.     Again, for the avoidance of any doubt, Lenders Trust, Platinum and Rubin shall not be granted a replacement lien on or against any claims or causes of action arising under sections 542 through 550 of the Bankruptcy Code (collectively, the "Avoidance Actions") or on or against any proceeds derived from the Avoidance Actions.

32.     The Debtor believes that the equity cushion coupled with the replacement liens described above is reasonable, in the best interest of its estate and sufficient to adequately protect the Lenders.  As such, the Debtor requests the Court grant the foregoing adequate protection to the Lenders on an interim basis.

33.     Notice of this motion was served in compliance with Federal Rule of Bankruptcy Procedure 4001(b) upon Lenders Trust, Platinum, Rubin, the Office of the United States Trustee and the persons and/or entities identified in the list of 20 largest unsecured creditors of the Debtor, as no unsecured creditors' committee has been appointed.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order substantially in the same form as the proposed order attached hereto as Exhibit "B": (i) granting the instant Motion; (ii) authorizing the Debtor's use of cash collateral in accordance with the Budget attached hereto as Exhibit "A" and the terms set forth herein; (iii) granting the replacement liens set forth above; (iv) scheduling a final hearing; and (v) granting the Debtor such other and further relief as is just and proper.

[*Certificate of Service on Following Page*]

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via CM/ECF to all parties registered to receive electronic notification from the Court and via U.S. Mail to (i) Lenders Trust at c/o Robert Leeds, Trustee, 1035 Park Ave., New York, New York 10028; (ii) Platinum at 2801 Fairview, Suite W, Greenwood, IN 46142, (iii) Rubin at 3055 NW 84 Ave. Miami, Florida 33122 and (iv) the attached Service List on this 19th day of December, 2017.

/s/ Joel L. Tabas
Joel L. Tabas
Florida Bar No. 516902
TABAS & SOLOFF, P.A.
As Applicant for Attorneys for Debtor
25 Southeast Second Avenue, Suite 248
Miami, Florida 33131
Telephone: (305) 375-8171
jtabas@tabassoloff.com

| For the Month Ending | | 12/31/17 | 1/31/18 | 2/28/19 | 3/31/18 | 4/30/18 |
|---|---|---|---|---|---|---|
| Cash flows from operating activities: | | | | | | |
| Net (loss)/income | $ | -16,984 | -3,680 | 1,108 | 4,322 | 3,344 |
| Adjustments to reconcile net (loss)/income to net | | | | | | |
| cash provided by operating activities: | | | | | | |
| Changes in operating assets and liabilities: | | | | | | |
| Accounts receivable from customers | | 75,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Inventories | | -70,000 | -60,000 | -100,000 | -80,000 | -80,000 |
| Prepaid and other assets | | | | | | |
| Goodwill | | | | | | * |
| Accounts payable and other expenses | | | | | | |
| Net cash provided by/(used in) operating activities | | -11,984 | 36,320 | 1,108 | 24,322 | 23,344 |
| Cash flows from investing activities: | | | | | | |
| (Purchase)/Disposal of property and equipment | | - | - | - | | - |
| Net cash (used in)/provided by investing activities | | 0 | 0 | 0 | 0 | 0 |
| Cash flows from financing activities: | | | | | | |
| Net (payments)/borrowing - loans payable | | | | | | |
| Beginning equity | | - | - | - | | * |
| VBI Promissory Note | | | | | | |
| Net cash provided by/(used in) financing activities | | | | | | |
| Increase/(decrease) in cash | | -11,984 | 36,320 | 1,108 | 24,322 | 23,344 |
| Cash at beginning of month | | 70,000 | 58,016 | 94,336 | 95,444 | 119,766 |
| Cash at end of month | $ | 58,016 | 94,336 | 95,444 | 119,766 | 143,110 |

Skypatrol, LLC
Monthly Income Statement Comparison

| | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| ------------------------- Sales ------------------------- | | | | | | | | | | |
| Sales-Distributors | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 175,000 |
| Sales-Rental Cos. | | | | | - | 385 | - | - | - | 385 |
| Sales-Powersports | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 22,500 |
| Sales-Domestic Fleet | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 175,000 |
| Sales-International | 100,000 | 125,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 1,275,000 |
| Sales-Communications | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 90,000 |
| Sales-Services | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 13,500 |
| **Total Sales** | 144,000 | 179,000 | 204,000 | 204,000 | 204,000 | 204,385 | 204,000 | 204,000 | 204,000 | 1,751,385 |
| ------------------------- Cost of Sales ------------------------- | | | | | | | | | | |
| Cost of Sales - Distributors | 7,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 87,500 |
| Cost of Sales - Rental Cos. | | | | | - | 34 | - | - | - | 34 |
| Cost of Sales - Powersports | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 11,250 |
| Cost of Sales - Domestic Fleet | 7,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 87,500 |
| Cost of Sales - International | 70,000 | 87,500 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 105,000 | 892,500 |
| Cost of Sales - Communications | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 180,000 |
| Duty - Customs | | | | | 315 | 152 | - | 372 | 326 | 1,165 |
| Freight In | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 13,500 |
| Freight Out | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 9,000 |
| Cost of Sales - Mapping | | | | - | - | - | | | | |
| Cost of Sales - Satellite Comm | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 2,250 |
| **Total Cost of Sales** | 109,000 | 131,500 | 149,000 | 149,000 | 149,315 | 149,186 | 149,000 | 149,372 | 149,326 | 1,284,699 |
| **Gross Margin** | 35,000 | 47,500 | 55,000 | 55,000 | 54,685 | 55,199 | 55,000 | 54,628 | 54,674 | 466,686 |
| | *24.3%* | *26.5%* | *27.0%* | *27.0%* | *26.8%* | *27.0%* | *27.0%* | *26.8%* | *26.8%* | *26.6%* |
| ------------------------- Operating Expenses ------------------------- | | | | | | | | | | |
| Alarm & Security | - | 800 | | | 800 | | - | 800 | | 2,400 |
| Bad Debts Expense | - | | | - | - | - | - | - | | - |
| Collection Charges | | | | | | | | | - | |
| Bank Charges | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 3,600 |
| Credit Card Fees | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 13,500 |
| Interest Expense | | | | | | - | - | | | - |
| Donations | - | | | - | | - | - | - | - | - |
| Dues & Subscriptions | | | | | | | - | | - | - |
| Miscellaneous | - | - | - | - | - | - | - | - | - | - |
| Office Expenses | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,350 |
| Postage | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 225 |
| Rent Expense | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 22,500 |
| Repairs & Maintenance | 494 | 118 | 1,157 | (362) | - | - | - | - | - | 1,407 |
| Telephone & Fax | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 18,000 |
| Call Center Expense | | | | | - | - | - | - | | |
| Temporary Labor | 1,412 | 1,536 | 1,987 | 1,347 | 349 | 318 | 3,282 | 3,061 | 2,127 | 15,419 |
| Utilities | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 9,000 |
| Advertising/Marketing | | | | | - | - | - | - | | - |
| Meals & Entertainment | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 2,250 |
| Outside Commissions | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 45,000 |

**Skypatrol, LLC**
**Monthly Income Statement Comparison**

| | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Shows | | | | | | | | | | - |
| Travel | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 13,500 |
| Auto Expenses | 175 | - | 614 | 1,196 | 359 | 101 | - | 131 | - | 2,574 |
| Auto Insurance | 1,242 | - | 1,032 | - | 1,206 | 1,143 | - | - | - | 4,623 |
| Auto Lease | 2,482 | 2,482 | 2,482 | 2,102 | 2,102 | 2,102 | 2,102 | 668 | 2,102 | 18,625 |
| Consulting Fees | | | | | | | | | | - |
| Legal | | | | | | | | | | - |
| Professional Fees | | | | | | - | | | | - |
| Management Fee | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 22,500 |
| Patents and Trademarks | - | - | - | | - | | | | | - |
| Health Insurance | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 13,500 |
| Insurance - Other | | | | | | - | | | | - |
| Computer Expenses | | | | | | - | | - | | - |
| Software Expenses | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 1,800 |
| Internet Service | | | | | | | - | | | - |
| Lease Equipment Expense | | | | | | | | | | |
| Employee Leasing Expense | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 28,000 | 252,000 |
| Salary-Bonus | | | | | | - | - | | | - |
| Taxes & Licenses | | | | | | | | | | - |
| Depreciation Expense | | | | | | | | | | - |
| **Total Operating Expenses** | 52,329 | 51,461 | 53,797 | 50,808 | 51,341 | 50,189 | 51,909 | 51,185 | 50,754 | 463,773 |
| **Net Income/(Loss) from Operations** | (17,329) | (3,961) | 1,203 | 4,192 | 3,344 | 5,010 | 3,091 | 3,443 | 3,919 | 2,913 |
| ------------------------ Other Income/Expenses ------------------------ | | | | | | | | | | |
| Finance Charges | - | - | - | - | - | - | - | - | - | - |
| Other Income | - | - | - | 25 | (254) | - | 1,568 | 685 | 650 | 2,674 |
| Other Income - Vending Machine | 345 | 280 | (95) | 105 | 254 | (102) | - | - | (406) | 382 |
| **Total Other Income/Expenses** | 345 | 280 | (95) | 130 | 0 | (102) | 1,568 | 685 | 243 | 3,056 |
| **Net Income/(Loss)** | (16,984) | (3,680) | 1,108 | 4,322 | 3,344 | 4,908 | 4,659 | 4,128 | 4,163 | 5,969 |

EXHIBIT
B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                          CASE NO.: 17-24842-BKC-RAM
                                                Chapter 11
SKYPATROL, LLC

          Debtor-In-Possession.
_____/

**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR**
**ORDER (1) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL**
**ON AN INTERIM BASIS AND (2) SETTING FINAL HEARING**

**THIS CAUSE** having come before the Court on an emergency basis on

_____, 2017 at _____ (the "Hearing") upon the Debtor's

Emergency Motion for Order (1) Authorizing the Debtor to use Cash Collateral on an

Interim Basis and (2) Setting Final Hearing [ECF __] (the "Motion"), and the Court,

having reviewed the Motion and the file, having heard argument of counsel at the

Hearing, and for the reasons set forth on the record, it is

          **ORDERED** as follows:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The Debtor is authorized to use cash collateral, as that term is defined in 11 U.S.C. § 363(a), to pay all ordinary and necessary expenses in the ordinary course of its business for the purposes contained in the budget attached hereto as Exhibit "A" (the "Budget"), through and including _____ (the "Interim Period").  The Debtor is also authorized: (i) to exceed any line item on the Budget by an amount equal to ten percent (10%) of each such line item; or (ii) to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

3.      The Debtor is authorized to use cash collateral for payment of any fees to the Clerk of the Court or the United States Trustee pursuant to 28 U.S.C. § 1930, regardless of whether these fees are specifically addressed by the Budget.

4.      In connection with the use of cash collateral during the Interim Period, and in order to provide the Lenders[1] with additional adequate protection, the Lenders shall have, *nunc pro tunc* to December 13, 2017 (the "Petition Date), a replacement lien pursuant to 11 U.S.C. § 361(2) on and in the property of the Debtor, but solely to the same extent and priority, and of the same kind and nature, as the property of the Debtor securing the pre-Petition Date obligations owed to each of the Lenders; provided, however, that under no circumstance shall the Lenders have a lien on any causes of action arising under 11 U.S.C. §§ 542, 544, 547, 548, 549, 550, 551 or 553 (the "Replacement Liens").

---

[1] All capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Motion.

5.      Notwithstanding anything in the Motion or herein to the contrary, the Court makes no finding as to the extent, validity or priority of the liens or claims held by Lenders Trust, Platinum or Rubin.  All parties reserve their rights thereto.

6.      This Order is without prejudice to the rights of any party who wishes to be heard in connection with the entry of this Order and/or any subsequent hearing to consider any further interim or final approval of the use of cash collateral.

7.      The relief provided herein, including the Debtor's use of the cash collateral, shall be *nunc pro tunc* to the Petition Date.

8.      This Court retains exclusive jurisdiction to (i) enforce, implement and interpret the terms of this Order and (ii) resolve any all disputes, controversies or claims arising out of or relating to this Order.

9.      A final hearing on the Motion shall be conducted by the Court on _____ at _____ at the United States Bankruptcy Court, C. Clyde Atkins U.S. Courthouse, 301 N. Miami Avenue, Courtroom 4, Miami, Florida 33128.

# # #

Submitted By:

Joel L. Tabas
Florida Bar No. 516902
Tabas & Soloff, P.A.
Proposed Counsel for the Debtor
25 S.E. 2nd Avenue, Suite 248
Miami, Florida 33131
Telephone:    (305) 375 8171
Facsimile:      (305) 381 7708
E mail: jtabas@tabassoloff.com

Attorney Joel L. Tabas is directed to serve copies of this Order on all interested parties and file a Certificate of Service.

EXHIBIT C

EXECUTION COPY

**NEITHER THIS NOTE NOR THE SECURITIES THAT MAY BE ISSUED BY THE COMPANY UPON CONVERSION HEREOF (COLLECTIVELY, THE "*SECURITIES*") HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*1933 ACT*"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THE SECURITIES NOR ANY INTEREST OR PARTICIPATION THEREIN MAY BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED: (I) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE 1933 ACT, OR APPLICABLE STATE SECURITIES LAWS; OR (II) IN THE ABSENCE OF AN OPINION OF COUNSEL, IN A FORM ACCEPTABLE TO THE ISSUER, THAT REGISTRATION IS NOT REQUIRED UNDER THE 1933 ACT OR; (III) UNLESS SOLD, TRANSFERRED OR ASSIGNED PURSUANT TO RULE 144 UNDER THE 1933 ACT.**

<u>CONVERTIBLE NOTE</u>

**$1,000,000.00**

December 31, 2015 (the "*Issuance Date*")

**FOR VALUE RECEIVED**, Skypatrol, LLC, a Delaware limited liability company (the "*Company*"), hereby promises to pay to the order of the parties identified on **Exhibit A** ("*Lender*"), the principal amount of One Million and No/100 Dollars (the "*Principal*") and to pay interest thereon ("*Interest*") in accordance with the terms hereof. Payment to Lender shall be made pro rata in accordance with the amounts set forth to each Lender's name on **Exhibit A** hereto.

The term "*Note*" and all references thereto, as used throughout this instrument, shall mean this Convertible Note as originally executed, or if later amended or supplemented, then as so amended or supplemented.

1.    **Definitions**. Capitalized terms used herein without definition have the meanings specified in the Operating Agreement. Additionally, for purposes of this Note, the following terms shall have the following meanings:

1.1.    "*Adjustments to Conversion Price*" has the meaning specified in Section 3(f) below.

1.2.    "*Conversion Date*" has the meaning specified in Section 3(b) hereof.

1.3.    "*Issuance Date*" has the meaning specified above.

1.4.    "*Company Target Value*" means Fifteen Million Dollars ($15,000,000); *provided, however*, that the Company Target Value shall be subject to Adjustments to Conversions Price and any Organic Changes.

1.5.    "*Conversion Amount*" means the sum of (a) the outstanding principal amount of this Note, plus (b) Full Interest on this Note (whether accrued or not.).

1.6.    "*Conversion Price*" means the price per Class A Common Unit determined by dividing the Company Target Value by the number of outstanding Units representing all issued Membership Interests on the Conversion Date.

1.7.    "*Conversion Rate*" means the number of Class A Common Units issuable upon conversion of this Note pursuant to Section 3(a).

1.8.    "*Full Interest*" means the Interest due on the Note as calculated from the Issuance Date to the Maturity Date.

1.9.    "*Holder*" means Lender, including its successors and assigns and includes, for greater certainty, any subsequent registered holder of this Note.

1.10.    "*Maturity Date*" means the date that is three (3) years from the Issuance Date.

1.11.    "*Operating Agreement*" means the Limited Liability Company Operating Agreement of the Company dated as of December 31, 2015.

1.12.    "*Person*" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

2.    <u>**Payments of Principal and Interest.**</u>

(a)    <u>Payment of Principal</u>. Unless converted earlier in accordance with Section 3 below, the Principal shall be paid to the Holder hereof on the Maturity Date.

(b)    <u>Payment of Interest</u>. Interest on the Principal shall accrue at a rate of seven percent (7%) per annum commencing on the Issuance Date. Interest shall be computed based on simple interest and a 365-day year and actual days elapsed. All Principal and Full Interest shall be due and payable on the earlier of the (i) Maturity Date, or (ii) the Conversion Date.

(c)    <u>General Payment Provisions</u>. Payments of Principal and Interest on this Note shall be made in lawful money of the United States of America by check to such account as the Holder may designate by written notice to the Company in accordance with the provisions of this Note. If payment is due on this Note, whether on the Maturity Date or upon the occurrence of an Event of Default, on any day which is not a Business Day (as defined below), the same shall instead be due on the next succeeding day which is a Business Day. For purposes of this Note, "*Business Day*" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the State of Delaware are authorized or required by law or executive order to remain closed.

3.    <u>**Conversion.**</u>

(a)    <u>Terms of Conversion</u>. At the option of either the Holder or the Company at any time after January 1, 2017 through the Maturity Date (the "*Conversion Period*"), this Note may be converted, in whole, into Class A Common Units of the Company, subject to the terms and conditions set forth in this Note and as calculated by dividing the Conversion Amount by the Conversion Price.

(b)    <u>Mechanics of Conversion</u>. The conversion of this Note shall be conducted in the following manner:

(i)    <u>Conversion Notice</u>. To convert this Note during the Conversion Period into Class A Common Units on any date set forth in the Conversion Notice (the "*Conversion Date*"),

(A)    if the Holder has elected to convert this Note, the Holder shall deliver by hand, certified mail or overnight courier, for receipt on or prior to 5:00 p.m., Eastern Time on such date, a copy of a fully executed notice of conversion in the form attached hereto as **Exhibit A-1** (the "*Holder Conversion Notice*") to the Company together with the original of this Note.

(B)    if the Company has elected to convert this Note, the Company shall transmit by U.S. Mail (or otherwise deliver), for receipt on or prior to 5:00 p.m., Eastern Time on such date, a copy of a fully executed notice of conversion in the form attached hereto as **Exhibit A-2** (the "*Company Conversion Notice*") to the Holder.

(ii)    <u>Company's Obligation upon Holder's Conversion</u>. Upon receipt by the Company of a copy of a Holder Conversion Notice from the Holder, the Company shall as soon as practicable, but in no event later than five (5) Business Days after receipt of such Conversion Notice, send, via fax and overnight courier, a confirmation of receipt of such Conversion Notice (the "*Conversion Confirmation*") to the Holder indicating that the Company will process such Conversion Notice in accordance with the terms herein. Within fifteen (15) Business Days after the date of the Conversion Confirmation, subject to receipt by the Company of the original of this Note and, if the Holder is not then a Member of the Company, a signed copy of the Joinder Agreement in substantially the form attached hereto as **Exhibit B** (the "*Joinder Agreement*"), the Company shall issue and surrender to a common carrier for delivery to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder, for the number of Class A Common Units to which the Holder shall be entitled.

(iii)    <u>Company's Obligation Upon Company's Conversion</u>. Within fifteen (15) Business Days after the date of the Company Conversion Notice, subject to receipt by the Company of the original of this Note and the Company Conversion Notice completed and signed by the Holder and, if the Holder is not then a Member of the Company, a signed copy of the Joinder Agreement, the Company shall issue and surrender to a common carrier for delivery to the address as specified by the Holder in the Company Conversion Notice, a certificate, registered in the name of the Holder, for the number of Class A Common Units to which the Holder shall be entitled.

(iv)    <u>Record Holder</u>. The Person or Persons entitled to receive the Class A Common Units issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such Class A Common Units on the Conversion Date.

(v)    <u>Fractional Units</u>. The Company shall not issue any fraction of a Class A Common Unit upon any conversion; if such issuance would result in the issuance of a fraction of a Class A Common Unit, the Company shall round such fraction of a Class A Common Unit up to the nearest whole Class A Common Unit.

(e)    <u>Taxes</u>. The Company shall pay any and all taxes that may be payable with respect to the issuance and delivery of Class A Common Units upon the conversion of this Note. The parties agree that the Holder will not realize and gain or loss for U.S. federal income tax purposes upon conversion to equity.

(f)    <u>Adjustments to Conversion Price</u>. If the Company at any time subdivides (by any split, dividend, recapitalization or otherwise) one or more classes of its outstanding Units into a greater number of Units, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time combines (by combination, reverse split or otherwise) one or more classes of its outstanding Units into a smaller number of Units, the Conversion Price in effect immediately prior to such combination will be proportionately increased. In order to avoid doubt, the Company acknowledges that the Holder shall be entitled to the benefit of all adjustments in the number of Units issuable upon conversion of any Preferred Units or as a result of any splits, recapitalizations, combinations, or other similar

transactions affecting the Units underlying the conversion Units, that occur prior to the conversion of the Note. The adjustments described in this Section 3(f) are referred to herein as "*Adjustments to Conversion Price*".

(g)    Additional Adjustments. Anything herein to the contrary notwithstanding, the Conversion Price shall be adjusted immediately prior to conversion hereof so that the Conversion Price upon conversion of this Note will equal the Conversion Price that would have been in effect if this Note had been converted on the Issuance Date.

**4.    Reorganization, Reclassification, Consolidation, Merger or Sale**. Any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's assets to another Person or other transaction which is effected in such a way that holders of Units are entitled to receive (either directly or upon subsequent liquidation) membership interests, units, securities or assets with respect to or in exchange for Units is referred to herein as an "*Organic Change*". Prior to the consummation of any (a) Organic Change or (b) other Organic Change following which the Company is not a surviving entity, the Company will secure from the Person purchasing such assets or the successor resulting from such Organic Change (in each case, the "*Acquiring Entity*") a written agreement (in form and substance reasonably satisfactory to the Holder) to deliver to the Holder in exchange for his Note, a security of the Acquiring Entity evidenced by a written instrument substantially similar in form and substance to the Note, and reasonably satisfactory to the Holder. Prior to the consummation of any other Organic Change, the Company shall make appropriate provision (in form and substance reasonably satisfactory to the Holder) to ensure that the Holder will thereafter have the right to acquire and receive in lieu of or in addition to (as the case may be) the Class A Common Units immediately theretofore acquirable and receivable upon the conversion of this Note, such membership interests, units, securities or assets that would have been issued or payable in such Organic Change with respect to or in exchange for the number of Class A Common Units which would have been acquirable and receivable upon the conversion of this Note as of the date of such Organic Change (without taking into account any limitations or restrictions on the convertibility of the Note).

**5.    Reservation of Units**. The Company shall at all times, so long as any amount of the Note is outstanding, reserve and keep available out of its authorized and unissued Class A Common Units, solely for the purpose of effecting the conversion of this Note, such number of Class A Common Units as shall at all times be sufficient to effect the conversion of this Note.

**6.    Voting Rights**. The Holder shall have no voting rights unless and until this Note has been converted, and then such voting rights shall apply solely to the Class A Common Units into which this Note was converted and be subject to the terms of the Operating Agreement then in effect. The foregoing notwithstanding, the Operating Agreement may not be amended so as to adversely affect the Class A Common Units.

**8.    Defaults and Remedies**.

(a)    Events of Default. An "*Event of Default*" means:

(i)    the failure of the Company to pay this Note within ten (10) days after the day on which payment either by the Note terms or by demand, is due; or

(ii)    the failure of the Company to comply with any other material provision of this Note within fifteen (15) days after receipt of notice of such default; or

(iii)    the failure of the Company to (A) provide semi-annual financials, (B) provide within 120 days of year end to provide management prepared financial statements, and (C) provided audited financial statements within fifteen (15) days after such audited financials have been received by the Company;

(iv)    the failure of the Company to pay any indebtedness for borrowed money owing to any other Person when the same shall be due and payable (beyond any applicable notice and cure period) in an amount in excess of $250,000;

(iv)    a material negative change in the financial condition of the Company, or

(v)    if, pursuant to or within the meaning of any Bankruptcy Law, the Company; (A) commences a voluntary case; (B) consents to the entry of an order for relief against it in an involuntary case; (C) consents to the appointment of a Custodian of it or for all or substantially all of its property; (D) makes a general assignment for the benefit of its creditors; or (E) admits in writing that it is generally unable to pay its debts as the same become due; or

(vi)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (A) is for relief against the Company in an involuntary case; (B) appoints a Custodian of the Company or for all or substantially all of its property; or (C) orders the liquidation of the Company, and the order or decree remains unstayed and in effect for sixty (60) days.

The term *"**Bankruptcy Law**"* means Title 11, U.S. Code, or any similar Federal or State law for the relief of debtors. The term *"**Custodian**"* means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

(b)    Remedies. If an Event of Default occurs and is continuing for ten (10) days after notification, then the Holder of this Note may, at its sole option either (i) declare all of this Note, including Full Interest and other amounts due, to be due and payable immediately or (ii) convert this Note pursuant to the terms of this Note notwithstanding that such conversion may occur prior to the Conversion Period. Upon and during the continuance of an Event of Default, the Company shall not have the right to convert this Note.

(c)    Actions to Collect on the Note. If action at law or equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

**9.    Lost or Stolen Note.** Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of an indemnification undertaking by the Holder to the Company in a form reasonably acceptable to the Company and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver an identical replacement Note.

**10.    Payment of Collection, Enforcement and Other Costs.** If: (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding; or (b) an attorney is retained to represent the Holder of this Note in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this Note, then the Company shall pay to the Holder all reasonable attorneys' fees, costs and expenses incurred in connection therewith, in addition to all other amounts due hereunder.

**11.    Cancellation**. If converted in accordance herewith, or after all Principal and accrued Interest and any other amounts at any time owed on this Note have been paid in full on the Maturity Date, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

**12.    Inspection of Books and Records**. So long as this Note remains outstanding, upon reasonable advance notice and during normal business hours, the Company shall permit the Holder and his agents to examine the Company's books and financial records, and to discuss the affairs, finances and accounts of the Company with its directors, officers and its then current accountants; and, by this provision, the Company authorizes such accountants to discuss with the Holder and his agents the affairs, finances and accounts of the Company. All such visits and inspections shall be at the expense of the Holder unless an Event of Default shall exist, in which event the reasonable costs and expenses associated with all such events and inspections shall be at the expense of the Company.

**13.    Waiver of Notice**. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

**14.    Amendment**. This Note and any provision hereof may only be amended by an instrument in writing signed by the Company and the Holder.

**15.    Governing Law**. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the laws of the State of Delaware, without giving effect to provisions thereof regarding conflict of laws. Each party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in Miami-Dade County, Florida, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by sending by certified mail or overnight courier a copy thereof to such party at the address for such notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

**16.    Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief**. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note, at law or in equity (including a decree of specific performance and/or other injunctive relief), and no remedy contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy and nothing herein shall limit a Holder's right to pursue actual damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder of this Note that there shall be no characterization

concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder thereof and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).

**17.**    **Construction**. No specific provision contained in this Note shall limit or modify any more general provision contained herein. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof.

**18.**    **Failure or Indulgence Not Waiver**. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

[SIGNATURES ON NEXT PAGE]

**IN WITNESS WHEREOF,** the Company has executed this Note on and as of the Issuance Date.

SKYPATROL, LLC

By: _____

Robert D. Rubin
Chief Executive Officer

EXHIBIT A

The following are deemed to be Lenders as defined in the Note

| | |
|---|---|
| Trust For Trebuchet Corp. | $900,000 |
| Isabel Catherine Leeds Trust | $50,000 |
| Oliver William Leeds Trust | $50,000 |

All notices shall be sent to:

Robert Leeds
As Trustee for (Lender)
1035 Park Avenue
New York, NY 10028

## EXHIBIT A-1

### HOLDER CONVERSION NOTICE

Reference is made to the Convertible Note issued by Skypatrol, LLC to Lender (the *"Note"*). In accordance with and pursuant to the Note, the undersigned Holder hereby elects to convert the principal balance of the Note together with all accrued and unpaid Full Interest thereon, indicated below, into Class A Common Units of the Company, by tendering the Note specified below as of the date specified below.

Date of Conversion: _____

Conversion Amount: _____

Conversion Price: _____

Number of Class A Common Units _____
to be issued:

Please issue the Class A Common Units into which the Note is being converted in the name(s) and to the address specified below:

_____

_____

Telephone Number: _____

Fax Number: _____

Authorization of Holder: _____

Name:

By: _____

Title: _____

Dated: _____

## EXHIBIT A-2

## COMPANY CONVERSION NOTICE

Reference is made to the Convertible Note issued by Skypatrol, LLC to Robert Leeds (the "*Note*"). In accordance with and pursuant to the Note, the Company hereby elects to convert the principal balance of the Note together with all accrued and unpaid interest thereon, indicated below, into Class A Common Units of the Company. Within ten (10) Business Days of receipt of this Conversion Notice, the Holder shall tender the original of the Note specified below to the Company together with a completed and signed version of this Conversion Notice.

**COMPANY TO COMPLETE**

Date of Conversion: _____

Conversion Amount: _____

Conversion Price: _____

Number of Class A Common Units _____
to be issued:

**HOLDER TO COMPLETE**

Please issue the Class A Common Units into which the Note is being converted in the name(s) and to the address specified below:

_____

_____

Telephone Number: _____

Fax Number: _____

Authorization of Holder: _____
Name

By _____
:

Title:_____

Dated _____
:

# EXHIBIT B

## SKYPATROL, LLC

### FORM OF JOINDER AGREEMENT

This Joinder Agreement, dated _____, 20__, is delivered pursuant to the Skypatrol, LLC Operating Agreement, dated as of December 31, 2015 (the "*Agreement*"), among the Members listed on **Schedule 1** thereto and any other Members who became party to the Agreement pursuant to the terms thereof. Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Subject to the terms and conditions of this Joinder Agreement and the Agreement, the undersigned hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the undersigned will be deemed to be a party to the Agreement for all purposes of the Agreement, and shall have all of the rights and obligations of a Member thereunder as fully as if he or she had executed the Agreement. The undersigned hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Agreement.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of _____, 20___.

_____
Name:

EXHIBIT
D

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "*Agreement*"), dated as of December 1, 2016 (the "*Effective Date*"), is made by and between Skypatrol, LLC, a Delaware limited liability company ("*Skypatrol*") and Total GPS Technologies, LLC, a Florida limited liability company ("*Total GPS*"; and together with Skypatrol, "*Debtor*"), on the one hand, and Robert Leeds, Trustee of Trust for Trebuchet Corp., Robert Leeds, Trustee of Isabel Catherine Leeds Trust, and Robert Leeds, Trustee of Oliver William Leeds Trust (collectively, "*Lender*"), on the other hand.

Debtor hereby grants a security interest in the Collateral (as hereinafter defined) to secure the payment and performance of all Obligations (as hereinafter defined) of Debtor to Secured Party, and Debtor hereby agrees with Secured Party as follows:

**1.    DEFINITIONS.** As used herein -

1.1    "*Collateral*" means any and all personal property and fixtures of Debtor in which Secured Party now has, by this Agreement acquires or hereafter acquires, a security interest, including following property of Debtor, whether such property is now owned or existing or is owned, acquired, or arises hereafter, wherever located, and all proceeds and products thereof: all personal property and fixtures of every kind and nature, including without limitation: all inventory, accounts, securities and investment property, equipment, goods, instruments, books, records, documents, documents of title, policies and certificates of insurance, chattel paper, deposit accounts, supporting obligations, letter-of-credit rights, commercial tort claims, rights and privileges, contract rights, deposits, bank accounts and other rights to receive the payment of money, vehicles, tools, machinery, furnishings, furniture, fixtures, building supplies, appliances, spare parts, materials, all semi-intangibles, all intangibles, all general intangibles (including without limitation, payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Debtor possesses, uses, or has authority to possess or use property (whether tangible or intangible) of others, or agreements to which others possess, use or have authority to possess or use property (whether tangible or intangible) of Debtor), all other rights to the payment of money including without limitation amounts due from affiliates, tax refunds, and insurance proceeds, and all recorded data or records of any kind or nature, regardless of the medium of recording, including without limitation all software, writings, plans, specifications and schematics and all other personal property of any kind and nature, all proceeds from sale of any of the foregoing, including without limitation insurance policies, and all of the books and records relating to any and all of the above.

1.2    "*Indebtedness*" means (a) all obligations of Skypatrol for borrowed money, (b) all obligations of Skypatrol evidenced by bonds, debentures, notes or similar instruments, (c) all such Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by Skypatrol, whether or not such Indebtedness secured thereby has been assumed, (d) all guarantees by Skypatrol of Indebtedness of others and (e) all capital lease obligations of Skypatrol and (f) all payables of Skypatrol.

1.3    "*Material Adverse Effect*" means a material adverse effect on the assets, business, condition (financial or otherwise), results of operations or prospects of Skypatrol, taken as a whole.

1.4    "*Note*" means the Convertible Note dated December 31, 2015, made by Debtor in favor of Skypatrol, as amended pursuant to the terms of the Reaffirmation Agreement.

1.5    "*Obligations*" means any and all obligations of Debtor to Secured Party of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to

perform acts and refrain from taking action as well as obligations to pay money.

      1.6    "**_Reaffirmation Agreement_**" means the Reaffirmation Agreement of even date herewith between Debtor and Secured Party.

      1.7    "**_Senior Indebtedness_**" means the sum up to $250,000 of the principal of, and premium, if any, and interest on (a) all Indebtedness of Skypatrol for monies borrowed from banks, trust companies, insurance companies and other financial institutions, including commercial paper and accounts receivable sold or assigned by Skypatrol to such institutions, and (b) deferrals, renewals, extensions and refundings of any such Indebtedness.

      1.8    All of the terms used herein which are defined in Article 9 of the New York Uniform Commercial Code, as from time to time amended (the "**_Uniform Commercial Code_**"), shall, unless otherwise defined herein, have the same meanings as specified therein.

      1.9    Capitalized terms used herein without definition have the meanings given in the Note or the Reaffirmation Agreement, as the case may be.

      **2.**    **SECURITY INTEREST.** As security for the payment and performance of all Obligations, Secured Party shall have and Debtor hereby grants to Secured Party a continuing first-lien security interest in the Collateral and pledges and assigns the Collateral to Secured Party. Borrowers agree to recognize, affirm, and defend the security interest granted in this Agreement and in the Reaffirmation Agreement (the "Security Interest") with respect to and against the claims of any creditors of either Borrower and neither Borrower will create, incur, agree to, assume, or suffer to exist any mortgage, pledge, lien or other encumbrance of any kind upon or any security interest in any of the Collateral (whether now owned or hereafter acquired), except (a) in favor of Lender or upon Lender's written consent (which may be granted or denied in Lender's sole and absolute discretion), (b) in favor of Laird Holdings Limited or any of its affiliates including without limitation, RecepTec Corp., provided that such indebtedness and any security interest therein or lien thereon shall be junior and subordinate in all respects to Lender, and (c) up to Two Hundred Fifty Thousand Dollars ($250,000) of Senior Indebtedness of Skypatrol incurred after the Effective Date.

**3.**    **AUTHORIZATION TO FILE FINANCING STATEMENTS**. Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file, wherever such filing is deemed by Secured Party to be necessary or desirable, any initial financing statements and amendments thereto indicating all or any part of the Collateral and containing any other information required by applicable law or deemed necessary or desirable by Secured Party for the sufficiency or filing office acceptance of any financing statement or amendment. Debtor agrees to furnish all such information to Secured Party promptly upon request. Debtor also ratifies its authorization for Secured Party to have filed any initial financing statements or amendments thereto if filed prior to the date hereof. Debtor hereby agrees to pay the cost of all such filings.

**4.**    **OTHER ACTIONS.** Further to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's security interest in the Collateral, Debtor agrees, in each case at Debtor's own expense, to take the following actions with respect to the following Collateral:

      4.1.    <u>Promissory Notes and Tangible Chattel Paper</u>. If Debtor shall at any time hold or acquire any promissory notes or tangible chattel paper, Debtor shall forthwith, in addition to other action required by Secured Party, endorse, assign and deliver the same to Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as Secured Party may from time to time specify.

      4.2.    <u>Deposit Accounts in Other Institutions</u>. For each deposit account that Debtor at any time opens or maintains at an institution other than Secured Party, Debtor shall, at Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to Secured Party, give Secured

Party control of such deposit account by either (a) causing the depository bank to agree to comply at any time with instructions from Secured Party to such depository bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Debtor, or (b) arranging for Secured Party to become the customer of the depository bank with respect to the deposit account, with Debtor being permitted to withdraw funds from such deposit account, only to the extent authorized by Secured Party from time to time. The provisions of this paragraph shall not apply to (i) any deposit account for which Debtor, the depository bank and Secured Party have entered into a cash collateral agreement specially negotiated among Debtor, the depository bank and Secured Party for the specific purpose set forth therein, or (ii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Debtor's salaried employees, to the extent so employed. Debtor agrees to promptly notify Secured Party in writing at any time it establishes a deposit account with any institution or terminates any deposit account.

    4.3.   <u>Investment Property</u>. If Debtor shall at any time hold or acquire any investment property, including without limitation, certificated securities, uncertificated securities, or securities held by Debtor or its nominee through a securities intermediary or commodity intermediary, Debtor shall promptly notify Secured Party of such investment property and shall forthwith at the request of Secured Party, take whatever action Secured Party deems necessary or appropriate to give Secured Party control of such investment property, including executing and delivering endorsements, assignments, pledge agreements and other agreements in form and substance satisfactory to Secured Party. Debtor will also cause any securities intermediary maintaining a securities account or commodities intermediary maintaining a commodities account to execute such agreements as Secured Party shall from time to time require in order to ensure Secured Party is granted control thereof, and to deliver to Secured Party such agreement, reports, and other documentation as Secured Party shall from time to time require, and Debtor will hold in trust and deliver to Secured Party any investment property received by Debtor, together with any required endorsements.

    4.4.   <u>Collateral in the Possession of a Bailee</u>. If any goods are at any time in the possession of a bailee, Debtor shall, unless otherwise directed by Secured Party, promptly notify Secured Party thereof and shall send notice to and obtain an acknowledgment from the bailee, in form and substance satisfactory to Secured Party. Such acknowledgment shall state that the bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party, without the further consent of Debtor. Debtor hereby authorizes Secured Party to obtain the acknowledgment directly from any bailee.

    4.5.   <u>Electronic Chattel Paper and Transferable Records; Letter-of-credit Rights; Commercial Tort Claims; Patents, Trademarks and Copyrights</u>. If Debtor at any time (i) holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in 201 of the federal Electronic Signatures in Global and National Commerce Act, or in 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, (ii) is a beneficiary under a letter-of-credit now or hereafter issued in favor of Debtor, (iii) holds or acquires a commercial tort claim, or (iv) holds or acquires any rights in any patents, trademarks, or copyrights or applications therefor, then Debtor shall notify Secured Party in writing of its interest therein, and shall provide such information and take such action as Secured Party shall request in order that Secured Party may perfect its security interest therein.

    4.6.   <u>Government Contracts</u>. Upon the request of Secured Party, Debtor will specifically assign to Secured Party all federal government contracts and will cooperate with Secured Party in giving notice of such assignment pursuant to the federal Assignment of Claims Act. Debtor will cooperate with Secured Party in providing such further information with respect to contracts with any state, other unit of local government or agency as Secured Party may require and will provide such instruments or take such actions of further assurance with respect to such contracts as Secured Party may require.

4.7.  Other Actions as to all Collateral. Debtor further agrees to take any other action reasonably requested by Secured Party to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's security interest in any and all of the Collateral.

## 5.  DEBTOR'S REPRESENTATIONS, WARRANTIES AND COVENANTS. Debtor represents, warrants and covenants as follows:

5.1  Debtor is duly organized, existing and in good standing under the laws of its state of organization and is duly qualified and in good standing in every other state in which it is doing business, except where the failure to so qualify would not have a Material Adverse Effect.

5.2  Debtor covenants with Secured Party as follows: (a) without providing at least thirty (30) days prior written notice to Secured Party, Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address and (b) Debtor will not change its type of organization, jurisdiction of organization or other legal structure. In connection with any such change Debtor will execute and deliver, or cause to be executed and delivered, to Secured Party all such additional security agreements, financing statements and other documents as Secured Party shall reasonably require. This provision shall not be deemed to constitute consent to any change identified above or otherwise prohibited in any agreement between Debtor and Secured Party.

5.3  The execution, delivery and performance hereof are within Debtor's powers, have been duly authorized, are not in contravention of law or the terms of its organizational documentation, or of any indenture, agreement or undertaking to which it is a party or by which it is bound.

5.4  Debtor further covenants with Secured Party as follows: (a) the Collateral will not move the Collateral from its current locations, without providing at least thirty (30) days prior written notice to Secured Party, (b) except for the security interest herein granted and the security interests of any subordinated indebtedness or Senior Indebtedness (as defined in the Reaffirmation Agreement), Debtor shall be the owner of or have other rights in the Collateral free from any lien, security interest or other encumbrance, and Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to Secured Party, (c) except for the security interests of any subordinated indebtedness or Senior Indebtedness, Debtor shall not pledge, mortgage or create, or suffer to exist a security interest in the Collateral in favor of any person other than Secured Party, (d) Debtor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, and will immediately notify Secured Party of any damage thereto or any loss or significant diminution of the value thereof, (e) Debtor will permit Secured Party, or its designee, may inspect the Collateral at any reasonable time, wherever located, (f) Debtor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, and (g) Debtor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for sales and leases of inventory and licenses of general intangibles in the ordinary course of business.

5.5  Except as set forth on **Schedule 5.5**, there are no actions, suits or proceedings pending or, to the knowledge of Debtor, threatened against Debtor or any subsidiary, at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality which would have a Material Adverse Effect.

5.6  No approval or authorization or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery or performance by Debtor of this Agreement or the consummation of the transaction contemplated hereby.

5.7  Until the occurrence of an Event of Default, Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this Agreement and not inconsistent with any policy

of insurance thereon.

## 6.    COLLATERAL PROTECTION EXPENSES; PRESERVATION OF COLLATERAL.

6.1.    <u>Expenses Incurred by Secured Party</u>. Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may discharge taxes, liens, security interests and other encumbrances at any time levied or placed on any of the Collateral, may pay for insurance on the Collateral, may pay for the maintenance and preservation of the Collateral, may pay for credit enhancements to insure Secured Party against risks of loss or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral, make repairs thereto and pay any necessary filing fees. Debtor agrees to reimburse Secured Party on demand for any payment made or any expense reasonably incurred by Secured Party pursuant to the foregoing authorization. Secured Party shall have no obligation to Debtor to make any such expenditures, nor shall the making thereof relieve Debtor of any default.

6.2.    <u>Secured Party's Obligations and Duties</u>. Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Secured Party of any payment relating to any of the Collateral, nor shall Secured Party be obligated in any manner to perform any of the obligations of Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Secured Party or to which Secured Party may be entitled at any time or times.

## 7.    PROMISES TO PAY. Debtor promises to pay to Secured Party on demand all taxes, charges and expenses, including reasonable attorneys' fees, disbursements and expenses of litigation, reasonably incurred or expended by Secured Party in connection with or in any way incurred by Secured Party in connection with the collection or sale or attempted collection or sale of accounts or Obligations, the supervision, protection and collection of and realization upon any Collateral, and the protection or enforcement of Secured Party's rights hereunder.

## 8.    INSURANCE. Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Secured Party may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as Secured Party may reasonably prescribe, for direct application by Debtor solely to the repair or replacement of Debtor's property so damaged or destroyed, or Secured Party may apply all or any part of such proceeds to the Obligations.

## 9.    COLLECTION OF ACCOUNTS OR OTHER COLLATERAL.

9.1    Until Secured Party requests that debtors on accounts or other Collateral of Debtor be notified of Secured Party's security interest, or Secured Party so notifies them, Debtor shall continue to collect them.

9.2    Upon and during the continuance of an Event of Default, Debtor shall, at the request of Secured Party, notify the account debtors and other persons obligated on any of the Collateral of the security interest of Secured Party in any account or other Collateral and that payment thereof is to be made directly to Secured Party, and Secured Party may itself at any time upon and during the continuance of an Event of Default, without notice to or demand upon Debtor, so notify account debtors.

9.3    Upon and during the continuance of an Event of Default, Secured Party may also request that Debtor hold the proceeds received from collection of Collateral as trustee for Secured Party without commingling the same with other funds of Debtor and shall turn the same over to Secured Party, or to

such bank as may be approved by Secured Party, immediately upon receipt in the identical form received. The making of such a request, or the giving of any such notification under 9.1 hereof, shall not affect the duties of Debtor described above with respect to proceeds of collection of accounts received by Debtor.

9.4    Secured Party shall credit the proceeds of collection of accounts received by Secured Party to the Obligations, such credits to be entered as of the third business day after receipt thereof by Secured Party. Such credits shall be conditional upon final payment in cash or credits of the items giving rise to them. If any item is not so paid, Secured Party, in its discretion, whether or not the item is returned, may either reverse any credit given for the item or charge it to any deposit account maintained by Debtor with Secured Party.

**10.    EVENTS OF DEFAULT.** Debtor shall be in default under this Agreement upon the happening of any of the following events or conditions:

(a)    default in the payment or performance, when due or payable, of any Obligation by Debtor or any endorser, guarantor or surety for any Obligation and such failure has not been cured within thirty (30) days after written notice;

(b)    any representation or warranty made in this Agreement or in any writing furnished in connection with or pursuant to this Agreement shall prove to be incorrect in any material respect as of the time made or furnished; or

(c)    an Event of Default under the Note or any other Loan Document (as defined in the Reaffirmation Agreement).

**11.    DISPOSITION OF COLLATERAL**

11.1    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party shall have the right to take immediate possession of the Collateral, and for that purpose Secured Party may, so far as Debtor can give authority therefor, enter upon any premises on which Collateral may be situated and remove the same therefrom. Secured Party may in its discretion require Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Debtor's principal office(s) or at such other locations as Secured Party may reasonably designate. Except for Collateral which is perishable or threatens to decline speedily in value or which is of a type customarily sold on a recognized market, Secured Party shall give to Debtor at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale of any other intended disposition is to be made. Secured Party shall also have in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code. The residue of any proceeds of collection or sale, after satisfying all Obligations in such order of preference as Secured Party may determine and making proper allowance for interest on Obligations not then due, and after making any payments required by the Uniform Commercial Code, shall be credited to any deposit account maintained by Debtor with Secured Party. Debtor shall remain liable for any deficiency. Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Secured Party's rights hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

11.2    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may at any time in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for Obligations or apply it on principal or interest due on Obligations. Insofar as Collateral shall consist of accounts, general intangibles, other claims and rights to the payment of money, insurance policies, instruments, chattel paper, choses in action or the like, Secured Party may, upon the occurrence of any Event of Default and at any time thereafter (such default not having been

cured), without notice to or demand on Debtor, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon Collateral as Secured Party may determine, whether or not Obligations or Collateral are then due and for the purpose of realizing Secured Party's rights therein, Secured Party may receive, open and dispose of mail addressed to Debtor and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of Debtor. The powers conferred on Secured Party by this are solely to protect the interest of Secured Party and shall not impose any duties on Secured Party to exercise any powers.

      11.3    Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, Debtor hereby irrevocably waives the benefits of all such laws.

**12.**    **STANDARDS FOR EXERCISING REMEDIES**. To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party (a) to fail to incur expenses reasonably deemed significant by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, or (j) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral. Without limitation upon the foregoing, nothing contained in this 12 shall be construed to grant any rights to Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this 12.

**13.**    **POWER OF ATTORNEY**. Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Debtor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Debtor or in Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all action that Secured Party deems necessary or desirable and to execute any and all documents and instruments

that Secured Party deems necessary or desirable to accomplish the purposes of this Agreement. The powers conferred on Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Debtor for any act or failure to act, except for Secured Party's own gross negligence or willful misconduct.

**14.    SET OFF.** Any deposits or other sums at any time credited by or due from Secured Party to Debtor or any guarantor, and any securities or other property of Debtor or any such guarantor at any time in the possession of Secured Party may at all times be held and treated as collateral for the payment of the Obligations. Regardless of the adequacy of collateral, Secured Party may apply or set off such deposits or other sums against such obligations at any time in the case of Debtor but only with respect to matured obligations in the case of guarantors thereof.

**15.    WAIVERS.** Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received, delivered or repossessed or other action taken in reliance hereon, and all other demands and notices of any description. With respect to both Obligations and Collateral, Debtor assents to any extension or postponement of the time of payment or other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payments thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Secured Party may deem advisable. Secured Party may exercise its rights with respect to Collateral without resorting or regard to other collateral or sources of reimbursement for Obligations. Secured Party shall not be deemed to have waived any of its rights upon or under Obligations or Collateral unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any other right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Secured Party on Obligations or Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised separately or concurrently. Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in 6.2.

**16.    SUBORDINATION.** Anything herein to the contrary notwithstanding, the Security Interest created hereby, and the rights and remedies of Secured Party hereunder, are subordinate, inferior and subject to the security interest in the Collateral of, and the rights and remedies in respect of Senior Indebtedness.

**17.    GENERAL.** If at any time or times by assignment or otherwise, Secured Party transfers any Obligation and collateral therefor, such transfer shall carry with it Secured Party's powers and rights under this Agreement with respect to the Obligation and collateral transferred and the transferee shall become vested with said powers and rights whether or not they are specifically referred to in the transfer. This Agreement shall be effective as a sealed instrument, and it and all rights and obligations under it, including matters of construction, validity and performance, shall be governed by the laws of the State of New York. No amendment or modification of any provision of this Agreement shall be effective unless in writing and signed and delivered by the parties hereto.

**18.    NOTICES.** Unless otherwise specifically set forth herein, any notice, consent or approval of a party shall be in writing and given (a) by hand; (b) by email and original posted first class mail, postage prepaid, within two (2) business days thereafter; or (c) by certified or registered mail with an acknowledgment of receipt, postage prepaid, return receipt requested; or (d) by a reputable private courier which provides evidence of receipt as a part of its delivery service, at such party's address set

forth below its signature hereto, or to such other address as may be designated in writing by either party from time to time in accordance herewith. Notices shall be deemed delivered two (2) business days following delivery by hand, by private courier or when so emailed and five (5) business days following proper dispatch by certified or registered mail. A "business day" is any Monday through Friday on which first class US mail is delivered in New York, New York.

**19.    SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, administrators, successors and assigns.

**20.    SEVERABILITY.** In case any one or more provisions of this Agreement shall be found by a court or other tribunal of competent jurisdiction to be invalid or unenforceable for any reason or in any respect or circumstance, such invalidity or unenforceability shall not limit or impair the validity or enforcement of any other provision hereof or affect the validity or enforcement of the provisions of this Agreement under any other circumstances.

**21.    WAIVER OF JURY TRIAL AND SPECIAL DAMAGES.** THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OF ANY KIND WHATSOEVER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT RELATED HERETO OR THE RELATIONSHIPS ESTABLISHED HEREUNDER OR THEREUNDER.

**22.    GOVERNING LAWS AND CONSENT TO JURISDICTION.** THIS AGREEMENT IS INTENDED TO TAKE EFFECT AS A SEALED INSTRUMENT AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. Debtor agrees that any suit for the enforcement of this Agreement may be brought in the courts of the State of New York or any Federal Court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon Debtor by mail at the address specified herein. Debtor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or based on such suit having been brought in an inconvenient court.

**23.    CONSTRUCTION.** The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation," (c) the term "days" refers to U.S. calendar days and not business days, unless expressly noted; and (d) any reference to "persons" includes natural persons, firms, partnerships, companies, corporations, associations, organizations, governments, states, foundations and trusts (in each case whether or not having separate legal personality). The parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party, and that ambiguities shall not be interpreted against the drafting party.

**24.    COUNTERPARTS.** This Agreement may be executed in one or more counterparts, and it shall be deemed fully executed when each party has signed a counterpart even though no one counterpart contains the signatures of all the parties. A facsimile signature of a party shall be deemed an original signature and fully effective as such. Each party executing this agreement represents that it has the full power and authority to do so.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed as a sealed instrument as of the Effective Date.

SECURED PARTY

TRUST FOR TREBUCHET CORP.

By: _____
     Robert Leeds
     Trustee

OLIVER WILLIAM LEEDS TRUST

By: _____
     Robert Leeds
     Trustee

ISABEL CATHERINE LEEDS TRUST

By: _____
     Robert Leeds
     Trustee

Address for all Secured Parties:
Robert Leeds
As Trustee for (Lender)
1035 Park Avenue
New York, NY 10028
Email: rleeds@silarcapital.com

DEBTOR

SKYPATROL, LLC

By: _____
     Robert D. Rubin
     Chief Executive Officer

TOTAL GPS TECHNOLGIES, LLC

By: _____
     Robert D. Rubin
     Chief Executive Officer

Address for both Debtors:
3055 N.W. 84th Avenue
Doral, Florida 33122
Attn: Robert D. Rubin, CEO
Email: rrubin@toppcompanies.com

## **SCHEDULE 5.5**

Litigation

Skypatrol, LLC, Plaintiff/Counterclaim Defendant vs. Morrison & Foerster LLP, Defendant/Counterclaim Plaintiff, Case No. 2015-012370-CA-01, 11th Circuit, Miami-Dade County, Florida

## REAFFIRMATION AGREEMENT

This Reaffirmation Agreement (the "*Agreement*") is made by and among Skypatrol, LLC, a Delaware limited liability company ("*Skypatrol*") and Total GPS Technologies, LLC, a Florida limited liability company ("*Total GPS*"), on the one hand, and Robert Leeds, Trustee of Trust for Trebuchet Corp., Robert Leeds, Trustee of Isabel Catherine Leeds Trust, and Robert Leeds, Trustee of Oliver William Leeds Trust (collectively, "*Lender*"), on the other hand. Skypatrol and Total GPS are collectively referred to herein as "*Borrowers*." Skypatrol, Total GPS and Lender are each individually referred to herein as a "*Party*" and collectively referred to herein as the "*Parties*." This Agreement shall be effective as of the latest of the dates of execution by all of the Parties hereto (the "*Effective Date*") as set forth in the signature blocks set forth below.

## RECITALS

WHEREAS, Lender has undertaken a first-lien secured lending relationship with Skypatrol governed by that certain Convertible Note bearing an Issuance Date of December 31, 2015 (the "*Note*") and other documents (collectively with the Note, the "*Initial Loan Documents*");

WHEREAS, as of the Effective Date, the total outstanding amount of principal under the Note is $500,000 (the "*Loan*");

WHEREAS, the Loan was made to Skypatrol to be used in the operation of its business in connection with, and after implementation of, the transaction governed by that certain Asset Purchase Agreement between Skypatrol and Total GPS made as of December 31, 2015 (the "*APA*"), pursuant to which Skypatrol purchased substantially all of the assets of Total GPS;

WHEREAS, in connection with the Note, Skypatrol granted Lender a security interest in and lien on all assets of Skypatrol (the "*Security Interest*");

WHEREAS, Lender and Borrowers have caused UCC-1 Financing Statements to be filed in the State of Delaware and in the State of Florida with respect to the Security Interest;

WHEREAS, certain events have occurred with respect to Skypatrol that Lender asserts would constitute a default or Event of Default, as defined in a pursuant to, section 8(a) of the Note;

WHEREAS, Skypatrol disputes Lender's assertion that any such events constitute a default or Event of Default under the Note;

WHEREAS, the members owning a majority in interest of the membership interests of Skypatrol are also members owning a majority in interests of the membership interests of Total GPS and, therefore, the benefits accruing to Skypatrol shall be benefits that also accrue to Total GPS;

WHEREAS, Lender has agreed not to pursue its assertion that a default or Event of Default occurred under the Note or any of the Loan Documents but only (i) upon receiving assurances from Skypatrol that its obligations under the Note and the other Initial Loan Documents remain in full force and effect and (ii) Borrowers' agreement to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the Parties' exchange of promises, the terms and conditions set forth below, and other consideration (the receipt and sufficiency of which are hereby acknowledged and confessed by the Parties), the Parties covenant and agree as follows:

**I.**

**CONSIDERATION BY SKYPATROL**

As consideration for the agreements and covenants by Borrowers set forth in this Agreement:

**A.**     **Recitals**. The Recitals set forth above (the "***Recitals***") serve as the basis for this Agreement, are incorporated herein and made a part hereof for all purposes, and are a substantive, contractual part of this Agreement. Borrowers represent and warrant that the Recitals are true and correct as of the Effective Date. Borrowers acknowledge that Lender is reasonably relying upon the foregoing representation and warranty by Borrowers, the other representations and warranties made by Borrowers throughout this Agreement, and the promises made by Borrowers in this Agreement.

**B.**     **Loan Document Obligations**. Until all of the amounts owing to Lender under the Note (the "***Obligations***") have been finally paid and fully satisfied, Borrowers will continue to comply with all covenants and other agreements and obligations of Skypatrol under the Initial Loan Documents and the Security Agreement (defined below). The Security Agreement and the Initial Loan Documents are referred to collectively herein as the "***Loan Documents***" and jointly and severally referred to herein as a "***Loan Document***".

**C.**     **Reaffirmation Of Secured Position**.

(1)     To further secure Skypatrol's Obligations to Lender under the Loan Documents and this Agreement, each of Borrowers acknowledges its original pledge to Lender of the Collateral (as defined in the Security Agreement) as security for the Obligations under the Loan Documents and Borrowers hereby acknowledge, ratify, reaffirm, grant, convey, and re-grant to Lender a continuing first-lien and security interest in and to the Collateral as security for repayment of the Obligations under the Loan Documents and this Agreement (the "***Reaffirmed Security Interest***"). Borrowers agree to recognize, affirm, and defend the Reaffirmed Security Interest with respect to and against the claims of any creditors of either Borrower and neither Borrower will create, incur, agree to, assume, or suffer to exist any mortgage, pledge, lien or other encumbrance of any kind upon or any security interest in any of the Collateral (whether now owned or hereafter acquired), except (a) in favor of Lender or upon Lender's written consent (which may be granted or denied in Lender's sole and absolute discretion), (b) in favor of Laird Holdings Limited or any of its affiliates including without limitation, RecepTec Corp., provided that such indebtedness and any security interest therein or lien thereon shall be junior and subordinate in all respects to Lender, and (c) up to Two Hundred Fifty Thousand Dollars ($250,000) of Senior Indebtedness (as defined below) of Skypatrol incurred after the Effective Date. Borrowers also hereby ratify the UCC-1 Financing Statements already filed in the State of Delaware and in the State of Florida by Lender and/or Borrowers with respect to the Obligations and Security Interest.

(2)     Without in any way limiting Section I.C(1) hereof, concurrently with the execution and delivery of this Agreement, Borrowers shall execute and deliver to Lender the security agreement in substantially the form attached hereto as **Exhibit A** (the "***Security Agreement***").

(3)     As further consideration for the agreements hereunder, the Parties hereby agree to amend the Note as follows:

(a)    The portion of the Note at page 1 stating "Skypatrol, LLC, a Delaware limited liability company (the "*Company*")" shall be stricken and replaced with the following: "Skypatrol, LLC, a Delaware limited liability company (the "*Company*" or "*Skypatrol*")".

(b)    The portion of the Note at page 1 defining "Note" shall be stricken and the following shall be inserted in its place: "The term "Note" and all references thereto, as used throughout this instrument, shall mean this Convertible Note and Loan Documents or Loan Document as originally executed, or if later amended or supplemented, then as so amended or supplemented."

(c)    The following shall be added to the Note in the Definition section:

"1.13.  "*Loan Documents*" and "*Loan Document*" mean, jointly and severally: (a) this Convertible Note; (b) the Reaffirmation Agreement; (c) that certain Security Agreement attached as Exhibit A to the Reaffirmation Agreement and executed concurrently with and pursuant to the Reaffirmation Agreement; and (d) any and all effective amendments or supplements to any of the foregoing."

1.14    "*Senior Indebtedness*" means the sum up to $250,000 of the principal of, and premium, if any, and interest on (a) all Indebtedness of Skypatrol for monies borrowed from banks, trust companies, insurance companies and other financial institutions, including commercial paper and accounts receivable sold or assigned by Skypatrol to such institutions, and (b) deferrals, renewals, extensions and refundings of any such Indebtedness.

1.15    "*Indebtedness*" means (a) all obligations of Skypatrol for borrowed money, (b) all obligations of Skypatrol evidenced by bonds, debentures, notes or similar instruments, (c) all such Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by Skypatrol, whether or not such Indebtedness secured thereby has been assumed, (d) all guarantees by Skypatrol of Indebtedness of others and (e) all capital lease obligations of Skypatrol and (f) all payables of Skypatrol.

1.16    "*Adverse Action*" means a demand, action or proceeding, motion, or any other form of request for judicial relief against Skypatrol or with respect to Skypatrol's business or with respect to any of Skypatrol's assets, debts, or liabilities: (a) seeking an attachment, sequestration, receivership, turnover, assignment for the benefit of creditors, temporary restraining order, preliminary injunction, constructive trust, or other special or ancillary relief; and/or (b) seeking liquidation, reorganization, or other relief under any Bankruptcy Law; and/or (c) seeking the appointment of a Custodian;

1.17    "*Affiliates*" means Lender's respective trustees, beneficiaries, managers, members, agents, representatives, shareholders, partners, officers, directors, attorneys, employees, successors, and assigns (jointly and severally, "*Affiliated Persons*") and each respective Affiliated Person's Affiliated Person, in any and all capacities, including without limitation Robert Leeds.

1.18   *"Bankruptcy Law"* means Title 11 of the United States Code, any insolvency law, or any similar federal or state law now or hereafter in effect for relief of debtors or creditors.

1.19   *"Bankruptcy Order"* means an order or decree under any Bankruptcy Law that: (a) is for relief against Skypatrol in an involuntary bankruptcy proceeding; (b) appoints a Custodian of Skypatrol or any of Skypatrol's assets; and/or (c) orders liquidation of Skypatrol or any of its assets. 1.20 *"Custodian"* means a trustee, receiver, liquidator, custodian, or other similar official.

1.20   *"Effective Date"* has the same meaning as the term "Effective Date" under the Reaffirmation Agreement.

1.21   *"Reaffirmation Agreement"* means that certain Reaffirmation Agreement made by and among Skypatrol, LLC, a Delaware limited liability company, Total GPS Technologies, LLC, Florida limited liability company, Robert Leeds, Trustee of Trust for Trebuchet Corp., Robert Leeds, Trustee of Isabel Catherine Leeds Trust, and Robert Leeds, Trustee of Oliver William Leeds Trust.

(4).   Section 8(a) of the Note is hereby amended by deleting it in its entirety and replacing it with the following:

"(a)   Event of Default. *"Event of Default"* means the occurrence of one or more of the following after the Effective Date:

(i)    Skypatrol fails to pay on the date when due any installment of principal or interest or other charge due under the Note or as required by any of the Loan Documents, when and as the same becomes due and payable to Lender, whether at maturity, by acceleration, or otherwise, and such default continues for a period of ten (10) days after written notice of such failure is given by Lender to Skypatrol;

(ii)   Skypatrol fails to strictly perform, observe and/or comply with any covenant, agreement, or term contained in this Agreement and/or under the Loan Documents, which failure continues uncured for fifteen (15) days after written notice of such failure is given by Lender to Skypatrol;

(iii)  Skypatrol commences a voluntary proceeding seeking liquidation, reorganization, or other relief under any Bankruptcy Law or seeking the appointment of a Custodian; and/or

(iv)   One or more creditors other than Lender commences an involuntary bankruptcy proceeding under any Bankruptcy Law against Skypatrol and Skypatrol either: (a) does not obtain a dismissal of the proceeding within sixty days; or (b) consents to the entry of an order in the involuntary case or seeks or consents to conversion of the involuntary case to a voluntary case under chapter 11 of the United States Bankruptcy Code;; and/or

(v)     One or more putative creditors or actual creditors other than Lender asserts an Adverse Action against Skypatrol and Skypatrol either (a) consents to such one or more aspects of the relief sought in the Adverse Action; or (b) does not obtain a withdrawal, dismissal, vacation, discharge, or stay of the Adverse Action within sixty days of initial assertion of the Adverse Action. and/or

(vi)     In Lender's reasonable discretion, Skypatrol makes or is deemed to have made any representation or warranty to Lender or any other creditor which is false, misleading, or erroneous in any material respect when made or deemed to have been made; and/or

(vii)     A judgment is entered against Skypatrol in any action or proceeding in favor of any person or entity other than Lender in excess of $250,000; and/or

(viii)     Any Loan Document shall cease to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested or challenged by Skypatrol or any other person or entity in whole or in part; and/or

(ix)     Skypatrol denies that Skypatrol has any liability or obligation under this any Loan Document; and/or

(x)     Any lien or security interest reaffirmed or created by any Loan Document shall for any reason cease to be a valid, perfected security interest in and lien upon any of the Collateral, subordinate only to any Senior Indebtedness; and/or

(xi)     Skypatrol fails to provide to Lender: (a) semi-annual financials; (b) management prepared financial statements (within 120 days of year-end); and (c) if Skypatrol has audited financial statements prepared on its behalf, copies of such audited financial statements within fifteen days after such audited financials have been received by the Company; and/or

(xii)     Skypatrol fails to pay any indebtedness for borrowed money owing to any other Person when the same shall be due and payable (beyond any applicable notice and cure period) in an amount in excess of $250,000; and/or

(xiii)     There is a material negative change in the financial condition of Skypatrol; and/or

(xiv)     Skypatrol makes a general assignment for the benefit of its creditors; and/or

(xv)     Skypatrol admits in writing that it is generally unable to pay its debts as the same become due;

(xvi)     A court of competent jurisdiction enters a Bankruptcy Order and that Bankruptcy Order remains in effect and unstayed for sixty days after entry;

(xvii)     Skypatrol or any other person or entity commences or threatens to commence any judicial or other proceeding against Lender or any of Lender's Affiliates relating directly or indirectly in whole or in part to the business or affairs of Skypatrol, the Loan Documents, this Agreement, or the Collateral; and/or

(xviii) One or more "Events of Default" under the other Loan Documents occurs after the Effective Date.

(5)    Skypatrol shall deliver to Lender a fully-executed original of the Note.

(6)    Notwithstanding anything to the contrary in this Reaffirmation Agreement, the Note, the Security Agreement, the Loan Documents, or any other agreement between the parties, at any time and each time Skypatrol seeks to incur Senior Indebtedness, Skypatrol must first notify Lender in writing of Skypatrol's intention to undertake Senior Indebtedness and provide Lender a right of first refusal to advance the Senior Indebtedness. If Skypatrol has received an indication of interest or proposal from a third party for Senior Indebtedness, the notice to Lender shall contain the terms of such proposal. Upon receipt of such notification and at Lender's option, Skypatrol shall enter into discussions with Lender for a period of no less than seven business days about the terms under which Lender (and any participants) would be willing to provide Senior Indebtedness to Skypatrol. If Lender makes a proposal to Skypatrol for Senior Indebtedness during this period and the proposal is rejected by Skypatrol, Skypatrol may not incur Senior Indebtedness from another person or entity unless the terms from such person or entity are materially more favorable to Skypatrol than the terms offered by Lender.

**D.    Skypatrol Election Right.** Any right or power of Skypatrol under the Note to opt to convert the Note to Class A Common Units (as defined in Skypatrol's Limited Liability Company Operating Agreement dated December 31, 2015, as amended the "*Operating Agreement*") is hereby terminated and/or irrevocably abandoned by Skypatrol.

**E.    Affirmation of No Claims Etc.**

(1)    Borrowers hereby represent and warrant to Lender that, as of the Effective Date, neither Borrower has any defense, claim, offset, counter-claim, cross-claim, cause of action, demand, damages, expenses, costs or rights of any kind or nature whatsoever (collectively, "*Claims*") against Lender, Lender's Affiliates or any other person or entity that can be asserted to reduce or eliminate all or any part of the liability to pay the Obligations or to assert damages or other affirmative relief of any kind or nature from Lender or Lender's Affiliates.

(2)    Notwithstanding the foregoing, to avoid all doubt and as a material part of the consideration provided to Lender by Borrowers under this Agreement, each of Borrowers hereby voluntarily, knowingly, and to the fullest extent permitted by law releases and forever discharges Lender and all of Lender's Affiliates of, from, and against any and all Claims Borrower has, may have, or may come in the future to have against Lender and Lender's Affiliates which directly or indirectly arise out of any fact, occurrence, act, or omission from the beginning of time through the Effective Date, whether known or unknown, ripened or not yet ripened, anticipated or unanticipated, suspected or unsuspected, fixed, contingent, or conditional By way of example and not by way of limitation, the foregoing release (the "Release") includes, without limitation, Claims for actual damages, compensatory damages, punitive or exemplary damages, disgorgement, invalidation, or any other relief and Claims in negligence, in tort, in contract, for breach of fiduciary duty or special relationship, under any federal, state, or local statute, rule, regulation, in equity, or under any law, or otherwise.

(3)    Each Borrower promises not to sue Lender or Lender's Affiliates, assert against Lender or Lender's Affiliates, or otherwise pursue any dispute or challenge any account of any of

the Claims that are the subject of the Release (the "Released Claims").

(4)      Each of Borrower indemnifies Lender and Lender's Affiliates from and hold each of them harmless against any and all losses, liabilities, claims, damages, costs and expenses (including attorney's fees and litigation expenses) to which any of them may become subject which arise from or relate to this Agreement, the Loan Documents, any action or alleged action or effort taken or alleged to have been taken by them in connection with the Collateral, or any action or forbearance under this Agreement.

**F.      Termination of Other Agreements**. The Parties acknowledge that Robert Leeds' resignation from the Skypatrol board of directors was effective at 9:55am EST on September 27, 2016. Any and all agreements, duties, and/or obligations arising out of Robert Leeds' tenure or position on the Skypatrol board are hereby terminated by Skypatrol in all respects as of the Effective Date.

**G.      Lender's Costs and Expenses/Attorney's Fees**. Skypatrol agrees to pay $10,000 to Lender's counsel ("Lender's Legal Fees Payment") to satisfy the charges of Lender's counsel in connection with the negotiation and drafting of this Agreement. Lender's Legal Fees Payment shall be made by wire transfer within one business day following the Effective Date to: Majorie and Associates, PC (Tax ID 75-2494448); Wells Fargo Bank Account No. 2000037583954; Wire Transfer Routing No. – Domestic: 121000248.

**H.      Additional Skypatrol Representations And Warranties**. Solely with respect to themselves and matters relating to themselves, each of Borrowers warrants and represents to Lender and Lender's Affiliates the following:

(1)      **Good Standing/Skypatrol Delaware**. Skypatrol is (a) duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and (b) is duly licensed, qualified to do business, and in good standing in each jurisdiction in which the ownership of its property or the conduct of its business requires such licensing and qualification and where the failure to be so licensed, qualified or in good standing could result in a material adverse effect on its business. Skypatrol has the power and authority to own its property and to carry on its business in each jurisdiction in which it does business.

(2)      **Good Standing/Total GPS**. Total GPS is (a) duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and (b) is duly licensed, qualified to do business, and in good standing in each jurisdiction in which the ownership of its property or the conduct of its business requires such licensing and qualification and where the failure to be so licensed, qualified or in good standing could result in a material adverse effect on its business. Total GPS has the power and authority to own its property and to carry on its business in each jurisdiction in which it does business.

(3)      **Authority and Compliance**. Each Borrower has full power and authority to execute, deliver, and perform the terms and provisions of this Agreement. No consent or approval of any public authority or third party is required as a condition to the validity or performance by Borrowers under this Agreement. Each Borrower is in compliance with all laws and regulatory requirements to which it is subject.

(4)      **Binding Agreement**. This Agreement has been duly executed and delivered by Borrowers and constitutes the valid and legally binding obligation of such Borrower enforceable

in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

(5)     **No Conflicting Agreements**. There is no charter, bylaw, stock provision, partnership agreement or other document pertaining to the power or authority of Borrowers, and no provision of any existing agreement, mortgage, indenture, or contract binding upon Borrowers or affecting any of Borrowers' property, which would conflict with or in any way prevent the execution, delivery, and performance of the terms of this Agreement.

(6)     **Loan Documents**. Each of the Loan Documents remains in full force and effect and is a valid and binding obligation of the Borrowers, enforceable against Borrowers in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights. Each Borrower hereby ratifies and reaffirms all of the terms and provisions of the Loan Documents, as amended hereby.

(7)     **Collateral**. Borrowers hereby acknowledge that the Collateral is comprised of all assets and other property of Borrowers and that Borrowers' Reaffirmed Security Interest in the Collateral to secure the payment and performance of the Obligations is and shall remain in full force and effect and binding on the Borrowers. Borrowers hereby acknowledge and agree that the Reaffirmed Security Interests in the Collateral are valid and subsisting liens and security interests. Nothing herein contained shall impair the validity or priority of the liens and security interests under the Loan Documents.

(8)     **Obligations**. Skypatrol hereby ratifies and reaffirms in full its duties to pay the Obligations under the Note and other Loan Documents and hereby acknowledges and agrees that this Agreement shall not constitute a novation or otherwise extinguish any of the Obligations, and the Obligations shall be paid in accordance with the terms and conditions in the Note, herein, and in the other Loan Documents, as amended.

(9)     **Non-waiver**. Unless and except as expressly set forth herein, the execution, delivery, performance, and effectiveness of this Agreement shall not operate nor be deemed to be nor construed as a waiver (a) of any right, power, or remedy of the Lender under any Loan Document or (b) of any other term, provision, representation, warranty, or covenant contained in any Loan Document. Further, none of the provisions of this Agreement shall constitute, be deemed to be or construed as, a waiver of any default or Event of Default under any Loan Document. Except as set forth herein, any default and/or Event of Default shall continue and shall not be deemed waived or cured in any way by the execution of this Agreement.

(10)     **Future Defaults**. Except for Events of Default which may presently exist under the Loan Documents, there exists no event or occurrence which, with the lapse of time or notice or both, could reasonably be expected to become an Event of Default of either Borrower under the Loan Documents of this Agreement.

(11)     **Third-Party Actions**. Other than with respect to the action captioned: Skypatrol, LLC, Plaintiff/Counterclaim Defendant vs. Morrison & Foerster LLP, Defendant/Counterclaim Plaintiff, Case No. 2015-012370-CA-01, 11th Circuit, Miami-Dade County, Florida, no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships, voluntary or involuntary proceedings in bankruptcy, or actions pursuant to any other debtor relief laws are pending against or to Borrowers' knowledge, threatened against Borrowers.

(12)     **Accuracy of Information**. To the knowledge of the Borrowers, all written factual

information (other than projections, other forward-looking information and information of a general or industry specific nature) furnished to the Lender in connection with and pursuant to this Agreement is and will be accurate and complete in all material respects on the date as of which such information is delivered to the Lender and is not and will not be incomplete by the omission of any material fact necessary to make such information not materially misleading.

**I.**      **Additional Documents**. Borrowers agree to execute and deliver to Lender from time to time such documents, instruments, agreements, and information related to Borrowers as Lender may reasonably require.

**J.**      **Survival.** All of the promises, representations, warranties, releases, and indemnities made by Borrowers under this Agreement shall survive repayment of the Obligations, and any amendments or modifications to the Loan Documents.

## II.

## DISCUSSIONS

**A.**      **Not Admissible In Evidence**. Other than to enforce this Agreement, any discussions and/or negotiations with respect to the Loan Documents shall not be discoverable or admissible in any proceeding to the same extent that such discussions and/or negotiations would not be discoverable or admissible as settlement discussions in accordance with Rule 408 of the Federal Rules of Evidence or any similar state rule.

**B.**      **No Amendment or Modification.** Except as expressly set forth in this Agreement, no Loan Documents shall be deemed amended by this Agreement or otherwise unless and until a further written agreement is executed and delivered by the Parties thereto. No discussions, negotiations or other action pursuant to this Agreement shall constitute a waiver of, or create an estoppel against the exercise of, any rights under any Loan Documents, at law or in equity, except as expressly set forth herein.

**C.**      **Alternative Opportunities.** Skypatrol will continue to pursue commercially reasonable alternative opportunities, including, without limitation, refinancing, sale, lease or admission of additional partners, subject, however, to the terms of the Loan Documents. To the extent that Lender has any right to object to, or vote against, any such alternative opportunities, Lender will not unreasonably withhold, condition or delay its consent or vote.

**D.**      **Relationship.** The relationship between Lender and Skypatrol is solely that of creditor and debtor, respectively. Neither Lender nor any of Lender's Affiliates bears a fiduciary duty or other special relationship with Skypatrol or is a partner or joint venture with Skypatrol, and no term or condition of this Agreement or any of the Loan Documents and the discussions/negotiations which may be undertaken by the Parties pursuant to this Agreement shall be construed to the contrary.

**E.**      **Sharing of Information**. Skypatrol understands that Lender may from time to time engage in discussions with other secured and unsecured creditors of Skypatrol. Subject to Lender's obligations under any confidentiality agreements with either Borrower, Skypatrol hereby agrees that Lender may engage in any such discussions. Borrowers acknowledge and agree that, as of the Effective Date, neither Lender nor Robert Leeds in any capacity owes a fiduciary duty to Borrowers.

## III.

## MISCELLANEOUS

**A.    Advice from Independent Counsel.** Each Party hereto understands that this is a legally binding agreement that may affect such Party's rights. Borrowers represent to Lender and Lender represents to Borrowers that: (a) each has obtained independent counsel of their own choice and selection in connection with the drafting and execution of Agreement and the meaning and legal significance of this Agreement; (b) each person executing this Agreement on their behalf has read the Agreement in its entirety and fully understands its content and effect; (c) each executes this Agreement of their own free will and choice, under no force of compulsion or duress.

**B.    Order of Precedence.** All terms and conditions of the Loan Documents and all rights and remedies held by the Parties shall remain in effect unless expressly modified by this Agreement and if any terms and/or conditions under the Loan Documents conflicts with any terms and./or conditions of this Agreement, the terms of this Agreement shall control.

**C.    Joint Preparation.** The Parties agree that this Agreement has been prepared through the joint efforts of the Parties and the terms and conditions should be given a fair and reasonable meaning and construction consistent with the intentions of the Parties as expressed herein, without regard to any rule of construction concerning the identity of the "drafter" of the Agreement.

**D.    Entire Agreement; Amendment.** This Agreement constitutes the entire agreement with respect to the subject matter hereof and supersedes any and all prior or contemporaneous representations or agreements concerning the subject matter hereof not contained herein. No agreement shall be effective to amend, change or modify this Agreement, in whole or in part, unless such agreement is in writing, refers expressly to this Agreement, and is signed by each Party hereto.

**E.    Severability.** Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement, and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

**F.    Successors.** This Agreement is binding upon and inures to the benefit of the Lender and Lender's Affiliates. This Agreement is binding upon Borrowers, and Borrowers' successors and permitted assigns; provided, however, neither Borrower may transfer its rights and obligations under this Agreement to any person or entity without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. Borrowers acknowledge and agree that Lender may freely assign this Agreement and any Loan Document at any time to any person or entity without the consent or advance notice to Borrowers.

**G.    No Benefit to Third Parties.** The terms, provisions, and conditions of this Agreement are between the Parties hereto for their exclusive mutual benefit and for the benefit of their successors and permitted assigns and not for the benefit of any other person or entity (except for Lender's Affiliates). No person other than the Parties hereto (and, in the case of the Release and indemnity provisions, the Parties and Lender's Affiliates) is entitled to rely upon the provisions and benefits hereof.

**H.    Law.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN SUBSTANTIALLY NEGOTIATED AND MADE IN THE STATE OF DELAWARE AND

SHALL BE INTERPRETED AND THE RIGHTS OF THE PARTIES DETERMINED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES APPLICABLE THERETO AND THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO AN AGREEMENT EXECUTED, DELIVERED AND PERFORMED THEREIN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW RULES THEREOF OR ANY OTHER PRINCIPLE THAT COULD REQUIRE THE APPLICATION OF THE SUBSTANTIVE LAW OF ANY OTHER JURISDICTION.

      **I.**      **Waiver of Jury Trial**. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

      **J.**      **Forum**. BY EXECUTION AND DELIVERY OF THIS AGREEMENT AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE LOAN DOCUMENTS, EACH OF THE BORROWERS AND LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF FEDERAL AND STATE COURTS IN NEW YORK COUNTY OF THE STATE OF NEW YORK (COLLECTIVELY, "NEW YORK COURTS") IN CONNECTION WITH ANY SUIT ARISING OUT OF OR RELATING DIRECTLY OR INDIRECTLY TO THE LOAN DOCUMENTS, THE COLLATERAL, OR THIS AGREEMENT ("LOAN DOCUMENT LITIGATION"). THE PARTIES IRREVOCABLY WAIVE ANY OBJECTION TO LOAN DOCUMENT LITIGATION IN NEW YORK COURTS, INCLUDING OBJECTIONS TO PERSONAL JURISDICTION, VENUE, OR FORUM NON CONVENIENS. IF LOAN DOCUMENT LITIGATION IS FILED AGAINST LENDER IN A COURT OTHER THAN NEW YORK COURTS, SKYPATROL WILL NOT OBJECT TO A TRANSFER OF SUCH LITIGATION TO NEW YORK COURTS.

      **K.**      **Notice**. Unless otherwise specifically set forth herein, any notice, consent or approval of a party shall be in writing and given (a) by hand; (b) by email and original posted first class mail, postage prepaid, within two (2) business days thereafter; or (c) by certified or registered mail with an acknowledgment of receipt, postage prepaid, return receipt requested; or (d) by a reputable private courier which provides evidence of receipt as a part of its delivery service, at such party's address set forth below its signature hereto, or to such other address as may be designated in writing by either party from time to time in accordance herewith. Notices shall be deemed delivered two (2) business days following delivery by hand, by private courier or when so emailed and five (5) business days following proper dispatch by certified or registered mail. A "business day" is any Monday through Friday on which first class US mail is delivered in New York, New York.

      **L.**      **Multiple Counterparts.** This Agreement may be executed in one or more counterparts, and it shall be deemed fully executed when each party has signed a counterpart even though no one counterpart contains the signatures of all the parties. A facsimile signature of a party shall be deemed an original signature and fully effective as such. Each party executing this agreement represents that it has the full power and authority to do so.

[SIGNATURE PAGE FOLLOWS]

**TRUST FOR TREBUCHET CORP.**

By: _____
         Robert Leeds
         Trustee

Date: _____12/5/16_____

**ISABEL CATHERINE LEEDS TRUST**

By: _____
         Robert Leeds
         Trustee

Date: _____12/5/16_____

**OLIVER WILLIAM LEEDS TRUST**

By: _____
         Robert Leeds
         Trustee

Date: _____12/5/16_____

Address for Lender:
Robert Leeds
As Trustee for (Lender)
1035 Park Avenue
New York, NY 10028
Email: rleeds@silarcapital.com

**SKYPATROL, LLC**, a Delaware limited
liability company

By: _____
         Robert D. Rubin
         Chief Executive Officer

Date: _____12/9/16_____

**TOTAL GPS TECHNOLOGIES, LLC**, a
Florida limited liability company

By: _____
         Robert D. Rubin
         Chief Executive Officer

Date: _____12/9/16_____

Address for Borrowers:
3055 N.W. 84th Avenue
Doral, Florida 33122
Attn:  Robert D. Rubin, CEO
Email: rrubin@toppcompanies.com

Reaffirmation Agreement-Skypatrol / Trebuchet                              Page 12 of 13

**EXHIBIT A**

Security Agreement

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "*Agreement*"), dated as of December 1, 2016 (the "*Effective Date*"), is made by and between Skypatrol, LLC, a Delaware limited liability company ("*Skypatrol*") and Total GPS Technologies, LLC, a Florida limited liability company ("*Total GPS*"; and together with Skypatrol, "*Debtor*"), on the one hand, and Robert Leeds, Trustee of Trust for Trebuchet Corp., Robert Leeds, Trustee of Isabel Catherine Leeds Trust, and Robert Leeds, Trustee of Oliver William Leeds Trust (collectively, "*Lender*"), on the other hand.

Debtor hereby grants a security interest in the Collateral (as hereinafter defined) to secure the payment and performance of all Obligations (as hereinafter defined) of Debtor to Secured Party, and Debtor hereby agrees with Secured Party as follows:

**1.    DEFINITIONS.** As used herein -

1.1    "*Collateral*" means any and all personal property and fixtures of Debtor in which Secured Party now has, by this Agreement acquires or hereafter acquires, a security interest, including following property of Debtor, whether such property is now owned or existing or is owned, acquired, or arises hereafter, wherever located, and all proceeds and products thereof: all personal property and fixtures of every kind and nature, including without limitation: all inventory, accounts, securities and investment property, equipment, goods, instruments, books, records, documents, documents of title, policies and certificates of insurance, chattel paper, deposit accounts, supporting obligations, letter-of-credit rights, commercial tort claims, rights and privileges, contract rights, deposits, bank accounts and other rights to receive the payment of money, vehicles, tools, machinery, furnishings, furniture, fixtures, building supplies, appliances, spare parts, materials, all semi-intangibles, all intangibles, all general intangibles (including without limitation, payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Debtor possesses, uses, or has authority to possess or use property (whether tangible or intangible) of others, or agreements to which others possess, use or have authority to possess or use property (whether tangible or intangible) of Debtor), all other rights to the payment of money including without limitation amounts due from affiliates, tax refunds, and insurance proceeds, and all recorded data or records of any kind or nature, regardless of the medium of recording, including without limitation all software, writings, plans, specifications and schematics and all other personal property of any kind and nature, all proceeds from sale of any of the foregoing, including without limitation insurance policies, and all of the books and records relating to any and all of the above.

1.2    "*Indebtedness*" means (a) all obligations of Skypatrol for borrowed money, (b) all obligations of Skypatrol evidenced by bonds, debentures, notes or similar instruments, (c) all such Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by Skypatrol, whether or not such Indebtedness secured thereby has been assumed, (d) all guarantees by Skypatrol of Indebtedness of others and (e) all capital lease obligations of Skypatrol and (f) all payables of Skypatrol.

1.3    "*Material Adverse Effect*" means a material adverse effect on the assets, business, condition (financial or otherwise), results of operations or prospects of Skypatrol, taken as a whole.

1.4    "*Note*" means the Convertible Note dated December 31, 2015, made by Debtor in favor of Skypatrol, as amended pursuant to the terms of the Reaffirmation Agreement.

1.5    "*Obligations*" means any and all obligations of Debtor to Secured Party of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to

perform acts and refrain from taking action as well as obligations to pay money.

1.6 "**_Reaffirmation Agreement_**" means the Reaffirmation Agreement of even date herewith between Debtor and Secured Party.

1.7 "**_Senior Indebtedness_**" means the sum up to $250,000 of the principal of, and premium, if any, and interest on (a) all Indebtedness of Skypatrol for monies borrowed from banks, trust companies, insurance companies and other financial institutions, including commercial paper and accounts receivable sold or assigned by Skypatrol to such institutions, and (b) deferrals, renewals, extensions and refundings of any such Indebtedness.

1.8 All of the terms used herein which are defined in Article 9 of the New York Uniform Commercial Code, as from time to time amended (the "**_Uniform Commercial Code_**"), shall, unless otherwise defined herein, have the same meanings as specified therein.

1.9 Capitalized terms used herein without definition have the meanings given in the Note or the Reaffirmation Agreement, as the case may be.

2. **SECURITY INTEREST.** As security for the payment and performance of all Obligations, Secured Party shall have and Debtor hereby grants to Secured Party a continuing first-lien security interest in the Collateral and pledges and assigns the Collateral to Secured Party. Borrowers agree to recognize, affirm, and defend the security interest granted in this Agreement and in the Reaffirmation Agreement (the "Security Interest") with respect to and against the claims of any creditors of either Borrower and neither Borrower will create, incur, agree to, assume, or suffer to exist any mortgage, pledge, lien or other encumbrance of any kind upon or any security interest in any of the Collateral (whether now owned or hereafter acquired), except (a) in favor of Lender or upon Lender's written consent (which may be granted or denied in Lender's sole and absolute discretion), (b) in favor of Laird Holdings Limited or any of its affiliates including without limitation, RecepTec Corp., provided that such indebtedness and any security interest therein or lien thereon shall be junior and subordinate in all respects to Lender, and (c) up to Two Hundred Fifty Thousand Dollars ($250,000) of Senior Indebtedness of Skypatrol incurred after the Effective Date.

3. **AUTHORIZATION TO FILE FINANCING STATEMENTS**. Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file, wherever such filing is deemed by Secured Party to be necessary or desirable, any initial financing statements and amendments thereto indicating all or any part of the Collateral and containing any other information required by applicable law or deemed necessary or desirable by Secured Party for the sufficiency or filing office acceptance of any financing statement or amendment. Debtor agrees to furnish all such information to Secured Party promptly upon request. Debtor also ratifies its authorization for Secured Party to have filed any initial financing statements or amendments thereto if filed prior to the date hereof. Debtor hereby agrees to pay the cost of all such filings.

4. **OTHER ACTIONS.** Further to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's security interest in the Collateral, Debtor agrees, in each case at Debtor's own expense, to take the following actions with respect to the following Collateral:

4.1. Promissory Notes and Tangible Chattel Paper. If Debtor shall at any time hold or acquire any promissory notes or tangible chattel paper, Debtor shall forthwith, in addition to other action required by Secured Party, endorse, assign and deliver the same to Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as Secured Party may from time to time specify.

4.2. Deposit Accounts in Other Institutions. For each deposit account that Debtor at any time opens or maintains at an institution other than Secured Party, Debtor shall, at Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to Secured Party, give Secured

Party control of such deposit account by either (a) causing the depository bank to agree to comply at any time with instructions from Secured Party to such depository bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Debtor, or (b) arranging for Secured Party to become the customer of the depository bank with respect to the deposit account, with Debtor being permitted to withdraw funds from such deposit account, only to the extent authorized by Secured Party from time to time. The provisions of this paragraph shall not apply to (i) any deposit account for which Debtor, the depository bank and Secured Party have entered into a cash collateral agreement specially negotiated among Debtor, the depository bank and Secured Party for the specific purpose set forth therein, or (ii) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Debtor's salaried employees, to the extent so employed. Debtor agrees to promptly notify Secured Party in writing at any time it establishes a deposit account with any institution or terminates any deposit account.

4.3.    <u>Investment Property</u>. If Debtor shall at any time hold or acquire any investment property, including without limitation, certificated securities, uncertificated securities, or securities held by Debtor or its nominee through a securities intermediary or commodity intermediary, Debtor shall promptly notify Secured Party of such investment property and shall forthwith at the request of Secured Party, take whatever action Secured Party deems necessary or appropriate to give Secured Party control of such investment property, including executing and delivering endorsements, assignments, pledge agreements and other agreements in form and substance satisfactory to Secured Party. Debtor will also cause any securities intermediary maintaining a securities account or commodities intermediary maintaining a commodities account to execute such agreements as Secured Party shall from time to time require in order to ensure Secured Party is granted control thereof, and to deliver to Secured Party such agreement, reports, and other documentation as Secured Party shall from time to time require, and Debtor will hold in trust and deliver to Secured Party any investment property received by Debtor, together with any required endorsements.

4.4.    <u>Collateral in the Possession of a Bailee</u>. If any goods are at any time in the possession of a bailee, Debtor shall, unless otherwise directed by Secured Party, promptly notify Secured Party thereof and shall send notice to and obtain an acknowledgment from the bailee, in form and substance satisfactory to Secured Party. Such acknowledgment shall state that the bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party, without the further consent of Debtor. Debtor hereby authorizes Secured Party to obtain the acknowledgment directly from any bailee.

4.5.    <u>Electronic Chattel Paper and Transferable Records; Letter-of-credit Rights; Commercial Tort Claims; Patents, Trademarks and Copyrights</u>. If Debtor at any time (i) holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in 201 of the federal Electronic Signatures in Global and National Commerce Act, or in 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, (ii) is a beneficiary under a letter-of-credit now or hereafter issued in favor of Debtor, (iii) holds or acquires a commercial tort claim, or (iv) holds or acquires any rights in any patents, trademarks, or copyrights or applications therefor, then Debtor shall notify Secured Party in writing of its interest therein, and shall provide such information and take such action as Secured Party shall request in order that Secured Party may perfect its security interest therein.

4.6.    <u>Government Contracts</u>. Upon the request of Secured Party, Debtor will specifically assign to Secured Party all federal government contracts and will cooperate with Secured Party in giving notice of such assignment pursuant to the federal Assignment of Claims Act. Debtor will cooperate with Secured Party in providing such further information with respect to contracts with any state, other unit of local government or agency as Secured Party may require and will provide such instruments or take such actions of further assurance with respect to such contracts as Secured Party may require.

4.7.    Other Actions as to all Collateral. Debtor further agrees to take any other action reasonably requested by Secured Party to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, Secured Party's security interest in any and all of the Collateral.

## 5.    DEBTOR'S REPRESENTATIONS, WARRANTIES AND COVENANTS. Debtor represents, warrants and covenants as follows:

5.1    Debtor is duly organized, existing and in good standing under the laws of its state of organization and is duly qualified and in good standing in every other state in which it is doing business, except where the failure to so qualify would not have a Material Adverse Effect.

5.2    Debtor covenants with Secured Party as follows: (a) without providing at least thirty (30) days prior written notice to Secured Party, Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address and (b) Debtor will not change its type of organization, jurisdiction of organization or other legal structure. In connection with any such change Debtor will execute and deliver, or cause to be executed and delivered, to Secured Party all such additional security agreements, financing statements and other documents as Secured Party shall reasonably require. This provision shall not be deemed to constitute consent to any change identified above or otherwise prohibited in any agreement between Debtor and Secured Party.

5.3    The execution, delivery and performance hereof are within Debtor's powers, have been duly authorized, are not in contravention of law or the terms of its organizational documentation, or of any indenture, agreement or undertaking to which it is a party or by which it is bound.

5.4    Debtor further covenants with Secured Party as follows: (a) the Collateral will not move the Collateral from its current locations, without providing at least thirty (30) days prior written notice to Secured Party, (b) except for the security interest herein granted and the security interests of any subordinated indebtedness or Senior Indebtedness (as defined in the Reaffirmation Agreement), Debtor shall be the owner of or have other rights in the Collateral free from any lien, security interest or other encumbrance, and Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to Secured Party, (c) except for the security interests of any subordinated indebtedness or Senior Indebtedness, Debtor shall not pledge, mortgage or create, or suffer to exist a security interest in the Collateral in favor of any person other than Secured Party, (d) Debtor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, and will immediately notify Secured Party of any damage thereto or any loss or significant diminution of the value thereof, (e) Debtor will permit Secured Party, or its designee, may inspect the Collateral at any reasonable time, wherever located, (f) Debtor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, and (g) Debtor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for sales and leases of inventory and licenses of general intangibles in the ordinary course of business.

5.5    Except as set forth on **Schedule 5.5**, there are no actions, suits or proceedings pending or, to the knowledge of Debtor, threatened against Debtor or any subsidiary, at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality which would have a Material Adverse Effect.

5.6    No approval or authorization or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery or performance by Debtor of this Agreement or the consummation of the transaction contemplated hereby.

5.7    Until the occurrence of an Event of Default, Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this Agreement and not inconsistent with any policy

of insurance thereon.

## 6.    COLLATERAL PROTECTION EXPENSES; PRESERVATION OF COLLATERAL.

6.1.    <u>Expenses Incurred by Secured Party</u>. Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may discharge taxes, liens, security interests and other encumbrances at any time levied or placed on any of the Collateral, may pay for insurance on the Collateral, may pay for the maintenance and preservation of the Collateral, may pay for credit enhancements to insure Secured Party against risks of loss or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral, make repairs thereto and pay any necessary filing fees. Debtor agrees to reimburse Secured Party on demand for any payment made or any expense reasonably incurred by Secured Party pursuant to the foregoing authorization. Secured Party shall have no obligation to Debtor to make any such expenditures, nor shall the making thereof relieve Debtor of any default.

6.2.    <u>Secured Party's Obligations and Duties</u>. Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Secured Party of any payment relating to any of the Collateral, nor shall Secured Party be obligated in any manner to perform any of the obligations of Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Secured Party or to which Secured Party may be entitled at any time or times.

## 7.    PROMISES TO PAY. Debtor promises to pay to Secured Party on demand all taxes, charges and expenses, including reasonable attorneys' fees, disbursements and expenses of litigation, reasonably incurred or expended by Secured Party in connection with or in any way incurred by Secured Party in connection with the collection or sale or attempted collection or sale of accounts or Obligations, the supervision, protection and collection of and realization upon any Collateral, and the protection or enforcement of Secured Party's rights hereunder.

## 8.    INSURANCE. Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Secured Party may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as Secured Party may reasonably prescribe, for direct application by Debtor solely to the repair or replacement of Debtor's property so damaged or destroyed, or Secured Party may apply all or any part of such proceeds to the Obligations.

## 9.    COLLECTION OF ACCOUNTS OR OTHER COLLATERAL.

9.1    Until Secured Party requests that debtors on accounts or other Collateral of Debtor be notified of Secured Party's security interest, or Secured Party so notifies them, Debtor shall continue to collect them.

9.2    Upon and during the continuance of an Event of Default, Debtor shall, at the request of Secured Party, notify the account debtors and other persons obligated on any of the Collateral of the security interest of Secured Party in any account or other Collateral and that payment thereof is to be made directly to Secured Party, and Secured Party may itself at any time upon and during the continuance of an Event of Default, without notice to or demand upon Debtor, so notify account debtors.

9.3    Upon and during the continuance of an Event of Default, Secured Party may also request that Debtor hold the proceeds received from collection of Collateral as trustee for Secured Party without commingling the same with other funds of Debtor and shall turn the same over to Secured Party, or to

such bank as may be approved by Secured Party, immediately upon receipt in the identical form received. The making of such a request, or the giving of any such notification under 9.1 hereof, shall not affect the duties of Debtor described above with respect to proceeds of collection of accounts received by Debtor.

9.4    Secured Party shall credit the proceeds of collection of accounts received by Secured Party to the Obligations, such credits to be entered as of the third business day after receipt thereof by Secured Party. Such credits shall be conditional upon final payment in cash or credits of the items giving rise to them. If any item is not so paid, Secured Party, in its discretion, whether or not the item is returned, may either reverse any credit given for the item or charge it to any deposit account maintained by Debtor with Secured Party.

**10.    EVENTS OF DEFAULT.** Debtor shall be in default under this Agreement upon the happening of any of the following events or conditions:

(a)    default in the payment or performance, when due or payable, of any Obligation by Debtor or any endorser, guarantor or surety for any Obligation and such failure has not been cured within thirty (30) days after written notice;

(b)    any representation or warranty made in this Agreement or in any writing furnished in connection with or pursuant to this Agreement shall prove to be incorrect in any material respect as of the time made or furnished; or

(c)    an Event of Default under the Note or any other Loan Document (as defined in the Reaffirmation Agreement).

**11.    DISPOSITION OF COLLATERAL**

11.1    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party shall have the right to take immediate possession of the Collateral, and for that purpose Secured Party may, so far as Debtor can give authority therefor, enter upon any premises on which Collateral may be situated and remove the same therefrom. Secured Party may in its discretion require Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Debtor's principal office(s) or at such other locations as Secured Party may reasonably designate. Except for Collateral which is perishable or threatens to decline speedily in value or which is of a type customarily sold on a recognized market, Secured Party shall give to Debtor at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale of any other intended disposition is to be made. Secured Party shall also have in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code. The residue of any proceeds of collection or sale, after satisfying all Obligations in such order of preference as Secured Party may determine and making proper allowance for interest on Obligations not then due, and after making any payments required by the Uniform Commercial Code, shall be credited to any deposit account maintained by Debtor with Secured Party. Debtor shall remain liable for any deficiency. Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Secured Party's rights hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

11.2    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may at any time in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for Obligations or apply it on principal or interest due on Obligations. Insofar as Collateral shall consist of accounts, general intangibles, other claims and rights to the payment of money, insurance policies, instruments, chattel paper, choses in action or the like, Secured Party may, upon the occurrence of any Event of Default and at any time thereafter (such default not having been

cured), without notice to or demand on Debtor, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon Collateral as Secured Party may determine, whether or not Obligations or Collateral are then due and for the purpose of realizing Secured Party's rights therein, Secured Party may receive, open and dispose of mail addressed to Debtor and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of Debtor. The powers conferred on Secured Party by this are solely to protect the interest of Secured Party and shall not impose any duties on Secured Party to exercise any powers.

      11.3    Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, Debtor hereby irrevocably waives the benefits of all such laws.

**12.    STANDARDS FOR EXERCISING REMEDIES**. To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party (a) to fail to incur expenses reasonably deemed significant by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other persons, whether or not in the same business as Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, or (j) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral. Without limitation upon the foregoing, nothing contained in this 12 shall be construed to grant any rights to Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this 12.

**13.    POWER OF ATTORNEY**. Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Debtor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Debtor or in Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all action that Secured Party deems necessary or desirable and to execute any and all documents and instruments

that Secured Party deems necessary or desirable to accomplish the purposes of this Agreement. The powers conferred on Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Debtor for any act or failure to act, except for Secured Party's own gross negligence or willful misconduct.

**14.    SET OFF.** Any deposits or other sums at any time credited by or due from Secured Party to Debtor or any guarantor, and any securities or other property of Debtor or any such guarantor at any time in the possession of Secured Party may at all times be held and treated as collateral for the payment of the Obligations. Regardless of the adequacy of collateral, Secured Party may apply or set off such deposits or other sums against such obligations at any time in the case of Debtor but only with respect to matured obligations in the case of guarantors thereof.

**15.    WAIVERS.** Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received, delivered or repossessed or other action taken in reliance hereon, and all other demands and notices of any description. With respect to both Obligations and Collateral, Debtor assents to any extension or postponement of the time of payment or other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payments thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Secured Party may deem advisable. Secured Party may exercise its rights with respect to Collateral without resorting or regard to other collateral or sources of reimbursement for Obligations. Secured Party shall not be deemed to have waived any of its rights upon or under Obligations or Collateral unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any other right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Secured Party on Obligations or Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised separately or concurrently. Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth in 6.2.

**16.    SUBORDINATION.** Anything herein to the contrary notwithstanding, the Security Interest created hereby, and the rights and remedies of Secured Party hereunder, are subordinate, inferior and subject to the security interest in the Collateral of, and the rights and remedies in respect of Senior Indebtedness.

**17.    GENERAL.** If at any time or times by assignment or otherwise, Secured Party transfers any Obligation and collateral therefor, such transfer shall carry with it Secured Party's powers and rights under this Agreement with respect to the Obligation and collateral transferred and the transferee shall become vested with said powers and rights whether or not they are specifically referred to in the transfer. This Agreement shall be effective as a sealed instrument, and it and all rights and obligations under it, including matters of construction, validity and performance, shall be governed by the laws of the State of New York. No amendment or modification of any provision of this Agreement shall be effective unless in writing and signed and delivered by the parties hereto.

**18.    NOTICES.** Unless otherwise specifically set forth herein, any notice, consent or approval of a party shall be in writing and given (a) by hand; (b) by email and original posted first class mail, postage prepaid, within two (2) business days thereafter; or (c) by certified or registered mail with an acknowledgment of receipt, postage prepaid, return receipt requested; or (d) by a reputable private courier which provides evidence of receipt as a part of its delivery service, at such party's address set

forth below its signature hereto, or to such other address as may be designated in writing by either party from time to time in accordance herewith. Notices shall be deemed delivered two (2) business days following delivery by hand, by private courier or when so emailed and five (5) business days following proper dispatch by certified or registered mail. A "business day" is any Monday through Friday on which first class US mail is delivered in New York, New York.

**19.    SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, administrators, successors and assigns.

**20.    SEVERABILITY.** In case any one or more provisions of this Agreement shall be found by a court or other tribunal of competent jurisdiction to be invalid or unenforceable for any reason or in any respect or circumstance, such invalidity or unenforceability shall not limit or impair the validity or enforcement of any other provision hereof or affect the validity or enforcement of the provisions of this Agreement under any other circumstances.

**21.    WAIVER OF JURY TRIAL AND SPECIAL DAMAGES.** THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OF ANY KIND WHATSOEVER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT RELATED HERETO OR THE RELATIONSHIPS ESTABLISHED HEREUNDER OR THEREUNDER.

**22.    GOVERNING LAWS AND CONSENT TO JURISDICTION.** THIS AGREEMENT IS INTENDED TO TAKE EFFECT AS A SEALED INSTRUMENT AND SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. Debtor agrees that any suit for the enforcement of this Agreement may be brought in the courts of the State of New York or any Federal Court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon Debtor by mail at the address specified herein. Debtor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or based on such suit having been brought in an inconvenient court.

**23.    CONSTRUCTION.** The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation," (c) the term "days" refers to U.S. calendar days and not business days, unless expressly noted; and (d) any reference to "persons" includes natural persons, firms, partnerships, companies, corporations, associations, organizations, governments, states, foundations and trusts (in each case whether or not having separate legal personality). The parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party, and that ambiguities shall not be interpreted against the drafting party.

**24.    COUNTERPARTS.** This Agreement may be executed in one or more counterparts, and it shall be deemed fully executed when each party has signed a counterpart even though no one counterpart contains the signatures of all the parties. A facsimile signature of a party shall be deemed an original signature and fully effective as such. Each party executing this agreement represents that it has the full power and authority to do so.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed as a sealed instrument as of the Effective Date.

SECURED PARTY

TRUST FOR TREBUCHET CORP.

By: _____
    Robert Leeds
    Trustee

OLIVER WILLIAM LEEDS TRUST

By: _____
    Robert Leeds
    Trustee

ISABEL CATHERINE LEEDS TRUST

By: _____
    Robert Leeds
    Trustee

Address for all Secured Parties:
Robert Leeds
As Trustee for (Lender)
1035 Park Avenue
New York, NY 10028
Email: rleeds@silarcapital.com

DEBTOR

SKYPATROL, LLC

By: _____
    Robert D. Rubin
    Chief Executive Officer

TOTAL GPS TECHNOLGIES, LLC

By: _____
    Robert D. Rubin
    Chief Executive Officer

Address for both Debtors:
3055 N.W. 84th Avenue
Doral, Florida 33122
Attn:  Robert D. Rubin, CEO
Email: rrubin@toppcompanies.com

# SCHEDULE 5.5

Litigation

Skypatrol, LLC, Plaintiff/Counterclaim Defendant vs. Morrison & Foerster LLP, Defendant/Counterclaim Plaintiff, Case No. 2015-012370-CA-01, 11th Circuit, Miami-Dade County, Florida

## SECOND REAFFIRMATION AGREEMENT AND AMENDMENT/SUPPLEMENT

This is a binding agreement (the "**Second Reaffirmation Agreement**") which serves as a binding amendment and supplement to that certain Reaffirmation Agreement dated as of December 9, 2016 (the "**Reaffirmation Agreement**") and to that certain Security Agreement dated as of December 1, 2016 (the "**Security Agreement**") made and entered into by and between Skypatrol, LLC, a Delaware limited liability company ("**Skypatrol**") and Total GPS Technologies, LLC, a Florida limited liability company ("**Total GPS**", and together with Skypatrol, "**Borrowers**"), on the one hand, and Robert Leeds, Trustee of Trust for Trebuchet Corp., Robert Leeds, Trustee of Isabel Catherine Leeds Trust, and Robert Leeds, Trustee of Oliver William Leeds Trust (collectively, "**Lender**"), on the other hand. Unless a contrary intention is shown, capitalized terms used but not defined herein shall have the meaning set forth in the Reaffirmation Agreement.

This Second Reaffirmation Agreement also affirms delivery of an original replacement note (the "**Replacement Note**") for the original of that certain Convertible Note dated December 31, 2015 in the principal amount of $1,000,000 executed by Skypatrol as maker and payable to Lender and amended and reaffirmed by the Borrowers as makers in the Ratification Agreement and secured by the Security Agreement (the "**Note**"), and adds an additional term for an Event Of Default under the Note as a binding amendment and supplement to the Reaffirmation Agreement and Security Agreement.

This Second Reaffirmation Agreement also confirms delivery of a new promissory note in the principal amount of $200,000 (the "**$200,000 Note**") payable to Lender by Borrowers as makers and the inclusion of the $200,000 loan evidenced by the $200,000 Note and, as a binding amendment and supplement to the Reaffirmation Agreement and Security Agreement, affirms inclusion of the $200,000 Note and the obligations thereunder as Indebtedness and Obligations within the meaning of the Security Agreement.

IN CONSIDERATION of Lender agreeing to advance an additional $200,000 to Skypatrol and of the mutual covenants and agreements contained herein (the receipt and sufficiency of which are hereby acknowledged), the Parties hereto agree as follows:

1.    **Replacement Note.** Pursuant to paragraph 9 of the Note and section I C (5) of the Reaffirmation Agreement, Skypatrol affirms that it has received satisfactory evidence of the loss of the original Note and is hereby concurrently issuing an original Replacement Note to Lender. Delivery and acceptance of the Replacement Note does not in any way alter or amend the Reaffirmation Agreement or Security Agreement. The Replacement Note shall be deemed to constitute the "Note" as if it were the original in all respects (including without limitation being subject to amendments by the Reaffirmation Agreement and being referred to in the Security Agreement).

2.    **Amendment To Note and Security Agreement Concerning Organic Change.** In addition to the amendments to the Note made in the Reaffirmation Agreement, the following change to paragraph 2(b) of the Note is hereby made:

> The sentence "All Principal and Full Interest shall be due and payable on the earlier of the (i) Maturity Date, or (ii) the Conversion Date" shall be deleted and in its place the following shall be inserted: "All Principal and Full Interest shall be due and payable on the earlier of the (i) Maturity Date, or (ii) the Conversion Date, or (iii) the occurrence of an Organic Change."

The Security Agreement is hereby amended and supplemented to add the following to the end of section 10: "(d) the occurrence of an Organic Change within the meaning of the Note."

3.      **$200,000 Note.** In exchange for Lender advancing $200,000 to Skypatrol (in addition to the $500,000 principal balance evidenced by the Note), Borrowers shall concurrently deliver to Lender an original signed promissory note in the form attached hereto as Exhibit A (the "$200,000 Note").

4.      **Further Amendments/Supplements.** This Second Reaffirmation Agreement and the $200,000 Note shall be deemed to be "Loan Documents" within the meaning of the Note and/or the Security Agreement. The Borrower's obligations under the $200,000 Note shall be included within the meaning of "Indebtedness" and "Obligations" under the Note and/or the Security Agreement. The definition of "Note" in section 1.4 of the Security Agreement is hereby amended and supplemented to mean: "(a) the Note; and/or (b) the $200,000 Note." The definition of Reaffirmation Agreement in section 1.6 of the Security Agreement is hereby amended and supplemented to mean: "(a) the Reaffirmation Agreement; and/or the Second Reaffirmation Agreement."

5.      **Reaffirmation of Obligations.** Borrowers hereby affirm their obligations to Lender under the Note, the Reaffirmation Agreement, the Security Agreement, this Second Reaffirmation Agreement, the $200,000 Note, and the other Loan Documents.

6.      **Governing Law.** This Second Reaffirmation Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Second Reaffirmation Agreement shall be governed by, the laws of the State of Delaware, without giving effect to provisions thereof regarding conflict of laws.

7.      **Fax Signatures.** A facsimile signature shall be deemed an original signature and fully effective as such. Borrowers represent that they have the full power and authority to execute, deliver, and perform under this Second Reaffirmation Agreement and the $200,000 Note.

8.      **Integration.** This Second Reaffirmation Agreement and the $200,000 Note shall be considered an integral part of the Loan Documents and shall be construed *in pari materia* therewith.

IN WITNESS WHEREOF, this Second Reaffirmation Agreement is effective as of December 27, 2016 when it is signed by the Parties in the spaces set forth below.

TRUST FOR TREBUCHET CORP.

By: _____
      Robert Leeds as Trustee

OLIVER WILLIAM LEEDS TRUST

By: _____
      Robert Leeds as Trustee

ISABEL LEEDS TRUST

By: _____
Robert Leeds as Trustee
      Address for all Secured Parties:
      Robert Leeds, As Trustee for (Lender)
      1035 Park Avenue
      New York, NY 10028
      Email: rleeds@silarcapital.com

SKYPATROL, LLC

By: _____
Robert D. Rubin
Chief Executive Officer

TOTAL GPS TECHNOLOGIES, LLC

By: _____
      Robert D. Rubin
      Chief Executive Officer

NEITHER THIS NOTE NOR THE SECURITIES THAT MAY BE ISSUED BY THE COMPANY UPON CONVERSION HEREOF (COLLECTIVELY, THE *"SECURITIES"*) HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE *"1933 ACT"*), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THE SECURITIES NOR ANY INTEREST OR PARTICIPATION THEREIN MAY BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED: (I) IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE 1933 ACT, OR APPLICABLE STATE SECURITIES LAWS; OR (II) IN THE ABSENCE OF AN OPINION OF COUNSEL, IN A FORM ACCEPTABLE TO THE ISSUER, THAT REGISTRATION IS NOT REQUIRED UNDER THE 1933 ACT OR; (III) UNLESS SOLD, TRANSFERRED OR ASSIGNED PURSUANT TO RULE 144 UNDER THE 1933 ACT.

<u>SECURED CONVERTIBLE NOTE</u>

$200,000.00

December 27, 2016 (the *"Issuance Date"*)

FOR VALUE RECEIVED, Skypatrol, LLC, a Delaware limited liability company (the *"Company"*), hereby promises to pay to the order of Robert Leeds, Trustee of Trust For Trebuchet Corp. (*"Lender"*), the principal amount of Two Hundred Thousand and No/100 Dollars (the *"Principal"*) and to pay interest thereon (*"Interest"*) in accordance with the terms hereof.

The term *"Note"* and all references thereto, as used throughout this instrument, shall mean this Convertible Note as originally executed, or if later amended or supplemented, then as so amended or supplemented.

1.      <u>Definitions</u>. Capitalized terms used herein without definition have the meanings specified in the Operating Agreement. Additionally, for purposes of this Note, the following terms shall have the following meanings:

        1.1.    *"2015 Note"* means the Secured Convertible Note dated December 31, 2015 in the original principal amount of $500,000 made by the Company in favor of Lender.

        1.2.    *"Adjustments to Conversion Price"* has the meaning specified in Section 3(f) below.

        1.3.    *"Adverse Action"* means a demand, action or proceeding, motion, or any other form of request for judicial relief against Skypatrol or with respect to Skypatrol' s business or with respect to any of Skypatrol' s assets, debts, or liabilities: (a) seeking an attachment, sequestration, receivership, turnover, assignment for the benefit of creditors, temporary restraining order, preliminary injunction, constructive trust, or other special or ancillary relief; and/or (b) seeking liquidation, reorganization, or other relief under any Bankruptcy Law; and/or (c) seeking the appointment of a Custodian.\

        1.4.    *"Affiliates"* means Lender's respective trustees, beneficiaries, managers, members, agents, representatives, shareholders, partners, officers, directors, attorneys, employees, successors, and assigns jointly and severally, "Affiliated Persons") and each respective Affiliated Person's Affiliated Person, in any and all capacities, including without limitation Robert Leeds.

1.5.    *"Applicable Laws"* means all laws, statutes, treaties, rules, codes, ordinances, regulations, certificates, orders, interpretations, licenses and permits of any Governmental Body, including the common or civil law and all judgments, decrees, injunctions, writs, orders, or like action of any court, arbitrator, or other Governmental Body of competent jurisdiction.

1.6.    *"Bankruptcy Law"* means Title 11 of the United States Code, any insolvency law, or any similar federal or state law now or hereafter in effect for relief of debtors or creditors.

1.7.    *"Bankruptcy Order"* means an order or decree under any Bankruptcy Law that: (a) is for relief against Skypatrol in an involuntary bankruptcy proceeding; (b) appoints a Custodian of Skypatrol or any of Skypatrol's assets; and/or (c) orders liquidation of Skypatrol or any of its assets.

1.8.    *"Change of Control"* means any consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization in which the Company shall not be the continuing or surviving entity of such reorganization or any transaction or series of related transactions by the Company in which in excess of 50% of the Company's voting control is transferred, or a sale of all or substantially all of the assets of the Company, other than any transaction or series of related transactions which is primarily for the purpose of financing the Company or a reincorporation of the Company.

1.9.    *"Conversion Date"* has the meaning specified in Section 3(b) hereof.

1.10.    *"Collateral"* means and includes all of the Company's assets, whether now owned or hereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Company or in which the Company may have any interest, however created or arising and whether or not earned by performance.

1.11.    *"Collection Expenses"* means all costs and expenses incurred by Lender in the collection and enforcement of this Note, including, without limitation, reasonable attorneys' fees and costs; the costs of each Lawsuit (as defined below), if any; and all out-of-pocket expenses including, without limitation, the reasonable fees and costs of all other professionals retained by Lender in connection with the collection and enforcement of this Note (including, without limitation, accountants, financial advisors, appraisers, expert witnesses, and consultants).

1.12.    *"Company Target Value"* means Fifteen Million Dollars ($15,000,000); *provided, however*, that the Company Target Value shall be subject to Adjustments to Conversions Price and any Organic Changes.

1.13.    *"Conversion Amount"* means the sum of (a) the outstanding principal amount of this Note, plus (b) Full Interest on this Note (whether accrued or not.).

1.14.   *"Conversion Price"* means the price per Class A Common Unit determined by dividing the Company Target Value by the number of outstanding Units representing all issued Membership Interests on the Conversion Date.

1.15.   *"Conversion Rate"* means the number of Class A Common Units issuable upon conversion of this Note pursuant to Section 3(a)

1.16.   *"Custodian"* means a trustee, receiver, liquidator, custodian, or other similar official.

1.17.   *"Effective Date"* means the date this Note is signed by the Company and delivered to Lender.

1.18.   *"Full Interest"* means the Interest due on the Note as calculated from the Issuance Date to the Maturity Date.

1.19.   *"Governmental Body"* means any federal, state, provincial, municipal, tribal, county, parish, or other federal, state or local governmental authority or judicial or regulatory agency, board, body, department, bureau, commission, instrumentality, court, tribunal or quasi-governmental authority in any jurisdiction (domestic or foreign).

1.20.   *"Holder"* means Lender, including its successors and assigns and includes, for greater certainty, any subsequent registered holder of this Note.

1.21.   *"Indebtedness"* means (a) all obligations of the Company for borrowed money, (b) all obligations of the Company evidenced by bonds, debentures, notes or similar instruments, (c) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by the Company, whether or not the Indebtedness secured thereby has been assumed, (d) all guarantees by the Company of Indebtedness of others and (e) all capital lease obligations of the Company (f) payables of the Company.

1.22.   *"Issuance Date"* has the meaning specified above.

1.23.   *"Lawsuit"* means any dispute, claim, or controversy between or among Holder, on the one hand, and the Company on the other hand, concerning (1) the interpretation or enforcement of this Note and/or any of the other Loan Documents, and/or (2) any other matter arising out of or relating to this Note and/or any of the other Loan Documents.

1.24.   *"Loan Documents"* means this Note, the 2015 Note, the Reaffirmation Agreement, the Security Agreement, the Second Reaffirmation Agreement, and any other documents and instruments executed and/or delivered in connection with this Note, the 2015 Note, the Reaffirmation Agreement, the Second Reaffirmation Agreement, and/or the Security Agreement, and any and all binding amendments or supplements thereto.

1.25.   *"Material Adverse Effect"* means a material adverse effect on (i) the business, condition (financial or otherwise), operations, performance or property of the Company or (ii) the ability of the Company to perform its obligations under the Loan Documents.

1.26.   *"Maturity Date"* means ninety (90) days from the Issuance Date unless the parties mutually agree to extend the date.

1.27.   *"Obligations"* means all advances to, and debts, liabilities, obligations, covenants and duties of, the Company arising under any Loan Document, whether direct or indirect

(including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Company of any proceeding under any bankruptcy or similar laws regarding debtor relief naming the Company as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

1.28.  *"Operating Agreement"* means the Limited Liability Company Operating Agreement of the Company dated as of December 31, 2015.

1.29.  *"Person"* means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

1.30.  *"Reaffirmation Agreement"* means the Reaffirmation Agreement dated December 9, 2016 between the Company and Total GPS, on the one hand, and Lender, among others, on the other hand.

1.31.  *"Second Reaffirmation Agreement"* means the Second Reaffirmation Agreement And Amendment/Supplement dated as of December 27, 2016 between the Company and GPS, on the one hand, and the Lender, among others, on the other hand.

1.32.  *"Security Agreement"* means the Security Agreement dated December 9, 2016 between the Company and Total GPS, on the one hand, and Lender, among others, on the other hand.

1.33.  *"Total GPS"* means Total GPS Technologies, LLC, a Florida limited liability company formerly known as Skypatrol, LLC.

2.  **Payments of Principal and Interest.**

(a)  Payment of Principal. Unless converted earlier in accordance with Section 3 below, the Principal shall be paid to the Holder hereof on the Maturity Date.

(b)  Payment of Interest. Interest on the Principal shall accrue at a rate of two percent (2%) per month commencing on the Issuance Date. Interest shall be computed based on simple interest and a 30-day month and actual days elapsed. All Principal and Full Interest shall be due and payable on the earlier of the (i) Maturity Date, (ii) the Conversion Date or (iii) the consummation of an Organic Change. Anything herein to the contrary notwithstanding, Lender does not intend to charge and the Company shall not be required to pay any interest or other fees or charges in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

(c)  Loan Origination Fee. In consideration of the loan hereunder, the Company agrees to pay to Lender a loan origination fee on the date hereof in the amount of $20,000 and Lender's legal fees in the amount of $2,500 (in addition to the $5,000 balance due for legal fees under the Reaffirmation Agreement), as deducted by Lender from principal proceeds advanced under this Note (net proceeds to the Company of $172,500).

(d)  General Payment Provisions. Payments of Principal and Interest on this Note shall be made in lawful money of the United States of America by check to such account as the Holder may designate by written notice to the Company in accordance with the provisions of this Note. If payment is due on this Note, whether on the Maturity Date or upon the occurrence of an Event of Default, on any day which is not a Business Day (as defined below), the same shall instead be

due on the next succeeding day which is a Business Day. For purposes of this Note, *"Business Day"* shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the State of Delaware are authorized or required by law or executive order to remain closed.

3.    Conversion.

(a)    Terms of Conversion. At the sole and absolute option of the Holder, any time after January 1, 2017 through the Maturity Date (or, if there is a default, until there is payment of all Obligations in full)(the *"Conversion Period"*), this Note may be converted, in whole, into Class A Common Units of the Company, subject to the terms and conditions set forth in this Note and as calculated by dividing the Conversion Amount by the Conversion Price.

(b)    Mechanics of Conversion. The conversion of this Note shall be conducted in the following manner:

(i)    Conversion Notice. To convert this Note during the Conversion Period into Class A Common Units on any date set forth in the Conversion Notice (the *"Conversion Date"*), the Holder shall deliver by hand, certified mail or overnight courier, for receipt on or prior to 5:00 p.m., Eastern Time on such date, a copy of a fully executed notice of conversion in the form attached hereto as **Exhibit A** (the *"Conversion Notice"*) to the Company together with the original of this Note.

(ii)    Company's Obligation upon Holder's Conversion. Upon receipt by the Company of a copy of a Conversion Notice from the Holder, the Company shall as soon as practicable, but in no event later than five (5) Business Days after receipt of such Conversion Notice, send, via fax and overnight courier, a confirmation of receipt of such Conversion Notice (the *"Conversion Confirmation"*) to the Holder indicating that the Company will process such Conversion Notice in accordance with the terms herein. Within fifteen (15) Business Days after the date of the Conversion Confirmation, subject to receipt by the Company of the original of this Note and, if the Holder is not then a Member of the Company, a signed copy of the Joinder Agreement in substantially the form attached hereto as **Exhibit B** (the *"Joinder Agreement"*), the Company shall issue and surrender to a common carrier for delivery to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder, for the number of Class A Common Units to which the Holder shall be entitled.

(iii)    Record Holder. The Person or Persons entitled to receive the Class A Common Units issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such Class A Common Units on the Conversion Date.

(iv)    Fractional Units. The Company shall not issue any fraction of a Class A Common Unit upon any conversion; if such issuance would result in the issuance of a fraction of a Class A Common Unit, the Company shall round such fraction of a Class A Common Unit up to the nearest whole Class A Common Unit.

(c)    Automatic Conversion. Anything herein to the contrary notwithstanding, this Note shall automatically convert into Class A Common Units pursuant to its terms upon a Change of Control.

(d)    Taxes. The Company shall pay any and all taxes that may be payable with respect to the issuance and delivery of Class A Common Units upon the conversion of this Note. The parties agree that the Holder will not realize and gain or loss for U.S. federal income tax purposes upon conversion to equity.

(e)     <u>Adjustments to Conversion Price</u>. If the Company at any time subdivides (by any split, dividend, recapitalization or otherwise) one or more classes of its outstanding Units into a greater number of Units, the Conversion Price in effect immediately prior to such subdivision will be proportionally reduced. If the Company at any time combines (by combination, reverse split or otherwise) one or more classes of its outstanding Units into a smaller number of Units, the Conversion Price in effect immediately prior to such combination will be proportionally increased. In order to avoid doubt, the Company acknowledges that the Holder shall be entitled to the benefit of all adjustments in the number of Units issuable upon conversion of any Preferred Units or as a result of any splits, recapitalizations, combinations, or other similar transactions affecting the Units underlying the conversion Units, that occur prior to the conversion of the Note. The adjustments described in this Section 3(f) are referred to herein as "*Adjustments to Conversion Price*".

(f)     <u>Additional Adjustments</u>. Anything herein to the contrary notwithstanding, the Conversion Price shall be adjusted immediately prior to conversion hereof so that the Conversion Price upon conversion of this Note will equal the Conversion Price that would have been in effect if this Note had been converted on the Issuance Date.

4.     <u>Security</u>. To secure the full and prompt payment to Holder of the Obligations, contemporaneously herewith Company hereby grants Holder a first priority lien against and security interest in the Collateral as part of the "Indebtedness" and "Obligations" under the Security Agreement.

5.     <u>Representations and Warranties.</u> The Company represents and warrants to Holder that:

(a)     <u>Due Authorization</u>. The Company has the corporate power to execute and deliver and carry out the terms of this Note and has taken all necessary corporate action to authorize the execution, delivery, and performance of this Note and the performance of its obligations hereunder.

(b)     <u>No Conflict</u>. The Company's execution, delivery, and performance of its obligations under this Note do not and will not contravene or conflict with any provision of (a) any Applicable Law, (b) any judgment, decree, or order applicable or binding upon Company, or (c) any agreement or instrument binding upon Company or upon any assets or property of Company.

(c)     <u>No Default</u>. The Company is not in default under any agreement or instrument binding upon Company or upon any assets or property of Company, which default could have a Material Adverse Effect.

(d)     <u>Enforceable Note</u>. This Note is the legal, valid, and binding obligation of Company enforceable against Company in accordance with its terms, subject only to bankruptcy, insolvency, reorganization, moratorium, and similar laws of general applicability relating to or affecting creditors' rights.

(e)     <u>Litigation, etc</u>. No litigation, arbitration proceeding, governmental proceeding or investigation, or regulatory proceeding is pending or, to the best of the Company's knowledge, threatened, against the Company that could have a Material Adverse Effect.

(f)     <u>Financial Condition</u>. The Company is a newly formed entity organized to acquire certain assets and identified liabilities from Total GPS. Both before and after giving effect to the transactions contemplated by this Note and the sale of from Total GPS to the Company, Total

GPS had sufficient assets required to pay all of its Indebtedness (including the Obligations), (ii) was and is able to pay all of its Indebtedness (including the Obligations) as such Indebtedness matures, and (iii) has capital sufficient to carry on its business.

6.    **Reorganization, Reclassification, Consolidation, Merger or Sale**. Any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's assets to another Person or other transaction which is effected in such a way that holders of Units are entitled to receive (either directly or upon subsequent liquidation) membership interests, units, securities or assets with respect to or in exchange for Units is referred to herein as an "*Organic Change*". Prior to the consummation of any (a) Organic Change or (b) other Organic Change following which the Company is not a surviving entity, the Company will secure from the Person purchasing such assets or the successor resulting from such Organic Change (in each case, the "*Acquiring Entity*") a written agreement (in form and substance reasonably satisfactory to the Holder) to deliver to the Holder in exchange for his Note, a security of the Acquiring Entity evidenced by a written instrument substantially similar in form and substance to the Note, and reasonably satisfactory to the Holder. Prior to the consummation of any other Organic Change, the Company shall make appropriate provision (in form and substance reasonably satisfactory to the Holder) to ensure that the Holder will thereafter have the right to acquire and receive in lieu of or in addition to (as the case may be) the Class A Common Units immediately theretofore acquirable and receivable upon the conversion of this Note, such membership interests, units, securities or assets that would have been issued or payable in such Organic Change with respect to or in exchange for the number of Class A Common Units which would have been acquirable and receivable upon the conversion of this Note as of the date of such Organic Change (without taking into account any limitations or restrictions on the convertibility of the Note).

7.    **Reservation of Units**. The Company shall at all times, so long as any amount of the Note is outstanding, reserve and keep available out of its authorized and unissued Class A Common Units, solely for the purpose of effecting the conversion of this Note, such number of Class A Common Units as shall at all times be sufficient to effect the conversion of this Note.

8.    **Voting Rights**. The Holder shall have no voting rights unless and until this Note has been converted, and then such voting rights shall apply solely to the Class A Common Units into which this Note was converted and be subject to the terms of the Operating Agreement then in effect. The foregoing notwithstanding, the Operating Agreement may not be amended so as to adversely affect the Class A Common Units.

9.    [RESERVED].

10.    **Defaults and Remedies**.

(a)    Event of Default. "*Event of Default*' means the occurrence of one or more of the following after the Effective Date:

(i)    Skypatrol fails to pay on the date when due any installment of principal or interest or other charge due under the Note or as required by any of the Loan Documents, when and as the same becomes due and payable to Lender, whether at maturity, by acceleration, or otherwise, and such default continues for a period of ten (10) days after written notice of such failure is given by Lender to Skypatrol;

(ii)    Skypatrol fails to strictly perform, observe and/or comply with any

covenant, agreement, or term contained in this Agreement and/or under the Loan Documents, which failure continues uncured for fifteen (15) days after written notice of such failure is given by Lender to Skypatrol;

(iii)    Skypatrol commences a voluntary proceeding seeking liquidation, reorganization, or other relief under any Bankruptcy Law or seeking the appointment of a Custodian; and/or

(iv)    One or more creditors other than Lender commences an involuntary bankruptcy proceeding under any Bankruptcy Law against Skypatrol and Skypatrol either: (a) does not obtain a dismissal of the proceeding within sixty days; or (b) consents to the entry of an order in the involuntary case or seeks or consents to conversion of the involuntary case to a voluntary case under chapter 11 of the United States Bankruptcy Code;; and/or

(v)    One or more putative creditors or actual creditors other than Lender asserts an Adverse Action against Skypatrol and Skypatrol either (a) consents to such one or more aspects of the relief sought in the Adverse Action; or (b) does not obtain a withdrawal, dismissal, vacation, discharge, or stay of the Adverse Action within sixty days of initial assertion of the Adverse Action. and/or

(vi)    In Lender's reasonable discretion, Skypatrol makes or is deemed to have made any representation or warranty to Lender or any other creditor which is false, misleading, or erroneous in any material respect when made or deemed to have been made; and/or

(vii)    A judgment is entered against Skypatrol in any action or proceeding in favor of any person or entity other than Lender in excess of $250,000; and/or

(viii)    Any Loan Document shall cease to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested or challenged by Skypatrol or any other person or entity in whole or in part; and/or

(ix)    Skypatrol denies that Skypatrol has any liability or obligation under this any Loan Document; and/or

(x)    Any lien or security interest reaffirmed or created by any Loan Document shall for any reason cease to be a valid, perfected security interest in and lien upon any of the Collateral, subordinate only to any Senior Indebtedness; and/or

(xi)    Skypatrol fails to provide to Lender: (a) semi-annual financials; management prepared financial statements (within 120 days of year-end); and if Skypatrol has audited financial statements prepared on its behalf, copies of such audited financial statements within fifteen days after such audited financials have been received by the Company; and/or

(xii)    Skypatrol fails to pay any indebtedness for borrowed money owing to any other Person when the same shall be due and payable (beyond any applicable notice and cure period) in an amount in excess of $250,000; and/or

(xiii)    There is a material negative change in the financial condition of Skypatrol; and/or

(xiv)    Skypatrol makes a general assignment for the benefit of its creditors; and/or

(xv)    Skypatrol admits in writing that it is generally unable to pay its debts

as the same become due;

(xvi)    A court of competent jurisdiction enters a Bankruptcy Order and that Bankruptcy Order remains in effect and unstayed for sixty days after entry;

(xvii)    Skypatrol or any other person or entity commences or threatens to commence any judicial or other proceeding against Lender or any of Lender's Affiliates relating directly or indirectly in whole or in part to the business or affairs of Skypatrol, the Loan Documents, this Agreement, or the Collateral; and/or

(xviii)    One or more "Events of Default" under the other Loan Documents occurs after the Effective Date.

(b)    <u>Remedies</u>. If an Event of Default occurs and is continuing for ten (10) days after notification, then the Holder of this Note may, at its sole option and in addition to any other rights or remedies available to it pursuant to this Note and the other documents or at law or in equity, Holder may take such action, without notice or demand, that Holder deems advisable to protect and enforce its rights against the Collateral, including, without limitation, declaring the Note to be immediately due and payable, and Holder may enforce or avail itself of any or all rights or remedies provided in this Note and the other documents against Company and any or all of the Collateral, including, without limitation, all rights or remedies available at law or in equity

(c)    <u>Actions to Collect on the Note.</u> If action at law or equity is necessary to enforce or interpret the terms of this Note, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

11.    <u>Lost or Stolen Note</u>. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of an indemnification undertaking by the Holder to the Company in a form reasonably acceptable to the Company and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver an identical replacement Note.

12.    <u>Payment of Collection, Enforcement and Other Costs</u>. If: (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding; or (b) an attorney is retained to represent the Holder of this Note in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this Note, then the Company shall pay to the Holder all reasonable attorneys' fees, costs and expenses incurred in connection therewith, in addition to all other amounts due hereunder.

13.    <u>Cancellation</u>. If converted in accordance herewith, or after all Principal and accrued Interest and any other amounts at any time owed on this Note have been paid in full on the Maturity Date, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

14.    <u>Inspection of Books and Records</u>. So long as this Note remains outstanding, upon reasonable advance notice and during normal business hours, the Company shall permit the Holder and his agents to examine the Company's books and financial records, and to discuss the affairs, finances and accounts of the Company with its directors, officers and its then current accountants; and, by this provision, the Company authorizes such accountants to discuss with the Holder and his agents the affairs, finances and accounts of the Company. All such visits and inspections shall be at the expense of the Holder unless an Event of Default shall exist, in which

event the reasonable costs and expenses associated with all such events and inspections shall be at the expense of the Company.

15.     <u>Waiver of Notice</u>. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

16.     <u>Amendment</u>. This Note and any provision hereof may only be amended by an instrument in writing signed by the Company and the Holder.

17.     <u>Governing Law</u>. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the laws of the State of Delaware, without giving effect to provisions thereof regarding conflict of laws. Each party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in Miami-Dade County, Florida, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by sending by certified mail or overnight courier a copy thereof to such party at the address for such notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

18.     <u>**Remedies, Characterizations, Other Obligations, Breaches and Injunctive Relief**</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note, at law or in equity (including a decree of specific performance and/or other injunctive relief), and no remedy contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy and nothing herein shall limit a Holder's right to pursue actual damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder of this Note that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder thereof and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).

19.     <u>Construction</u>. No specific provision contained in this Note shall limit or modify any more general provision contained herein. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof.

20.     <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall

any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

21.    <u>Notices</u>. Unless otherwise specifically set forth herein, any notice, consent or approval of a party shall be in writing and given (a) by hand; (b) by email and original posted first class mail, postage prepaid, within two (2) business days thereafter; or (c) by certified or registered mail with an acknowledgment of receipt, postage prepaid, return receipt requested; or (d) by a reputable private courier which provides evidence of receipt as a part of its delivery service, at such party's address set forth below, or to such other address as may be designated in writing by either party from time to time in accordance herewith. Notices shall be deemed delivered two (2) business days following delivery by hand, by private courier or when so emailed and five (5) business days following proper dispatch by certified or registered mail. A "business day" is any Monday through Friday on which first class US mail is delivered in New York, New York.

If to the Company, to:                             If to Lender, to:

3055 N.W. 84th Avenue                         Robert Leeds
Doral, Florida 33122                              As Trustee for Trust for Trebuchet
Attn:  Robert D. Rubin, CEO                 1035 Park Avenue
Email: rrubin@toppcompanies.com        New York, NY 10028
                                                              Email: rleeds@brevetcapital.com


[SIGNATURES ON NEXT PAGE]

**IN WITNESS WHEREOF,** the Company has executed this Note on and as of the Issuance Date.

SKYPATROL, LLC

By: _____

Robert D. Rubin
Chief Executive Officer

## EXHIBIT A

## CONVERSION NOTICE

Reference is made to the Secured Convertible Note dated December __, 2016 issued by Skypatrol, LLC to Lender (the *"Note"*). In accordance with and pursuant to the Note, the undersigned Holder hereby elects to convert the principal balance of the Note together with all accrued and unpaid Full Interest thereon, indicated below, into Class A Common Units of the Company, by tendering the Note specified below as of the date specified below.

Date of Conversion: _____

Conversion Amount: _____

Conversion Price: _____

Number of Class A Common Units _____
to be issued:

Please issue the Class A Common Units into which the Note is being converted in the name(s) and to the address specified below:

_____

_____

Telephone Number: _____

Fax Number: _____

Authorization of Holder: _____

Name: _____

By: _____

Title: _____

Dated: _____

EXHIBIT B

SKYPATROL, LLC

FORM OF JOINDER AGREEMENT

This Joinder Agreement, dated _____, 20__, is delivered pursuant to the Skypatrol, LLC Operating Agreement, dated as of December 31, 2015 (the "*Agreement*"), among the Members listed on **Schedule 1** thereto and any other Members who became party to the Agreement pursuant to the terms thereof. Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

Subject to the terms and conditions of this Joinder Agreement and the Agreement, the undersigned hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the undersigned will be deemed to be a party to the Agreement for all purposes of the Agreement, and shall have all of the rights and obligations of a Member thereunder as fully as if he or she had executed the Agreement. The undersigned hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Agreement.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of _____, 20___.


_____
Name:

**EXHIBIT**

**Composite G**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

Delaware Department of State
U.C.C. Filing Section
Filed: 10:39 AM 02/01/2016
U.C.C. Initial Filing No: 2016 0593325

Service Request No:   20160500792

A. NAME & PHONE OF CONTACT AT FILER (optional)
Brian L. Berlandi, Esq.  212-804-6329

B. E-MAIL CONTACT AT FILER (optional)
bberlandi@bnrllp.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Brian L. Berlandi, Esq.
Berlandi Nussbaum & Reitzas LLP
527 Route 22, Suite 2
Pawling, NY 12564
To be filed: Delaware Secretary of State

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Skypatrol, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3055 NW 84th Avenue | Miami | FL | 33122 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Trust for Trebuchet Corp. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1035 Park Avenue | NEW YORK | NY | 10028 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of the Debtor's assets, whether now owned or hereafter acquired or arising, and wherever the same may be located from time to time Including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property, or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Debtor or in which the Debtor may have any interest, however created or arising and whether or not earned by performance.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)  ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

# UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

| | 9a. ORGANIZATION'S NAME |
|---|---|
| | **Skypatrol, LLC** |
| OR | 9b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S) · · · · · · · · · · SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | 10b. INDIVIDUAL'S SURNAME | | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☑ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **Isabel Catherine Leeds Trust** | | | |
| OR | 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 11c. MAILING ADDRESS | **1035 Park Avenue** | CITY **New York** | STATE **NY** / POSTAL CODE **10028** | COUNTRY **USA** |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the
REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16
(if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT **ADDENDUM**

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

**Skypatrol, LLC**

OR
9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☑ ADDITIONAL SECURED PARTY'S NAME  **or**  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

**Oliver William Leeds Trust**

OR
| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| 11c. MAILING ADDRESS **1035 Park Avenue** | CITY **New York** | STATE **NY** | POSTAL CODE **10028** | COUNTRY **USA** |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the
REAL ESTATE RECORDS  (if applicable)

14. This FINANCING STATEMENT:

☐ covers timber to be cut      ☐ covers as-extracted collateral      ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16
(if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
ROSITA  CORTEZ (800) 221-0102

**B. E-MAIL CONTACT AT FILER (optional)**
RCORTEZ@NATIONALCORP.COM

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

COGENCY GLOBAL INC.

10 EAST 40TH STREET

10TH FLOOR

NEW YORK, NY 10016

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:47 PM 05/01/2017**
**U.C.C. Initial Filing No: 2016 0593325**
**Amendment No: 2017 2860390**
**Service Request No:  20172955702**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| **1a.** INITIAL FINANCING STATEMENT FILE NUMBER<br>**20160593325** | **1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:    **AND**  Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete item 6a or 6b, and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| **OR** | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| **OR** | 7b. INDIVIDUAL'S SURNAME | | | |
| | INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**8.** ☑ **COLLATERAL CHANGE:**  Also check one of these four boxes:    ☐ ADD collateral    ☑ DELETE collateral    ☐ RESTATE covered collateral    ☐ ASSIGN collateral

Indicate collateral:
All "Purchased Assets" as such term is defined in the Asset Purchase Agreement dated as of May 1, 2017 by and among Skypatrol, LLC, a Delaware limited liability company, VBI Group, LLC, a Delaware limited liability company d/b/a Skypatrol USA and Sam Mahrouq.

**9. NAME** OF **SECURED PARTY** OF **RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
if this is an Amendment authorized by a **DEBTOR**, check here ☑ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME<br>SKYPATROL, LLC | | | |
|---|---|---|---|---|
| **OR** | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA:**
FILED W/ DE-SOS; DEBTOR: SKYPATROL, LLC

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
    (845) 425-0077

B. E-MAIL CONTACT AT FILER (optional)
SEARCHES@VCORPSERVICES.COM

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

VCORP SERVICES, LLC

25 ROBERT PITT DRIVE, SUITE 204

MONSEY, NY 10952

US

**Delaware Department of State**
**U.C.C. Filing Section**
Filed: 05:16 PM 05/17/2017
**U.C.C. Initial Filing No: 2016 0593325**
**Amendment No: 2017 3260830**
**Service Request No:  20173664535**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
|---|---|
| 2016 0593325 | (or recorded) in the REAL ESTATE RECORDS |
| | Filer: *attach* Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, *and* address of Assignee in item 7c *and* name of Assignor in item 9
For partial assignment, complete items 7 and 9 *and* also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check *one* of these two boxes:
This Change affects ☐ Debtor *or* ☐ Secured Party of record

**AND** Check *one* of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b, *and* item 7a or 7b, *and* item 7c
☐ ADD name: Complete item 7a or 7b, *and* item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:**  Complete for Party Information Change - provide only *one* name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only *one* name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☑ **COLLATERAL CHANGE:**  *Also* check *one* of these four boxes:  ☐ ADD collateral   ☐ DELETE collateral   ☑ RESTATE covered collateral   ☐ ASSIGN collateral

indicate collateral:
**All of Skypatrol, LLC's (the "Company") assets, whether owned on December 31, 2015 or thereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Company or in which the Company may have any interest, however created or arising and whether or not earned by performance, including without limitation the**

9. **NAME** OF **SECURED PARTY** OF **RECORD AUTHORIZING THIS AMENDMENT:** Provide only *one* name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a **DEBTOR**, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| TRUST FOR TREBUCHET CORP. | | | |
| OR | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
FILED W/ DE-SOS; DEBTOR: SKYPATROL, LLC

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **AMENDMENT ADDENDUM**

FOLLOW INSTRUCTIONS

**11. INITIAL FINANCING STATEMENT FILE NUMBER:** Same as item 1a on Amendment form
20160593325

**12. NAME** OF PARTY AUTHORIZING THIS AMENDMENT: Same as item 9 on Amendment form

12a. ORGANIZATION'S NAME
**TRUST FOR TREBUCHET CORP.**

OR

12b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**13. Name of DEBTOR on related financing statement** (Name of a current Debtor of record required for indexing purposes only in some filing offices - see Instruction item 13): Provide only one Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

13a. ORGANIZATION'S NAME

OR

| 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

**14. ADDITIONAL SPACE FOR ITEM 8 (Collateral)**
following: (1) The Company's "Excluded Assets," as that term is defined in the Asset Purchase Agreement ("APA") dated as of May 1, 2017 by and between Skypatrol, LLC, a Delaware limited liability company, VBI Group, LLC, a Delaware limited liability company d/b/a Skypatrol USA, and Sam K. Mahrouq as guarantor; (2) the Company's security interest(s) in all "Purchased Assets" as such term is defined in the APA; and (3) the Company's rights to the "Earn-Out Payments" as such term is defined in the APA.

**15.** This FINANCING STATEMENT AMENDMENT:
☐ covers timber to be cut  ☐ covers as-extracted collateral  ☐ is filed as a fixture filing

**17.** Description of real estate:

**16.** Name and address of a RECORD OWNER of real estate described in item 17
(if Debtor does not have a record interest):

**18. MISCELLANEOUS:**

International Association of Commercial Administrators

**FILING OFFICE COPY** — UCC FINANCING STATEMENT AMENDMENT ADDENDUM (Form UCC3Ad) (Rev. 04/20/11)

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Rosita Cortez                        (800) 221-0102

**B. E-MAIL CONTACT AT FILER (optional)**
rcortez@nationalcorp.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

National Corporate Research, Ltd.
10 East 40th Street
10th Floor
New York, NY  10016

FLORIDA SECURED TRANSACTION REGISTRY

# FILED
**2016 Sep 27 04:10 PM**
****** 201608978921 ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| **1a. ORGANIZATION'S NAME** Skypatrol, LLC, (DE company) | | | |
| **1b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **1c. MAILING ADDRESS** 3055 NW 84th Avenue | CITY Doral | STATE FL  POSTAL CODE 33122 | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | |
| **2b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **2c. MAILING ADDRESS** | CITY | STATE  POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| **3a. ORGANIZATION'S NAME** Trust For Trebuchet Corp. | | | |
| **3b. INDIVIDUAL'S SURNAME** | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **3c. MAILING ADDRESS** c/o Robert Leeds, As Trustee for Secured Parties, 1035 Park Avenue | CITY New York | STATE NY  POSTAL CODE 10028 | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All of the Company's assets, whether now owned or hereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Company or in which the Company may have any interest, however created or arising and whether or not earned by performance

All documentary stamps due and payable or to become due and payable pursuant to s.201.22 F.S., have been paid.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
**6b.** Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
Filed with: FL - Central Filing Office

F#538899
A#749965

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)



# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**

Skypatrol, LLC, (DE company)

OR

**9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)**    **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME**

OR

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)**    **SUFFIX**

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☒ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

Isabel Catherine Leeds Trust

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Robert Leeds, As Trustee for Secured Parties, 1035 Park Avenue | New York | NY | 10028 | USA |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14. This FINANCING STATEMENT:** ☐ covers timber to be cut    ☐ covers as-extracted collateral    ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16. Description of real estate:**

**17. MISCELLANEOUS:**

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)**

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME

Skypatrol, LLC, (DE company)

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 19b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 20b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

22. ☒ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Oliver William Leeds Trust | | | | | |
| OR 22b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS c/o Robert Leeds, As Trustee for Secured Parties, 1035 Park Avenue | | CITY New York | STATE NY | POSTAL CODE 10028 | COUNTRY USA |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |

24. MISCELLANEOUS:

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Rosita Cortez                                    (800) 221-0102

**B. E-MAIL CONTACT AT FILER (optional)**
rcortez@nationalcorp.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

National Corporate Research, Ltd.
10 East 40th Street
10th Floor
New York, NY 10016

FLORIDA SECURED TRANSACTION REGISTRY

# FILED
2017 Jan 17 04:12 PM
****** 20170000301X ******

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |  |  |  |  |  |
|---|---|---|---|---|---|
| Skypatrol, LLC, (DE company) |  |  |  |  |  |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3055 NW 84th Avenue | Doral | FL | 33122 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| Trust For Trebuchet Corp. |  |  |  |  |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Robert Leeds, As Trustee for Secured Parties, 1035 Park Avenue | New York | NY | 10028 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of the Company's assets, whether now owned or hereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Company or in which the Company may have any interest, however created or arising and whether or not earned by performance

All documentary stamps due and payable or to become due and payable pursuant to s.201.22 F.S., have been paid.

Filed in connection with the Secured Convertible Note in the principal amount of $200,000 dated December 27, 2016 made by Debtor in favor of Secured Party.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: FL - Central Filing Office

F#538899
A#749965

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)        International Association of Commercial Administrators (IACA)

**A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON**

WILLIAM ZAYAC; 8954255077

Email WILLIAM@VCORPSERVICES.COM

**B. SEND ACKNOWLEDGEMENT TO:**

# FILED

2017 May 17 05:43 PM

\*\*\*\*\*\* 201701249888 \*\*\*\*\*\*

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

---

**1a. INITIAL FINANCING STATEMENT FILE #** 201608978921

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

---

**2. CURRENT RECORD INFORMATION - DEBTOR NAME - INSERT ONLY ONE DEBTOR NAME (2a OR 2b)**

2a. ORGANIZATION'S NAME
SKYPATROL, LLC, (DE COMPANY)

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

---

**3. CURRENT RECORD INFORMATION - SECURED PARTY NAME - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)**

3a. ORGANIZATION'S NAME
TRUST FOR TREBUCHET CORP.

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

---

**4.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**5.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**6.** ☐ **ASSIGNMENT** ☐ Full or ☐ Partial : Give name of assignee in item 9a or 9b and address of assignee in item 9c; and also give name of assignor in item 11.

**7.** ☑ **AMENDMENT** (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 8 and/or 9.

☐ **CHANGE** name and/or address: Give current record name in item 8a or 8b; Also give new name (if name change) in item 9a or 9b and/or new address (if address change) in item 9c.

☐ **DELETE** name: Give record name to be deleted in item 8a or 8b.

☐ **ADD** name: Complete item 9a or 9b, and 9c; also complete items 9d-9g (if applicable).

---

**8. CURRENT RECORD INFORMATION** - INSERT ONLY ONE NAME (8a OR 8b) - Do Not Abbreviate or Combine names

8a. ORGANIZATION'S NAME

| 8b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

---

**9. CHANGED (NEW) OR ADDED INFORMATION:** - INSERT ONLY ONE NAME (9a OR 9b) - Do Not Abbreviate or Combine names

9a. ORGANIZATION'S NAME

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 9c. MAILING ADDRESS Line One | | | This space not available. | | |
|---|---|---|---|---|---|
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

---

**10. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

See attached

---

**11. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT**

(name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor, which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

11a. ORGANIZATION'S NAME
TRUST FOR TREBUCHET CORP.

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

---

**12. OPTIONAL FILER REFERENCE DATA** Filed w/FL-Central Filing Office; Debtor: Skypatrol, LLC

**STANDARD FORM - FORM UCC-3 (REV.05/2013)** Filing Office Copy Approved by the Secretary of State, State of Florida

All of Skypatrol, LLC's (the "Company") assets, whether owned on December 31, 2015 or thereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Company or in which the Company may have any interest, however created or arising and whether or not earned by performance, including without limitation the following: (1) The Company's "Excluded Assets," as that term is defined in the Asset Purchase Agreement ("APA") dated as of May 1, 2017 by and between Skypatrol, LLC, a Delaware limited liability company, VBI Group, LLC, a Delaware limited liability company d/b/a Skypatrol USA, and Sam K. Mahrouq as guarantor; (2) the Company's security interest(s) in all "Purchased Assets" as such term is defined in the APA; and (3) the Company's rights to the "Earn-Out Payments" as such term is defined in the APA.

## PARTIAL ASSIGNMENT OF RIGHTS AND INTEEREST

This Assignment of Rights and Interest (the "Assignment") is entered into by and between **Platinum Financial Trust, LLC ("Assignee")** and Skypatrol, LLC a Delaware Limited Liability Company ("Assignor") as of the date that this Assignment is fully executed as reflected below.

**Whereas,** Assignor is a creditor and note holder in "The Asset Purchase Agreement Dated May 1, 2017 between Assignor and VBI Group, LLC a Delaware Limited Liability Company as purchaser ("PA") "Exhibit A".

. **Whereas,** Assignor had previously approved by Joint Written Consent In Lieu Of A Meeting of the Board Of Directors And The Members on May 1, 2017 "Exhibit B".

**Whereas,** Assignor is confident that all payments will be timely made under the "PA".

**Whereas,** Assignor has agreed to provide a Confession of judgment should there be any delay in payments to the Assignee.

**Whereas,** The Assignor is now in need of immediate Capitol to complete a previously entered settlement agreement with a net saving to the Company in an amount of no less than $350,000.00.

**Whereas,** Assignee will provide funds in an amount of $125,000.00

**It is now, therefore, agreed by and between Assignor and Assignee that:**

1.      By executing this Assignment and in consideration for all of the promises and covenants by Assignor set forth herein, Assignee hereby accepts the assignment by Assignor for a stream of 17 equal monthly in an amount $10,000.00 beginning July 16th, 2017 and every month thereafter until paid.

2.      If the Assignor is in default the Assignee shall have the sole and absolute right to pursue and assert rights to any and all assets of Assignor until paid in full, specifically including the rights under the "PA".

3.      Assignee shall also have the absolute and unqualified right to settle, sell or otherwise resolve the validly perfected senior lien on the Assignor's assets should the assignor be in default to Assignee.

4.      Assignor warrants and represents that it has not previously assigned, transferred, pledged, encumbered or otherwise disposed of all or any part of the rights and interest that it purports to assign to Assignee by way of this Assignment with the exception of the senior lien.

5.      Each the Assignor and the Assignee agrees to submit to jurisdiction in the State and or Federal Court of Indiana.

6.      Assignor and Assignee agree that this Assignment and The Confession of Judgment represents the full, complete and integrated agreement between them regarding the subjects contained herein and that, in entering into this Assignment, neither of them is relying upon any prior representation, promise or agreement made by any person which is not specifically set forth herein. This Assignment cannot be modified or changed in any manner other than in a written agreement executed by both Assignor and Assignee.


Dated:

Platinum Financial Trust ,LLC ("Assignee")

1

By: _____

Its: _____

Phone: 812-605-0004

FAX: 317-214-8521

Address: 2801 Fairview Suite W

       Greenwood, IN, 46142

Assignor _____ CEO  SKYPATROL, LLC

**Print name(s)** ( ROGERT D. RUSIN

_____

**Print name(s)**

2

Affidavit of Confession of Judgment

State of Florida

County of Miami-Dade

ROBERT d. RUBIN,  being duly sworn, deposes and says:

1. I am a Director, member and CEO  of Skypatrol, LLC a Delaware Limited Liability Company doing business at 3055 NW 84th Av, Doral Florida 33122, and as such, I have authority to act on behalf of Defendant, and have been authorized by defendant to execute this affidavit of confession of Judgment.
2. I reside at 13040 Old Cutler Road, Pinecrest, Florida  and in county of Miami-Dade County.
3. I on behalf of Defendant consent to jurisdiction of this Court.
4. Defendant hereby confesses judgment and authorizes entry of judgment in favor of Plaintiff and against Defendants in the Federal District Court for the Southern District of Indiana , Johnson County Court Indiana and or any civil Court of Florida , County of Dade, in the sum of $250,000.00 less any payments timely made pursuant to the Assignment Agreement dated June 16th, 2017 plus legal fees to Plaintiff calculated at twenty five percent (25%) of the total aforesaid sums, costs, expenses and disbursement and interest at the rate of 16% per annum from June 16th, 2017 or highest amount by law. Such amount shall be set forth in and affidavit to be executed by the Plaintiff or an affirmation by Plaintiff's attorney, which will be attached hereto at the time of entry of this Affidavit of Confession of Judgment.
5. This Confession of Judgment is for the sum due to Plaintiff arising from Defendants' failure to pay the Plaintiff , Defendants receivable, which was partially purchased by Plaintiff pursuant to an Assignment Purchase agreement dated June 16th , 2017, and for defendants breach of such, plus agreed-upon interest, attorney fees, costs and disbursements, as agreed-upon by Defendant, of which supporting documents include a UCC-1 financing statement dually authorized by defendant.
6. Defendant and I hereby agree that the execution and delivery of this Affidavit of Confession of Judgment and any entry of Judgment thereon shall be without prejudice to any and all rights of Plaintiff, which reserves all rights and remedies against defendants.
7. If for any reason entry of judgment in the above specified amount or execution on the same is outside the jurisdiction of this Court, Defendant and I hereby consent to the jurisdiction , entry of Judgment in any State or Federal Court of the United States of America.

By: _____

Robert D. Rubin , CEO /Member

Skypatrol, LLC Delaware.


State of _FLORIDA_
County of _MIAMI-DADE_
On this _16TH_ day of _JUNE 2017_
before me personally appeared
_ROBERT D. RUBIN_
to me known to be the person who executed the
foregoing instrument, and acknowledged that he
executed the same as his free act and deed.
SEAL (signed) _____
NOTARY PUBLIC

THEODORE J. BRENNAN
Notary Public - State of Florida
Commission # FF 899687
My Comm. Expires Nov 6, 2019
Bonded through National Notary Assn.

**EXHIBIT I**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Brian L. Berlandi Esq.  212-804-6329**

B. E-MAIL CONTACT AT FILER (optional)
**bberlandi@bnrllp.com**

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

⌐
**Brian L. Berlandi, Esq.**
**Berlandi Nussbaum & Reitzas LLP**
**527 Route 22, Suite 2**
**Pawling, NY 12564**
⌐

Delaware Department of State
U.C.C. Filing Section
Filed: 08:59 AM 08/08/2017
U.C.C. Initial Filing No: 2017 5240574

Service Request No:  20175615794

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Skypatrol, LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3055 NW 84th Avenue** | **Miami** | **FL** | **33122** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Platinum Financial Trust, LLC** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **2801 Fairview, Suite W** | **Greenwood** | **IN** | **46142** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**All assets of Debtor, both tangible and intangible, in accordance with the terms of that certain Partial Assignment of Rights and Interest executed by Debtor in favor of Secured Party.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR UNDER THE PROVISIONS OF ANY APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THIS NOTE MAY NOT BE SOLD, PLEDGED, TRANSFERRED OR ASSIGNED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER PROVISIONS OF THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT.

## SECURED PROMISSORY NOTE

$50,000.00                                                    May 3, 2017 (the "*Issuance Date*")

FOR VALUE RECEIVED, Skypatrol LLC, a Delaware limited liability company ("*Maker*"), hereby promises to pay to Robert Rubin ("*Holder*"), the sum of Fifty Thousand Dollars ($50,000), in accordance with the terms of this Secured Promissory Note (this "*Note*").

**1.**     **Payment of Principal**. Maker shall pay the principal amount within ten (10) days after written demand by Holder but no later than December 31, 2017 (the "*Maturity Date*"). On the Maturity Date, the entire unpaid balance and all accrued and unpaid interest thereon shall be due and payable.

**2.**     **Interest**.

2.1     Interest Rate. Interest on this Note shall commence accruing on the Issuance Date at a rate equal to five percent (5%) per annum (the "*Interest Rate*") and shall be computed on the basis of a 365-day year and actual days elapsed. Except as otherwise provided herein, interest payable pursuant to this Note shall be payable in arrears on each Payment Date, including the Maturity Date when all accrued and unpaid interest shall be due and payable.

2.2     Default Rate. From and after the occurrence of an Event of Default, the Interest Rate shall be increased to fifteen percent (15%). In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure; provided that the interest as calculated at such increased rate during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of cure of such Event of Default.

**3.**     **Security**. The indebtedness evidenced by this Note is secured to the extent and in the manner set forth in the Security Agreement.

**4.**     **Interest Method of Payment; Application**. All payments of principal (including any prepayments) of this Note shall be made by wire transfer of immediately available funds to the account set forth on Exhibit A hereto, or as Holder may from time to time otherwise designate in writing. Payments (including all prepayments) received by Holder on this Note shall be applied first to the payment of accrued and unpaid interest and only thereafter to the outstanding principal balance of this Note.

**5.**     **Prepayment**. This Note may be prepaid in whole or in part without premium or penalty.

**6.**     **Events of Default**. The entire principal balance of this Note shall, at the option of Holder, be immediately due and payable upon the occurrence of one or more of the following events (each, an "*Event of Default*"):

(a)     default in the payment of principal or interest on this Note when the same shall become due and payable;

(b)     Maker's material failure to comply with any of the provisions of, or the material inaccuracy of any representation or warranty contained in, this Note or the Security Agreement;

(c)     Maker's (i) application for, or consent to, the appointment of a receiver, trustee or liquidator of Maker or of its property, (ii) written admission of its insolvency or its inability to pay its debts as they mature, or (iii) general assignment of its assets for the benefit of creditors;

(d)     Maker's filing of a voluntary petition in bankruptcy or a petition or an answer seeking reorganization, or an arrangement with creditors;

(e)     the entry of a court order approving a bankruptcy petition filed against Maker against Maker that is not vacated or set aside within thirty (30) days;

(f)    the Security Agreement shall for any reason fail or cease to create a valid and perfected first priority Lien on the Collateral (as defined in the Security Agreement) in favor of Secured Party (as defined in the Security Agreement).

7.    <u>Rights of Maker upon Default</u>. Upon the occurrence of an Event of Default, and at any time thereafter during the continuance of such Event of Default, Holder may, by written notice to Maker, declare all outstanding principal and interest to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein to the contrary notwithstanding. In addition to the foregoing remedies, upon the occurrence and during the continuance of any Event of Default, Holder may exercise any other right power or remedy granted to it or permitted to it by law, either by suit in equity or by action at law, or both.

8.    <u>Costs of Collection</u>. If default is made in the payment of this Note, Maker shall pay Holder hereof all costs of collection, including reasonable attorneys' fees and expenses paid or incurred by Holder in connection with collection of this Note, whether paid or incurred in connection with collection by suit or otherwise.

9.    <u>Notices</u>. All notices, approvals, consents, correspondence or other communications required or desired to be given hereunder shall be given in accordance with Section 10.2 of the Purchase Agreement.

10.    <u>Miscellaneous</u>.

10.1    <u>Waivers</u>. Maker hereby: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold maker liable with respect to this note; (b) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts; (c) waives any right to interpose any set-off or non-compulsory counterclaim or to plead laches or any statute of limitations as a defense in any such action or proceeding; and (d) irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Holder from or on behalf of Maker. Maker agrees that Holder shall have the continuing exclusive right to apply any and all such payments against the then due and owing obligations of Maker in such order of priority as Holder may deem advisable.

10.2    <u>Stamp Tax</u>. Maker shall pay any documentary stamp required with respect to the execution, delivery, performance or enforcement of this Note.

10.3    <u>Amendments.</u> This Note and any provision hereof may only be amended by an instrument in writing signed by Maker and Holder. The term *"Note"* and all references thereto, as used throughout this instrument, shall mean this instrument as originally executed and as may be amended or supplemented.

10.4    <u>Failure or Indulgence Not Waiver; Remedies Cumulative</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

10.5    <u>Assignment.</u> This Note shall be binding upon Maker and its successors and permitted assigns, and shall inure to the benefit of Holder and its successors and assigns. Maker shall not assign this Note or any proceeds of it, or assign or delegate any of its rights or obligations, without the prior written consent of Holder in each instance. Secured Party, in its sole discretion, may transfer this Note, and may sell or assign participations or other interest in all or any part of this Note, all without notice to or the consent of Maker.

10.6    <u>Usury</u>. It is the express intent of Maker and Holder that the payment of all or any portion of the outstanding principal balance of and accrued interest on this Note be exempt from the application of any applicable usury law or similar laws under any federal, state of foreign jurisdiction. Maker hereby irrevocably waives, to the fullest extent permitted by law, any objection or defense which Maker may now or hereafter have to the payment when due of any and all principal or accrued interest arising out of or relating to a claim of usury or similar laws and Maker hereby agrees that neither it nor any of its affiliates shall in the future bring, commence, maintain, prosecute or voluntarily aid in any action at law, proceeding in equity or other legal proceeding against Holder based on a claim that Maker's payment obligations under this Note violate the usury or similar laws of any federal, state or foreign jurisdiction. Notwithstanding the foregoing, in the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, that portion of the interest payment representing an amount deemed to be in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

10.7     Governing Law: Jurisdiction. This Note shall be governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of laws. The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the courts of the State of Florida located in Miami-Dade County and the United States District Court for the Southern District of Florida for any action, suit or proceeding arising out of or relating to this Agreement, and agree not to commence any action, suit or proceeding related thereto except in such courts. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE OR ANY TRANSACTION DOCUMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.8     Obligations Not Affected. No renewal or extension granted, or any indulgence shown to, or any release of, or any dealings between Holder and any other Person now or hereafter interested in this Note, whether as owner, encumbrancer, guarantor, or otherwise, shall discharge, extend or in any way affect the obligations of Maker hereunder.

10.9     Entire Agreement. This Note, the other Transaction Documents, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written. In the event of any inconsistency between the terms of this Note and any schedule or exhibit hereto, the terms of this Note shall govern.

10.10     Counterparts. This Note may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Note may also be executed and delivered by facsimile signature, PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com).

**[SIGNATURE PAGE FOLLOWS]**

**In Witness Whereof,** the parties have executed this Note as of the Issuance Date.

MAKER:

SKYPATROL LLC

By: _____
    Ted Brennan, CFO

HOLDER

**Robert D. Rubin**

_____
    Robert D. Rubin

## EXHIBIT A

<u>Wiring Instructions</u>

## Schwab Wire Instructions:

Citibank NA
NYC, NY 10043
ABA # 021000089
FBO: Charles Schwab & Co., Inc.
A/C # 40553953
For the Account of:  Robert & Marcia Rubin
Schwab A/C #:  2589-4795

---

## Check Deposit Instructions:

If you are depositing a check into your account then write:

Pay to the order of: Schwab F/B/O Robert & Marcia Rubin
Memo: Acct#2589-4795

Place the check in an envelope and mail to:

Regular Mail
Charles Schwab & Co. Inc.
Institutional Client Service Group
PO Box 628290
Orlando, FL  32862-9906


Overnight
Charles Schwab & Co. Inc.
Institutional Client Service Group
1958 Summit Park Drive
Orlando, FL  32810

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "*Agreement*"), dated as of May 3, 2017 (the "*Effective Date*"), is made by and between Skypatrol, LLC, a Delaware limited liability company ("*Debtor*") and Robert D. Rubin ("*Secured Party*").

Recital

Pursuant to a Promissory Note dated May 3, 2017 (the "Note"), to secure repayment of the indebtedness evidenced by the Note, Debtor desires to grant a security interest in the assets of Debtor to Secured Party as described herein.

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      **DEFINITIONS.** As used herein -

1.1     "*Collateral*" means any and all personal property and fixtures of Debtor in which Secured Party now has, by this Agreement acquires or hereafter acquires, a security interest, including the following property of Debtor, whether such property is now owned or existing or is owned, acquired, or arises hereafter, wherever located, and all proceeds and products thereof: all personal property and fixtures of every kind and nature, including: all inventory, accounts, securities and investment property, equipment, goods, instruments, books, records, documents, documents of title, policies and certificates of insurance, chattel paper, deposit accounts, supporting obligations, letter-of-credit rights, commercial tort claims, rights and privileges, contract rights, deposits, bank accounts and other rights to receive the payment of money, vehicles, tools, machinery, furnishings, furniture, fixtures, building supplies, appliances, spare parts, materials, all semi-intangibles, all intangibles, all general intangibles (including payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Debtor possesses, uses, or has authority to possess or use property (whether tangible or intangible) of others, or agreements to which others possess, use or have authority to possess or use property (whether tangible or intangible) of Debtor), all other rights to the payment of money including amounts due from affiliates, tax refunds, and insurance proceeds, and all recorded data or records of any kind or nature, regardless of the medium of recording, including all software, writings, plans, specifications and schematics and all other personal property of any kind and nature, all proceeds from sale of any of the foregoing, including insurance policies, and all of the books and records relating to any and all of the above.

1.2     "*Obligations*" means any and all obligations of Debtor to Secured Party of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money, includes all obligations of Debtor to Secured Party under the Note.

1.3     All of the terms used herein which are defined in Article 9 of the Florida Uniform Commercial Code, as from time to time amended (the "*Uniform Commercial Code*"), shall, unless otherwise defined herein, have the same meanings as specified therein.

1.4     Capitalized terms used herein without definition have the meanings given in the Purchase Agreement or the Note, as the case may be.

2.      **Security Interest.** As security for the payment and performance of all Obligations, Secured Party shall have, and Debtor hereby grants to Secured Party, a continuing first-lien security interest in the Collateral (the "*Security Interest*") and pledges and assigns the Collateral to Secured Party. Debtor agrees to recognize, affirm, and defend the Security Interest with respect to and against the claims of any creditors of Debtor and Debtor will not create, incur, agree to, assume, or suffer to exist any mortgage, pledge, lien or other encumbrance of any kind upon or any security interest in any of the Collateral (whether now owned or hereafter acquired), except in favor of Secured Party or upon Secured Party's written consent (which may be granted or denied in Secured Party's sole and absolute discretion).

3.      **Authorization to File Financing Statements.** Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file, wherever such filing is deemed by Secured Party to be necessary or desirable, any initial financing statements, continuations and amendments thereto indicating all or any part of the Collateral and containing any other information required by applicable law or deemed necessary or desirable by Secured Party for the sufficiency or filing office acceptance of any financing statement or amendment. Debtor agrees to furnish all such information to Secured Party promptly upon request. Debtor also ratifies its authorization for Secured Party to have filed any initial financing statements or amendments thereto if filed prior to the date hereof. Debtor hereby agrees to pay the cost of all such filings.

4.      **Other Actions.** Further to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, the Security Interest in the Collateral, Debtor agrees, in each case at Debtor's own expense, to take the following actions with respect to the following Collateral:

4.1    Promissory Notes and Tangible Chattel Paper. If Debtor shall at any time hold or acquire any promissory notes or tangible chattel paper, Debtor shall forthwith, in addition to other action required by Secured Party, endorse, assign and deliver the same to Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as Secured Party may from time to time specify.

4.2    Deposit Accounts. For each deposit account that Debtor at any time opens or maintains, Debtor shall, at Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to Secured Party, give Secured Party control of such deposit account by either (a) causing the depository bank to agree to comply at any time with instructions from Secured Party to such depository bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Debtor, or (b) arranging for Secured Party to become the customer of the depository bank with respect to the deposit account, with Debtor being permitted to withdraw funds from such deposit account, only to the extent authorized by Secured Party from time to time. The provisions of this Section 4.2 shall not apply to deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Debtor's salaried employees, to the extent so employed. Debtor agrees to promptly notify Secured Party in writing at any time it establishes a deposit account with any institution or terminates any deposit account.

4.3    Investment Property. If Debtor shall at any time hold or acquire any investment property, including certificated securities, uncertificated securities, or securities held by Debtor or its nominee through a securities intermediary or commodity intermediary, Debtor shall promptly notify Secured Party of such investment property and shall forthwith at the request of Secured Party, take whatever action Secured Party deems necessary or appropriate to give Secured Party control of such investment property, including executing and delivering endorsements, assignments, pledge agreements and other agreements in form and substance satisfactory to Secured Party. Debtor will also cause any securities intermediary maintaining a securities account or commodities intermediary maintaining a commodities account to execute such agreements as Secured Party shall from time to time require in order to ensure Secured Party is granted control thereof, and to deliver to Secured Party such agreement, reports, and other documentation as Secured Party shall from time to time require, and Debtor will hold in trust and deliver to Secured Party any investment property received by Debtor, together with any required endorsements.

4.4    Collateral in the Possession of a Bailee. If any goods are at any time in the possession of a bailee, Debtor shall, unless otherwise directed by Secured Party, promptly notify Secured Party thereof and shall send notice to and obtain an acknowledgment from the bailee, in form and substance satisfactory to Secured Party. Such acknowledgment shall state that the bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party, without the further consent of Debtor. Debtor hereby authorizes Secured Party to obtain the acknowledgment directly from any bailee.

4.5    Electronic Chattel Paper and Transferable Records; Letter-of-credit Rights; Commercial Tort Claims; Patents, Trademarks and Copyrights. If Debtor at any time (a) holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in 201 of the federal Electronic Signatures in Global and National Commerce Act, or in 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, (b) is a beneficiary under a letter-of-credit now or hereafter issued in favor of Debtor, (c) holds or acquires a commercial tort claim, or (d) holds or acquires any rights in any patents, trademarks, or copyrights or applications therefor, then Debtor shall notify Secured Party in writing of its interest therein, and shall provide such information and take such action as Secured Party shall request in order that Secured Party may perfect its security interest therein.

4.6    Government Contracts. Upon the request of Secured Party, Debtor will specifically assign to Secured Party all federal government contracts and will cooperate with Secured Party in giving notice of such assignment pursuant to the federal Assignment of Claims Act. Debtor will cooperate with Secured Party in providing such further information with respect to contracts with any state, other unit of local government or agency as Secured Party may require and will provide such instruments or take such actions of further assurance with respect to such contracts as Secured Party may require.

4.7    Other Actions as to all Collateral. Debtor further agrees to take any other action reasonably requested by Secured Party to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, the Security Interest in any and all of the Collateral.

**5.    Debtor's Representations, Warranties And Covenants.** Debtor represents, warrants and covenants as follows:

5.1    Organization; Good Standing. Debtor is duly organized, existing and in good standing under the laws of its state of organization and is duly qualified and in good standing in every other state in which it is doing business, except where the failure to so qualify would not have a Material Adverse Effect.

5.2    Organizational Changes. Debtor covenants with Secured Party as follows: (a) without providing at least thirty (30) days prior written notice to Secured Party, Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address and (b) Debtor will not change its type of organization, jurisdiction of organization or other legal structure. In connection with any such change Debtor will execute and deliver, or cause to be executed and

delivered, to Secured Party all such additional security agreements, financing statements and other documents as Secured Party shall reasonably require. This provision shall not be deemed to constitute consent to any change identified above or otherwise prohibited in any agreement between Debtor and Secured Party.

5.3    Authorization. The execution, delivery and performance hereof are within Debtor's powers, have been duly authorized, are not in contravention of law or the terms of its organizational documentation, or of any indenture, agreement or undertaking to which it is a party or by which it is bound.

5.4    Protection of Collateral. Debtor further covenants with Secured Party as follows: (a) Debtor will not move the Collateral from its current locations, without providing at least thirty (30) days prior written notice to Secured Party; (b) except for the Security Interest herein granted, Debtor shall be the owner of or have other rights in the Collateral free from any lien, security interest or other encumbrance, and Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to Secured Party; (c) Debtor shall not pledge, mortgage or create, or suffer to exist a security interest in the Collateral in favor of any person other than Secured Party; (d) Debtor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, and will immediately notify Secured Party of any damage thereto or any loss or significant diminution of the value thereof; (e) Debtor will permit Secured Party, or its designee, may inspect the Collateral at any reasonable time, wherever located; (f) Debtor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement; and (g) Debtor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for sales and leases of inventory and licenses of general intangibles in the Ordinary Course.

5.5    Litigation. There are no actions, suits or proceedings pending or, to the knowledge of Debtor, threatened against Debtor or any subsidiary, at law or in equity or before or by any Governmental Authority.

5.6    Consents and Approvals. No approval or authorization or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery or performance by Debtor of this Agreement.

5.7    Event of Default. Until the occurrence of an Event of Default, Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this Agreement and not inconsistent with any policy of insurance thereon.

**6.    Collateral Protection Expenses; Preservation of Collateral**

6.1.    Expenses Incurred by Secured Party. Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may discharge taxes, liens, security interests and other encumbrances at any time levied or placed on any of the Collateral, may pay for insurance on the Collateral, may pay for the maintenance and preservation of the Collateral, may pay for credit enhancements to insure Secured Party against risks of loss or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral, make repairs thereto and pay any necessary filing fees. Debtor agrees to reimburse Secured Party on demand for any payment made or any expense reasonably incurred by Secured Party pursuant to the foregoing authorization. Secured Party shall have no obligation to Debtor to make any such expenditures, nor shall the making thereof relieve Debtor of any default.

6.2.    Secured Party's Obligations and Duties. Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Secured Party of any payment relating to any of the Collateral, nor shall Secured Party be obligated in any manner to perform any of the obligations of Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Secured Party or to which Secured Party may be entitled at any time or times.

**7.    Promises to Pay.** Debtor promises to pay to Secured Party on demand all taxes, charges and expenses, including reasonable attorneys' fees, disbursements and expenses of litigation, reasonably incurred or expended by Secured Party in connection with or in any way incurred by Secured Party in connection with the collection or sale or attempted collection or sale of accounts or Obligations, the supervision, protection and collection of and realization upon any Collateral, and the protection or enforcement of Secured Party's rights hereunder.

**8.    Insurance.** Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Secured Party may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as Secured Party may reasonably prescribe, for direct application by Debtor solely to the repair or replacement of Debtor's property so damaged or destroyed, or Secured Party may apply all or any part of such proceeds to the Obligations.

**9.    Collection of Accounts or Other Collateral**

9.1    Collection of Accounts. Until Secured Party requests that debtors on accounts or other Collateral of Debtor be notified of the Security Interest, or Secured Party so notifies them, Debtor shall continue to collect them.

9.2    Collection on Default.

(a)    Upon and during the continuance of an Event of Default, Debtor shall, at the request of Secured Party, notify the account debtors and other persons obligated on any of the Collateral of the Security Interest of Secured Party in any account or other Collateral and that payment thereof is to be made directly to Secured Party, and Secured Party may itself at any time upon and during the continuance of an Event of Default, without notice to or demand upon Debtor, so notify account debtors.

(b)    Upon and during the continuance of an Event of Default, Secured Party may also request that Debtor hold the proceeds received from collection of Collateral as trustee for Secured Party without commingling the same with other funds of Debtor and shall turn the same over to Secured Party, or to such bank as may be approved by Secured Party, immediately upon receipt in the identical form received. The making of such a request, or the giving of any such notification shall not affect the duties of Debtor described above with respect to proceeds of collection of accounts received by Debtor.

9.3    Application of Proceeds. Secured Party shall credit the proceeds of collection of accounts received by Secured Party to the Obligations, such credits to be entered as of the third (3rd) business day after receipt thereof by Secured Party. Such credits shall be conditional upon final payment in cash or credits of the items giving rise to them. If any item is not so paid, Secured Party, in its discretion, whether or not the item is returned, may either reverse any credit given for the item or charge it to any deposit account maintained by Debtor with Secured Party.

**10.    Disposition of Collateral**

10.1    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party shall have the right to take immediate possession of the Collateral, and for that purpose Secured Party may, so far as Debtor can give authority therefor, enter upon any premises on which Collateral may be situated and remove the same therefrom. Secured Party may in its discretion require Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Debtor's principal office(s) or at such other locations as Secured Party may reasonably designate. Except for Collateral which is perishable or threatens to decline speedily in value or which is of a type customarily sold on a recognized market, Secured Party shall give to Debtor at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale of any other intended disposition is to be made. Secured Party shall also have in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code. The residue of any proceeds of collection or sale, after satisfying all Obligations in such order of preference as Secured Party may determine and making proper allowance for interest on Obligations not then due, and after making any payments required by the Uniform Commercial Code, shall be paid to Debtor; provided, that Debtor shall remain liable for any deficiency. Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Secured Party's rights hereunder, including its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

10.2    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may at any time in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for Obligations or apply it on principal or interest due on Obligations. Insofar as Collateral shall consist of accounts, general intangibles, other claims and rights to the payment of money, insurance policies, instruments, chattel paper, choses in action or the like, Secured Party may, upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), without notice to or demand on Debtor, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon Collateral as Secured Party may determine, whether or not Obligations or Collateral are then due and for the purpose of realizing Secured Party's rights therein, Secured Party may receive, open and dispose of mail addressed to Debtor and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of Debtor. The powers conferred on Secured Party by this are solely to protect the interest of Secured Party and shall not impose any duties on Secured Party to exercise any powers.

10.3    Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the

Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, Debtor hereby irrevocably waives the benefits of all such laws.

11.  **Standards For Exercising Remedies.** To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party (a) to fail to incur expenses reasonably deemed significant by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, or (j) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral. Without limitation upon the foregoing, nothing contained in this Section 11 shall be construed to grant any rights to Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 11.

12.  **Power of Attorney.** Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Debtor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Debtor or in Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all action that Secured Party deems necessary or desirable and to execute any and all documents and instruments that Secured Party deems necessary or desirable to accomplish the purposes of this Agreement. The powers conferred on Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Debtor for any act or failure to act, except for Secured Party's own gross negligence or willful misconduct.

13.  **Set Off.** Any deposits or other sums at any time credited by or due from Secured Party to Debtor or any guarantor, and any securities or other property of Debtor or any such guarantor at any time in the possession of Secured Party may at all times be held and treated as collateral for the payment of the Obligations. Regardless of the adequacy of collateral, Secured Party may apply or set off such deposits or other sums against such obligations at any time in the case of Debtor but only with respect to matured obligations in the case of guarantors thereof.

14.  **Waivers.** Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received, delivered or repossessed or other action taken in reliance hereon, and all other demands and notices of any description. With respect to both Obligations and Collateral, Debtor assents to any extension or postponement of the time of payment or other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or Person primarily or secondarily liable, to the acceptance of partial payments thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Secured Party may deem advisable. Secured Party may exercise its rights with respect to Collateral without resorting or regard to other collateral or sources of reimbursement for Obligations. Secured Party shall not be deemed to have waived any of its rights upon or under Obligations or Collateral unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any other right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Secured Party on Obligations or Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised separately or concurrently. Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth herein.

15.  **Amendment.** No amendment or modification of any provision of this Agreement shall be effective unless in writing and signed and delivered by the parties hereto.

16.  **Notices.** All notices, approvals, consents, correspondence or other communications required or desired to be given

hereunder shall be given to the addresses in this Agreement.

**17.      Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective successors and assigns, except that Debtor shall not have the right to assign its rights hereunder or any interest herein without Secured Party's prior written consent. Secured Party may sell or assign all or any portion of its rights and benefits hereunder and, in connection therewith, may deliver to such prospective buyer or assignee financial statements and other relevant information pertaining to Debtor or any obligor on the Obligations.

**18.      Severability.** In case any one or more provisions of this Agreement shall be found by a court or other tribunal of competent jurisdiction to be invalid or unenforceable for any reason or in any respect or circumstance, such invalidity or unenforceability shall not limit or impair the validity or enforcement of any other provision hereof or affect the validity or enforcement of the provisions of this Agreement under any other circumstances.

**19.      Waiver of Jury Trial.** THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OF ANY KIND WHATSOEVER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT RELATED HERETO OR THE RELATIONSHIPS ESTABLISHED HEREUNDER OR THEREUNDER.

**20.      Governing Law; Jurisdiction.** This Agreement is intended to take effect as a sealed instrument and shall be governed by, and construed in accordance with, the laws of the State of Florida, without regard to principles of conflicts of laws. Debtor agrees that any suit for the enforcement of this Agreement may be brought in the courts of Miami Dade County, Florida or any Federal Court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon Debtor by mail at the address specified herein. Debtor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or based on such suit having been brought in an inconvenient court.

**21.      Construction.** The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," and (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation". The parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party, and that ambiguities shall not be interpreted against the drafting party.

**22.      Counterparts.** This Agreement may be executed in one or more counterparts, and it shall be deemed fully executed when each party has signed a counterpart even though no one counterpart contains the signatures of all the parties. A facsimile signature of a party shall be deemed an original signature and fully effective as such. Each party executing this agreement represents that it has the full power and authority to do so.


        IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed as a sealed instrument as of the Effective Date.


**SECURED PARTY**                                          **DEBTOR**

Robert D. Rubin                                            Skypatrol, LLC


By: _____                                By: _____
      Robert D. Rubin                                            Ted Brennan
                                                                 Chief Financial Officer


13040 Old Cutler Road                                      3055 NW 84TH Avenue
Pinecrest, FL 33122                                        Doral, FL 33122

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Rosita Cortez**

B. E-MAIL CONTACT AT FILER (optional)
**rcortez@cogencyglobal.com**

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

⌐ **Cogency Global, Inc.**
**10 East 40th St.**
**10th Floor**
**New York, NY 10016** ⌐

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 11:48 AM 05/17/2017**
**U.C.C. Initial Filing No: 2017 3245377**

**Service Request No:   20173633621**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **Skypatrol, LLC (DE)** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **3055 NW 84th Avenue** | **Doral** | **FL** | **33122** | **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| **Rubin** | **Robert** | | **D** | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **13040 Old Cutler Road** | **Miami** | **FL** | **33156** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:

**All of the Debtor's assets, whether now owned or hereafter acquired or arising, and wherever the same may be located from time to time including, but not limited to, all present and future accounts, accounts receivable, customer lists, hardware, software, inventory, intellectual property or any license, bank accounts, agreements, contracts, leases, contract rights, payment intangibles, rights to payment, instruments, documents, and all forms of obligations owing to the Debtor or in which the Debtor may have any interest, however created or arising and whether or not earned by performance.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)    ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien    ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State; Filed by: Secured Party**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

17-24842-RAM
Skypatrol, LLC
3055 N.W. 84th Avenue
Miami, FL 33122-1921

17-24842-RAM
Agility Logistics Corp
5496 Paysphere Cir
Chicago, IL 60674-0054

17-24842-RAM
American Express
P.O. Box 5300001
Atlanta, GA 30353

17-24842-RAM
Beacon Law Group, LLC
470 Atlantic Ave., #400
Boston, MA 02210-2208

17-24842-RAM
Blackhill USA Corp
2642 SW 153 Path
Miami, FL 33185-4863

17-24842-RAM
Brad Ponsford
c/o Gavin P. Kassel, Esq.
334 West Third St., #207
San Bernardino, CA 92401-1828

17-24842-RAM
Bunstine, Watson, McElroy
First Tennessee Plaza
800 South Gay St., #2001
Knoxville, TN 37929-9710

17-24842-RAM
Claudia Gonzalez
16444 SW 66th Street
Miami, FL 33193-5613

17-24842-RAM
Coffey Burlington
2601 S. Bayshore Dr., PH
Miami, FL 33133-5419

17-24842-RAM
Comcast
PO BOX 37601
Philadelphia, PA 19101-0601

17-24842-RAM
David Schmidt
24252 Ontario Ln
Lake Forest, CA 92630-1919

17-24842-RAM
David Topp
2627 S. Bayshore Drive, #605
Miami, FL 33133-5439

17-24842-RAM
Donald Mausar
Weltman, Weinberg & Reis
323 W Lakeside Ave., 200
Cleveland, OH 44113-1009

17-24842-RAM
EarthLink Business
Deltacom 1058
PO Box 2252
Birmingham, AL 35246-0031

17-24842-RAM
Employment Development Dept.
POB 826215 MIC 3A
Sacramento, CA 94230-6215

17-24842-RAM
Endeavor Miami, Inc
121 Alhambra Plaza, #1605
Miami, FL 33134-4540

17-24842-RAM
Expressway Motorcars, Inc.
9775 NW 12 St.
Miami, FL 33172-2787

17-24842-RAM
Federal Express
P.O. Box 660481
Dallas, TX 75266-0481

17-24842-RAM
Five9
4000 Executive Pkwy., #400
San Ramon, CA 94583-4206

17-24842-RAM
Florida Department of Revenue
5050 W. Tennessee St
Tallahassee, FL 32399-0100

17-24842-RAM
Florida Department of Revenue
Attn: Maritza Bolano-Moya
8175 NW 12th Street
Suite 119, Miami, FL  33126

17-24842-RAM
Gerson Preston Robinson, CPA
666 71st St
Miami Beach, FL 33141-3099

17-24842-RAM
Honorable Benjamin G. Greenberg
United States Attorney
99 NE 4 St
Miami, FL 33132-2145

17-24842-RAM
Honorable Jefferson Sessions
Attorney General of the United States
950 Pennsylvania Ave, NW, #4400
Washington, DC 20530-0001

17-24842-RAM
IOTM Solutions Ltd.
32 Zalman Shneur
Ramat Hasharon,  47239 Israel

17-24842-RAM
Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia Pa 19101-7346

17-24842-RAM
Iridium Satellite LLC
PO Box 37542
6200 Chevy Chase Drive
Baltimore, MD 21297-3542

17-24842-RAM
JAMS, Inc.
PO Box 845402
Los Angeles, CA 90084-0012

17-24842-RAM
Jackson Lewis P.C.
PO BOX 416019
Boston, MA 02241-6019

17-24842-RAM
Ken Wiesner
1036 Lexington Avenue
Broomfield, CO 80023-9363

17-24842-RAM
Kopelowitz Ostrow Ferguson
1 West Las Olas Blvd., #500
Fort Lauderdale, FL 33301-1928

17-24842-RAM
Laird Technologies
62722 Collections Center Dr.
Chicago, IL 60693-0627

17-24842-RAM
Law Offices of Kenneth Freed
14226 Ventura Blvd.,
PO Box 5914
Sherman Oaks, CA 91413-5914

17-24842-RAM
Lawrence A. Jones
751 NE 4th Ave
Fort Lauderdale, FL 33304-2681

17-24842-RAM
Lerman & Lerman
Flagler Station Building
48 E. Flagler Street, PH 101
Miami, FL 33131-1012

17-24842-RAM
Lott & Fischer
255 Aragon Avenue, Third FL
Miami, FL 33134-5054

17-24842-RAM
Martin L. Nathan
2699 S. Bayshore Drive
Miami, FL 33133-5408

17-24842-RAM
Mercedes Benz Credit
POB 685
Roanoke, TX 76262-0685

17-24842-RAM
Michael Guzzardi
11426 S. Belmont Dr.
Plainfield, IL 60585-6130

17-24842-RAM
Montt & CIA. S.A.
1700 Los Conquistadores Ave 11
11th Floor
Providencia Santiago,  753012  CHILE

17-24842-RAM
Morrison & Foerster, LLP
755 Page Mill Road
Palo Alto, CA 94304-1061

17-24842-RAM
Morrison & Foerster, LLP
c/o Harvey W. Gurland, Jr.
200 S. Biscayne Blvd., Suite 3400
Miami, FL 33131-5323

17-24842-RAM
Nissan Motor Acceptance Corp.
PO Box 740596
Cincinnati, OH 45274-0596

17-24842-RAM
North Carolina Dept of Commerce
Division of Unemployment
POB 26504
Raleigh, NC 27611-6504

17-24842-RAM
Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130-1614

17-24842-RAM
Original Rubins Land Corp.
13040 Old Cutler Road
Miami, FL 33156-6466

17-24842-RAM
Platinum Financial Trust, LLC
2801 Fairview, Suite W
Greenwood, IN 46142-1339

17-24842-RAM
Position Logic LLC
2343 Vanderbilt Beach Rd., #616
Naples, FL 34109-2777

17-24842-RAM
Prysma Technologies
155 Sunrise Pkwy
Mountainside, NJ 07092-2912

17-24842-RAM
Queclink Wireless Solutions, Ltd
Adam Liao
Room 501, Bldg. 9
99 Tianzhou Road, Shanghai PRC

17-24842-RAM
Reginald G. Ponsford, IV
2042 Flamingo Dr.
Costa Mesa, CA 92626-4722

17-24842-RAM
Regus Management Group, LLC
PO Box 842456
Dallas, TX 75284-2456

17-24842-RAM
Robert D. Rubin
3055 NW 84 Ave
Miami, FL 33122-1921

17-24842-RAM
Trebuchet Corp. Trust
c/o Robert Leeds, Trustee
1035 Park Ave.
New York, NY  10028

17-24842-RAM
Robert Rubin
13040 Old Cutler Rd.
Miami, FL 33156-6466

17-24842-RAM
Rogers
40 Weber Street East, 5th Floor
Kitchener, ON  N2H 6H3  CANADA

17-24842-RAM
Rogers Wireless Partnership
1 Mount Pleasant, 12th Floor
Toronto, ON M4Y2Y5

17-24842-RAM
Royal New Group d/b/a Royal Media Group
80 Broad St., #1701
New York, NY 10004-2245

17-24842-RAM
Sax Willinger & Gold
5801 NW 151 St., #307
Hialeah, FL 33014-2476

17-24842-RAM
Sean Graham
51 Rue St. Tropez
Miramar Beach, FL 32550-7158

17-24842-RAM
Ship ESC
PO Box 527622
Miami, FL 33152-7622

17-24842-RAM
Shook Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, MO 64108-2613

17-24842-RAM
Simplex Grinnell
10550 Commerce Parkway
Hollywood, FL 33025-3913

17-24842-RAM
Sure-Trac, LLC
2450 Atlanta Hwy., #203
Cumming, GA 30040-1251

17-24842-RAM
T Mobile
PO Box 742596
KY 42574-2596

17-24842-RAM
Telegraph Hill Advisors
535 Mission Street, 14th FL
San Francisco, CA 94105-3253

17-24842-RAM
Telenor Connexion AB
Snaroyveien 30
N-1331
Fornebu, Norway

17-24842-RAM
Tesla Finance LLC
POB 4387
Portland, OR 97208-4387

17-24842-RAM
Thomas H. Walters
Howard & Howard Attorneys PLLC
450 W Fourth St.
Royal Oak, MI 48067-2557

17-24842-RAM
Thompson & Knight LLP
1722 Routh St., #1500
Pittsburgh, PA 15201-2533

17-24842-RAM
Topp Group, Inc.
3055 NW 84 Ave
Miami, FL 33122-1921

17-24842-RAM
Topp Investments
3055 NW 84 Ave
Miami, FL 33122-1921

17-24842-RAM
Topp Labels, LLC
3055 NW 84 Ave
Miami, FL 33122-1921

17-24842-RAM
Topp, Inc.
3055 NW 84 Ave
Miami, FL 33122-1921

17-24842-RAM
VBI Group
8399 N.W. 30th Terrace
Miami, FL 33122-1916

17-24842-RAM
Verizon Wireless
PO Box 660108
Dallas, TX 75266-0108

17-24842-RAM
Vodafone Global Enterprise Ltd.
Vodafone House
The Connection, Newbury, Berkshire
RG142FN England

17-24842-RAM
William Northrup
611 Whittier Rd
Spencerport, NY 14559-9742