UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                                    CASE NO.: 17-24842-BKC-RAM
                                                          Chapter 11
**SKYPATROL, LLC**
TID #81-0911864

   Debtor-In-Possession.

_____/

SKYPATROL, LLC                                            ADV. CASE NO.: _____

  Plaintiff,

v.

VBI GROUP, LLC, and
SAM K. MAHROUQ

  Defendants.

_____/

<u>**NOTICE OF REMOVAL OF STATE COURT ACTION**</u>

     Skypatrol, LLC ("Skypatrol" or "Debtor"), through counsel and pursuant to 28 U.S.C. §§ 1334, 1441 and 1452 and Federal Rule of Bankruptcy Procedure 9027, hereby removes to this Court an action pending in the 11th Judicial Circuit in and for Miami-Dade County, Florida bearing Case No. 17-23954 CA 34 (the "State Court Action"), and in support thereof, states as follows:

<h2 style="text-align:center">I. <u>Background</u></h2>

     1.    On December 13, 2017 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as Debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

     2.    Skypatrol is a Delaware limited liability company maintaining its offices in Miami-Dade County, Florida.  Skypatrol is a privately held company.

**The State Court Case**

3.      Prior to the Petition Date, on or October 11, 2017, the Debtor filed a complaint against VBI Group and Mahrouq which commenced the State Court Action.

4.      The State Court Action seeks, among other relief, (i) damages for breach of contract, (ii) action on guaranty, (iii) action on security agreement and (iv) action for breach of shared services agreement.

## II. Removal

5.      28 U.S.C. §1452 provides, in pertinent part, that

> A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such cause or claim under section 1334 of this title.

6.      Federal Rule of Bankruptcy Procedure 9027 requires that a notice of removal be filed no later than 90 days after entry of the Order for Relief.

7.      The State Court Action may be removed pursuant to the provisions of 11 U.S.C. §§1334(b) and 1452 and Federal Rule of Bankruptcy Procedure 9027, as said action arises under Title 11 of the United States Code, arises in a case under Title 11 of the United States Code, or is related to a case under Title 11 of the United States Code.

8.      The State Court Action is a civil proceeding, which both arises under, and is related to the Chapter 11 bankruptcy case, and the adjudication of the claims subject of the State Court Action directly affect the administration of the instant bankruptcy case in that, *inter alia,* it (i) involves property of the bankruptcy estate, and (ii) affects the reorganization of the Debtor.

9.      VBI Group and Mahrouq do not oppose the removal of the State Court Action.

10.    Upon removal, the State Court Action and the determination of all matters pertaining to the claims of the Debtor will be a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C) and (E).  To the extent that any such removed claims or causes of action are determined to be non-core proceedings, the Debtor consents to final orders being entered by the United States Bankruptcy Court, Southern District of Florida, Miami Division.

11.    Attached hereto as Composite Exhibit "A" and incorporated by reference are copies of all process and pleadings filed in the State Court Action.

12.    After filing this Notice of Removal, the Trustee will notify the Clerk of the Circuit Court of Miami-Dade County, Florida by filing a Notice of Filing of Notice of Removal.

**WHEREFORE**, the Debtor-In-Possession, Skypatrol, LLC, hereby removes the entire State Court Action to the District Court and, by reference and local rules, from the District Court to this Court

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on March 13, 2018, a true and correct copy of the foregoing was furnished via CM/ECF to all parties registered to receive electronic notification from the Court and via U.S. Mail to:

VBI Group, LLC                                        Sam K. Mahrouq
c/o Capitol Corporate Services, Inc.        c/o Jeff Whitfield, Esquire
515 East Park Avenue, 2nd FL                201 Main Street, Suite 2500
Tallahassee, FL 32301                           Ft. Worth, Texas 76102

Respectfully submitted,

/s/ Joel L. Tabas_____
Joel L. Tabas
Florida Bar No. 516902
TABAS & SOLOFF, P.A.
Attorneys for Debtor
25 SE Second Avenue, Suite 248
Miami, Florida 33131
Telephone: (305) 375-8171
Email: jtabas@tabassoloff.com

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law.  This form must be filed by the plaintiff or petitioner for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to section 25.075, Florida Statutes.  (See instructions for completion.)

I. **CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

Case No.: _____
Judge: _____

<u>SKYPATROL LLC.</u>
 Plaintiff
              vs.
<u>VBI GROUP LLC., SAM MAHROUQ</u>
Defendant

II. **TYPE OF CASE**

- ☐ Condominium
- ☒ Contracts and indebtedness
- ☐ Eminent domain
- ☐ Auto negligence
- ☐ Negligence – other
  - ☐ Business governance
  - ☐ Business torts
  - ☐ Environmental/Toxic tort
  - ☐ Third party indemnification
  - ☐ Construction defect
  - ☐ Mass tort
  - ☐ Negligent security
  - ☐ Nursing home negligence
  - ☐ Premises liability – commercial
  - ☐ Premises liability – residential
- ☐ Products liability
- ☐ Real Property/Mortgage foreclosure
  - ☐ Commercial foreclosure $0 - $50,000
  - ☐ Commercial foreclosure $50,001 - $249,999
  - ☐ Commercial foreclosure $250,000 or more
  - ☐ Homestead residential foreclosure $0 – 50,000
  - ☐ Homestead residential foreclosure $50,001 - $249,999
  - ☐ Homestead residential foreclosure $250,000 or more
  - ☐ Non-homestead residential foreclosure $0 - $50,000
  - ☐ Non-homestead residential foreclosure $50,001 - $249,999

- ☐ Non-homestead residential foreclosure $250,00 or more
- ☐ Other real property actions $0 - $50,000
- ☐ Other real property actions $50,001 - $249,999
- ☐ Other real property actions $250,000 or more

- ☐ Professional malpractice
  - ☐ Malpractice – business
  - ☐ Malpractice – medical
  - ☐ Malpractice – other professional
- ☐ Other
  - ☐ Antitrust/Trade Regulation
  - ☐ Business Transaction
  - ☐ Circuit Civil - Not Applicable
  - ☐ Constitutional challenge-statute or ordinance
  - ☐ Constitutional challenge-proposed amendment
  - ☐ Corporate Trusts
  - ☐ Discrimination-employment or other
  - ☐ Insurance claims
  - ☐ Intellectual property
  - ☐ Libel/Slander
  - ☐ Shareholder derivative action
  - ☐ Securities litigation
  - ☐ Trade secrets
  - ☐ Trust litigation

**EXHIBIT**

**COMPOSITE "A"**

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**III.**   **REMEDIES SOUGHT** (check all that apply):
☒   Monetary;
☐   Non-monetary declaratory or injunctive relief;
☐   Punitive

**IV.**   **NUMBER OF CAUSES OF ACTION: (     )**
(Specify)

1-BREACH  OF  CONTRACT  2-ACTION  ON  GUARANTY  3-ACTION  ON  SECURITY
AGREEMENT 4-ACTION FOR BREACH OF SHARED SERVICES AGREEMENT

**V.**   **IS THIS CASE A CLASS ACTION LAWSUIT?**
☐   Yes
☒   No

**VI.**   **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
☒   No
☐   Yes – If "yes" list all related cases by name, case number and court:

**VII.**   **IS JURY TRIAL DEMANDED IN COMPLAINT?**
☐   Yes
☒   No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature s/ Robert P. Frankel       FL Bar No.:  304786
          Attorney or party                                              (Bar number, if attorney)


Robert P. Frankel        10/11/2017
          (Type or print name)                                              Date

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

    Plaintiff,

CASE NO.:

vs.

VBI Group, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

    Defendants.

_____/

## COMPLAINT

Plaintiff, Skypatrol, LLC ("Skypatrol") sues the Defendants, VBI Group, LLC ("VBI") and

Sam L. Mahrouq ("Mahrouq") and alleges:

## COUNT I

## (BREACH OF CONTRACT –
## ASSET PURCHASE AGREEMENT AND SECURED PROMISSORY NOTE)

1.    This is an action seeking damages in excess of $15,000 exclusive of legal fees,

interest and costs.

2.    The Plaintiff, Skypatrol, is a Delaware limited liability company maintaining offices

in Miami-Dade County, Florida.  The Plaintiff, Skypatrol, was previously engaged

in the business of providing G.P.S. tracking software and hardware solutions to,

among other businesses, the vehicle finance and franchise auto dealer businesses

until such time as the transaction occurred that is the subject matter of this action.

3.    The Defendant, VBI is a Delaware limited liability company doing business as

Skypatrol USA.

4.    The Defendant, Mahrouq, is the Chief Executive Officer of the Defendant, VBI.

Both the Defendants, VBI and Mahrouq, consented to the venue of the courts of

Miami-Dade County with respect to any actions arising out of an Asset Purchase Agreement, Secured Promissory Note and Security Agreement, have expressly waived any challenge to venue and personal jurisdiction. See section 10.5 of the Asset Purchase Agreement attached to the Complaint as Composite Exhibit A and section 10.7 of the Secured Promissory Note.

5.     On May 1, 2017, the Plaintiff, Skypatrol, executed an Asset Purchase Agreement with the Defendant, VBI, as purchaser and the Defendant, Mahrouq, as guarantor. Pursuant to the terms of the Asset Purchase Agreement, the Defendant, VBI agreed to purchase the described assets and to the assumption of certain liabilities. The purchase price was $2,500,000 plus an earnout of up to $2,500,000. Pursuant to the terms of the Asset Purchase Agreement, the Defendant, VBI, was required to make designated payments commencing on May 1, 2017. Although the Defendant, VBI, made the May 1, 2017 and June 1, 2017 payments, it failed to make the full July 1, 2017 payment which resulted in a default in the amount of $100,000.00 for the July payment. Thereafter, the Defendant, VBI, failed to pay the August 1, 2017 and September 1, 2017 payments. In addition, pursuant to the terms of the Asset Purchase Agreement, Plaintiff, Skypatrol, agreed to finance the balance of the purchase price in the amount of $900,000.00. As a result, the Defendant, VBI, executed a secured promissory note in the principal amount of $900,000.00. A copy of the secured Promissory Note dated May 1, 2017 in the principal amount of $900,000.00 is attached to the Complaint as Exhibit B. Moreover, section 10.7 of the secured Promissory Note provides that the Defendants "irrevocably and unconditionally consented to the exclusive jurisdiction of the courts in Miami-Dade County, Florida."

6.     The Plaintiff is the owner and holder of the secured promissory note and maintains possession of the original promissory note.

7.     All conditions precedent to the filing of this action have been performed, satisfied or excused by virtue of the Defendants' conduct.

8.     Pursuant to section 1.3(a) of the Asset Purchase Agreement, the Defendant, VBI defaulted by failing to make payments that are due and owing since May 1, 2017. Moreover, the Defendant, VBI has defaulted under the terms of the Secured Promissory Note by failing to pay the September 28, 2017 payment.

9.     In addition to failing to make the full July 1, 2017 payment and the August and September payments, the Defendant, VBI, defaulted under the terms of the Asset Purchase Agreement and secured Promissory Note by failing to pay the September 28, 2017 payment.

10.     The Defendant, VBI owes the Plaintiff, Skypatrol all of the payments commencing with the May 1, 2017 payment under the terms of the Asset Purchase Agreement and all subsequent payments due under the terms of the Secured Promissory Note. In addition, during the transition with respect to the transaction between the Plaintiff, Skypatrol, and the Defendant, VBI, Plaintiff made several payments on accounts payables, payroll and other expenses on behalf of the Defendant, VBI. This was done because the Defendant, VBI, claimed it needed time to transition certain accounts/bills over to its name and had not set up the proper mechanism to commence with their payroll expenses. Therefore, Plaintiff has incurred to date in excess of $140,000.00 which is clearly the obligation of the Defendant, VBI, which agreed that it would immediately reimburse the Plaintiff but has failed and refused to do so.

11.     The Defendant, VBI, owes the Plaintiff the full amount of unpaid monthly payments, the full amount of the Secured Promissory Note in the approximate sum of $140,000.00 plus accrued interest under the terms of the Secured Promissory Note and Asset Purchase Agreement including legal fees and costs.

12.     The Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay him a reasonable fee for his services.

WHEREFORE, Plaintiff, Skypatrol, demands judgment against the Defendant, VBI, for the outstanding balance owed under the terms of the Asset Purchase Agreement and the Secured Promissory Note, plus court costs, prejudgment interest and reasonable attorney's fees.

## COUNT II

### (ACTION ON GUARANTY)

13.     Plaintiff adopts and realleges paragraphs 1 - 11.

14.     As set forth in the Asset Purchase Agreement attached to the Complaint as composite Exhibit A, the Defendant, Mahrouq, executed an Absolute and Unconditional Guaranty with respect to the liabilities owed by the Defendant, VBI, to the Plaintiff, Skypatrol. A copy of the Guaranty executed by the Defendant, Mahrouq is attached to the Complaint as Exhibit C.

15.     Since the Defendant, VBI, defaulted under the terms of the Asset Purchase Agreement and the secured promissory note, the Defendant, Mahrouq, is absolutely and unconditionally liable for the amounts due under the terms of the Asset Purchase Agreement and Secured Promissory Note.

WHEREFORE, Plaintiff demands compensatory damages against the Defendant, Mahrouq, plus court costs, prejudgment interest and reasonable attorney's fees.

**Law Offices of Robert P. Frankel, P.A.**

Royal Palm 1 at Southpointe, 1000 S. Pine Island Rd., Suite 410, Plantation, Florida 33324 • Tel: (305) 358-5690 • (954) 607-2861     4

## COUNT III

### (ACTION ON SECURITY AGREEMENT)

16.    Plaintiff adopts and realleges paragraphs 1 - 11.

17.    In connection with the Asset Purchase Agreement and Secured Promissory Note, the Defendant, VBI, executed a Security Agreement with the Plaintiff, Skypatrol.  A copy of the Security Agreement is attached to the Complaint as Exhibit D.

18.    Since the Defendant, VBI defaulted under the terms of the Asset Purchase Agreement and the Secured Promissory Note, Plaintiff is entitled to exercise his rights and remedies under the terms of the Security Promissory Note to foreclose against the assets that are the subject matter of the Security Agreement.

19.    Having defaulted under the terms of the Asset Purchase Agreement and Secured Promissory Note, Plaintiff is entitled to foreclose its security interest in the assets that are the subject matter of the Security Agreement.

WHEREFORE, Plaintiff requests this Court to take jurisdiction over this action; to authorize the Plaintiff to proceed to foreclose against the assets and to take such other relief consistent with the rights of the Plaintiff as the secured party under Florida law and to award the Plaintiff such other relief as the court deems just and proper under the circumstances.

## COUNT IV

### (ACTION FOR BREACH OF SHARED SERVICES AGREEMENT)

20.    Plaintiff adopts and realleges paragraphs 1 - 5.

21.    On May 1, 2017, the Plaintiff, Skypatrol, and the Defendant, VBI, executed a Shared Services Agreement, a copy of which is attached to the Complaint as Exhibit E.

22.    Pursuant to the terms of the Shared Services Agreement, Plaintiff, sought to provide the Defendant, VBI, with a smooth transition, however the Defendant, VBI, failed

and refused to pay many of the required services described in the Shared Services Agreement. As a result of the breach by the Defendant, VBI, of the Shared Services Agreement, the Plaintiff was required to pay consultants who suffered a loss of customers and business in other cases. In fact, through the date of the filing of this Complaint, the Plaintiff continues to incur damages because the Defendant, VBI, has failed to comply with the terms of the Shared Services Agreement.

23.    Pursuant to Section 6.8 of the Shared Services Agreement, the Defendant, VBI, consented to the jurisdiction of the courts in Miami-Dade County.

WHEREFORE, Plaintiff demands judgment against the Defendant, VBI, plus court costs and prejudgment interest.

Dated: _____.

> **Law Offices of Robert P. Frankel, P.A.**
> Attorneys for Plaintiff
> 1000 S. Pine Island Rd., Suite 410
> Plantation, Florida 33324
> Robert@frankelpa.com
> (305) 358-5690; (954) 607-2861
>
> By_____/s/ Robert P. Frankel_____
>         ROBERT P. FRANKEL
>         Florida Bar No. 304786

# COMPOSITE EXHIBIT A

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("*Agreement*") dated as of May 1, 2017 (the "*Effective Date*"), between Skypatrol, LLC, a Delaware limited liability company ("*Seller*") and VBI Group LLC, a Delaware limited liability company doing business as Skypatrol USA ("*Purchaser*"). Sam K. Mahrouq, an individual ("*Guarantor*") joins this Agreement as guarantor to confirm his obligations under Article II (Representations and Warranties of Purchaser and Guarantor), Section 10.6 (Non-Competition) and Section 1.3 (Purchase Price). Seller and Purchaser may each be referred to herein as a "Party" and collectively as the "Parties."

### RECITALS

A. Seller is engaged in the business of providing GPS tracking software and hardware solutions to, among other businesses, the vehicle finance and franchise auto dealer businesses (the "*Purchased Business*").

B. Purchaser desires to purchase all assets of the Purchased Business from Seller except as expressly excluded herein, and Seller desires to sell such assets to Purchaser.

C. Guarantor is an officer and director, and the sole member of Purchaser.

D. Certain defined terms used herein have the meanings given in **Annex A** hereto ("*Additional Definitions*"), incorporated herein.

E. Seller and Purchaser desire to enter into this Agreement to evidence their mutual agreement with respect to the matters set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals, the covenants, agreements, representations, and warranties contained in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, and Guarantor as applicable, hereby agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF ASSETS; PURCHASE PRICE

**1.1    Purchase and Sale of Assets.**

(a)      Purchased Assets. Subject to the terms and conditions of this Agreement, on the Closing Date (defined below) Seller shall sell, transfer, convey, assign, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all assets of the Purchased Business listed on **Schedule 1.1(a)** hereto, expressly excluding the Excluded Assets (defined below) as is (the "*Purchased Assets*"). Seller shall sell all Purchased Assets and transfer all Contracts to Purchaser free and clear of any Liens.

(b)      Excluded Assets. Anything herein to the contrary notwithstanding, the Purchased Assets do not include any of the following property (the "*Excluded Assets*"):

(i)      except to the extent provided for in the Trademark License Seller's name "Skypatrol" and all other trademarks or service marks, trade names, slogans, logos or other like property of Seller and not used exclusively in the Purchased Business;

(ii)      any assets or property owned or used by Seller in connection with its international business, fleet business, power sport business, personal tracking business and distributor business (collectively, the "*Retained Business*"), and any other assets or property not used in the Purchased Business;

(iii)      all insurance policies and rights thereunder of Seller, including rights to any cancellation value as of the Closing Date;

(iv)      all of the Seller's Books and Records that relate solely to the Purchased Assets or Assumed Liabilities (the "*Assigned Books and Records*"); provided, that (A) Seller may keep a copy of the Assigned Books and Records solely for its use in accounting and tax preparation, provided that all copies of such Assigned Books and Records shall be kept confidential by Seller except in regard to its Representatives possessing a need to know; and (B) such Assigned Books and Records shall not include (1) any information which, if disclosed, would violate an attorney-client privilege or would constitute a waiver of rights as to attorney work product or attorney-client privileged communications, unless such information is needed for operation of the Purchased Business, and the Parties enter a mutually agreeable joint defense agreement related thereto, (2) bids received from and records of negotiations with third parties relating to the sale of the Purchased Assets, and (3) any information relating to the Excluded Assets or the Excluded Liabilities;

(v)      all proprietary or confidential business or technical information, Intellectual Property, records and policies which relate to Seller and its lines of business other than the Purchased Business; and

(vi)      all property expressly described on **Schedule 1.1(b)** attached hereto and made a part hereof.

**1.2      Assumption of Liabilities or Obligations.**

(a)      Purchaser shall assume only the liabilities or obligations of Seller specifically listed below (the "*Assumed Liabilities*"):

(i)      Telecommunication carrier charges;

(ii)      Liabilities related to the NWC Adjustment (defined below);

(iii)      All Liabilities of the Purchased Business arising after the Closing associated with the Purchased Assets, including executory Liabilities arising from and after the Closing under the Contracts (other than Liabilities relating to any failure to pay, violation or breach that occurred, or conditions that existed or occurred on or prior to Closing); and

(iv)      accrued but unused vacation with respect to the employees primarily employed in the conduct of the Purchased Business and listed on Section 2.15 of the Disclosure Schedule (the "*Business Employees*")

(b)      Additionally, the term "Assumed Liabilities" shall not include any Liability relating to or arising out of the Contracts, the Purchased Business, or the Purchased Assets as a result of: (i) any transaction, status, event, condition, occurrence or situation existing, occurring or arising on or prior to the Closing Date; (ii) any violation of Law, breach of warranty, tort or infringement occurring on or prior to the Closing Date; or (iii) any Losses arising out of events or actions occurring on or prior to the Closing Date.

(c)      Other than the Assumed Liabilities, Seller shall remain liable for any and all Liabilities prior to the Closing, including tax obligations incurred by Seller in connection with the Transaction whether assessed prior to Closing or not, all tax Liabilities arising from or attributable to the Purchased Business or the Purchased Assets on or prior to the Closing, whether assessed prior to Closing or not, including with respect to the ownership, distribution, use or operation thereof on or prior to the Closing, Liabilities of Seller relating to recorded or unrecorded accounts payable, payroll, vacation and sick leave, employees, current and deferred income Taxes, Taxes related to any real property of Seller prior to the Closing Date or its members, any Taxes attributable to Seller or its members and attributable to periods or events prior to or ending on or occurring on the Closing Date, all Liabilities and costs incurred by Seller in connection with any restructuring by or of Seller or its business operations in connection with the Transaction, and, except as otherwise expressly set forth herein, any Taxes, legal, accounting, brokerage, finder's fees, or other expenses of whatsoever kind or nature incurred by Seller or any member, affiliate, director, employee, or officer of Seller as a result of the execution of this Agreement or the consummation of the Transaction. In addition to the Assumed Liabilities, Purchaser shall be liable for any and all Losses arising after the Closing except as specifically provided herein.

**1.3      Purchase Price.** Subject to the terms and conditions set forth in this Agreement, and in consideration of the sale, assignment, transfer and delivery of the Purchased Assets to Purchaser, the aggregate consideration for the Purchased Assets shall be Two Million Five Hundred Thousand United States Dollars (US $2,500,000) (the "*Purchase Price*"), subject to the NWC Adjustment (defined below), payable to Seller as follows:

(a)      Cash Payments (collectively, "*Cash Payments*").

(i)      Six Hundred Fifty Thousand Dollars ($650,000) shall be paid to Seller in cash at Closing (the "*Closing Cash Payment*").

(ii)      One Hundred Fifty Thousand Dollars ($150,000) shall be paid to Seller in cash fourteen (14) days after the Closing Date.

(iii)      Two Hundred Thousand Dollars ($200,000) shall be paid to Seller in cash thirty (30) days after the Closing Date.

(iv)      Two Hundred Thousand Dollars ($200,000) shall be paid to Seller in cash sixty (60) days after the Closing Date.

(v)      Two Hundred Thousand Dollars ($200,000) shall be paid to Seller in cash ninety (90) days after the Closing Date.

(vi)      Two Hundred Thousand Dollars ($200,000) shall be paid to Seller in cash one hundred twenty (120) days after the Closing Date.

Each of the payments under Sections 1.3(a)(ii), (iii), (iv), (v) and (vi) are referred to herein individually as a "*Post Closing Cash Payment*" and, collectively, as the "*Post Closing Cash Payments*". All Cash Payment amounts referred to herein are stated in United States Dollars and all Cash Payments required hereunder shall be made in United States Dollars.

(b)     Note. Seller shall finance the balance of the Purchase Price, Nine Hundred Thousand Dollars (US $900,000)) pursuant to a secured promissory note in substantially the form attached hereto as **Exhibit B** (the "*Note*") made by Purchaser and payable to Seller in twenty-six (26) equal monthly installments of principal and interest at the rate of five percent (5%) per year on the unpaid principal balance. Payments will be made in advance on the one hundred fiftieth (150th) day after the Closing and then on the same day of each and every month thereafter until payment in full. Seller may prepay any or all of the Note at any time without penalty.

(c)     Security. The Note will be secured by a security interest in the Purchased Assets, pursuant to a security agreement in substantially the form attached hereto as **Exhibit C** (the "*Security Agreement*").

(d)     Guaranty. The Cash Payments, the Note and the Earn-Out Payments will be personally guaranteed by Guarantor ("*Guarantor*") and his successors and assigns, pursuant to a guarantee in substantially the form attached hereto as **Exhibit D** (the "*Guaranty*").

(e)     Earn-Out.

(i)     In addition to the Cash Payments and the Note, Seller shall be entitled to earn-out payments ("*Earn-Out Payments*") during the ten (10) year period immediately following the Closing (the "*Earn-Out Period*") as follows, subject to the Earn-Out Cap (defined below):

(A)     If Purchaser's EBITDA (attributable to its business operations directly related to the Purchased Assets) for any Measurement Period is more than Five Hundred Thousand Dollars ($500,000), Purchaser shall pay Seller twenty five percent (25%) of the amount by which EBITDA for such Measurement Period exceeds $500,000. For example purposes only, if EBITDA at the end of the first Measurement Period is $1,000,000, Purchaser shall pay Seller $125,000.

(B)     If a Change of Control shall occur during the Earn-Out Period (or within 90 days after the end of the Earn-Out Period), Purchaser shall pay Seller twenty five percent (25%) (the "*Change of Control Earn-Out Payment*") of the amount by which the gross consideration (including cash, equity securities or other property or assets) paid or payable in connection with the Change of Control (the "*Change of Control Consideration*"), exceeds Two Million Five Hundred Dollars ($2,500,000), or such lesser amount if the amount of Purchase Price paid by Purchaser to Seller as of the closing of the Change of Control is less than $2,500,000 (the "*Consideration Threshold*"); provided that, before the calculation of the Change of Control Earn-Out Payment, the Change of Control Consideration shall be reduced by the amount of Purchaser's cash contributions to the Purchased Business in excess of the Consideration Threshold ("*Purchaser Contributions*"); provided further that Purchaser Contributions are reflected on Purchaser's books as equity and any Purchaser Contributions constituting Indebtedness shall not reduce the amount of the Change of Control Consideration. For example purposes only: (1) if the Change of Control Consideration upon a Change of Control is $10,000,000, and, as of the closing of the Change of Control, Purchaser has paid Seller the total $2,500,000 Purchase Price Purchaser, the Change of Control Earn-Out Payment shall be $1,700,000; (2) if the Change of Control Consideration upon a Change of Control is $10,000,000, and, as of the closing of the Change of Control, Purchaser has paid Seller the total $2,500,000 Purchase Price, and Purchaser Contributions totaled $1,000,000 in equity and $1,000,000 in Indebtedness, , the Change of Control Earn-Out Payment shall be $2,125,000. The Change of Control Earn-Out Payment shall be made within thirty (30) days of the closing of the Change of Control.

(C)     Anything in Sections 1.3(e)(i) or (ii) to the contrary notwithstanding, the aggregate Earn-Out Payments paid to Seller shall not exceed Two Million Five Hundred Thousand Dollars ($2,500,000) (the "*Earn-Out Cap*").

(ii)     Earn-Out Payments shall be subject to the following.

(A)     Each Earn-Out Payment shall be payable to Seller within ten (10) business days of Purchaser's determination of EBITDA, which shall be determined promptly after the end of the applicable Measurement Period but in no event later than sixty (60) days after the end of the applicable Measurement Period.

(B)     Purchaser shall deliver with each Earn-Out Payment a notice to Seller setting forth a reasonably detailed calculation for the applicable Earn-Out Period (each, an "*Earn-Out Report*"). Purchaser shall upon Seller's request made within the same period, make available to Seller the Books and Records of Purchaser, to the extent such Books and Records relate to computation of the Earn-Out Payment and are reasonably necessary to calculate the Earn-Out Payment. If Seller establishes a mistake in the calculation which Purchaser does not

dispute, the Earn-Out Payment shall be adjusted accordingly and the Party in whose favor the mistake was made shall promptly pay the other Party the amount due.

(C)    In the event a dispute exists as to the Earn-Out Payment, Seller shall provide written notice to Purchaser specifying in reasonable detail its concerns. Seller and Purchaser shall in good faith discuss resolution of the dispute. In the event, after thirty (30) days after receipt of such written notice, Seller and Purchaser are unable to resolve the dispute, Seller shall have the right to submit the dispute to binding arbitration with an independent certified public accountant. In the event the parties cannot agree on an independent certified public accountant Seller shall select one independent certified public accountant and Purchaser shall select a second independent certified public accountant. The two certified independent public accountants will then select a third independent public accountant. The independent accountants will then review the Earn-Out Report and all of the supporting documentation and render its decision by majority vote. Seller shall be responsible for the cost of the arbitration unless the arbitrators determine that there is at least a five percent (5%) difference between the Earn-Out Report and the actual amount due pursuant to the Earn Out in which case the cost of the arbitration shall be borne by Purchaser.

(f)    NWC Adjustment. The Purchase Price shall be subject to adjustment as follows:

(i)    On the Closing Date, Seller shall prepare and deliver to Purchaser a calculation of the estimated Net Working Capital of the Purchased Business as of the start of business on the Closing Date (the "*Estimated Net Working Capital*"), together with the detailed work papers in support thereof.

(ii)    Within ninety (90) days after the Closing, Purchaser shall deliver to Seller a calculation of the Net Working Capital of the Purchased Business as of the start of business on the Closing Date prior to giving effect to the Closing (the "*Actual Net Working Capital*"). Seller shall have a period of ten (10) business days from receipt of the Actual Net Working Capital to review such calculation of Actual Net Working Capital (the "*Review Period*"). In connection therewith, Purchaser shall provide Seller and its Representatives with access to all Books and Records reasonably necessary to compute and verify the Actual Net Working Capital.

(iii)    If the Actual Net Working Capital is less than the Estimated Net Working Capital, the next succeeding Post-Closing Cash Payment(s) shall be decreased in total amount equal to the difference between the Actual Net Working Capital and the amount of the Estimated Net Working Capital. If the Actual Net Working Capital is greater than the Estimated Net Working Capital, the next succeeding Post-Closing Cash Payment shall be increased in an amount equal to the difference between the Actual Net Working Capital and the amount of the Estimated Net Working Capital. Such increase or decrease is referred to herein as the "*NWC Adjustment*".

(iv)    If Seller disputes the Actual Net Working Capital within the Review Period, Seller shall notify Purchaser in a writing setting forth the items, amount, and basis of such dispute (a "*Dispute Notice*"). In the event of such dispute, Purchaser and Seller shall first use diligent good-faith efforts to resolve such dispute between themselves. If Seller and Purchaser are unable to resolve any remaining disputes within thirty (30) days after delivery of the Actual Net Working Capital, then such dispute shall be submitted to a mutually agreed upon independent public accounting firm with no material relationship to any Party or Guarantor hereto (the "*Arbitrator*"). Within thirty (30) days thereafter, the Arbitrator shall determine the Actual Net Working Capital and report its determination to Seller and Purchaser in writing. The Arbitrator's decision shall be in writing and shall be final, conclusive and binding on both Parties and Guarantor. A judgment on the determination made by the Arbitrator pursuant to this Section 1.3(f) may be entered into and enforced by any court of appropriate jurisdiction. The fees and expenses of the Arbitrator in connection with the resolution of disputes pursuant to this Section 1.3(f) shall be split equally between Seller and Purchaser.

(v)    Any undisputed amount of the NWC Adjustment shall be paid with the next succeeding Post-Closing Cash Payment after Purchaser's delivery of the Actual NWC Adjustment.

(vi)    The NWC Adjustment shall be determined in accordance with *GAAP*. The amount of the NWC Adjustment (whether agreed to by the Parties or determined by the Arbitrator) shall be an adjustment to the Purchase Price.

(g)    Allocation. The aggregate consideration for the Purchased Assets (which for purposes of this Section 1.3(g) shall include the Purchase Price and any Liabilities and other items required to be treated as part of the consideration for U.S. federal income tax purposes) shall be allocated among the Purchased Assets by Purchaser in compliance with the principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder within thirty (30) days after the Closing Date (the "*Allocation*"), and such Allocation shall include details regarding fair market values and useful lives. Any adjustments to the aggregate consideration for the Purchased Assets pursuant to Section 1.3(e) or otherwise shall be applied to the Allocation as required by Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

The Parties shall make consistent use of the Allocation for all Tax purposes and in all filings, declarations, reports, and statements with the IRS in respect thereof, including the reports or statements (including any supplemental reports or statements) required to be filed under Section 1060 of the Code. Purchaser shall prepare and deliver IRS Form 8594 to Seller within forty-five (45) days after the Closing Date to be filed with the IRS by Purchaser and Seller with their respective tax returns. In any proceeding related to the determination of any Tax, neither Purchaser, Seller nor any of their respective members, affiliates, directors, employees, or officers shall contend or represent that such Allocation is not a correct allocation.

      (h)    <u>Payments</u>. All payments made under this Agreement shall be made by wire transfer of immediately available funds to Seller's account indicated on <u>**Exhibit E**</u> hereto.

      (i)    <u>Responsibility for Transaction Costs and Fees</u>. Each of the parties hereby agrees that Seller on one hand and Purchaser on the other hand shall be solely responsible for all of its respective accounting, legal, and broker fees and out-of-pocket expenses incurred in connection with the Transaction.

      (j)    <u>Prepayment</u>. Prior to or at the Closing, Purchaser has paid or shall pay to Seller the amount of Two Hundred Thousand Dollars ($200,000) (the "**_Prepayment_**"). The Estimated Net Working Capital as of April 25, 2017 provided by Seller to Purchaser at or prior to the Closing reflects the amount of $382,745.29. Notwithstanding Section 1.3(f) hereof, the Prepayment shall be credited against the Actual Net Working Capital agreed upon by the Parties after the Closing in accordance with Section 1.3(f) hereof; provided, that if such agreed upon Actual Net Working Capital is less than the amount of the Prepayment, not later than ten (10) days following a determination that the Actual Net Working Capital is less than the amount of the Prepayment, Seller shall pay Purchaser the amount of the NWC Adjustment, taking into consideration the amount of the Prepayment.

**ARTICLE II**

**REPRESENTATIONS, WARRANTIES, AND COVENANTS OF SELLER**

      Seller represents, warrants, and covenants to Purchaser that, except as set forth on the disclosure schedule attached as <u>**Exhibit F**</u> hereto (the "**_Disclosure Schedule_**"), which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations, warranties and covenants are and will continue to be true, complete and not misleading on the Effective Date and on the Closing Date, provided the foregoing exceptions shall not apply to the extent otherwise provided herein. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections and subsections contained in this <u>Article II</u>, and the disclosures in any section or subsection of the Disclosure Schedule shall qualify other sections and subsections in this <u>Article II</u>.

      **2.1**    **Organization and Good Standing**. Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and is duly qualified to transact business as a foreign corporation and is in good standing in every jurisdiction in which the conduct of its business or the character or location of property owned or leased by Seller requires it to be so qualified and where the failure to be so qualified would have a Materially Adverse Effect on the Purchased Business. Seller's federal taxpayer identification number is 81-0911864.

      **2.2**    **Authorization**. Seller has full power and authority to enter into this Agreement and each other Transaction Document to which Seller is a party, to perform its obligations hereunder and thereunder, to transfer the Purchased Assets, and to carry out the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and each other Transaction Document to which Seller is a party, the performance by Seller of all the terms and conditions hereof and thereof to be performed by it and the consummation of the Transaction have been duly authorized and approved by all required action. This Agreement has been duly executed and delivered by Seller and upon the execution and delivery of the remaining Transaction Documents to which Seller is a party by a duly authorized officer of Seller, such remaining Transaction Documents will have been duly executed and delivered by Seller, and, assuming the due execution and delivery by Purchaser and Guarantor, this Agreement is and such other Transaction Documents will be, upon due execution and delivery thereof, the legal, valid, and binding obligations of Seller enforceable according to their terms, except (a) as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium general principle, or similar laws now or hereafter in effect relating to creditors' rights and (b) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding may be brought.

      **2.3**    **Title to Purchased Assets**. Seller owns and has good, marketable and indefeasible title to all Purchased Assets, free and clear of all Liens (including without limitation any Liens involving (i) Trust for Trebuchet Corp. or any Affiliate of it;(ii) Isabel Catherine Leeds Trust or any affiliate of it, (iii) Oliver William Leeds Trust or any affiliate of it, (the foregoing items (i) through (iii), collectively, the "**_Trebuchet Liens_**") (iv) Totalbank or any Affiliate of it; (v) American Express Bank or American Express Bank, FSB or any Affiliate of either of them; (vi) Suntrust Bank or any

Affiliate of it; (vii) BB&T Financial, FSB – Sheffield Financial or any Affiliate of it; (viii) Tri-Jack Enterprises, Inc. or any Affiliate of it; or (ix) Robert Leeds, personally or as Trustee for the trusts described as (i), (ii) and (iii) herein), except for the following ("Permitted Liens"): Liens for current taxes not yet due and payable (and, for the avoidance of doubt, the Permitted Liens do not include any Liens involving (i) any Trebuchet Liens, (ii) Totalbank or any Affiliate of it; (iii) American Express Bank or American Express Bank, FSB or any Affiliate of either of them;; or (iv) Robert Leeds. personally or as Trustee for the trusts described as Trebuchet Liens).With respect to any and all Liens involving the Purchased Assets which existed at any time prior to the Closing Date, releases of all of such Liens will be provided to Purchaser on or prior to the Closing in the form of copies of such releases and have been or will be publicly filed by Seller with the applicable Governmental Authority or registry (e.g., the Florida Secured Transaction Registry and any other applicable registry) prior to or after the Closing Date. Prior to the Closing, Seller has delivered to Purchaser copies of UCC-3 Termination Statements with respect to the Totalbank and American Express Liens and will deliver at Closing a UCC-3 Amendment releasing the Purchase Assets from the Trebuchet Liens.

2.4     **No Violation.** The execution, delivery and performance by Seller of this Agreement (a) does not and will not violate or conflict with any provision of the Certificate of Formation or Operating Agreement of Seller, (b) does not and will not violate any provision of applicable Law, and (c) does not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contract, lease, loan agreement, mortgage, security agreement or other agreement or instrument to which Seller is a party or by which it is bound or to which any of the Purchased Assets is subject.

2.5     **Financial Statements.** Seller has delivered to Purchaser true and complete copies of the Financial Statements (defined below) pertaining to the Purchased Business. The Financial Statements of Seller: (a) correctly, accurately and completely reflect all assets, liabilities and transactions of the Purchased Business in accordance with GAAP, applied on a consistent basis throughout the periods covered, (b) are in accordance with the books and records of Seller and (c) are true and complete in all material respects and present, fairly and accurately, the financial position and results of operations of the Purchased Business at the dates and for the periods indicated therein. "*Financial Statements*" means (i) the unaudited balance sheet of the Purchased Business as of February 28, 2017 (the "*Balance Sheet Date*"), and all notes and schedules thereto (the "*Balance Sheet*") and the related statements of income, retained earnings, and cash flow for the period then ended, together with all notes or schedules thereto and (ii) the unaudited balance sheets of the Purchased Business as of December 31, 2015 and December 31, 2016 and the related statements of income, retained earnings and cash flows for the periods then ended, together with all notes or schedules thereto.

2.6     **Accounts.** Except as set forth on Section 2.6 of the Disclosure Schedule, all of the accounts, notes, and other receivables which are reflected in the Financial Statements were acquired by Seller in the ordinary and regular course of business; and, except for any reserve for doubtful accounts reflected on the Financial Statements, all of the accounts, notes, and other receivables which are reflected in the balance sheet shall be collected in full in accordance with their respective terms, in the ordinary and regular course of business.

2.7     **Contracts.** Section 2.7 of the Disclosure Schedule, lists each contract to which Seller is a party with Seller obligations in excess of $2,500 (the "*Contracts*"). Each Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither Seller or, to Seller's Knowledge, any other party thereto, is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been provided to Purchaser.

2.8     **Litigation.** There is no Action now pending or, to the Knowledge of Seller, threatened before any Governmental Authority to which Seller is a party or which would result in any Governmental Order which would have a Material Adverse Effect on the Purchased Business or the Purchased Assets. There are no outstanding Governmental Orders and no unsatisfied judgments, injunctions, orders, decrees, penalties or awards against or unsatisfied by the Seller, or relating to or affecting any aspect of the Purchased Business or any of the Purchased Assets. The representations, warranties and covenants which comprise the two immediately preceding sentences are not and shall not be effected by anything set forth on Section 2.8 of the Disclosure Schedule. Seller has complied. and is now complying, with all Laws applicable to ownership and use of the Purchased Assets or the operation of the Purchased Business, the failure to so comply with would have a Material Adverse Effect, and, to the Knowledge of the Seller, there is no basis for any Action arising out of or in connection therewith. Seller has not received any written notice of any violation of any Law.

2.9     **Conduct Since the Balance Sheet Date.** Except as set forth on Section 2.9 of the Disclosure Schedule, Since the Balance Sheet Date, Seller:

(a) has conducted the Purchased Business in the Ordinary Course, except as contemplated by this Agreement;

(b) has not accelerated, terminated, modified or cancelled any material Contract which is a Purchased Asset;

(c) has not mortgaged, pledged or subjected the Purchased Assets to any Lien, except for Permitted Liens;

(d) has not sold, leased, assigned or transferred any of its material tangible assets with respect to the Purchased Business or canceled without fair consideration any debts or claims owing to or held by it with respect to the Purchased Business, in each case except in the Ordinary Course;

(e) has not suffered any material damage, destruction, theft or casualty loss to the Purchased Assets, whether or not covered by insurance, with respect to the Purchased Business; or

(f) has not committed or agreed in writing to do any of the foregoing as described in subsections 2.9(b) through 2.9(e).

**2.10** **Taxes.** Except as set forth on <u>Section 2.10 of the Disclosure Schedule</u>:

(a) The sale by Seller of all non-inventory tangible personal property in the Transaction constitutes the distribution or sale by Seller in complete liquidation of non-inventory tangible personal property pursuant to the dissolution of a division thereof.

(b) Seller has timely filed proper, accurate, correct, and complete federal, state and local Tax Returns (including all reports and estimates) for all years and periods (and portions thereof) through the Closing Date with respect to the Purchased Business and the Purchased Assets for which any such Tax Returns were due or shall be due; and any and all Taxes due and payable (including any and all sales, use, and property Taxes) with respect to the Purchased Business and the Purchased Assets have been paid in full (whether or not shown on any Tax Return). Seller has not requested, and is not presently the beneficiary of, any extension of time within which to file Tax Returns with respect to the Purchased Business or the Purchased Assets or waived any statute of limitations in respect of Taxes with respect to the Purchased Business or the Purchased Assets. The federal income Tax Returns of Seller with respect to the Purchased Business and the Purchased Assets have never been examined by the IRS, and, to the Knowledge of Seller, no such investigation is now pending.

(c) No deficiency in payment of Taxes, including any penalties or fines arising therefrom, has been asserted against Seller with respect to the Purchased Business or the Purchased Assets by any Governmental Authority which has not been settled in full, and the details of any settlement have been provided by Seller to Purchaser.

(d) To the Knowledge of Seller, there are no unsettled potential Tax liabilities, penalties or fines arising from non-compliance with any applicable Laws prior to and as of the Closing Date with respect to the Purchased Business or the Purchased Assets.

(e) Neither Seller nor Member (nor any officer of Seller nor any employee of Seller responsible for Seller's Tax matters) has received notice from any Governmental Authority of its intention to assess any additional Taxes with respect to the Purchased Business and the Purchased Assets for any period for which any Tax Returns have been filed.

(f) There is no dispute or claim concerning any Tax liability of Seller with respect to the Purchased Business or the Purchased Assets either (i) claimed or raised by any Governmental Authority in writing or (ii) as to which Seller or Member (or any officer of Seller or any employee of Seller responsible for Seller's Tax matters) has Knowledge. Neither Seller nor Member (nor any officer of Seller nor any employee of Seller responsible for Seller's Tax matters) has, to the Knowledge of Seller, been notified that either the IRS or any other Governmental Authority has raised any issues (including the potential or actual assessment of additional Taxes), or notified Seller of an intent to raise such issues, in connection with any Tax Return of Seller, and no basis exists for any such issues to be raised.

(g) Except with respect to Taxes not yet due and payable, there are no Liens for unpaid Taxes on any of the Purchased Business or the Purchased Assets, and there are no unpaid Taxes with respect to any period ending on or before the Closing Date that are or could become a lien or other encumbrance on the Purchased Business or any of the Purchased Assets, except for current Taxes not yet due and payable.

(h) No claim, or notice of a claim, of which Seller has Knowledge, has ever been made with respect to the Purchased Business or the Purchased Assets by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

(i) Seller is not a party to any Action, nor is any such Action threatened by any Governmental Authority for the assessment or collection of any Taxes with respect to the Purchased Business or the Purchased Assets, and no claim of which Seller has Knowledge for the assessment or collection of any Taxes with respect to the Purchased Business or the Purchased Assets has been asserted against Seller with respect to the Purchased Business or the Purchased Assets that has

not been settled with all amounts due having been paid. Neither Seller nor Member (nor any officer of Seller nor any employee of Seller responsible for Seller's Tax matters) has Knowledge that any Governmental Authority will propose or assess any additional Taxes with respect to the Purchased Business or the Purchased Assets.

(j)       Seller has withheld and paid, and will withhold and pay prior to the Closing Date, proper, accurate, correct, and complete amounts of Taxes from its employees, independent contractors, creditors, members and other third parties in compliance in all material respects with all withholding and similar provisions of any Tax laws.

(k)       Seller is not a party to any contract, agreement, or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code Section 280G (or any corresponding provision of state, local or foreign Tax law).

(l)       Seller has paid all estimated Taxes required to be paid for Seller's current taxable year with respect to the Purchased Business and the Purchased Assets, and such Taxes fully reflect the taxable income and gain of Seller with respect to the Purchased Business and the Purchased Assets for such year.

(m)       Seller has never been a member of a combined, consolidated, affiliated or unitary group for Tax purposes.

(n)       Seller has not agreed to, and is not required to, make any adjustments or changes either on, before or after the Closing Date, to its accounting methods pursuant to Section 481 of the Code (or similar provisions of state, local, or foreign law), and Seller has no Knowledge of any proposal by the IRS or any Taxing authority for any such adjustments or changes in the accounting methods of Seller.

(o)       Seller is not, nor ever has been, a party to any Tax allocation, sharing, indemnity or similar Contract allocating tax liability that will not be terminated on the Closing Date.

(p)       Seller has not engaged in any transaction that gives rise to: (x) a registration obligation under section 6111 of the Code or the Treasury Regulations promulgated thereunder; (y) a list maintenance obligation under section 6112 of the Code or the Treasury Regulations promulgated thereunder; or (z) a disclosure obligation as a "reportable transaction" under section 6011 of the Code or the Treasury Regulations promulgated thereunder.

(q)       Seller is not a party to a gain recognition Contract under Section 367 of the Code.

(r)       Seller is, and has been since its formation, a partnership for U.S. federal income Tax purposes.

(s)       Since Seller's formation, there has not been any change with respect to Seller in financial or Tax accounting methods or period of accounting or in any accounting policy, principles, procedures or practices.

(t)       Since Seller's formation, there has not been, with respect to Seller, any change or rescission of any material Tax election, filing of any amended Tax Return not required by Law, entry into any closing Contract relating to Taxes, waiver or extension of the statute of limitations in respect of Taxes, or settlement or compromise any material Tax liability, or surrender of any right or claim for a Tax refund.

(u)       With respect to any Employee Plan, there has occurred no "prohibited transaction," as defined in Section 406 of ERISA or Section 4975 of the Code and not otherwise exempt under Section 408 of ERISA, or breach of any duty under ERISA or other applicable Law that could reasonably be expected to result in any Taxes, penalties or other Liability to Seller.

(v)       Due to Purchaser's provision to Seller of a copy of its Florida Annual Resale Certificate for Sales Tax (in accordance with Section 6.4(d) herein), Seller shall not collect or seek to collect sales tax from Purchaser in connection with the inventory items being sold in the Transaction.

**2.11**       **Licenses and Permits.** Except as set forth on Section 2.11 of the Disclosure Schedule and as would not have a Material Adverse Effect, Seller has obtained, and maintains in full force and effect, all Permits that are necessary for Seller to use the Purchased Assets and to carry on the Purchased Business as currently conducted. All such Permits are listed on Section 2.11 of the Disclosure Schedule, and none of such Permits have been revoked, suspended, canceled or terminated, nor has Seller received oral or written notice of any threatened revocation, suspension, cancellation or termination of any such Permit.

**2.12**       **Compliance with Laws.** Seller is in compliance with all applicable Laws, except where the failure to so comply would not have a Material Adverse Effect on the Purchased Business or the Purchased Assets.

**2.13**       **Indebtedness.** Seller does not have any outstanding debts pertaining to the Purchased Business or Purchased Assets except (a) as reflected in the Financial Statements and (b) as disclosed in Section 2.13 of the Disclosure Schedule.

**2.14** **Insurance.** Seller has maintained and now maintains insurance with respect to the Purchased Assets and the Purchased Business covering property damage by fire or other casualty, and against such liabilities, claims and risks and in such amounts as is customary or appropriate in the industry. All such insurance policies will be in full force and effect through the Closing Date.

**2.15** **Employees.** Section 2.15 of the Disclosure Schedule sets forth a list of the names, classification, and current compensation levels (including bonus opportunities and commission rates) of each of the Business Employees as of the Closing Date. To Seller's Knowledge, no key executive officer or group of Business Employees has any plans to terminate their employment. Except as set forth on Section 2.15 of the Disclosure Schedule or otherwise required by local law, (i) all Business Employees are "at will" and may be terminated at the discretion of Seller, at any time and for any reason or no reason and without any liability with respect to any form of severance or similar payment; and (ii) Seller has no oral agreements with any of the Business Employees. Seller has complied in all material respects with all applicable Laws relating to the employment of the Business Employees, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining and the payment of social security and other Taxes relating to the Purchased Business. To Seller's Knowledge, no Business Employee is in violation of any term of any employment contract, confidentiality or other proprietary information disclosure agreement or any other contract relating to the right of such Business Employee to be employed by, or otherwise perform services for, Seller. Seller has not experienced any strikes, grievances, unfair labor practices claims, collective bargaining disputes or other labor relations problems. To Sellers Knowledge, no organizational effort presently has been made or threatened by or on behalf of any labor union with respect to the Business Employees. Except for the Assumed Liabilities related to the Business Employees pursuant to Section 1.2(a), Purchaser shall have no liability with respect to any Business Employees or executive officers (past or present in all cases) of Seller for any matters relating to or arising prior to the Closing, all of which shall remain the sole responsibility of Seller. Notwithstanding anything herein to the contrary, prior to Closing, Seller shall terminate all Business Employees who may be told that they can make application for employment with Purchaser. Notwithstanding the list of employees on Section 2.15 of the Disclosure Schedule, the following names shall be deemed to be excluded from such list: Claudia P. Gonzales, Harold E. Grimaldo and Raul Vergara.

**2.16** **Intellectual Property.**

(a)    Section 2.16 of the Disclosure Schedule sets forth a complete and correct list of all of the following that are owned or used by Seller and are used in the Purchased Business: all Intellectual Property; and all contracts, licenses or similar agreements or arrangements to which Seller is a party, either as licensee or licensor, for the Intellectual Property (excluding licenses for unmodified, commercially-available, off-the-shelf software purchased or licensed for a total cost of less than US$10,000).

(b)    Except as set forth on Section 2.16 of the Disclosure Schedule or except as would not have a Material Adverse Effect on the Seller or the Purchased Assets:

(i)    Seller owns or has the valid and enforceable right to use all Intellectual Property;

(ii)    all contracts, licenses or similar agreements or arrangements to which Seller is a party, either as licensee or licensor, for the Intellectual Property are in full force and effect and there is no default thereunder by Seller, nor, to the Knowledge of Seller, any counterparty to any such contract, license, agreement or arrangement;

(iii)    to Seller's Knowledge, no Person is infringing, misappropriating or otherwise violating any Intellectual Property related to the Purchased Business;

(iv)    the conduct of the Purchased Business as currently conducted does not infringe, misappropriate or otherwise violate the Intellectual Property of any Person.

(c)    No present or former employee or consultant of Seller, and no other Person, owns or has a proprietary, financial or other interest, direct or indirect, in whole or in part, in any Intellectual Property owned by Seller which is material to the operation of the Purchased Business.

**2.17** **Bankruptcy.** As of the Effective Date and the Closing, Seller has not received written notice from any Person advising Seller that an involuntary petition for bankruptcy naming Seller as debtor has been or will be filed seeking to liquidate Seller. The Seller has taken no steps to seek protection pursuant to any insolvency or bankruptcy Law.

**2.18** **Brokerage.** Except for Telegraph Hill Advisors, no broker or finder has acted directly or indirectly for Seller in connection with this Agreement or the Transaction, and no broker or finder is entitled to any brokerage or finder's fee or other commission in respect thereof based in any way on the actions or statements of, or agreements, arrangements, or understandings made with Seller. Seller shall indemnify, defend and hold harmless Purchaser from any such fees or commissions.

2.19    **Ownership of Competing Businesses**. Immediately after the Closing, and except pursuant to the terms of the Transaction, including with regard to the Post-Closing Cash Payments, the Earn-Out Payments, the Note and the Security Agreement, neither Seller nor any Affiliate of Seller, nor any of their respective immediate family members, owns, directly or indirectly, any interest or has any investment or profit participation in any Person that is a Purchaser Competitive Business; provided that, Seller and any of Seller's Affiliates may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller and any of its Affiliates, do not own, directly or indirectly, five percent (5%) or more of any class of securities of such Person.

2.20    **Inventory**. Except as set forth on Section 2.19 of the Disclosure Schedule, Seller has good and marketable title to the Inventory free and clear of all Liens; and all Inventory shall be part of the Purchased Assets. The Inventory is in good and merchantable condition, is salable, suitable and usable for the purposes for which it is intended. Except for the Third Party Security Interest, which Third Party Security Interest will be terminated prior to or concurrently with the Closing, no part of the Inventory has been pledged as collateral or is held by Seller on consignment from others. The amount of Inventory most recently based on quantities determined by physical count or measurement was performed on or about January 1, 2017.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF PURCHASER AND GUARANTOR

Purchaser and Guarantor hereby represent and warrant to Seller as set forth below:

3.1    **Organization and Good Standing**. Purchaser is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware, and is or promptly following Closing will take such action as required by Law to become  duly qualified to transact business as a foreign corporation and will thereafter be in good standing in every jurisdiction in which the conduct of its business requires it to be so qualified and where the failure to be so qualified would have a Material Adverse Effect on its business.

3.2    **Authorization**.

(a)    Purchaser has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which it is or will be a party, to perform its obligations hereunder and thereunder, and to carry out the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by Purchaser and, upon the execution and delivery of the remaining Transaction Documents by a duly authorized officer of Purchaser, the remaining Transaction Documents will have been duly executed and delivered by Purchaser, and, assuming the due execution and delivery by Seller, this Agreement is, and such other Transaction Documents will be, upon due execution and delivery thereof, the legal, valid, and binding obligations of Purchaser, enforceable according to their terms (i) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights, and (ii) that the remedy of specific enforcement and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(b)    Guarantor has the legal capacity, to execute and deliver this Agreement and the other Transaction Documents to which he is or will be a party, and to perform his obligations hereunder and thereunder. This Agreement has been duly executed and delivered by Guarantor and, upon the execution and delivery by Guarantor of the remaining Transaction Documents to which Guarantor is a party, such remaining Transaction Documents will have been duly executed and delivered by Guarantor, and, assuming the due execution and delivery by Seller, this Agreement is, and such other Transaction Documents will be, upon due execution and delivery thereof, the legal, valid, and binding obligations of Guarantor, enforceable according to their terms (i) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights, and (ii) that the remedy of specific enforcement and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

3.3    **No Violation**.

(a)    The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Documents to which it is or will be a party (i) does not and will not violate or conflict with any provision of the Certificate of Incorporation or By-laws (or equivalent documents) of Purchaser, (ii) does not and will not violate or conflict with any provision of Law, and (iii) does not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, or other agreement or instrument to which Purchaser is a party or by which it is bound or to which any of its properties or assets is subject.

(b)    The execution, delivery and performance by Guarantor of this Agreement and the other Transaction Documents to which he is or will be a party (i) does not and will not violate or conflict with any provision of Law, and

(ii) does not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan agreement, mortgage, security agreement, or other agreement or instrument to which Guarantor is a party or by which he is bound or to which any of its properties or assets is subject.

**3.4    Business Employees.** Purchaser has offered employment to each of the Business Employees, in each case on terms no less favorable to the Business Employee than those currently provided by Seller, subject to the consummation of the Transaction, which provides for employment with Purchaser to commence on the day following the Closing Date.

**3.5    No Reliance.** Purchaser acknowledges that, in connection with the Transaction (including in making its determination to proceed with such transactions), Purchaser has not relied upon any representation or warranty, whether oral or written, express or implied, by Seller or any of its officers, directors, managers, owners or representatives, except for the representations and warranties of Seller specifically and expressly set forth herein.

**3.6    Brokerage.** No broker or finder has acted directly or indirectly for Purchaser or Guarantor in connection with this Agreement or the transactions contemplated hereby, and no broker or finder is entitled to any brokerage or finder's fee or other commission in respect thereof based in any way on the actions or statements of, or the agreements, arrangements, or understandings made with Purchaser or Guarantor. Purchaser and Guarantor, jointly and severally, shall indemnify, defend and hold harmless Seller from any such fees or commissions.

## ARTICLE IV
## ADDITIONAL COVENANTS

Seller hereby covenants and agrees with Purchaser and Purchaser hereby covenants and agrees with Seller that:

**4.1    Reasonable Access.** During the Due Diligence Period, Seller will cause its Representatives to cooperate with Purchaser and its Representatives as reasonably necessary in connection with Purchaser's due diligence investigation; and Seller will provide Purchaser with access to its facilities and Books and Records solely as they relate to the Purchased Business or the Purchased Assets. Seller agrees to (and agrees to cause its Representatives to) assist Purchaser in facilitating the Transaction by attending meetings and phone conferences as reasonably requested by Purchaser and providing assistance to Purchaser and its Representatives to help understand the Purchased Assets and in conducting its due diligence review. Purchaser will be under no obligation to continue with its due diligence investigation if, at any time, the results of its due diligence investigation are not satisfactory to Purchaser for any reason, in its sole discretion. In the event Purchaser decides to discontinue negotiations and cease pursuing the Transaction, Purchaser will provide written notice to Seller of such decision.

**4.2    Conduct Before Closing Date.** Before the Closing Date, except as otherwise expressly provided in this Agreement, Seller shall:

(a)    maintain the Purchased Assets in good condition, working order, and repair (except for ordinary wear and tear);

(b)    perform its obligations under the Contracts;

(c)    use reasonable efforts to maintain good relationships with its employees, suppliers and customers, maintain its Books and Records and conduct the Purchased Business in the Ordinary Course.

(d)    apply for and provide to Purchaser prior to Closing, a Certificate of Compliance from the Florida Department of Revenue, and any other documentation proving that such Department has not issued a Notice of Intent to Audit Books and Records of Seller.

**4.3    Further Assurances.** Before and after the Closing, each Party and Guarantor hereto shall execute and deliver such instruments and take such other actions as any other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the other Transaction Documents. Each Party hereto and Guarantor shall use its best efforts to cause the transactions contemplated by this Agreement and the other Transaction Documents to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Governmental Authorities and third parties and to make all filings with and give all notices to government agencies and third parties that may be necessary or reasonably required to effect the Transaction.

**4.4    Expenses.** Except as otherwise provided herein, each of the Parties hereto and Guarantor will pay its own fees and expenses (including attorneys' and accountants' fees, legal costs, and expenses) incurred in connection with the negotiation of this Agreement and the other Transaction Documents, the performance of their obligations under this Agreement and the other Transaction Documents and the consummation of the Transaction.

**4.5    Sales, Transfer, and Property Tax.**

(a)    Purchaser shall bear and pay after the Closing, as they become due and payable, any sales and use Taxes (including any penalties and interest) that are due and payable upon the sale or transfer of the Purchased Assets, subject to any available exemptions or exceptions (including any sales or use Tax exemptions or exceptions). Seller shall fully cooperate with Purchaser and do any and all things reasonably requested by Purchaser or necessary in order for the Transaction to qualify for any exemptions or exceptions (and if exemption or exception is not available, reduction to the greatest extent possible) with respect to sales and use Taxes that may be available in connection with the Transaction.

(b)    Seller shall bear and pay all other transfer, documentary, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement, when due.

(c)    Property Taxes shall be deemed attributable to the period during which ownership of the applicable properties gives rise to liability for such property Taxes, and liability therefor allocated to Seller for all pre-Closing Date Tax periods, and to Buyer for all post-Closing Date Tax periods. For purposes of determining the allocations described in this Section 4.5(c), each property Tax pertaining to a Tax period beginning on or before the Closing Date and ending after the Closing Date (a "*Straddle Period*"; the time period in a Straddle Period beginning on or before and ending on and including the Closing Date is the "*Pre-Closing Straddle Period*"; and the time period in a Straddle Period beginning after the Closing Date is the "*Post-Closing Straddle Period*"), shall be allocated between the days in the Pre-Closing Straddle Period and the days in the Post-Closing Straddle Period by prorating such property Tax based on the number of days in the applicable Straddle Period. Notwithstanding anything to the contrary in this Section 4.5(c), Seller shall remit and pay (or cause to be remitted and paid) all Pre-Closing Straddle Period property Taxes due within ten (10) days of Purchaser's written request therefor; provided such request includes the applicable statement or invoice received from the applicable Tax authority for such property Taxes.

(d)    Seller shall cooperate with Purchaser to eliminate (or if elimination is not possible, reduce to the greatest extent possible) any Taxes which may be imposed on Purchaser in connection with the Transaction (including without limitation through the retention of any resale certificates or other exemption certificates and providing assistance to Purchaser in connection with the preparation of any Tax Returns).

**4.6    Payments of Accounts Receivable.** All payments of accounts receivable of Seller included in the Purchased Assets which have been or will be received by Seller on or after the Closing Date from any third party in the name of or to Seller in connection with or arising out of the Purchased Business, shall be held by Seller in trust for the benefit of Purchaser, and within ten (10) business days after receipt by Seller of any such payment, Seller shall pay over to Purchaser the aggregate amount of each such payment, endorsed where necessary, together with all corresponding notes, documentation and information received in connection therewith. From and after the Closing Date, if Purchaser receives or collects any accounts receivable, notes receivable or other receivables of Seller that are not included in the Purchased Assets, such payments , shall be held by Purchaser in trust for the benefit of Seller, within ten (10) business days after receipt by Purchaser of any such payment, Purchaser shall pay over to Seller the aggregate amount of each such payment, endorsed where necessary, together with all corresponding notes, documentation and information received in connection therewith.

**4.7    Lease.** Seller and Purchaser shall enter into a lease for the premises on which the Purchased Business is operated commencing on the Closing Date in the form attached hereto as **Exhibit G** (the "*Lease*").

**4.8    Shared Services Agreement.** Seller and Purchaser shall enter into a shared services agreement in the form attached hereto as **Exhibit H** (the "*Shared Services Agreement*").

**4.9    Trademark License.** Seller and Purchaser shall enter into a trademark license agreement in the form attached hereto as **Exhibit I** (the "*Trademark License*"), pursuant to which Seller shall license the name "Skypatrol" to Purchaser for use solely in connection with the Purchased Business.

**4.10    Patent License.** For use by Purchaser solely in connection with the Purchased Business, Seller and Purchaser shall enter into a patent license agreement in the form attached hereto as **Exhibit J** (the "*Patent License*"), pursuant to which Seller shall license the Patent Application to Purchaser to the extent permitted by law, provided if the said Patent Application cannot be so licensed as of the Closing Date or is insufficient for any reason to itself confer license rights to Purchaser if and when the patent applied for shall issue, Seller and Purchaser shall enter into a substantially similar Patent License promptly after the patent applied for in the Patent Application shall issue.

**4.11    Tax Certificate.** Seller shall provide to Purchaser prior to Closing a Certificate of Compliance from the Florida Department of Revenue and any other documentation proving that such Department has not issued a Notice of Intent to Audit Books and Records of Seller.

4.12    **Acknowledgment by Purchaser.** Purchaser acknowledges that it has conducted, or is conducting, to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of Seller and the Purchased Business and, in making its determination to proceed with the Transaction, has relied or will rely solely on the results of its own independent investigation and verification and the representations and warranties of Seller expressly and specifically set forth in this Agreement, including the Disclosure Schedule. SUCH REPRESENTATIONS AND WARRANTIES BY SELLER CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLER TO PURCHASER IN CONNECTION WITH THE TRANSACTION, AND PURCHASER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF SELLER OR THE BUSINESS) ARE SPECIFICALLY DISCLAIMED BY SELLER. FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS SECTION 4.11 SHALL AFFECT PURCHASER'S RIGHT TO RELY ON ANY REPRESENTATION, WARRANTY OR COVENANT MADE IN THIS AGREEMENT OR IN ANY OTHER DOCUMENT FURNISHED BY OR ON BEHALF OF SELLER UNDER THIS AGREEMENT.

## ARTICLE V
## CONDITIONS TO PURCHASER'S OBLIGATIONS

The obligation of Purchaser under this Agreement to consummate the Closing on the Closing Date shall be subject to the satisfaction by Seller or waiver by Purchaser, on or before the Closing Date, of each of the following conditions:

5.1    **Representations and Warranties.** The representations and warranties of Seller contained herein, in the other Transaction Documents and in all certificates and documents delivered by Seller shall be true and accurate as of the Closing Date.

5.2    **No Material Adverse Changes.** Since the Balance Sheet Date, there has been no change, event or development that has had or would reasonably be expected to have a Material Adverse Effect on the Purchased Business or the Purchased Assets.

5.3    **Performance.** Seller shall have performed and complied in all material respects with all agreements, obligations, and conditions required by this Agreement or the other Transaction Documents to be performed or complied with by it on or before the Closing Date.

5.4    **Consents.** All filing and consents required to consummate the Transaction shall have been made or obtained, except to the extent that obtaining any such filing or consent has been waived in writing by Purchaser or the failure to obtain any such filing or consent would not have a Material Adverse Effect on the Purchased Assets or the Transaction.

5.5    **No Litigation.** No Action is pending or threatened in writing before any Governmental Authority in which it is sought to restrain or prohibit or to obtain damages or other relief (including rescission) in connection with the Transaction.

5.6    **Closing Documents.** Seller has delivered to Purchaser the following:

(a)    all books, records and other materials related to the Purchased Business (provided that Seller may keep a copy of such books, records and other materials);

(b)    the Bill of Sale and Assumption Agreement, duly executed by Seller, in substantially the form attached hereto as **Exhibit K** (the "*Bill of Sale*");

(c)    the Shared Services Agreement, the Trademark License, the Lease and the Security Agreement, duly executed by Seller;

(d)    certificates from the Secretaries of State of the States of Delaware and Florida, the Delaware Division of Revenue, and the Florida Department of Revenue as to Seller's good standing and payment of all applicable Taxes (including a certificate of compliance from the Florida Department of Revenue proving that it has not issued a Notice of Intent to Audit Books and Records and that there are no outstanding Liabilities on Seller's account);

(e)    a certificate of the President of Seller certifying that (i) attached thereto are true and complete copies of all resolutions duly adopted by the Members of Seller authorizing the execution, delivery and performance of this Agreement and the Transaction Documents and the consummation of the Transaction, and (ii) identifying the name and title and bearing the signatures of the officers of Seller authorized to execute this Agreement and the Transaction Documents;

(f)       a duly completed and executed Internal Revenue Service Form W-9 (or applicable successor thereto) of each "payee" (as that term is defined for purposes of Chapters 3 and 4 of Subtitle A of the Code);

(g)       A nonforeign affidavit in accordance with Section 1445 of the Code, completely accurately; and

(h)       such other Transaction Documents as are reasonably required to be delivered in order to affect the Transaction, duly executed by Seller.

## ARTICLE VI
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller under this Agreement to consummate the Closing on the Closing Date shall be subject to the satisfaction by Purchaser or waiver by Seller, on or before the Closing Date, of each of the following conditions.

**6.1       Representations and Warranties.** The representations and warranties of Purchaser and Guarantor contained herein, in the other Transaction Documents, and in all certificates and documents delivered by Purchaser or Guarantor, shall be true and accurate as of the Closing Date.

**6.2       Performance.** Purchaser and Guarantor shall have performed and complied in all material respects with all agreements, obligations, and conditions required by this Agreement to be performed or complied with by it or him on or before the Closing Date.

**6.3       Consents.** All filings and consents required to consummate the Transaction shall have been made or obtained, except to the extent that obtaining any such filing or consent has been waived in writing by Seller or the failure to obtain any such filing consent would not have a Material Adverse Effect on the assets or business of Purchaser or the Transaction.

**6.4       Closing Documents.** Purchaser and Guarantor shall have delivered to Seller the following documents and instruments on the Closing Date or another date specified below:

(a)       the Closing Cash Payment;

(b)       the Note, the Security Agreement, the Guaranty, the Shared Services Agreement, the Trademark License, the Bill of Sale and the Lease, each duly executed by Purchaser and Guarantor, as the case may be;

(c)       a certificate of Purchaser certifying that (i) attached thereto are true and complete copies of all resolutions duly adopted by the sole member of Purchaser authorizing the execution, delivery and performance of this Agreement and the Transaction Documents and the consummation of the Transaction, and (ii) identifying the name and title and bearing the signatures of Sam Marhouq authorized to execute this Agreement and the Transaction Documents; and

(d)       a copy of Purchaser's Florida Annual Resale Certificate for Sales Tax as soon as practical after being made available to Purchaser by the State of Florida;

(e)       such other Transaction Documents as are reasonably required to be delivered in order to affect the Transaction, duly executed by Purchaser or Seller, as the case may be.

## ARTICLE VII
## CLOSING; CLOSING DATE

**7.1       Closing.** The closing of the Transaction ("*Closing*") will be held on or before _____ __, 2017, or at such other time and place as the Parties may mutually agree upon in writing (the "*Closing Date*"), and the Closing shall be deemed to occur effective as of 11:59 p.m. on the Closing Date. The Closing shall take place at a location acceptable to the Parties, and may be completed remotely through the exchange of signature pages by electronic means. The Parties shall take such actions, including the delivery of documents in escrow or by facsimile or e-mail as may be agreed upon by the Parties, in order to facilitate completion on the Closing Date of the Transaction. Each Party's obligations to consummate the Transaction shall be conditioned on the other Party delivering at the Closing each of the documents or items required to be delivered by such other Party under Section 5.6 or Section 6.4, as applicable, and the satisfaction or waiver of all other conditions to the obligations of the Parties to consummate the Transaction.

**7.2       Mechanics.** In connection with the Closing, Seller shall promptly file UCC-3 Amendments for each of the Trebuchet Liens, releasing the Purchased Assets as collateral secured by Trebuchet, in all jurisdictions where UCC-1 financing statements were filed to perfect the Trebuchet Liens. Prior to the Closing, Seller has delivered to Purchaser copies of UCC-3 Termination Statements with respect to the Totalbank and American Express Liens. Upon evidence of the Trebuchet filings, Purchaser shall pay to Seller by wire transfer the amounts required to be paid hereunder on the Closing Date.

## ARTICLE VIII
## INDEMNIFICATION

**8.1    Survival.**

(a)    **Representations and Warranties.** Subject to the provisions of this Agreement, the representations and warranties contained in this Agreement shall survive the Closing and shall remain in full force and effect until the date that is thirty six (36) months from the Closing Date; *provided, however,* that the representations and warranties in Section 2.1 (Organization and Good Standing), Section 2.2 (Authority), Section 2.3 (Title), Section 2.10 (Taxes), Section 3.1 (Organization Good Standing) and Section 3.2 (Authority) (collectively, the *"Fundamental Representations"*) shall survive as hereafter provided. The Fundamental Representations contained in Section 2.10 (Taxes) shall survive the Closing and shall remain in full force and effect for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 30 days; and all of the other Fundamental Representations shall survive indefinitely. All covenants and agreements of the Parties and Guarantor contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.

(b)    **Covenants.** Any covenant set forth herein that extends beyond the Closing, shall survive for the period of time applicable to each such covenant. Without limiting the generality of the foregoing, the Software System Restrictive Covenant set forth in Section 10.6.1 shall continue in full force and effect after the Closing and survive indefinitely.

**8.2    Indemnification by Seller.** Subject to all of the terms and conditions of this Agreement, including without limitation, Section 8.4, the Seller shall defend, indemnify and hold harmless each of Purchaser and its Affiliates and their respective Representatives, successors and assigns (collectively, the *"Purchaser Indemnified Parties"*), from and against any and all Losses suffered, sustained, incurred or required to be paid by any Purchaser Indemnified Party to the extent arising out of, relating to, based upon, in connection with, caused by, or as a result of:

(a)    any Liability arising from the Purchased Assets or the Purchased Business prior to the Closing, other than the Assumed Liabilities;

(b)    any failure or breach of any representation or warranty of Seller made in this Agreement or any other Transaction Document;

(c)    any breach or nonfulfillment of any covenant or agreement of Seller made in this Agreement or in any other Transaction Document;

(d)    any claim or Action based, in part or in whole, on infringement (including without limitation patent infringement, trademark infringement, or other intellectual property-based infringement) of any Intellectual Property included in the Purchased Assets in connection with the use, offer to sell, or sale of any of the Purchased Assets or any licensed to Purchaser; provided, that Seller shall have no obligation to indemnify Purchaser with respect to any infringement claim to the extent that such claim is based upon any modification of such Intellectual Property after the Closing Date or upon the use of such Intellectual Property in combination with any other software, equipment or other materials where the Intellectual Property by itself would not be infringing; or

(e)    any Excluded Asset.

**8.3    Indemnification by Purchaser.** Subject to all of the terms and conditions of this Agreement including without limitation, Section 8.4, Purchaser shall defend, indemnify and hold harmless Seller and its Affiliates and Representatives, successors and assigns (collectively, *"Seller Indemnified Parties"*), from and against any and all Losses suffered, sustained, incurred or required to be paid by any Seller Indemnified Party to the extent arising out of, relating to, based upon, in connection with, caused by or as a result of:

(a)    any Assumed Liability;

(b)    any failure or breach of any representation or warranty of Purchaser made in this Agreement or any other Transaction Document;

(c)    any breach or nonfulfillment of any covenant or agreement of Purchaser made in this Agreement or any other Transaction Document; or

(d)    any Liability arising from the Purchased Assets or the Purchased Business from and after the Closing provided the foregoing shall in no way require Purchaser to defend, indemnify or hold harmless from and against any and all Losses to the extent the same may relate in any way to the condition of a Purchased Asset(s); provided, that Purchaser's defense, indemnity and hold harmless obligations shall not be limited with respect to any change in the condition of the Purchased Asset(s) after the Closing Date, including any changes due to the acts or omissions of Purchaser, its Affiliates, and its and their respective employees, contractors, customers and agents.

8.4    Limitations on Indemnification and Gross-Up

(a)    Notwithstanding the provisions of Section 8.2 and except as provided in Section 8.4(b), (i) Seller shall not be liable under Section 8.2(b) for Losses arising from breaches of representations and warranties unless and until the aggregate amount of such Losses exceeds Five Thousand Dollars ($5,000) (the *"Basket Amount"*), provided, that to the extent the amount of Losses exceeds the Basket Amount, Purchaser shall be entitled to recover the Basket Amount as well as the amount of Losses in excess of the Basket Amount, and (ii) the aggregate liability of Seller under Section 8.2(b) for Losses arising from breaches of representations and warranties (other than the Fundamental Representations) shall not exceed, in the aggregate, Five Million Dollars ($5,000,000) (the *"Cap"*).

(b)    The obligation of Seller to indemnify the Purchaser Indemnified Parties under Section 8.2(b) shall expire, with respect to any representation or warranty, on the date on which the survival of such representation or warranty shall expire in accordance with Section 8.1, except with respect to any Notice of Claim which any Purchaser Indemnified Parties have delivered to Seller prior to such date, in which case the obligation of Seller to indemnify the Purchaser Indemnified Parties shall continue until any Losses payable to Purchaser Indemnified Parties with respect to such Notice of Claim are finally determined. Notwithstanding anything in this Agreement to the contrary, any claims based on any facts or circumstances which constitute fraud, intentional misrepresentation or willful misconduct by Seller shall not be subject to the time limitations set forth in this Section.

(c)    The obligation of Purchaser to indemnify the Seller Indemnified Parties under Section 8.3(b) shall expire, with respect to any representation or warranty, on the date on which the survival of such representation or warranty shall expire in accordance with Section 8.1, except with respect to any Notice of Claim which any Seller Indemnified Parties have delivered to Purchaser prior to such date, in which case the obligation of Purchaser to indemnify the Seller Indemnified Parties shall continue until any Losses payable to the Seller Indemnified Parties with respect to such Notice of Claim are finally determined. Notwithstanding anything in this Agreement to the contrary, any claims based on any facts or circumstances which constitute fraud, intentional misrepresentation or willful misconduct by Purchaser shall not be subject to the time limitations set forth in this Section.

(d)    The calculation of the amount of any Losses for which indemnification is payable under this Article VIII (including for purposes of determining whether the Basket Amount or the Cap has been met) shall be net of any amounts actually recovered by the Indemnified Party under or pursuant to any insurance policy, title insurance policy, indemnity, reimbursement arrangement or contract with a third party (collectively, *"Alternative Arrangements"*) with respect to such Losses. If, after an indemnification claim by an Indemnified Party is paid hereunder, (x) such Indemnified Party recovers amounts under such Alternative Arrangement with respect to the Losses previously paid in respect of such indemnification claim pursuant to this Article VIII and (y) the amounts so recovered would have reduced the aggregate amount of the Losses for which such Indemnified Party would have been indemnified under this Article VIII had such recovery occurred before such indemnification claim was paid hereunder, such Indemnified Party shall refund to the applicable Indemnifying Party an amount (net of collection costs for the amounts so recovered under such Alternative Arrangement) equal to the least of (i) the amount of such reduction that would have occurred, (ii) the amounts so recovered under such Alternative Arrangement, and (iii) the Losses previously paid in respect of such indemnification claim pursuant to this Article VIII. After the Closing, each Indemnified Party shall, in good faith, make a reasonable claim under the Alternative Arrangements in connection with any indemnification claim brought by it hereunder and shall use reasonable efforts to pursue such claim, provided that no Indemnified Party shall be required to initiate or threaten to initiate any Action under any Alternative Arrangements in connection herewith.

(e)    Notwithstanding anything to the contrary in this Agreement, no "multiple of profits" or "multiple of cash flow" or similar valuation methodology shall be used in calculating the amount of any Damages, except to the extent such amounts are paid or payable to a third party in respect of a Third-Party Action (defined below) and an Indemnified Party seeks indemnification in respect thereof under this Article VIII.

(f)    Following the Closing, in the event of any breach giving rise to an indemnification obligation under this Article VIII, an Indemnified Party shall take and shall use reasonable efforts to cause its Affiliates to take, and shall use reasonable efforts to cooperate with the applicable Indemnifying Party if such cooperation is reasonably requested by the Indemnifying Party in order to take, reasonable measures to mitigate the Losses resulting from such breach. All such efforts taken and cooperation provided by the Indemnified Party and its Affiliates shall be at the Indemnifying Party's expense and the Indemnifying Party shall pay for or promptly reimburse the Indemnified Party and its Affiliates for all costs reasonably incurred in connection therewith.

(g)    If an Indemnified Party will be liable for any additional Taxes (the *"Additional Tax Amount"*) as a result of its receipt of a payment of any amounts in respect of a Loss, the Indemnifying Party shall also pay to the Indemnified Party (x) the Additional Tax Amount; plus (y) any additional amount so that the Indemnified Party shall have received from

the Indemnifying Party, net of the payment of Taxes, an amount equal to such Loss (and, for the purpose of this Agreement, "Losses" shall include the sum of the amounts describe in (x) and (y) immediately above).

(h)     Notwithstanding anything to the contrary in this Agreement, any amounts payable pursuant to the indemnification obligations under this Article VIII shall be paid without duplication and in no event shall any Party hereto be indemnified under different provisions of this Agreement for the same Losses.

8.5     **Indemnification Claim Procedures.**

(a)     If any Purchaser Indemnified Party or Seller Indemnified Party (an *"Indemnified Party"*) believes that it has suffered or incurred or will suffer or incur any Losses for which it is entitled to indemnification under this Article VIII, such Indemnified Party shall deliver to the Party or Parties from whom indemnification is being claimed (an *"Indemnifying Party"*) reasonably prompt written notice of such claim setting forth, in reasonable detail, the nature and basis of the claim and the amount thereof, to the extent known, and any other relevant information in the possession of the Indemnified Party (a *"Notice of Claim"*). The Notice of Claim shall be accompanied by any relevant documents in the possession of the Indemnified Party relating to the claim. Subject to the provisions of this Agreement including Section 8.4(b) and Section 8.4(c), the failure of an Indemnified Party to give any Notice of Claim required by this Section shall not affect any of such Party's rights under this Article VIII or otherwise except and to the extent that such failure is actually prejudicial to the rights and obligations of the Indemnifying Party. Notwithstanding anything herein to the contrary, if any Notice of Claim relates to a Third-Party Action, the procedures of Section 8.5(d) shall apply to such Third-Party Action.

(b)     After an Indemnified Party has delivered a Notice of Claim requesting payment from an Indemnifying Party for any Losses, the Indemnifying Party shall, within 30 days of receipt of such Notice of Claim, (i) pay to the Indemnified Party, in immediately available funds, the amount of Losses, or (ii) deliver to the Indemnified Party written notice (a *"Dispute Notice"*) advising the Indemnified Party that it disputes the claim for indemnification. If, within 30 days of receipt of such Notice of Claim, the Indemnifying Party fails to pay said amount to the Indemnified Party or deliver to the Indemnified Party a Dispute Notice, the Indemnifying Party shall be deemed to have accepted and agreed to such claim for indemnification (a *"Deemed Acceptance"*) and the Indemnified Party may exercise any and all legal or equitable remedies available to the Indemnified Party under this Agreement or otherwise with respect to such Losses.

(c)     If, within such 30 day period following receipt of the Notice of Claim, the Indemnifying Party delivers a Dispute Notice with respect to the Indemnified Party's claim for indemnification for Losses, the Indemnifying Party and the Indemnified Party agree that, prior to commencing any litigation or other proceedings against the other concerning any matter in which such Party intends to claim a right of indemnification, they will negotiate in good faith to resolve any dispute with respect to such claim and to provide each other with all relevant information relating to such dispute. If the Indemnifying Party and the Indemnified Party are unable to resolve any such dispute within 30 days of the delivery of a Dispute Notice (or such longer period as the Parties may agree upon), the Indemnifying Party or the Indemnified Party may thereafter commence litigation or other proceedings to resolve such dispute. The successful Party in any such proceeding shall be entitled to reimbursement from the non-successful Party for any and all of the successful Party's costs and expenses including reasonable attorneys' fees, incurred in connection with such proceeding.

(d)     If any Notice of Claim relates to any Action against any Indemnified Party by a third party (a *"Third-Party Action"*), the Indemnifying Party shall be entitled to participate in such Third-Party Action and, at its option, assume the defense thereof with its own counsel (to be reasonably satisfactory to the Indemnified Party), at the Indemnifying Party's sole expense, by providing written notice to the Indemnified Party delivered within 30 days after the Indemnifying Party receives the Notice of Claim; provided, however, that the Indemnifying Party shall not have the right to assume the defense of any Third-Party Action if the Indemnified Party shall have one or more legal or equitable defenses available to the Indemnified Party which are different from or in addition to those available to the Indemnifying Party, and, in the reasonable opinion of counsel for the Indemnified Party, counsel for the Indemnifying Party could not adequately represent the interests of the Indemnified Party because such interests could be in conflict with those of the Indemnifying Party. Notwithstanding anything within the immediately preceding sentence to the contrary, the Indemnifying Party shall reimburse the Indemnified Party its costs and expenses including reasonable attorneys' fees in a situation as therein described. If the Indemnifying Party shall assume the defense of any Third-Party Action, the Indemnified Party shall be entitled to participate in any Third-Party Action at its expense. The Indemnifying Party shall not consent to the entry of a judgment with respect to the Third-Party Action or enter into any settlement that involves anything other than the payment of money by the Indemnifying Party without the Indemnified Party's prior written consent (which shall not be unreasonably withheld or delayed). Whether or not the Indemnifying Party assumes the defense of any Third-Party Action, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, such Third-Party Action without the Indemnifying Party's prior written consent (which consent shall not be unreasonably withheld). The Indemnified Party shall provide the Indemnifying Party with access to its records and personnel reasonably relating to any such Third-Party Action during normal business hours and shall otherwise cooperate with the Indemnifying Party in the

defense or settlement thereof. If the Indemnifying Party elects not to defend the Indemnified Party against such Third Party Action, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then the amount of the applicable claim or demand, or, if the same be contested by the Indemnified Party, then that portion thereof as to which such defense is unsuccessful (and the reasonable costs and expenses, including reasonable attorneys' fees pertaining to such defense) shall be the liability of the Indemnifying Party hereunder to the extent any Losses are sustained which are otherwise the subject of indemnification under this Section 8.5.

**8.6    Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the Parties as an adjustment to the Purchase Price (and/or the Earn-Out Payments) for Tax purposes, as determined by the applicable Indemnified Party, unless otherwise required by Law.

**8.7    Set-Off.** Purchaser shall be entitled to deduct and set off from any amounts due and owing to Seller under the Transaction Documents any amounts owed by Seller to Buyer pursuant to the Transaction Documents and that have been resolved by mutual reasonable written agreement or by a final and binding Government Order or arbitration decision.

## ARTICLE IX
## TERMINATION

**9.1    Termination.** This Agreement may be terminated at any time before the Closing Date:

(a)    by mutual consent of Purchaser and Seller;

(b)    by Purchaser during the Due Diligence Period if Purchaser determines in its sole discretion not to proceed with the Transaction pursuant to Section 4.1 hereof; or

(c)    by either Purchaser or Seller if there has been a material breach on the part of the other Party in any material representation, warranty or covenant set forth in this Agreement that is not cured within ten (10) days after such other Party has been notified of the intent to terminate this Agreement pursuant to this Section 9.1(c).

**9.2    Effect of Termination.** In the event of termination of this Agreement as expressly permitted under Section 9.1, this Agreement shall forthwith become void (excluding this Section 9.2 which shall survive termination) and there shall be no liability on the part of either Seller, Purchaser, or their respective officers, directors and affiliates. In the event of termination hereunder before the Closing, each Party shall return promptly to the other Party all documents, work papers, and other material of the other Party furnished or made available to such Party or its Representatives and all copies thereof. Anything herein to the contrary notwithstanding, upon termination of this Agreement for any reason, the Parties and Guarantor shall continue to be bound by the Confidentiality Agreement in accordance with the terms thereof.

## ARTICLE X
## OTHER AGREEMENTS

**10.1    Amendment and Modification; Waiver of Compliance.** Subject to the applicable Law, this Agreement may be amended, modified, and supplemented only by written agreement signed by all of the Parties. Any failure by any Party to this Agreement to comply with any obligation, covenant, agreement, or condition contained herein may be expressly waived in writing by the other Party hereto, but such waiver or failure to insist upon strict compliance shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of any Party hereto, such consent shall be given in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 10.1.

**10.2    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.2).

(a)    If to Purchaser, to:

      MEI Auto Finance, Inc.
      108 North Collins Street
      Arlington, TX 76011-7316
      Attention: Sam K. Mahrouq
      Fax: 817-542-0716
      Email: sam@automax4u.com

      With a copy to:

      Howard L. Rosenthal
      Kelly Hart & Hallman LLP
      201 Main St., Suite 2500
      Fort Worth, TX 76102
      Fax: (817)878-9701
      Email: howard.rosenthal@kellyhart.com

(b)    If to Seller, to:

      Skypatrol, LLC
      3055 NW 84th Avenue
      Doral, Florida 33122
      Attention: Robert D. Rubin, CEO
      Fax: (786) 331-3392
      Email: rrubin@toppcompanies.com

      With a copy to:

      Steven M Shishko, Esq.
      Beacon Law Group, LLC
      200 Highland Avenue, Suite 301
      Needham, MA 02494
      Fax: 774.759.3063
      Email: sshishko@beaconlawgroup.com

      **10.3**    **Public Announcements/Confidentiality.** No Party hereto, nor Guarantor nor any of their respective Representatives, shall make any public announcement with respect to this Agreement, the other Transaction Documents, or the Transaction without the prior written consent of the other Party. The foregoing shall not restrict in any respect a Party's ability to communicate information concerning the Transaction to such Party's respective Representatives who have a need to know such information, and, to the extent relevant, to third parties whose consent is required in connection with the Transaction. All information concerning this Transaction, the terms and conditions of any of the Transaction Documents, and financial and other information about any Party shall remain confidential in accordance with the Confidentiality Agreement.

      **10.4**    **Assignment.** This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and Guarantor, and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interest, or obligations hereunder shall be assigned by either of the Parties hereto or Guarantor without the prior written consent of the other Parties; provided, that Seller may assign its rights under this Agreement and each other Transaction Agreement to which it is a party (the "*Permitted Assignment*") to the Third Party Lender or the Third Party Lender's designee (as applicable, the "*Permitted Assignee*"); provided further, that the documents entered into between Seller and the Permitted Assignee reflecting the Permitted Assignment shall expressly provide that the Permitted Assignee shall have no right to take any Action against Purchaser or Guarantor or the Purchased Business or Purchased Assets, unless and until Purchaser or Guarantor shall be in default (beyond any applicable notice and cure period) under this Agreement or any other Transaction Document to which Purchaser or Guarantor is a party, and any claim the Permitted Assignee may have under its rights as the Permitted Assignee prior to such Purchaser or Guarantor default shall be made solely against Seller (or any party other than Purchaser or Guarantor that the Permitted Assignee may have rights against as the Permitted Assignee).

**10.5    Governing Law; Venue.** This Agreement and the legal relations between the parties hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware without reference to the conflict of laws principles thereof. The parties irrevocably and unconditionally submit to the exclusive jurisdiction of the courts of the State of Florida located in Miami-Dade County or in the United States District Court for the Southern District of Florida and the State of Texas located in Tarrant County, Texas or in the United States District Court for the Northern District of Texas, for the purposes of an Action arising out of this Agreement or the subject matter hereof brought by either Party hereto or Guarantor; and hereby waive and agree not to assert as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper or that this Agreement or the subject matter hereof may not be enforced by such court.

**10.6    Non-competition.**

10.6.1    Seller's Covenants.

(a)    *Non-Competition.* For a period of two (2) years commencing on the Closing Date (the "***Restricted Period***"), so long as neither Purchaser nor Guarantor is in material default of this Agreement or any other Transaction Document, Seller and Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in any business that directly or indirectly competes with the Purchased Business except to the extent any of the Retained Businesses or customers of the Retained Businesses may be deemed to compete as of the Closing Date (a "***Purchaser Competitive Business***"); (ii) have an interest in any Person that engages directly or indirectly in a Purchaser Competitive Business in any capacity, including without limitation, as a partner, shareholder, member, lender, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any actual or prospective client, customer, supplier or licensor of the Purchased Business, or any other Person who has a business relationship with the Purchased Business, to terminate or modify any such actual or prospective relationship. Seller, Member and their respective Affiliates may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller and Member, and their respective Affiliates, do not own, directly or indirectly, five percent (5%) or more of any class of securities of such Person.

(b)    *Non-Solicitation.* During the Restricted Period, so long as neither Purchaser nor Guarantor is in material default of this Agreement or any other Transaction Document, Seller and Member shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, hire or solicit any Business Employee or any person who is or was employed in the Purchased Business at any time during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 10.6.1(b) shall prevent Seller, Member or any of their respective Affiliates from hiring (i) any employee whose employment has been terminated by Purchaser, or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee provided that neither Seller, Member nor any of their respective Affiliates has, directly or indirectly, solicited the employee to terminate his or her employment.

(c)    *Software System Restrictive Covenant.*

(i)    From and after the Closing, Seller and Seller's Affiliates (i) shall not sell, license, assign, convey or otherwise transfer (each, a "***Transfer***"), all or any part of the Skypatrol Software System, to any Purchaser Competitive Business and (ii) shall not permit any buyer, licensee, assignee, or transferee (each, a "***Transferee***") of all or any part of the Skypatrol Software System, to Transfer all or any part of the Skypatrol Software System, to any Purchaser Competitive Business, whether any such Transferee received the Skypatrol Software System or any part thereof from Seller or any of its Affiliates or from any other such Transferee of the Skypatrol Software System or any part thereof (the foregoing, collectively, the "***Software System Restrictive Covenant***"). For purposes of this Section, the Skypatrol Software System shall be deemed to include any and all improvements, supplements, modifications, alterations, additions, revisions and enhancements thereto.

(ii)    In the event of any Transfer of all or any part of the Skypatrol Software System not prohibited under Section 10.6.1(c)(i) hereof, within fifteen (15) days after such Transfer, Seller, or the applicable Transferee (each in such capacity, a "***Transferor***"), shall notify Purchaser in writing of the name and contact information of the Transferor's Transferee.

10.6.2    Purchaser's and Guarantor's Covenants.

(a)    *Non-Competition.* During the Restricted Period, so long as Seller is not in material default of this Agreement or any other Transaction Document, Purchaser and Guarantor shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in any business that directly competes with the Retained Business (a "***Seller Competitive Business***"); (ii) have an interest in any Person that engages

directly or indirectly in a Seller Competitive Business in any capacity, including as a partner, shareholder, member, lender, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any actual or prospective client, customer, supplier or licensor of the Retained Business, or any other Person who has a business relationship with the Retained Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Purchaser, Guarantor and their respective Affiliates may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Purchaser and Guarantor, and their respective Affiliates, do not own, directly or indirectly, five percent (5%) or more of any class of securities of such Person.

(b)  *Non-Solicitation*. During the Restricted Period, so long as Seller is not in material default of this Agreement or any other Transaction Document, Purchaser and Guarantor shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, hire or solicit any person who is or was employed in the Retained Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 10.6.2(b) shall prevent Purchaser, Guarantor or any of their respective Affiliates from hiring (i) any employee whose employment has been terminated by Seller, or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee provided that neither Purchaser, Guarantor nor any of their respective Affiliates has, directly or indirectly, solicited the employee to terminate his or her employment.

10.6.3  Reasonableness of Restrictions. Each of the restrictions contained in this Section 10.6 is separate and severable and in the event of any such restriction being determined to be unenforceable in whole or in part for any reason, that unenforceability shall not affect the enforceability of the remaining restrictions or (in the case of restrictions unenforceable in part) the remainder of that restriction. While the restrictions contained in this Section 10.6 are considered by the Parties and Guarantor to be reasonable in all the circumstances, it is recognized that restrictions of the nature in question may fail for technical reasons and accordingly it is hereby agreed and declared that if any of such restrictions shall be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of a Party but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope, the said restriction shall apply with such modifications as may be necessary to make it valid and effective, and each Party and Guarantor agrees to be bound by the same restrictions to the extent of the modified time periods or geographical scope.

10.6.4  Exceptions. Anything in Section 10.6.1 to the contrary notwithstanding, Purchaser and Guarantor acknowledge and agree that Seller, through the Retained Business, will continue to have business relationships with clients, customers, suppliers, distributors, resellers, vendors, licensors and others with whom Seller had business relationships in connection with the Purchased Business prior to the Closing. Accordingly, neither Seller nor Member, nor any of their respective Affiliates, will be deemed to be in breach of Section 10.6.1 solely by virtue of such ongoing relationships. Notwithstanding the foregoing, neither Seller or Member shall at any time in or pursuant to any such relationships or in any other way with any other Person during the Restricted Period, disparage Purchaser or any of its officers, members, or employees or the business being operated by Purchaser as a result of its acquisition of the Purchased Business and Purchased Assets. For purposes of this Section, "disparage" shall mean any negative statement, whether written or oral.

10.7  **Reserved**.

10.8  **Incorporation of Recitals**. The Recitals are incorporated herein.

10.9  **Counterparts**. This Agreement may be executed in counterparts each of which when executed and delivered shall be deemed to be an original and all of which together shall constitute one and the same instrument. An electronic or facsimile copy of the executed Agreement or counterpart shall be deemed, and shall have the same legal force and effect as, an original document.

10.10  **Entire Agreement**. This Agreement, the exhibits and schedules hereto and the other Transaction Documents, embody the entire agreement and understanding of the Parties hereto and Guarantor in respect of the subject matter contained herein and supersede all prior agreements and understandings, written or oral, between the Parties and Guarantor with respect to such subject matter, including the Letter of Intent other than Part Two-Binding Provisions of such letter. There are no restrictions, promises, warranties, covenants, or undertakings other than those expressly set forth or referred to herein.

10.11  **Construction**. The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation," (c) references to "hereunder," "herein" or "hereof" relate to this Agreement as a whole, (d) the term "days" refers to U.S. calendar days and

not business days, unless expressly noted; and (e) where a word or phrase is given a defined meaning in this Agreement, any other part of speech or other grammatical form in respect of such word or phrase has a corresponding meaning. The Parties and Guarantor agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either Party or Guarantor, and that ambiguities shall not be interpreted against the drafting Party.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS, Seller, Purchaser and Guarantor have caused this Agreement to be duly executed as of the Effective Date.

**SELLER**

SKYPATROL, LLC

By: _____

Robert D. Rubin
Chief Executive Officer

**PURCHASER**

VBI GROUP LLC DOING BUSINESS AS
SKYPATROL USA

By: _____

Sam Mahroug
Chief Executive Officer

**GUARANTOR**

_____

Sam Mahroug, individually

Accepted and Agreed solely in regard to Section 10.6.1 (Non-competition) and 10.6.4.

_____

Robert D. Rubin

## ANNEX A

### Additional Definitions

"*Action*" means any claim, action, complaint, petition, cause of action, demand, lawsuit or arbitration or other proceeding, inquiry, investigation, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity, or before any arbitrator, judge, or Governmental Authority.

"*Actual Net Working Capital*" is defined in Section 1.3(f).

"*Affiliate*" means any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, "control" (including "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, or the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

"*Assigned Books and Records*" is defined in Section 1.1(b).

"*Balance Sheet*" is defined in Section 2.5.

"*Balance Sheet Date*" is defined in Section 2.5.

"*Basket Amount*" is defined in Section 8.4.

"*Bill of Sale*" is defined in Section 5.6(b).

"*Books and Records*" means all documents, instruments, papers, books and records, books of account, financials, tax documents, files and data (including customer and supplier lists), catalogs, brochures, sales literature, promotional material, certificates and other documents.

"*Business Day*" means any Monday through Friday on which first class US mail is delivered in Miami, Florida.

"*Business Employees*" is defined in Section 1.2(a).

"*Cap*" is defined in Section 8.4.

"*Cash Payments*" is defined in Section 1.3(a).

"*Change of Control*" means any (i) merger or consolidation in which Purchaser is a constituent party, except any such merger or consolidation in which the equity ownership of Purchaser outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of equity securities that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the equity ownership of the surviving or resulting entity (or the ultimate parent entity of such surviving or resulting entity) or (ii) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by Purchaser of all or substantially all the assets of Purchaser; provided that it shall not be a "Change of Control" if, as a result of any of the transactions described above, the constituent party other than Purchaser is an Affiliate of Purchaser or the sale, lease, transfer, exclusive license or other disposition of all or substantially all of the assets of Purchaser are transferred to an Affiliate of Purchaser.

"*Closing*" is defined in Section 7.1.

"*Closing Cash Payments*" is defined in Section 1.3(a).

"*Closing Date*" is defined in Section 7.1.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended

"*Confidentiality Agreement*" means the confidentiality/nondisclosure agreement dated March 22, 2017 between Seller and Purchaser.

"*Contracts*" is defined in Section 2.7.

"*Due Diligence Period*" means the thirty- (30) day period immediately following the date of the Letter of Intent. Should such period otherwise conclude on a Saturday, Sunday or legal holiday, the period shall end at 11:59 PM Central Time on the immediately following Business Day.

"*Earn-Out Cap*" is defined in Section 1.3(e).

"*Earn-Out Payments*" is defined in Section 1.3(e).

"*Earn-Out Period*" is defined in Section 1.3(e).

"*EBITDA*" means the net income of the Purchased Business (calculated as if the Purchased Business were being operated as a separate, stand-alone business) before taking into account deductions for interest, taxes, the depreciation of assets, and the amortization of costs and expenses in connection with this Transaction, including Earn-Out Payments, if any, and, excluding in all cases (i) payments to Mark Peters and Kevin St. Hilaire, to the extent such payments (whether compensation or otherwise) exceed $250,000 annually in aggregate compensation to Mark Peters and Kevin St. Hilaire, and (ii) any payments which would be considered infrequent or unusual under FASB, including payments to Persons that are not engaged in the Purchased Business on a full-time basis or Persons that are not in positions or roles in the Purchased Business that do not directly contribute to the Purchased Business.

"*Employee Plan*" means each "employee benefit plan," as such term is defined in Section 3(3) of ERISA, that is subject to any provision of ERISA and is maintained or contributed to by Seller.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Estimated Net Working Capital*" is defined in Section 1.3(f).

"*Excluded Assets*" is defined in Section 1.1(b).

"*Financial Statements*" is defined in Section 2.5.

"*Governmental Authority*" means any agency, bureau, board, commission, department, court, official, political subdivision, tribunal, or other administrative, legislative or regulatory authority or instrumentality of any government, whether federal, state, local, domestic, or foreign.

"*Governmental Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"*Guaranty*" is defined in Section 1.3(d).

"*Indebtedness*" means, with respect to the Purchased Business or the Purchased Assets: (i) all obligations of Seller for borrowed money (including any principal, premium, accrued and unpaid interest, related expenses, prepayment penalties, commitment and other fees payable in connection therewith), (ii) all obligations of Seller evidenced by bonds, debentures, notes or similar instruments, (iii) all indebtedness of others guaranteed or secured by any Lien on the Purchased Assets, (iv) all obligations relating to the issuance of letters of credit, and (v) all obligations under capitalized leases.

"*Indemnified Party*" is defined in Section 8.5.

"*Indemnifying Party*" is defined in Section 8.5.

"*Intellectual Property*" means, solely with respect to the Purchased Business and the Purchased Assets, (i) Internet domain names, trademarks, service marks, trade dress, trade names, business names, patents (excluding the Patent Application), know-how, websites, logos and corporate or company names (both foreign and domestic) and registrations and applications for registration thereof together with all of the goodwill associated therewith, and unregisterable intellectual property, expressly excluding the trademark "SKYPATROL" except as to be licensed to Purchaser under the terms of this Agreement, (ii) registered copyrights and copyrightable works (both foreign and domestic) and registrations and applications for registration thereof, (iii) computer software, data, data bases and documentation thereof, including rights to third party software used in the Purchased Business (excluding "shrink wrap" software and other software that can generally be purchased commercially for less than US$10,000 per user), and (iv) trade secrets and other confidential information (including ideas, formulas, inventions (whether patentable or unpatentable and whether or not reduced to practice), know how, processes and techniques, financial and marketing plans and customer and supplier lists and information).

"*Inventory*" means, solely with respect to the Purchased Business or the Purchased Assets, all inventory of any kind, character, nature or description, whatever its description as at the Closing, owned by Seller including all finished goods, work in process, supplies, raw materials, manufactured and purchased parts, scrap, containers, packaging materials and spares, whether located at the Seller' s warehouse or facilities and any other Inventory owned by Seller but located at another location, in transit, or elsewhere.

"*IRS*" means the U.S. Internal Revenue Service.

"*Knowledge*" as to (a) Purchaser means the actual knowledge of Guarantor, and (b) Seller means the actual knowledge of Member and Ted Brennan after reasonable inquiry of their direct reports.

"*Law*" means any applicable law, rule, regulation, ordinance, order, judgment or decree of a Governmental Authority.

"*Lease*" is defined in Section 4.7.

"*Letter of Intent*" means the letter of intent dated March ___, 2017 by and between Seller and MEI Auto Finance, Inc..

"*Liability*" means any liability, obligation, demand, claim against or contract of a Person of any kind or nature, including without limitation for Taxes, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, whether or not recorded on the books and records of such Person, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether disputed or undisputed, whether secured or unsecured, whether joint or several, whether vested or unvested, whether liquidated or unliquidated, whether due or to become due, or whether executory, determined, determinable, or otherwise, related to the Purchased Business or the Purchased Assets or arising out of, pertinent to or by reason of this Transaction or any other transaction or event occurring prior or subsequent to the Closing.

"*Liens*" means, with respect to any property or asset, any lien, mortgage, claim, pledge, charge, security interest or other encumbrance of any kind in respect of such property or asset.

"*Losses*" (and, with correlative meaning, "Loss") means losses, damages, liabilities, deficiencies, claims, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees, and the cost of enforcing any right to indemnification hereunder (and including the amounts set forth in clauses (x) and (y) in Section 8.4(f), as applicable).

"*Material Adverse Effect*" means, with respect to any Person or the Purchased Assets, any circumstance, change or effect that (i) is or would reasonably be expected to be materially adverse to the business, operations or condition (financial or otherwise), operating results or prospects of such Person or the Purchased Assets, or (ii) materially impedes or would reasonably be expected to impede the ability of such Person to complete the Transactions, but shall exclude any circumstance, change or effect resulting or arising from: (A) any change in general economic conditions in the industries or markets of which the Purchased Assets or the Purchased Business are a part; (B) seasonal reductions in revenues or earnings relating to the Purchased Assets or the Purchased Business substantially consistent with the historical results of such Purchased Assets or the Purchased Business; (C) national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; or (D) changes in Law or GAAP; or (E) the entry into or announcement of this Agreement.

"*Measurement Period*" means each of the twelve (12) month period commencing on the Closing Date and ending on the day immediately prior to the first anniversary of the Closing Date and each 12-month period thereafter through and including the tenth (10th) anniversary of the Closing Date.

"*Member*" means Robert D. Rubin.

"*Net Working Capital*" means current assets (included in the Purchased Assets), exclusive of cash, *less* current liabilities (included in the Assumed Liabilities). (i) "Current assets" includes (A) accounts receivable, (B) prepaid expenses, (C) saleable inventory and (D) deposits. (ii) "Current liabilities" includes (A) accounts payable and (B) accrued expenses (including employment-related expenses).

"*Notice of Claim*" is defined in Section 8.5.

"*NWC Adjustment*" is defined in Section 1.3(f).

"*Ordinary Course*" means, with respect to any Person, in the ordinary course of that Person's business consistent with past practice, including as to the quantity, quality and frequency.

"*Patent*" has the meaning given in the Patent License.

"*Patent Application*" has the meaning given in the Patent License.

"*Patent License*" is defined in Section 4.10.

"*Permits*" means authorizations, licenses, permits or certificates issued by Governmental Authorities.

"*Permitted Liens*" is defined in Section 2.3.

"*Person*" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority, trust or other entity or organization of any kind.

"*Post-Closing Cash Payments*" is defined in Section 1.3(a).

"*Purchased Assets*" is defined in Section 1.1(a).

"*Purchased Business*" is defined in Recital A.

"*Purchaser Competitive Business*" is defined in Section 10.6.1.

"*Purchaser Indemnified Parties*" is defined in Section 8.2.

"*Representatives*" means a Person's members, stockholders, directors, officers, employees, attorneys, and accountants, and other authorized agents and representatives of such Person.

"*Restricted Period*" is defined in Section 10.6.1.

"*Sales Tax*" is defined in Section 1.3(i).

"*Security Agreement*" is defined in Section 1.3(c).

"*Seller Competitive Business*" is defined in Section 10.6.2.

"*Seller Indemnified Parties*" is defined in Section 8.3.

"*Shared Services Agreement*" is defined in Section 4.8.

"*Skypatrol Software System*" is described on Schedule 1.2(a).

"*Software System Restrictive Covenant*" is defined in Section 10.6.1.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"*Taxes*" "Taxes" (and, with correlative meaning, "Tax") means (a) any federal, state, local, foreign and other taxes, including without limitation, income taxes, taxes imposed under Section 1374 of the Code, estimated taxes, alternative or add-on minimum taxes, excise taxes, sales taxes, franchise taxes, employment and payroll related taxes, withholding taxes, transfer taxes, gross receipts taxes, license taxes, severance taxes, stamp taxes, occupation taxes, premium taxes, windfall profits taxes, environmental taxes (including taxes under Section 59A of the Code), customs duties, capital stock taxes, profits taxes, social security (or similar) taxes, unemployment taxes, disability taxes, real property taxes, personal property taxes, registration taxes, value added taxes or other taxes, charges, fees or assessments of any kind whatsoever and all deficiencies, or other additions to tax, interest, fines and penalties owed by it, and (b) any liability for any item described in clause (a) hereof as a result of (i) the several liability of a company pursuant to Treasury Regulation 1.1502-6 or any analogous state, local or foreign Law, (ii) being a transferee, or (iii) any contract or agreement entered into on or before the Closing Date or otherwise.

"*Third Party Action*" is defined in Section 8.5.

"*Third Party Lender*" means, collectively, Robert Leeds, Trustee of Trust for Trebuchet Corp., Robert Leeds, Trustee of Isabel Catherine Leeds Trust, and Robert Leeds, Trustee of Oliver William Leeds Trust.

"*Third Party Loan*" means the loans made by the Third Party Lender in the aggregate original principal amount of $700,000, which loans are outstanding and will be outstanding until the Closing Date.

"*Third Party Security Interest*" means the security interest in and lien on all of Seller's assets and property, including the Purchased Assets, securing the Third Party Loan.

"*Trademark License*" is defined in Section 4.9.

"*Transaction*" means the transaction contemplated by this Agreement and the other Transaction Documents.

"*Transaction Documents*" means this Agreement, the Note, the Security Agreement, the Lease, the Trademark License, the Shared Services Agreement and the Bill of Sale, and all exhibits and schedules hereto or thereto, and each other agreement, document, certificate or instrument delivered pursuant hereto or thereto, all as amended, supplemented, restated, amended and restated, or otherwise modified from time to time.

EXHIBIT A

[RESERVED]

**EXHIBIT B**

Note

**EXHIBIT C**

Security Agreement

**EXHIBIT D**

Guaranty

**EXHIBIT E**

Wire Transfer Instructions

**EXHIBIT F**

<u>Disclosure Schedule</u>

# EXHIBIT G

Lease

**EXHIBIT H**

Shared Services Agreement

# EXHIBIT I

Trademark License

**EXHIBIT J**

Patent License

[if applicable]

**EXHIBIT K**

Bill of Sale

Schedule 1(a)

Purchased Assets

See attached list of computers, servers, furniture and equipment.

The customer list dated April [21]. 2017 has been separately provided to Purchaser.

| Assigned for: | PC Name | Make | Model# | PC/Laptop | OS | CPU | Storage | Memory | Office | Screen Size |
|---|---|---|---|---|---|---|---|---|---|---|
| Magda Abade | PC318 | Dell | Vostro 220 | PC | 7 | Core Box 2 | 250GB | 4GB | 2007 | N/A |
| Maria Fortiere | Desktop PC | HP | HP Pro 6300 Series | PC | 7 Pro | i5 | 4GB | 8GB | 2013 | N/A |
| Iris Vega | PC601 | HP | HP Pro 3400 Series | PC | 7 Pro | i3 | 450GB | 4GB | 2014 | N/A |
| Reudado Hernandez | PC740 | HP | HP Pro 3500 Series | PC | 7 Pro | i5 | 450GB | 16GB | 2011 | N/A |
| Ronniel Lambertiz | PC703 | HP | Elitebook 8460 | PC | 7 | i5 | 11TB | 4GB | N/A | N/A |
| Jandro Suarez | PC703 | HP | Pro 3500 | PC | 10 Pro | i5 | 11TB | 4GB | 2010 | N/A |
| Sheila Antino | | HP | Easy 360 | Laptop | 7 | i7 | 916GB | 1TB | 2013 | 15" |
| Edgar Alayon | Skye PC | HP | Pro 3500 | PC | 7 | i3 | 500GB | 4GB | 2010 | N/A |
| Yailez | PC316 | HP | 500B Microtower | PC | 10 Pro | i3 | 500GB | 4GB | 2010 | N/A |
| Franklin Mabile | PC203 | HP | 500B Microtower | PC | 7 | i3 | 500GB | 4GB | 2009 | N/A |
| Franklin Mabile | PC203 | HP | Pro 3000 | PC | 7 | i3 | 500GB | 4GB | 2009 | N/A |
| Johnny Cardona | SKYPRO0000 | HP | HP Pro 3500 Series | PC | 7 Pro | i3 | 450GB | 4GB | 2010 | N/A |
| Stephanie Benet | SKYPRO0001 | HP | HP Pro 3500 Series | PC | 7 Pro | i3 | 450GB | 4GB | 2007 | N/A |
| Mileya | PC130 | HP | 500B Microtower | PC | 7 | Core Box 2 | 500GB | 4GB | 2091 | N/A |
| ? Esquel Production | PC105 | HP | Pro 3100 | PC | 7 | i3 | 450GB | 4GB | N/A | N/A |
| QCPC | PC101A | HP | D220 | PC | XP | Pentium 4 | 40GB | 512MB | N/A | N/A |
| QCPC | PC150a | HP | Pro 3100 | PC | 7 | i3 | 500GB | 4GB | N/A | N/A |
| Vicky | PC290 | HP | Pro 3400 | PC | 7 | i3 | 500GB | 4GB | N/A | N/A |
| Production labels | PC101 | HP | Pro 3400 | PC | 7 | i3 | 250GB | 2GB | 2010 | N/A |
| Production Wright | PC148 | HP | D93200 | PC | XP | i3 | 80GB | N/A | N/A | N/A |
| Ramiro Sanchez | PC142 | HP | 800203 | PC | XP | Pentium 4 | 40GB | 1GB | 2003 | N/A |
| Ramiro Sanchez | PC410 | HP | HP290 | PC | 7 | i3 | 350GB | 4GB | 2003 | N/A |
| Ramiro Sanchez | | HP | | PC | 7 | Pentium 4 | 46GB | 4GB | 2001 | N/A |
| Jhonny Perez | | HP | Elitebook 8460w | Laptop | 7 | i5 | 450GB | 4GB | 2015 | 14" |
| Jhonny Perez | PC114 | Dell | XPS 8300 | PC | 7 | i7 | 700GB | 4GB | 2001 | N/A |
| Denny Perez | | HP | Elitebook | Laptop | RH | i5 | 11GB | 8GB | 2013 | 15" |
| Kevin S. Walter | Benty | HP | Elitebook Folio 9470m | Laptop | 7 | i7 | 500GB | 4GB | 2010 | 14" |
| Murillo Martinez | | HP | Probook 4550 | Laptop | 7 | i3 | 450GB | 4GB | 2011 | N/A |
| Joselito Garcia | | HP | Probook 6560n | Laptop | 7 | i5 | 450GB | 4GB | 2016 | N/A |
| Oscar Benitz | Joketop PC | HP | | PC | 7 Pro | i5 | 450GB | 4GB | 2013 | N/A |
| Jorge Vegara | PC402 | HP | HP Pro 3500 Series | PC | 7 Pro | i5 | 350GB | 16GB | 2013 | N/A |
| Alberchin Ibarra | Desktop PC | HP | HP 290 G1 ME | PC | 10 Pro | i5 | 450GB | 4GB | 2013 | |
| Nguyen Bui | Control opPC | HP | Pro 3000 Series | PC | 10 Pro | i3 | 450GB | 4G | 2013 | |
| Ani Nguyen | PC890 | HP | HP Pro3500 series | PC | 7 Pro | i3 | 450GB | 4GB | 2043 | |
| Mark Reform | | HP | | 7 | 7 | i3 | | | | 14" |
| Alia Greene | | HP | Elitebook Folio 9370m | Laptop | 7 | i5 | 156GB | 4GB | 2910 | |
| Melba Leon | | HP | | Laptop | 10 Pro | i7 | 250GB | 16GB | 2043 | |
| Betsy Dvoskin | | HP | | Laptop | 7 | i7 | 250GB | 16GB | 2013 | |
| Betsy Dvoskin | Kidsroom PC | HP | ZBook15 Power Workstation | PC | 7 Pro | i7 | 256GB | 16GB | 2013 | |



SkyPatrol - Miami Data Center Network Diagram



Skypatrol - Montreal Data Center Network Diagram
1350, Nobel, room K01, Boucherville,
PQ. J4B 5H3

General Inventory

| Department | Furniture | Qty | Electronic devices | Qty | Tools | Qty | General Accessories | Qty |
|---|---|---|---|---|---|---|---|---|
| Warehouse | Desk | 7 | Monitor | 3 | Bench grinder | 1 | Regular containers | All |
| Warehouse | Chair | 5 | PC | 2 | magnifying lamp | 4 | Wheel containers | 15 |
| Warehouse | Programming stations | 2 | Keyboard | 3 | Soldered | 2 | Units trays | All |
| Warehouse | | | Television | 1 | Heat gun | 2 | Racks | 8 |
| Warehouse | | | Mouse | 1 | Electric screwdrivers | 2 | Plastic sealer | 1 |
| Warehouse | | | IP Phone | 2 | Hand jack | 1 | | |
| Warehouse | | | Fedex weight scale | 1 | Mobile staircase | 1 | | |
| Warehouse | | | Label printer | 1 | Paper cutter | 1 | | |
| Warehouse | | | Bar code reader | 1 | | | | |
| Warehouse | | | Power supply | 2 | | | | |
| Warehouse | | | USB hub | 4 | | | | |
| Warehouse | | | GPS repeater | 1 | | | | |
| Vivian's office | Desk | 1 | Monitor | 2 | | | | |
| Vivian's office | Chair | 2 | PC | 1 | | | | |
| Vivian's office | Table | 1 | Keyboard | 1 | | | Racks | 9 |
| Vivian's office | File cabinet | 1 | mouse | 1 | | | | |
| Vivian's office | | | Printer | 1 | | | | |
| Vivian's office | | | Bar code reader | 1 | | | | |
| Vivian's office | | | Television | 1 | | | | |
| Vivian's office | | | IP Phone | 1 | | | | |
| Vivian's office | | | Label printer | 1 | | | | |
| Production area | Programming table | 8 | PC | 12 | Hand cart | 3 | Racks | 8 |
| Production area | Desk | 3 | Keyboard | 12 | Heat gun | 1 | FedEx supplies | All |
| Production area | Packaging table | 11 | Mouse | 12 | Drill press | 1 | UPS supplies | All |
| Production area | Programming stations | 7 | Monitor | 17 | | | Office supplies | All |
| Production area | Chair | 15 | Weight scale | 1 | | | Packaging supplies | All |
| Production area | Small table | 2 | Television | 2 | | | | |
| Production area | Water dispenser | | Fedex printer | 1 | | | | |
| Production area | | | UPS printer | 1 | | | | |
| Production area | | | IP Phone | 5 | | | | |
| Production area | | | Label printer | 3 | | | | |
| Production area | | | Printer | 1 | | | | |
| Production area | | | Miliner printer | 1 | | | | |
| Production area | | | Bar code reader | 9 | | | | |
| Production area | | | Power supply | 6 | | | | |
| Production area | | | USB hub | 14 | | | | |
| Production area | | | GSM repeater | 1 | | | | |
| Production area | | | GPS repeater | 1 | | | | |
| Sandra's office | Desk | 1 | PC | 1 | | | IP Phone supplies | All |
| Sandra's office | Chair | 3 | Keyboard | 1 | | | Office supplies | All |
| Sandra's office | | | Mouse | 1 | | | Stations supplies | All |
| Sandra's office | | | Monitor | 2 | | | Coffee marker | 1 |
| Sandra's office | | | IP Phone | 1 | | | | |
| Sandra's office | | | Printer | 1 | | | | |
| Sandra's office | | | Bar code reader | 1 | | | | |
| Hardware area | Desk | 4 | PC | 3 | | | Racks | 3 |
| Hardware area | Small conference table | 1 | Keyboard | 3 | | | Office supplies | All |
| Hardware area | Chair | 6 | Mouse | 3 | | | Whiteboards | 2 |
| Hardware area | Wall cabinets | 3 | Monitor | 5 | | | | |
| Hardware area | | | Power supply | 2 | | | | |
| Ramiro's office | Desk | 2 | PC | 1 | | | | |
| Ramiro's office | Chair | 3 | Keyboard | 1 | | | Whiteboard | 1 |
| Ramiro's office | Wall cabinets | 1 | Mouse | 1 | | | | |
| Ramiro's office | | | Monitor | 1 | | | | |
| Ramiro's office | | | IP Phone | 1 | | | | |
| Ramiro's office | | | Power supply | 4 | | | | |
| Manuel's office | Desk | 1 | PC | 1 | | | Whiteboards | 2 |
| Manuel's office | Chair | 3 | Keyboard | 1 | | | | |
| Manuel's office | Wall cabinets | 1 | Mouse | 1 | | | | |
| Manuel's office | | | Monitor | 3 | | | | |
| Manuel's office | | | IP Phone | 1 | | | | |
| Support/CAMs area | Cubicles | 16 | PC | 13 | | | Office supplies | All |
| Support/CAMs area | Chair | 12 | Keyboard | 13 | | | | |
| Support/CAMs area | | | Mouse | 13 | | | | |
| Support/CAMs area | | | Monitor | 28 | | | | |
| Support/CAMs area | | | IP Phone | 12 | | | | |
| Support/CAMs area | | | Television | 2 | | | | |
| Support/CAMs area | | | Miliner printer | 1 | | | | |
| Marketing area | Desk | 1 | PC | 1 | | | Whiteboard | 1 |
| Marketing area | Chair | 3 | Keyboard | 1 | | | | |
| Marketing area | Wall cabinets | 1 | Monitor | 2 | | | | |
| Marketing area | Aluminium shelf | 1 | Apple monitor | 1 | | | | |
| Marketing area | | | IP Phone | 2 | | | | |
| 2nd floor conference | Conference table | 1 | Projector | 1 | | | Whiteboard | 1 |
| 2nd floor conference | Small table | 1 | PC | 1 | | | Coffee maker | 1 |
| 2nd floor conference | Chair | 4 | Keyboard | 2 | | | | |
| 2nd floor conference | | | Power supply | 1 | | | | |

Schedule 1(b)

Excluded Assets

1. All customers and assets relating to the international business, the fleet business, the power sport business, the personal tracking business, the rental car business and the GPS tracking distributors.

2. The computers and office equipment, furniture, fixtures, inventory and artwork, personal items, supplies and materials not specifically listed as Purchased Assets on Schedule 1.1(a).

3. Any interest in Skypatrol Chile, Skypatrol Puerto Rico and Skypatrol Colombia.

4. Two (2) programming work stations and related equipment, 1 Zebra label printer and one barcode scanner

5. Any interest in Skypatrol Medical, LLC

6. Any patents or patents pending owned by Skypatrol LLC

7. The trademark, URL, domain name and other use of the name Skypatrol, including Skypatrol.com

Schedule 2.7

Contracts exceeding $2,500 annually

1.   ADP totalsource – employment, payroll and healthcare contract
2.   Queclink Wireless Solutions – GPS tracking device manufacturer
3.   Verizon Wireless – wireless carrier
4.   Laird Technologies - GPS tracking device manufacturer
5.   Gosafe - GPS tracking device manufacturer
6.   Vodafone Global Enterprise Ltd – wireless carrier
7.   Tran Thi Bich Van – software outsource vendor in Vietnam
8.   Kore Telematics – wireless carrier
9.   Sure-Trac, LLC – GPS device installation company
10.  Stream Technologies – wireless carrier
11.  Rogers – wireless carrier
12.  The General Center for Internet – colocation center in Montreal
13.  Jasper Wireless – wireless carrier
14.  Icon Owner Pool 1 LA – California office rent
15.  Google, Inc. – mapping
16.  Telefonica USA, Inc. – wireless carrier
17.  Transunion Risk and Alternative – insurance
18.  Milner Voice and Data – copiers and phone system

Disclosure Schedule
Section 1.2

Assumed Liabilities

1. All liabilities and obligations arising after the Closing related to the operations of the Purchased Business, including all carrier charges, federal express charges, American Express charges, travel expenses, salaries, outsource programmers expense, rent, insurance, electric, water and sewer, etc.

2. All obligations accruing after the Closing related to return materials authorizations.

3. The carrier charges payable after the Closing related to product sold prior to the Closing.

Disclosure Schedule
Section 2.3

Permitted Liens

None

Disclosure Schedule
Section 2.8

Pending Legal Matters

1. *Skypatrol v. ORBIMATICS S.A. DE C.V., a foreign company, and JOSE GERSTL, individually,* CASE NO. 14-3126 CA 02 IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA; this is a collection matter for Skypatrol product purchased in Miami for sale in Mexico. We have filed the lawsuit in Miami. Gerstl fought jurisdiction. Skypatrol won the jurisdiction issue in the circuit court and the decision was affirmed by the appellate court. Gerstl has not answered the complaint and Skypatrol is moving for a default.

2. ACP, Inc. v. Skypatrol, LLC et al CASE NO. 4:13-cv-01572-PJH, Court of Appeals Docket #: 13-16840 Appeal From: U.S. District Court for Northern California, Oakland; ACP is a private equity firm that agreed to invest in the combined companies of Skypatrol and Passtime USA. Both Passtime and Skypatrol had worked over many months to strategize what a merger would look like between the companies and ACP had commenced their due diligence. ACP had proposed some changes that were not acceptable to Passtime so Stanley Sewartz, CEO of Passtime, advised Skypatrol and ACP it would not continue to pursue ACP's proposed transaction. ACP ultimately filed a lawsuit to collect costs and fees it incurred for the purpose financing the joint company. The trial court ruled on summary judgment in favor of Skypatrol and Passtime. ACP filed an appeal. The matter was briefed and a hearing held. The appellate court affirmed the trial court but didn't rule out promissory estoppel if appropriate. ACP brought a promissory estoppel claim and discovery has been completed. Skypatrol and Passtime filed a summary judgment, which will be argued in the near future.

3. Bradley Ponsford v. Skypatrol, LLC and Topp Group, Inc., Case No. R1C1616124, Superior Court in the State of California in the County of Riverside. The complaint alleges (1) wrongful discharge/constructive discharge in violation of public policy; (2) unlawful retaliation –whistle blowing; (3) violation of unfair competition law. The case was moved to federal court based on diversity of the parties. Plaintiff has filed to remand to state court. The Plaintiff filed in their remand that the matter in controversy was less than $75,000. The Plaintiff was dismissed as part of a Reduction in Workforce. The Plaintiff was a regional manager and was the lowest performing regional manager.

4. Victor Yotis vs Skypatrol LLC, Case no. 17-CA-002103, in the Circuit Court of the Thirteenth Judicial Circuit, in Hillsborough County, Florida, Civil Court Division. The lawsuit is for unpaid commissions after termination. No demand was made and we don't have any information about commissions owed to him. The answer is due on April 3, 2017.

5. Orthosie Systems, LLC v Skypatrol, LLC. Civil Action no. 4:16-cv-997; United States District Court for the Eastern District of Texas. This is a complaint for patent infringement. The answer is due on or before April 10, 2017.

6. Skypatrol LLC (Florida predecessor of Skypatrol Delaware) v. Morrison Forester, LLP, Case No. 15:012370 CA 01, in the 11th Judicial Circuit in Miami-Dade County. Skypatrol (Florida) filed challenging the overcharging of legal fees. Defendant counterclaimed for unpaid legal fees. Defendant filed for partial summary judgment, which is scheduled to be argued on May 8, 2017.

Disclosure Schedule
Section 2.9

Conduct Since February 28, 2017

None

Disclosure Schedule
Section 2.11

Licenses and Permits

Skypatrol has not paid the license fees to Spireon since January 2016, as required by the terms of the settlement agreement between Skypatrol, Schumacher and Spireon dated August 2013. The license agreement will terminate on June 30, 2017. (See also Section 2.16 of the Disclosure Schedule.)

Disclosure Schedule
Section 2.13

Indebtedness

None

Disclosure Schedule
Section 2.15

| Employee Name | Title | Pay Rate | | Rate Type | Frequency |
|---|---|---|---|---|---|
| Alarcon,Edgar A | Clerk Truck Driver | 12.00 | | Hourly | Bi-weekly |
| Alvarez,Vivian P | Production Supervisor | 1,207.12 | | Salaried | Bi-weekly |
| Amado,Magda | Purchasing Supervisor | 1,440.00 | | Salaried | Bi-weekly |
| Bradberry,Jeffrey W | Sales Executive | 2,250.00 | * | Salaried | Semi-monthly |
| Brennan,Theodore J | Chief Financial Officer | 4,833.33 | | Salaried | Semi-monthly |
| Bui,Nguyen H.T. | Chief Technical Officer | 4,583.33 | | Salaried | Semi-monthly |
| Cardona,Johnny | RMA Technician | 13.00 | | Hourly | Bi-weekly |
| Castro,Sandra | Director of Operations | 2,096.15 | | Salaried | Bi-weekly |
| Espana,Jorge Humberto | Technical Support Agent | 12.00 | | Hourly | Bi-weekly |
| Garcia,Jennifer | Customer Account Manager | 13.00 | | Hourly | Bi-weekly |
| Guridi,Oscar | Technical Support Agent | 12.00 | | Hourly | Bi-weekly |
| Gutierrez,Natalia | Accounts Payable Clerk | 17.00 | | Hourly | Bi-weekly |
| Guzzardi,Michael F. | Midwest Regional Sales Director | 3,000.00 | * | Salaried | Semi-monthly |
| Hernandez,Humberto | Field Support Technician | 1,307.69 | | Salaried | Bi-weekly |
| Hilzen,Michelle Ann | Customer Account Manager | 15.00 | | Hourly | Bi-weekly |
| Juarez,Stephanie | Warehouse Clerk | 13.50 | | Hourly | Bi-weekly |
| Landestoy,Yammir Rafael | Technical Support Supervisor | 16.35 | | Hourly | Bi-weekly |
| Leon,Mario | Marketing Manager | 2,916.67 | | Salaried | Semi-monthly |
| Madriz,Franklin Jamil | Programmer | 11.50 | | Hourly | Bi-weekly |
| Martinez,Maurilio | Winn-back Account Manager | 12.00 | * | Hourly | Semi-monthly |
| Matalon,Nathan Jacob | Sales Rep | - | | N/A | Commissions |
| McGee,Thomas Wilson | Regional Sales Executive | 2,291.67 | * | Salaried | Semi-monthly |
| Morales Sanchez,Betsy A | Graphic Designer | 1,875.00 | | Salaried | Semi-monthly |
| Nguyen,Nhu An Thuy | Quality Assurance Technician | 17.31 | | Hourly | Semi-monthly |
| Phan, Khuong Nhat | Software Engineer | 1,666.67 | | Salaried | Semi-monthly |
| Pozas,Manuel | VP of IT | 3,166.67 | | Salaried | Semi-monthly |
| Renne,Wesley R | Sales Executive | 2,250.00 | * | Salaried | Semi-monthly |
| Rodriguez,Mireya | Programmer | 11.50 | | Hourly | Bi-weekly |
| Rodriguez,Yadira | Shipping | 13.00 | | Hourly | Bi-weekly |
| Roques,Renaud | Software Engineer | 10.00 | | Hourly | Bi-weekly |
| Rosales,Francisco L. | Jr. Project Manager | 1,583.33 | | Salaried | Semi-monthly |
| Sanchez,Wilmer R | Director of Hardware Engineering | 3,125.00 | | Salaried | Semi-monthly |
| Simpson,Megan Somer | Strategic Account Manager | 2,208.33 | | Salaried | Semi-monthly |
| Soulong,Sarphy E | Hardware Engineer | 2,916.67 | | Salaried | Semi-monthly |
| Torres,Romy M | Project Manager | 3,000.00 | | Salaried | Semi-monthly |
| Tramonte,Sam J | Sales Executive | 1,583.33 | * | Salaried | Semi-monthly |
| Turner,James Craig | Eastern Regional Sales Director | 3,500.00 | * | Salaried | Semi-monthly |
| Vega,Ipsia | Accounts Receivable Manager | 1,560.00 | | Salaried | Semi-monthly |

\*   Plus car allowance, commissions and bonus
\*\*  Stay on payroll through 5/15/17

**Disclosure Statement**
**Section 2.16**

Intellectual Property

Protek name, logo and domain name: ProtekGPS, www.protekGPS.com

Defender name, logo and domain name: Defender GPS, www.defenderGPS.com

Skypatrol name, logo and domain name (to be provided to Purchaser under license agreement with Seller)

Seller is licensed to use third party software programs from the following companies:

> Google for mapping
> TLO (TransUnion) for Data Verification Tool (DVT Reports)
> Authorize.net for e-check and credit card processing
> Zoho for CRM
> Microsoft SQL Server 2008 R2 databases
> Twilio SMS service (https://www.twilio.com/)

Seller has developed a proprietary software system that includes gateways, decoders, web servers, reverse geocoding, mobile applications with Android and Apple for Protek, Defender and Installations, production/warehouse system, analytics system, and user interfaces that are all used in the Business.

| Tracking system | Gateways and Decoders |
|---|---|
| | Web servers |
| | SQL Server 2008 R2 - Database Server |
| | Reverse Geocoding Server |
| Billing system | Accounting software including Sage, Myorders |
| | Zoho account and backend syncing periodically |
| Mobile Apps | Google stores: Install app and Consumer App<br>https://play.google.com/store/apps/details?id=activities.skypatrol.com.skypatrol_ht<br>https://play.google.com/store/apps/details?id=com.defender.tools |
| | Apple stores: Install app and Consumer App<br>https://itunes.apple.com/us/app/skypatrol-installation/id967299451?mt=8<br>https://itunes.apple.com/us/app/protekGPS-tracking-solutions/id1078370039?mt=8 |
| Mobile web apps | for all UI app with mobile web apps:<br>http://mdefender.skypatrol.com<br>http://mobile.protekGPS.com<br>http://mobile.protekGPSplus.com |
| Provisioning software | The program that we are using in Production warehouse to port firmware/config to the device |
| Other software | API Web Service http://wsp.skypatrol.com/help |
| | TLO – Data Verification Tool |
| | Skypatrol Carrier Services |
| | Payment Gateway with Authorize.net |

Skypatrol had entered into a Settlement, Release and License Agreement with Spireon, among others, dated August 2013. The License Agreement survives for the duration of the patents in 2017 and 2018. Skypatrol has not paid any license fees since January 1, 2016. Pursuant to a notice dated March 31, 2017 from Spireon, the License Agreement will terminate effective June 29, 2017 (90 days after the notice date). Skypatrol does not intend to take action with respect to the notice or the license fees.

# EXHIBIT B

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE *"SECURITIES ACT"*), OR UNDER THE PROVISIONS OF ANY APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THIS NOTE MAY NOT BE SOLD, PLEDGED, TRANSFERRED OR ASSIGNED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER PROVISIONS OF THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT.

## SECURED PROMISSORY NOTE

$900,000.00

May 1, 2017 (the *"Issuance Date"*)

FOR VALUE RECEIVED, VBI Group LLC, a Delaware limited liability company doing business as Skypatrol USA (*"Maker"*), hereby promises to pay to Skypatrol, LLC, a Delaware limited liability company, or its registered assigns (*"Holder"*), the sum of Nine Hundred Thousand Dollars ($900,000), pursuant to the Asset Purchase Agreement dated as of May 1, 2017 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the *"Purchase Agreement"*) and in accordance with the terms of this Secured Promissory Note (this *"Note"*). Capitalized terms used herein without definition have the meanings given in the Purchase Agreement.

1.    **Payment of Principal**. Maker shall pay the principal amount of this Note in twenty-six (26) equal monthly installments of Thirty-Four Thousand Six Hundred Fifteen and 38/100 Dollars ($34,615.38) commencing on September 28, 2017 and continuing on the twenty-eighth (28th) day of each and every month thereafter (each such date, a *"Payment Date"*) through and including October 28, 2019 (the *"Maturity Date"*) when the entire unpaid balance and all accrued and unpaid interest thereon shall be due and payable.

2.    **Interest**.

2.1    Interest Rate. Interest on this Note shall commence accruing on the Issuance Date at a rate equal to five percent (5%) per annum on the unpaid principal balance(the *"Interest Rate"*) and shall be computed on the basis of a 365-day year and actual days elapsed. Except as otherwise provided herein, interest payable pursuant to this Note shall be payable in arrears on each Payment Date, including the Maturity Date, when all accrued and unpaid interest shall be due and payable.

2.2    Default Rate. During the continuance of an Event of Default, the Interest Rate shall be increased to fifteen percent (15%). In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure; provided that the interest as calculated at such increased rate during the continuance of such Event of Default shall continue to apply to the days after the occurrence of such Event of Default through and including the date of cure of such Event of Default.

3.    **Security**. The indebtedness evidenced by this Note is secured to the extent and in the manner set forth in the Security Agreement.

4.    **Interest Method of Payment; Application**. All payments of principal (including any prepayments) of this Note shall be made by wire transfer of immediately available funds to the account set forth on Exhibit A hereto, or as Holder may from time to time otherwise designate in writing. Payments (including all prepayments) received by Holder on this Note shall be applied first to the payment of accrued and unpaid interest and only thereafter to the outstanding principal balance of this Note.

5.    **Prepayment**. This Note may be prepaid in whole or in part without premium or penalty.

6.    **Events of Default**. If any one or more of the following events (each such event is herein referred to as an "Event of Default") shall happen, the Holder shall have the rights described within Section 7 hereof:

(a)    default in the payment of principal or interest on this Note when the same shall become due and payable, and such default continues for five (5) Business Days after written notice of such default is delivered to Maker;

(b)    Maker's material failure to comply with any of the provisions of this Note, the Purchase Agreement, the Security Agreement or any other Transaction Document, and such failure continues for fifteen (15) days after written notice of such failure is delivered to Maker; provided that no Event of Default shall occur hereunder if such failure cannot be cured in such 15-day period so long as Maker commences to cure such failure within said 15-day period and thereafter uses reasonable diligence to cure such failure and completes such cure within forty-five (45) days after written notice of such failure was originally delivered to Maker;

(c)     the material inaccuracy of any representation or warranty contained in this Note, the Purchase Agreement, the Security Agreement or any other Transaction Document that has a Material Adverse Effect on Holder's Lien on the Collateral (as defined in the Security Agreement), Holder's rights under any of the Transaction Documents, or Maker's ability to perform its obligations under any of the Transaction Documents;

(d)     Maker's (i) application for, or consent to, the appointment of a receiver, trustee or liquidator of Maker or of its property, (ii) written admission of its insolvency or its inability to pay its debts as they mature, or (iii) general assignment of its assets for the benefit of creditors;

(e)     Maker's filing of a voluntary petition in bankruptcy or a petition or an answer seeking reorganization, or an arrangement with creditors;

(f)     the entry of a court order approving a bankruptcy petition filed against Maker that is not vacated or set aside within sixty (60) days;

(g)     the Security Agreement, together with any associated filings and/or actions, shall for any reason other than any act or omission of Holder, fail or cease to create a valid and perfected first priority Lien on the Collateral (as defined in the Security Agreement) in favor of Secured Party (as defined in the Security Agreement);

(h)     the occurrence of an event of default under any of the other Transaction Documents (including any amendment, modification or extension thereof) which is not cured within any applicable cure period (if any) set forth therein.

7.     **Rights of Maker upon Default**. Upon the occurrence of an Event of Default, and at any time thereafter during the continuance of such Event of Default, Holder may, by written notice to Maker, declare all outstanding principal and interest to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived to the fullest extent permitted by law, anything contained herein to the contrary notwithstanding. In addition to the foregoing remedies, upon the occurrence and during the continuance of any Event of Default, Holder may exercise any other right, power or remedy granted to it or permitted to it by law, either by suit in equity or by action at law, or both.

8.     **Costs of Collection**. If an Event of Default occurs in the payment of this Note, Maker shall pay Holder hereof all costs of collection, including reasonable attorneys' fees and expenses paid or incurred by Holder in connection with collection of this Note, whether paid or incurred in connection with collection by suit or otherwise.

9.     **Notices**. All notices, approvals, consents, correspondence or other communications required or desired to be given hereunder shall be given in accordance with Section 10.2 of the Purchase Agreement.

10.     **Miscellaneous**.

10.1     Waivers. Maker hereby, to the fullest extent permitted by Law: (a) waives demand, presentment, protest, notice of dishonor, suit against or joinder of any other person, and all other requirements necessary to charge or hold ~~maker~~ Maker liable with respect to this Note; (b) waives any right to immunity from any such action or proceeding and waives any immunity or exemption of any property, wherever located, from garnishment, levy, execution, seizure or attachment prior to or in execution of judgment, or sale under execution or other process for the collection of debts; (c) waives any right to interpose any set-off or non-compulsory counterclaim or to plead laches or any statute of limitations as a defense in any such action or proceeding; and (d) irrevocably waives the right to direct the application of any and all payments at any time hereafter received by Holder from or on behalf of Maker.

10.2     Stamp Tax. Maker shall pay any documentary stamp required with respect to the execution, delivery, performance or enforcement of this Note.

10.3     Amendments. This Note and any provision hereof may only be amended by an instrument in writing signed by Maker and Holder. The term "*Note*" and all references thereto, as used throughout this instrument, shall mean this instrument as originally executed and as may be amended or supplemented.

10.4     Failure or Indulgence Not Waiver; Remedies Cumulative. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

10.5     Assignment. This Note shall be binding upon Maker and its successors and permitted assigns, and shall inure to the benefit of Holder and its successors and assigns. Maker shall not assign this Note or any proceeds of it, or assign

or delegate any of its rights or obligations, without the prior written consent of Holder in each instance. Secured Party, in its sole discretion, may transfer this Note, and may sell or assign participations or other interest in all or any part of this Note, all without notice to or the consent of Maker.

10.6     Usury. It is the express intent of Maker and Holder that the payment of all or any portion of the outstanding principal balance of and accrued interest on this Note be exempt from the application of any applicable usury law or similar laws under any federal, state of foreign jurisdiction. Maker hereby irrevocably waives, to the fullest extent permitted by law, any objection or defense which Maker may now or hereafter have to the payment when due of any and all principal or accrued interest arising out of or relating to a claim of usury or similar laws and Maker hereby agrees that neither it nor any of its affiliates shall in the future bring, commence, maintain, prosecute or voluntarily aid in any action at law, proceeding in equity or other legal proceeding against Holder based on a claim that Maker's payment obligations under this Note violate the usury or similar laws of any federal, state or foreign jurisdiction. Notwithstanding the foregoing, in the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, that portion of the interest payment representing an amount deemed to be in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note, or, if this Note has been paid in full, refunded to Maker.

10.7     Governing Law: Jurisdiction. This Note shall be governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of laws. The parties hereby irrevocably and unconditionally consent to the exclusive jurisdiction of the courts of the State of Florida located in Miami-Dade County and the United States District Court for the Southern District of Florida for any action, suit or proceeding arising out of or relating to this Note, and agree not to commence any action, suit or proceeding related thereto except in such courts. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE OR ANY TRANSACTION DOCUMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.8     Obligations Not Affected. No renewal or extension granted, or any indulgence shown to, or any release of, or any dealings between Holder and any other Person now or hereafter interested in this Note, whether as owner, encumbrancer, guarantor, or otherwise, shall discharge, extend or in any way affect the obligations of Maker hereunder.

10.9     Entire Agreement. This Note, the other Transaction Documents, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written. In the event of any inconsistency between the terms of this Note and any schedule or exhibit hereto, the terms of this Note shall govern.

10.10    Counterparts. This Note may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Note may also be executed and delivered by facsimile signature, PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com).

[SIGNATURE PAGE FOLLOWS]

In Witness Whereof, the parties have executed this Note as of the Issuance Date.

MAKER:

VBI GROUP LLC, a Delaware limited liability company doing business as Skypatrol USA

By: _____
Sam-Mahrouq
Chief Executive Officer

HOLDER:

SKYPATROL, LLC

By: _____
Robert D. Rubin
Chief Executive Officer and President

## EXHIBIT A

Wiring Instructions

[to be attached]

**patrol**

# SKYPATROL, LLC – CITY NATIONAL BANK OF FLORIDA
# INTERNATIONAL INSTRUCTIONS FOR INCOMING WIRES

| | |
|---|---|
| Beneficiary Bank:<br>Beneficiary Bank Address: | City National Bank of Florida<br>1450 Brickell Ave 28th Floor<br>Miami, FL 33131 |
| ABA/Fed ABA:<br>SWIFT Code: | 066004367<br>CINAUS6L |
| Beneficiary Name:<br>Beneficiary Address: | Skypatrol, LLC<br>3055 NW 84th Ave<br>Doral, FL 33122 |
| Beneficiary Account: | 1954628179 |
| Intermediary Bank:<br>Bank Location:<br>SWIFT Code: | Wells Fargo Bank Int'l<br>San Francisco, CA<br>WFBIUS6S |

# EXHIBIT C

## GUARANTY

This Guaranty ("*Guaranty*") is dated as of May 1, 2017, by Sam Mahrouq, an individual, ("*Guarantor*"), in favor of Skypatrol, LLC, a Delaware limited liability company ("*Secured Party*"). Capitalized terms used but not otherwise defined herein shall have the meanings given in the Note or the Purchase Agreement, as the case may be.

### Recitals

A.  Pursuant to the Asset Purchase Agreement dated as of May 1, 2017 (the "*Purchase Agreement*"), by and among Secured Party, VBI Group LLC, a Delaware limited liability company doing business as Skypatrol USA ("*Purchaser*" or "*Debtor*") and Guarantor, Purchaser is acquiring the Purchased Assets from Secured Party.

B.  Pursuant to the Purchase Agreement, a portion of the Purchase Price will be paid at Closing, a portion of the Purchase Price will be paid in cash installments over the four (4) month period following the Closing and a portion of the Purchase Price will be paid pursuant to a Note issued by Purchaser in favor of Secured Party.

C.  Guarantor is an officer, director and sole member of Purchaser, and Guarantor acknowledges and agrees that he will derive benefit under the Purchase Agreement and the Transaction.

D.  As an inducement to Secured Party to enter into the Purchase Agreement and consummate the Transaction, and as consideration therefor, Guarantor has agreed to enter into this Guaranty in favor of Secured Party.

NOW THEREFORE, in consideration of the premises and covenants hereinafter contained, and to induce Secured Party to consummate the Transaction, Guarantor hereby agrees as follows:

### 1.  Guaranty.

1.1    Guaranty. Guarantor hereby unconditionally and irrevocably guarantees, jointly and severally with any other guarantor of the Obligations, the punctual payment, performance and observance when due, whether at stated maturity, by acceleration or otherwise, of all of the Obligations now or hereafter existing, whether for principal, interest (including all interest that accrues after the commencement of any insolvency, bankruptcy or reorganization of Purchaser, whether or not constituting an allowed claim in such proceeding), fees, commissions, expense reimbursements, liquidated damages, indemnifications or otherwise arising under (i) Purchaser's obligations under the Purchase Agreement to make the Cash Payments and the Earn-Out Payments and (ii) the Note (such obligations, to the extent not paid by Purchaser being the "*Guaranteed Obligations*" and included in the definition of "Obligations" in the Security Agreement), and agrees to pay any and all costs, fees and expenses (including reasonable counsel fees and expenses) incurred by Secured Party in enforcing any rights under this Guaranty. Without limiting the generality of the foregoing, Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by Purchaser to Secured Party, but for the fact that they are unenforceable or not allowable due to the existence of an insolvency, bankruptcy or reorganization involving Purchaser.

1.2    Guaranty Absolute. Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Note and the Purchase Agreement, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Secured Party with respect thereto. The obligations of Guarantor under this Guaranty are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against Guarantor to enforce such obligations, irrespective of whether any action is brought against Purchaser or any other guarantor or whether Purchaser or any other guarantor is joined in any such action or actions. The liability of Guarantor under this Guaranty constitutes a primary obligation, and not a contract of surety, and to the extent permitted by law, shall be irrevocable, absolute and unconditional irrespective of, and Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity of the Note or the Purchase Agreement or any other Transaction Document;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any amendment or waiver of or any consent to departure from the Note or the Purchase Agreement, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to Purchaser or otherwise;

(c)    any taking, exchange, release, subordination or non-perfection of any Collateral (as defined in the Security Agreement), or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the recovery of any judgment against Purchaser or any action to enforce the same;

(e)       any failure by Secured Party to give notice of default to Guarantor or any other notice to Guarantor;

(f)       the occurrence or continuance of any event of bankruptcy, reorganization or insolvency with respect to Guarantor or Purchaser, or the dissolution, liquidation or winding up of Guarantor or Purchaser;

(g)       any change, restructuring or termination of the corporate structure or existence of Purchaser; or

(h)       any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by Secured Party that might otherwise constitute a defense available to, or a discharge of, Purchaser or any other guarantor or surety.

1.3       Primary Obligation. Guarantor is a primary obligor and not merely a surety for the Guaranteed Obligations and Secured Party may, in its sole discretion, bring and prosecute a separate action or actions against Guarantor for the full amount of the Guaranteed Obligations, regardless of whether action is brought against Purchaser or any other Person, whether or not Purchaser or any other Person is joined in any such action or actions. Guarantor unconditionally waives, to the extent permitted by applicable Law, (a) notice of any of the matters referred to in this Section 1, the incurrence of any Guaranteed Obligations, any breach or default by Purchaser with respect to the Guaranteed Obligations or any other notice required, by Law or otherwise, to preserve the rights of Secured Party against Guarantor and (b) presentment to or demand of payment from Purchaser or Guarantor with respect to the Note, Purchase Agreement or any other Transaction Document, or protest for nonpayment or dishonor.

**2.       Demand by Secured Party.** In addition to the terms of this Guaranty set forth herein, and in no manner imposing any limitation on such terms, it is expressly understood and agreed that, if the Obligations are declared to be or otherwise become immediately due and payable, then Guarantor shall, upon demand in writing therefor by Secured Party to Guarantor, immediately pay the Guaranteed Obligations to Secured Party. Payment by Guarantor shall be made to Secured Party to be credited and applied upon the Guaranteed Obligations, in immediately available funds, to an account designated by Secured Party or at any address that may be specified in writing from time to time by Secured Party within the continental United States. This section shall in no way affect Secured Party's right to resort to any Collateral that may be held by Secured Party without demand as provided herein. Any payment received by Secured Party with respect to the Obligations shall reduce the Guaranteed Obligations by the amount of such payment.

**3.       Guarantor Waivers, Etc.**

3.1       Waivers Etc. Guarantor hereby acknowledges and agrees as follows, to the fullest extent allowed by Law:

(a)       Guarantor expressly waives any right he may now or in the future have to require Secured Party to, and Secured Party shall not have any liability to, first pursue or enforce against Debtor, the Collateral, or any other security, guaranty, or pledge that may now or hereafter be held by Secured Party for the Obligations or for the Guaranteed Obligations, or to apply such security, guaranty, or pledge to the Obligations or to the Guaranteed Obligations (except with respect to funds or proceeds thereof or received with respect thereto), or to pursue any other remedy in Secured Party's power that Guarantor may or may not be able to pursue itself and that may lighten Guarantor's burden, before proceeding against the Collateral. Guarantor shall remain liable for the Guaranteed Obligations, notwithstanding any judgment Secured Party may obtain against Debtor, any other guarantor of the Obligations, or any other Person, or any modification, extension, or renewal with respect thereto.

(b)       Guarantor has entered into this Guaranty based solely upon his independent knowledge of Debtor's financial condition and Guarantor assumes full responsibility for obtaining any further information with respect to Debtor or the conduct of its business. Guarantor represents that he is now, and during the term of this Guaranty will be, responsible for ascertaining the financial condition of Debtor. Guarantor hereby waives any duty on the part of Secured Party to disclose to Guarantor, and agrees that he is not relying upon nor expecting Secured Party to disclose to him, any fact known or hereafter known by Secured Party relating to the operation or condition of Debtor or its business. Guarantor knowingly accepts the full range of risk encompassed in a contract of guaranty, which risk includes the possibility that Debtor may incur indebtedness after its financial condition or its ability to pay its debts as they mature has deteriorated.

(c)       Secured Party shall not be under any liability to marshal any assets in favor of Guarantor or in payment of any or all of the Obligations or Guaranteed Obligations.

(d)       Guarantor hereby waives: (i) presentment, demand, protest, notice of acceleration, dishonor, non-payment, protest, or any delay related thereto, with respect to any instruments or documents relating to the Obligations or the Guaranteed Obligations; (ii) notice of any extension, modification, renewal, or amendment of any of the terms of the Note or any other Transaction Document relating to the Obligations or the Guaranteed Obligations; (iii) notice of

the occurrence of any Event of Default with respect to the Obligations, the Guaranteed Obligations, or the Collateral; and (iv) notice of any exercise or non-exercise by Secured Party of any right, power, or remedy with respect to the Obligations, the Collateral, or the Guaranteed Obligations.

(e)     If Secured Party may, under applicable Law, proceed to realize its benefits under any Transaction Document giving Secured Party a lien upon any Collateral, either by judicial foreclosure or by nonjudicial sale or enforcement, Secured Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Guaranty. If, in the exercise of any of its rights and remedies, Secured Party shall forfeit any of its rights or remedies under any Transaction Document, including obtaining a deficiency judgment against Debtor or any other person, whether because of any applicable laws pertaining to "election of remedies," anti-deficiency rules, or the like, Guarantor hereby consents to such action by Secured Party and waives any claim based upon such action. Any election of remedies that results in the denial or impairment of the right of Secured Party to seek a deficiency judgment against Debtor shall not impair Guarantor's obligations under this Guaranty. In the event Secured Party shall bid at any foreclosure or trustee's sale or at any public or private sale permitted by law or the Transaction Documents, Secured Party may bid all or less than the amount of the Obligations or the Guaranteed Obligations and the amount of such bid need not be paid by Secured Party but shall be credited and applied as set forth in Section 11 hereof. The amount of the successful bid at any such sale, whether Secured Party or any other party (including Guarantor) is the successful bidder, shall be deemed to be *prima facie* evidence of the fair market value of the Collateral sold and the amount remaining after application of such bid amount in the manner set forth in Section 11 hereof shall be deemed to be *prima facie* evidence of the amount of the Obligations.

(f)     Until payment in full of the Guaranteed Obligations, Guarantor shall have no right of subrogation, reimbursement, indemnity, or contribution, and shall have no recourse with respect to the Collateral or any lien held therefor, all of which Guarantor expressly waive.

(g)     Guarantor agrees and represents that the Obligations are and shall be incurred by Debtor, and that the Guaranteed Obligations are and shall be incurred by Guarantor, for business and commercial purposes only. Guarantor agrees that any claim of Secured Party against Guarantor arising out of this Guaranty arises out of the conduct by Guarantor of their trade, business, or profession. Guarantor undertakes all the risks encompassed in the Note and the other Transaction Documents as they may be now or are hereafter agreed upon by Secured Party and Debtor. Secured Party, in such manner and upon such terms and at such time as it deems best, and with or without notice to Guarantor, may release, add, subordinate or substitute security for the Obligations or the Guaranteed Obligations.

(h)     Guarantor waives and agrees that he shall not at any time insist upon, plead, or in any manner whatever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, or redemption laws, exemption, whether now or at any time hereafter in force, which may delay, prevent, or otherwise affect the performance by Guarantor of the Guaranteed Obligations or the enforcement by Secured Party of this Guaranty.

(i)     Guarantor expressly waives the benefit of any statute of limitation affecting the Obligations and expressly agrees that the running of a period of limitation on, or Secured Party's delay or omission in, any action by Secured Party against Debtor or for the foreclosure of any lien or the enforcement of any security interest in the Collateral shall not exonerate or affect Guarantor's liability to pay and perform the Guaranteed Obligations.

(j)     Guarantor waives any defense based upon or arising by reason of: (i) any disability or other defense of Debtor or any other person; (ii) the cessation of liability or limitation from any cause whatsoever of the Obligations or any portion thereof, other than payment in full or payment of such portion; (iii) any lack of authority of any agent or other person acting or purporting to act on behalf of Debtor, or any defect in the formation of Debtor; (iv) the application by Debtor of the proceeds of the Obligations or any other obligation of Debtor or Secured Party for purposes other than the purposes represented to, or intended or understood by Secured Party; (v) any act or omission by Secured Party that directly or indirectly results in or aids the discharge of Debtor or any portion of the Obligations or any other obligation of Debtor to Secured Party by operation of law or otherwise; or (vi) any modification of the Obligations or any other obligation of Debtor to Secured Party in any form whatsoever, including the renewal, extension, acceleration or other change in time for payment of the Obligations, or other change in the terms of the Obligations or any part thereof, including increase or decrease of the rate of interest thereon.

3.2     Reasonableness and Effect of Waivers. Guarantor warrants and agrees that each of the waivers set forth in this Guaranty is made with full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective only to the maximum extent permitted by law.

4.      **Continuing Guaranty; Assignments**. This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the later of the indefeasible cash or other payment in full of the Guaranteed Obligations, (b) be binding upon Guarantor, its successors and assigns, and (c) inure to the benefit of and be enforceable by Secured Party and its successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), Secured Party may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Guaranty (including all or any portion of its Note owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Secured Party or otherwise.

5.      **Subrogation**. Guarantor will not exercise any rights that it may now or hereafter acquire against Secured Party or other guarantor (if any) that arise from the existence, payment, performance or enforcement of Guarantor's obligations under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from Secured Party or other guarantor (if any), directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this Guaranty shall have been indefeasibly paid in full.

6.      **Representations and Warranties**. Guarantor represents and warrants to Secured Party as follows, which representations and warranties shall survive the execution and delivery of this Guaranty:

        (a)     Guarantor has and, until the Guaranteed Obligations are paid in full, will continue to have, the requisite power to execute, deliver and perform its obligations under this Guaranty.

        (b)     The execution, delivery and performance of this Guaranty: (i) does not and will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of Law, any order or judgment of any court or Governmental Authority or any indenture, agreement or other instrument to which Guarantor is a party or by which Guarantor or any of Guarantor's assets is or may be bound or affected; (ii) does not and will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of Guarantor's assets; and (iii) does not and will not require any authorization or license from, or any filing with, any Governmental Authority.

        (c)     This Guaranty constitutes the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally, and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

        (d)     The Guaranteed Obligations are not subject to any offset or defense against Secured Party or Debtor of any kind, and Guarantor specifically waives its right to assert any such defense or right of offset. Guarantor further agrees that the Guaranteed Obligations shall not be subject to any counterclaims, offsets, or defenses against Secured Party or Debtor that may arise in the future, except for (i) any defense of prior performance or payment, (ii) any defense based on any applicable provision of the Uniform Commercial Code (as defined in the Security Agreement) requiring that the Collateral be disposed of in a commercially reasonable manner, which Debtor or Guarantor may have or assert, or (iii) applicable provisions of the laws of the State of Florida governing the disposal of the Collateral upon foreclosure of the liens created thereon by any Security Agreement in favor of Secured Party.

7.      **Consultation with Legal Counsel**. Guarantor acknowledges that the waivers and other terms set forth in Section 3 herein are a material inducement to Secured Party to make the advances under the Transaction Documents and that Secured Party is relying upon the foregoing waivers in its future dealings with Debtor. Guarantor warrants and represents that it has reviewed the foregoing waivers with its legal counsel and that, after such review with its legal counsel, Guarantor has agreed to the foregoing waivers.

8.      **Expenses**. Guarantor shall pay to Secured Party, on demand, the amount of any and all reasonable expenses, including reasonable attorneys' fees and expenses, which Secured Party may incur in connection with exercise or enforcement of any the rights, remedies or powers of Secured Party hereunder.

9.      **Term; Binding Effect**. This Guaranty shall (a) remain in full force and effect until payment and satisfaction in full of all of the Guaranteed Obligations; (b) be binding upon Guarantor and its successors and permitted assigns; and (c) inure to the benefit of Secured Party and its successors and assigns. Upon the payment in full of the Guaranteed Obligations, (i) this Guaranty shall terminate and (ii) Secured Party will, upon Guarantor's request and at Guarantor's expense, execute and deliver to Guarantor such documents as Guarantor shall reasonably request to evidence such termination, all without any representation, warranty or recourse whatsoever.

10. **Governing Law; Jurisdiction; Waiver of Jury Trial**.

10.1    Governing Law; Jurisdiction. This Guaranty shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts or choice of law. Any legal action or proceeding against Guarantor with respect to this Guaranty may be brought in the state or federal courts of Miami-Dade County, Florida and, by execution and delivery of this Guaranty, Guarantor hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Guarantor hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Guaranty brought in the aforesaid courts and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Guaranty or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Guaranty and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by applicable Law.

10.2    Waiver of Jury Trial. The parties hereto hereby waive, to the extent permitted by law, the right to trial by jury in any action or proceeding involving, directly or indirectly, any matter of any kind whatsoever in any way arising out of, related to, or connected with this Guaranty, any document related hereto or the relationships established hereunder or thereunder.

11.    **Application of Payments**. Any payment made by Guarantor under this Guaranty may be applied by Secured Party, in Secured Party's sole discretion, first, to the satisfaction of Guarantor's indemnification liabilities pursuant to Section 12, and then to the Guaranteed Obligations, in any order that Secured Party, in its sole discretion, may determine.

12.    **Indemnification**. Guarantor shall indemnify and hold Secured Party harmless from and against any liabilities, claims and damages, including reasonable costs, attorneys' fees, and disbursements, and other expenses incurred or arising in respect of any action to enforce payment of the Guaranteed Obligations. The liabilities of Guarantor under this Section 12 shall survive the termination of this Guaranty.

13.    **Reinstatement**. This Guaranty shall remain in full force and effect and continue to be effective, as the case may be, if at any time payment and performance of the Guaranteed Obligations under the Transaction Documents, or any part thereof, is, pursuant to applicable law, avoided, rescinded or reduced in amount, or must otherwise be restored or returned by Secured Party, or any obligee of the Guaranteed Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is avoided, rescinded, reduced, restored, or returned, the Guaranteed Obligations shall be reinstated and deemed reduced only by such amount paid and not so avoided, rescinded, reduced, restored, or returned.

14.    **Miscellaneous**.

14.1    Waiver and Amendment; Remedies Cumulative. This Guaranty shall not be modified, altered, or otherwise amended except pursuant to an instrument in writing executed and delivered by each of the parties hereto. Except as otherwise provided in this Guaranty, any failure of any party hereto to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligations, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. No failure on the part of Secured Party to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Secured Party of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power. The rights, remedies and powers of Secured Party, not only hereunder, but also under any other Transaction Documents and under applicable Law are cumulative, and may be exercised by Secured Party from time to time in such order as Secured Party may elect.

14.2    Notices. All notices, approvals, consents, correspondence or other communications required or desired to be given hereunder shall be given in accordance with Section 10.2 of the Purchase Agreement, except that notice shall also be given to Guarantor at the following address:

Sam Mahrouq
MEI Investments, Inc.
1911 E. Division Street
Arlington, TX 76011
Fax: (817) 542-0716
Email: sam@automax4u.com

14.3    Successors and Assigns. This Guaranty and all the provisions hereof shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective successors and permitted assigns. Guarantor may not assign or delegate, in whole or in part, its obligations hereunder to any other person without the prior written consent of Secured Party, and any purported assignment or delegation in violation of this Section 14.3 shall, in the sole discretion of Secured Party, be void *ab initio*.

14.4    Severability. If any provision of this Guaranty, or the application thereof to any Person or circumstance, is held invalid, such invalidity shall not affect any other provisions which can be given effect without the invalid provision or application, and to this end the provisions hereof shall be severable and the remaining, valid provisions shall remain of full force and effect.

14.5    Entire Agreement. This Guaranty and the other Transaction Documents, together with the Exhibits and Schedules hereto and thereto, contains the entire agreement between the parties with respect to the Transaction and supersedes all prior agreements or understandings, whether written or oral, between the parties.

14.6    Specific Performance. Guarantor agrees that irreparable damage would occur and that Secured Party would not have any adequate remedy at law if any of the provisions of this Guaranty were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that Secured Party shall be entitled to an injunction or injunctions to prevent breaches of this Guaranty and to enforce specifically the terms and provisions of this Guaranty without proof of actual damages, this being in addition to any other remedy to which Secured Party is entitled at law or in equity. Guarantor further agrees that (a) Secured Party shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any such remedy, and Guarantor hereby irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument and (b) Guarantor will not oppose the granting of such remedy.

14.7    Construction. The titles of the sections of this Guaranty are for convenience of reference only and are not to be considered in construing this Guaranty. Unless the context of this Guaranty clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," and (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation". The parties agree that this Guaranty shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party, and that ambiguities shall not be interpreted against the drafting party.

14.8    Counterparts. This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Guaranty may also be executed and delivered by facsimile signature, PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com).

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Guaranty to be executed by Guarantor and by an officer of Secured Party thereunto duly authorized, as of the Effective Date.

**GUARANTOR:**

Sam Mahrouq, individually

**SECURED PARTY**

**SKYPATROL, LLC**

By: _____

Robert D. Rubin
Chief Executive Officer and President

# EXHIBIT D

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "*Agreement*"), dated as of May 1, 2017 (the "*Effective Date*"), is made by and between VBI Group LLC, a Delaware limited liability company doing business as Skypatrol USA ("*Debtor*") and Skypatrol, LLC, a Delaware limited liability company ("*Secured Party*").

Recitals

A.  Pursuant that certain Asset Purchase Agreement (the "*Purchase Agreement*") dated May 1, 2017 between Debtor and Secured Party, Debtor acquired the Purchased Assets. In connection therewith, Debtor has executed and delivered to Secured Party the Note.

B.  To secure repayment of the indebtedness evidenced by the Note and all other Obligations (defined below) of Debtor to Secured Party, Debtor desires to grant a security interest in the assets of Debtor_to Secured Party as described herein.

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows:

**1.      DEFINITIONS. As used herein -**

1.1      "*Collateral*" means any and all Purchased Assets, specifically including customer lists and all inventory used or consumed in the Purchased Business or held for sale or lease, whether now owned or hereafter acquired, and insurance policies, and all proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing whether in the possession of Debtor, warehouseman, bailee, or any other Person, wherever located.

1.2      "*Obligations*" means any and all obligations of Debtor to Secured Party under the Note, the Purchase Agreement (including Section 1.3 thereof) and the other Transaction Documents.

1.3      All of the terms used herein which are defined in Article 9 of the Florida Uniform Commercial Code, as from time to time amended (the "*Uniform Commercial Code*"), shall, unless otherwise defined herein, have the same meanings as specified therein.

1.4      Capitalized terms used herein without definition have the meanings given in the Purchase Agreement or the Note, as the case may be.

**2.      Security Interest.** As security for the payment and performance of all Obligations, Secured Party shall have, and Debtor hereby grants to Secured Party, a continuing first-lien security interest in the Collateral (the "*Security Interest*") and pledges and collaterally assigns the Collateral to Secured Party. Debtor agrees to recognize, affirm, and defend the Security Interest with respect to and against the claims of any creditors of Debtor and Debtor will not create, incur, agree to, assume, or suffer to exist any mortgage, pledge, lien or other encumbrance of any kind upon or any security interest in any of the Collateral (whether now owned or hereafter acquired), except in favor of Secured Party or upon Secured Party's written consent (which may be granted or denied in Secured Party's sole and absolute discretion).

**3.      Authorization to File Financing Statements.** Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file, wherever such filing is deemed by Secured Party to be necessary or desirable, any initial financing statements, continuations and amendments thereto indicating all or any part of the Collateral and containing any other information required by applicable law or deemed necessary or desirable by Secured Party for the sufficiency or filing office acceptance of any financing statement or amendment. Debtor agrees to furnish all such information to Secured Party promptly upon request. Debtor also ratifies its authorization for Secured Party to have filed any initial financing statements or amendments thereto if filed prior to the date hereof. Debtor hereby agrees to pay the cost of all such filings.

**4.      Other Actions.** Further to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, the Security Interest in the Collateral, Debtor agrees, in each case at Debtor's own expense, to take the following actions with respect to the following types of collateral, but only insofar as the Collateral actually consists of any of the following:

4.1      Promissory Notes and Tangible Chattel Paper. If Debtor shall at any time hold or acquire any promissory notes or tangible chattel paper, Debtor shall forthwith, in addition to other action required by Secured Party, endorse, assign and deliver the same to Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as Secured Party may from time to time specify.

4.2      Deposit Accounts. For each deposit account that Debtor at any time opens or maintains, Debtor shall, at Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to Secured Party, give Secured Party control of such deposit account by either (a) causing the depository bank to agree to comply at any time with instructions from Secured Party to such depository bank directing the disposition of funds from time to time credited to such deposit account, without further consent of Debtor, or (b) arranging for Secured Party to become the customer of the

depository bank with respect to the deposit account, with Debtor being permitted to withdraw funds from such deposit account, only to the extent authorized by Secured Party from time to time. The provisions of this Section 4.2 shall not apply to deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Debtor's salaried employees, to the extent so employed. Debtor agrees to promptly notify Secured Party in writing at any time it establishes a deposit account with any institution or terminates any deposit account.

4.3     Investment Property. If Debtor shall at any time hold or acquire any investment property, including certificated securities, uncertificated securities, or securities held by Debtor or its nominee through a securities intermediary or commodity intermediary, Debtor shall promptly notify Secured Party of such investment property and shall forthwith at the request of Secured Party, take whatever action Secured Party deems necessary or appropriate to give Secured Party control of such investment property, including executing and delivering endorsements, assignments, pledge agreements and other agreements in form and substance satisfactory to Secured Party. Debtor will also cause any securities intermediary maintaining a securities account or commodities intermediary maintaining a commodities account to execute such agreements as Secured Party shall from time to time require in order to ensure Secured Party is granted control thereof, and to deliver to Secured Party such agreement, reports, and other documentation as Secured Party shall from time to time require, and Debtor will hold in trust and deliver to Secured Party any investment property received by Debtor, together with any required endorsements.

4.4     Collateral in the Possession of a Bailee. If any goods are at any time in the possession of a bailee, Debtor shall, unless otherwise directed by Secured Party, promptly notify Secured Party thereof and shall send notice to and obtain an acknowledgment from the bailee, in form and substance satisfactory to Secured Party. Such acknowledgment shall state that the bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party, without the further consent of Debtor. Debtor hereby authorizes Secured Party to obtain the acknowledgment directly from any bailee.

4.5     Electronic Chattel Paper and Transferable Records; Letter-of-credit Rights; Commercial Tort Claims; Patents, Trademarks and Copyrights. If Debtor at any time (a) holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in 201 of the federal Electronic Signatures in Global and National Commerce Act, or in 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, (b) is a beneficiary under a letter-of-credit now or hereafter issued in favor of Debtor, (c) holds or acquires a commercial tort claim, or (d) holds or acquires any rights in any patents, trademarks, or copyrights or applications therefor, then Debtor shall notify Secured Party in writing of its interest therein, and shall provide such information and take such action as Secured Party shall request in order that Secured Party may perfect its security interest therein.

4.6     Government Contracts. Upon the request of Secured Party, Debtor will specifically assign to Secured Party all federal government contracts and will cooperate with Secured Party in giving notice of such assignment pursuant to the federal Assignment of Claims Act. Debtor will cooperate with Secured Party in providing such further information with respect to contracts with any state, other unit of local government or agency as Secured Party may require and will provide such instruments or take such actions of further assurance with respect to such contracts as Secured Party may require.

4.7     Other Actions as to all Collateral. Debtor further agrees to take any other action reasonably requested by Secured Party to ensure the attachment, perfection and first priority of, and the ability of Secured Party to enforce, the Security Interest in any and all of the Collateral.

**5.     Debtor's Representations, Warranties And Covenants.** Debtor represents, warrants and covenants as follows:

5.1     Organization; Good Standing. Debtor is duly organized, existing and in good standing under the laws of its state of organization and is duly qualified and in good standing in every other state in which it is doing business, except where the failure to so qualify would not have a Material Adverse Effect.

5.2     Organizational Changes. Debtor covenants with Secured Party as follows: (a) without providing at least thirty (30) days-'_prior written notice to Secured Party, Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address and (b) Debtor will not change its type of organization, jurisdiction of organization or other legal structure. In connection with any such change Debtor will execute and deliver, or cause to be executed and delivered, to Secured Party all such additional security agreements, financing statements and other documents as Secured Party shall reasonably require. This provision shall not be deemed to constitute consent to any change identified above or otherwise prohibited in any agreement between Debtor and Secured Party.

5.3     Authorization. The execution, delivery and performance hereof are within Debtor's powers, have been duly authorized, are not in contravention of law or the terms of its organizational documentation, or of any indenture, agreement or undertaking to which it is a party or by which it is bound.

5.4     Protection of Collateral. Debtor further covenants with Secured Party as follows: (a) Debtor will not move the Collateral from its current locations, without providing at least thirty (30) days' prior written notice to Secured Party;

(b) except for the Security Interest herein granted, Debtor shall be the owner of or have other rights in the Collateral free from any lien, security interest or other encumbrance, and Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to Secured Party; (c) Debtor shall not pledge, mortgage or create, or suffer to exist a security interest in the Collateral in favor of any person other than Secured Party; (d) Debtor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, and will immediately notify Secured Party of any damage thereto or any loss or significant diminution of the value thereof; (e) Debtor will permit Secured Party, or its designee, upon commercially reasonable prior written notice to Debtor (except notice shall not be required during the continuance of an Event of Default), to inspect the Collateral during normal business hours, wherever located (but (i) in the absence of an existing Event of Default, no more often than two (2) times in any twelve (12) month period, and (ii) no such inspection shall unreasonably disrupt or interfere with Debtor's business); (f) Debtor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement; and (g) Debtor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for sales and leases of inventory and licenses of general intangibles in the Ordinary Course.

5.5      Litigation. There are no actions, suits or proceedings pending or, to the knowledge of Debtor, threatened against Debtor or any subsidiary, at law or in equity or before or by any Governmental Authority.

5.6      Consents and Approvals. No approval or authorization or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery or performance by Debtor of this Agreement.

5.7      Event of Default. Until the occurrence of an Event of Default, Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this Agreement and not inconsistent with any policy of insurance thereon.

### 6.      Collateral Protection Expenses; Preservation of Collateral

6.1.      Expenses Incurred by Secured Party. Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may discharge taxes, liens, security interests and other encumbrances at any time levied or placed on any of the Collateral, may pay for insurance on the Collateral, may pay for the maintenance and preservation of the Collateral, may pay for credit enhancements to insure Secured Party against risks of loss or disposition of Collateral or to provide to Secured Party a guaranteed return from the collection or disposition of Collateral, make repairs thereto and pay any necessary filing fees. Debtor agrees to reimburse Secured Party on demand for any payment made or any expense reasonably incurred by Secured Party pursuant to the foregoing authorization. Secured Party shall have no obligation to Debtor to make any such expenditures, nor shall the making thereof relieve Debtor of any default.

6.2.      Secured Party's Obligations and Duties. Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Secured Party of any payment relating to any of the Collateral, nor shall Secured Party be obligated in any manner to perform any of the obligations of Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Secured Party or to which Secured Party may be entitled at any time or times.

7.      **Promises to Pay.** Debtor promises to pay to Secured Party on demand all taxes, charges and expenses, including reasonable attorneys' fees, disbursements and expenses of litigation, reasonably incurred or expended by Secured Party in connection with or in any way incurred by Secured Party in connection with the protection or enforcement of Secured Party's rights hereunder.

8.      **Insurance.** Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Secured Party may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as Secured Party may reasonably prescribe, for direct application by Debtor solely to the repair or replacement of Debtor's property so damaged or destroyed, or Secured Party may apply all or any part of such proceeds to the Obligations.

### 9.      Collection of Accounts or Other Collateral

9.1      Collection of Accounts. Until Secured Party requests that debtors on accounts or other Collateral of Debtor be notified of the Security Interest, or Secured Party so notifies them, Debtor shall continue to collect them.

9.2      Collection on Default.

(a)      Upon and during the continuance of an Event of Default, Debtor shall, at the request of Secured Party, notify the account debtors and other persons obligated on any of the Collateral of the Security Interest of Secured Party in

any account or other Collateral and that payment thereof is to be made directly to Secured Party, and Secured Party may itself at any time upon and during the continuance of an Event of Default, without notice to or demand upon Debtor, so notify account debtors.

(b)    Upon and during the continuance of an Event of Default, Secured Party may also request that Debtor hold the proceeds received from collection of Collateral as trustee for Secured Party without commingling the same with other funds of Debtor and shall turn the same over to Secured Party, or to such bank as may be approved by Secured Party, immediately upon receipt in the identical form received. The making of such a request, or the giving of any such notification shall not affect the duties of Debtor described above with respect to proceeds of collection of accounts received by Debtor.

9.3    Application of Proceeds. Secured Party shall credit the proceeds of collection of accounts received by Secured Party to the Obligations, such credits to be entered as of the third (3rd) business day after receipt thereof by Secured Party. Such credits shall be conditional upon final payment in cash or credits of the items giving rise to them. If any item is not so paid, Secured Party, in its discretion, whether or not the item is returned, may either reverse any credit given for the item or charge it to any deposit account maintained by Debtor with Secured Party.

10.    **Disposition of Collateral**

10.1    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party shall have the right to take immediate possession of the Collateral, and for that purpose Secured Party may, so far as Debtor can give authority therefor, enter upon any premises on which Collateral may be situated and remove the same therefrom. Secured Party may in its discretion require Debtor to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Debtor's principal office(s) or at such other locations as Secured Party may reasonably designate. Except for Collateral which is perishable or threatens to decline speedily in value or which is of a type customarily sold on a recognized market, Secured Party shall give to Debtor at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale of any other intended disposition is to be made. Secured Party shall also have in any jurisdiction where enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code. The residue of any proceeds of collection or sale, after satisfying all Obligations in such order of preference as Secured Party may determine and making proper allowance for interest on Obligations not then due, and after making any payments required by the Uniform Commercial Code, shall be paid to Debtor; provided, that Debtor shall remain liable for any deficiency. Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Secured Party's rights hereunder, including its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

10.2    Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Secured Party may at any time in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for Obligations or apply it on principal or interest due on Obligations. Insofar as Collateral shall consist of accounts, general intangibles, other claims and rights to the payment of money, insurance policies, instruments, chattel paper, choses in action or the like, Secured Party may, upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), without notice to or demand on Debtor, demand, collect, receipt for, settle, compromise, adjust, use, sue for, foreclose or realize upon Collateral as Secured Party may determine, whether or not Obligations or Collateral are then due and for the purpose of realizing Secured Party's rights therein, Secured Party may receive, open and dispose of mail addressed to Debtor and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of Debtor. The powers conferred on Secured Party by this are solely to protect the interest of Secured Party and shall not impose any duties on Secured Party to exercise any powers.

10.3    Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may, Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, Debtor hereby irrevocably waives the benefits of all such laws.

11.    **Standards For Exercising Remedies**. To the extent that applicable law imposes duties on Secured Party to exercise remedies in a commercially reasonable manner, Debtor acknowledges and agrees that it is not commercially unreasonable for Secured Party (a) to fail to incur expenses reasonably deemed significant by Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished

products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, or (j) to the extent deemed appropriate by Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Secured Party in the collection or disposition of any of the Collateral. Without limitation upon the foregoing, nothing contained in this Section 11 shall be construed to grant any rights to Debtor or to impose any duties on Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 11.

12.      **Power of Attorney**. Upon the occurrence of any Event of Default and at any time thereafter (such default not having been cured), Debtor hereby irrevocably constitutes and appoints Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Debtor or in Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all action that Secured Party deems necessary or desirable and to execute any and all documents and instruments that Secured Party deems necessary or desirable to accomplish the purposes of this Agreement. The powers conferred on Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Debtor for any act or failure to act, except for Secured Party's own gross negligence or willful misconduct.

13.      **Set Off**. Any deposits or other sums at any time credited by or due from Secured Party to Debtor or any guarantor, and any securities or other property of Debtor or any such guarantor at any time in the possession of Secured Party upon and after an Event of Default may be held and treated as collateral for the payment of the Obligations. Regardless of the adequacy of collateral, upon and after an Event of Default, Secured Party may apply or set off such deposits or other sums against such obligations at any time in the case of Debtor but only with respect to matured obligations in the case of guarantors thereof.

14.      **Waivers**. To the extent permitted by law, Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received, delivered or repossessed or other action taken in reliance hereon, and all other demands and notices of any description. With respect to both Obligations and Collateral, Debtor assents to any extension or postponement of the time of payment or other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or Person primarily or secondarily liable, to the acceptance of partial payments thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as Secured Party may deem advisable. Secured Party may exercise its rights with respect to Collateral without resorting or regard to other collateral or sources of reimbursement for Obligations. Secured Party shall not be deemed to have waived any of its rights upon or under Obligations or Collateral unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any other right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Secured Party on Obligations or Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised separately or concurrently. Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof as set forth herein.

15.      **Amendment**. No amendment or modification of any provision of this Agreement shall be effective unless in writing and signed and delivered by the parties hereto.

16.      **Notices**. All notices, approvals, consents, correspondence or other communications required or desired to be given hereunder shall be given in accordance with Section 10.2 of the Purchase Agreement.

17.      **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective successors and assigns, except that Debtor shall not have the right to assign its rights hereunder or any interest herein without Secured Party's prior written consent. Secured Party may sell or assign all or any portion of its rights and benefits hereunder and, in connection therewith, may deliver to such prospective buyer or assignee financial

statements and other relevant information pertaining to Debtor or any obligor on the Obligations; provided, that Secured Party may assign its rights under this Agreement and each other Transaction Agreement to which it is a party (the "*Permitted Assignment*") to the Third Party Lender or the Third Party Lender's designee (as applicable, the "*Permitted Assignee*"); provided further, that the documents entered into between Secured Party and the Permitted Assignee reflecting the Permitted Assignment shall expressly provide that the Permitted Assignee shall have no right to take any Action against Purchaser or Guarantor or the Purchased Business or Purchased Assets, unless and until Purchaser or Guarantor shall be in default (beyond any applicable notice and cure period) under this Agreement or any other Transaction Document to which Purchaser or Guarantor is a party, and any claim the Permitted Assignee may have under its rights as the Permitted Assignee prior to such Purchaser or Guarantor default shall be made solely against Seller (or any party other than Purchaser or Guarantor that the Permitted Assignee may have rights against as the Permitted Assignee).

18.     Severability. In case any one or more provisions of this Agreement shall be found by a court or other tribunal of competent jurisdiction to be invalid or unenforceable for any reason or in any respect or circumstance, such invalidity or unenforceability shall not limit or impair the validity or enforcement of any other provision hereof or affect the validity or enforcement of the provisions of this Agreement under any other circumstances.

19.     Waiver of Jury Trial. THE PARTIES HERETO HEREBY WAIVE, TO THE EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER OF ANY KIND WHATSOEVER IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT, ANY DOCUMENT RELATED HERETO OR THE RELATIONSHIPS ESTABLISHED HEREUNDER OR THEREUNDER.

20.     Governing Law; Jurisdiction. This Agreement is intended to take effect as a sealed instrument and shall be governed by, and construed in accordance with, the laws of the State of Florida, without regard to principles of conflicts of laws. Debtor agrees that any suit for the enforcement of this Agreement may be brought in the courts of Miami Dade County, Florida or any Federal Court sitting therein and consents to the non-exclusive jurisdiction of such court and to service of process in any such suit being made upon Debtor by mail at the address specified herein. Debtor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or based on such suit having been brought in an inconvenient court.

21.     Construction. The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," and (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation". The parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party, and that ambiguities shall not be interpreted against the drafting party.

22.     Counterparts. This Agreement may be executed in one or more counterparts, and it shall be deemed fully executed when each party has signed a counterpart even though no one counterpart contains the signatures of all the parties. A facsimile signature of a party shall be deemed an original signature and fully effective as such. Each party executing this agreement represents that it has the full power and authority to do so.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed as a sealed instrument as of the Effective Date.

**SECURED PARTY**

**DEBTOR**

SKYPATROL, LLC

By: _____
Robert D. Rubin
Chief Executive Officer and President

VBI GROUP, LLC, a Delaware limited liability company doing business as Skypatrol USA

By: _____
Sam Mahrouq
Chief Executive Officer

## LAW OFFICES OF ROBERT P. FRANKEL, P.A.
### Royal Palm I at Southpointe
### 1000 South Pine Island Road, Suite 410
### Plantation, Florida 33324
### (305) 358-5690
### (305) 907-5901 FAX

Robert P. Frankel
robert@frankelpa.com

October 11, 2017

**PERSONAL & CONFIDENTIAL**
Natalie Carlos, Esquire Ncarlos@carltonfields.com

> **Re:    Bluestein and Wayne, P.A. vs. Natalie J. Carlos**
> **Our File Nos: 5842**
> **FOR SETTLEMENT PURPOSES ONLY**
> **PRIVILEGED COMMUNICATION**

Dear Ms. Carlos:

As you know, I represent Bluestein & Wayne, P.A. which filed a lawsuit against you.

I learned from my client that you wire transferred $20,000 to my client's operating account. Since your email did not explain whether this amount was paid with the expectation of a settlement, my client has authorized me to make the following proposal:

1.    My client will accept the sum of $20,000 plus legal fees and costs incurred to date in the amount of $ _____ and will waive the balance that is owed;
2.    We will prepare a stipulation for dismissal with prejudice along with a proposed court order;
3.    The execution and exchange of reciprocal general releases.

Please let me know whether this settlement proposal is acceptable. If not, my client is prepared to any of the following:

1.    The $20,000 will be returned to you immediately;
2.    The $20,000 that you paid will be transferred to the Bluestein & Wayne Trust Account pending your acceptance of this proposal and the exchange of the executed settlement documents;
3.    Apply the $20,000 to the outstanding balance that is the subject matter of the lawsuit without the waiver of my client's rights to proceed with the litigation for the balance of the amounts owed with credit provided for the $20,000.

Should you care to discuss the matter, please contact me.

Sincerely yours,
**Law Offices of Robert P. Frankel, P.A.**

By _/s/ Robert P. Frankel_
ROBERT P. FRANKEL

RPF:kga
cc:    Harold Bluestein, Esq.
Barry Wayne, Esq.

# EXHIBIT E

## SHARED SERVICES AGREEMENT

THIS SHARED SERVICES AGREEMENT ("*Agreement*") is entered into as of May 1, 2017 (the "*Effective Date*"), by and between Skypatrol, LLC, a Delaware limited liability company ("*Seller*" or "*Skypatrol*") and VBI Group LLC, a Delaware limited liability company doing business as Skypatrol USA ("*Purchaser*"). Seller and Purchaser are sometimes referred to herein, individually, as a "*Party*" and, collectively, as the "*Parties*".

### Recitals

A. Seller and Purchaser have entered into an Asset Purchase Agreement dated as of May 1 2017 (the "*Asset Purchase Agreement*"), pursuant to which Seller has agreed to sell and assign to Purchaser and Purchaser has agreed to purchase from Seller, the Purchased Assets used in the Business (as such terms are defined in the Asset Purchase Agreement, all as more fully described therein.

B. Seller will continue to have an ongoing business (the "*Retained Business*") separate from the Business acquired by Purchaser, and each of Purchaser and Seller will continue to need certain of the services of the other.

C. As a condition to consummating the transactions contemplated by the Asset Purchase Agreement, the Parties pursuant to Section 4.8 of the Asset Purchase Agreement have agreed to enter into this Agreement, pursuant to which each Party will provide, or cause its Third Party Providers (as hereinafter defined) to provide, the other Party with certain services, subject to the terms and conditions set forth herein.

D. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth and as contained in the Asset Purchase Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**1.    SERVICES**

**1.1    Provision of Services.**

(a)    Each Party agrees to provide (in such capacity, "*Provider*"), or cause its Third Party Providers to provide, the services (the "*Services*") set forth on **Exhibit A** attached hereto (as such exhibit may be amended or supplemented pursuant to the terms of this Agreement, the "*Services Exhibit*"), to the other Party (in such capacity, "*Recipient*") for the periods and on the other terms and conditions set forth in this Agreement and in the Services Exhibit. The Services Exhibit may be revised from time to time upon mutual written agreement of the Parties. Services to be provided by one particular Party, as Provider, to the other Party, as Recipient, are referred to herein as such Provider's "*Provider Services*".

(b)    Notwithstanding the contents of the Services Exhibit, each Party agrees to respond in good faith to any reasonable written (including electronic) request by the other Party for access to any additional services that are necessary for the operation of the Business or the Retained Business which are not currently contemplated in the Services Exhibit or to continue the Services beyond the End Date, at the then current hourly rate for Provider's personnel for a given Service multiplied times 1.25, and as otherwise may be mutually agreed upon in writing after good faith negotiations between the Parties. Any such additional services so provided shall constitute Services under this Agreement and shall be subject in all respects to the provisions of this Agreement as if fully set forth in the Services Exhibit as of the date hereof.

(c)    Subject to Section 2.2 (Extension of Services), Section 2.3 (Terminated Services), and Section 3.4 (Force Majeure), the obligations of either Party under this Agreement to provide its Provider Services shall terminate on the earlier of (i) the date specified on Exhibit A as the end period specified for the services and (ii) the date that is five years following the Effective Date or the mutual agreement of the Parties (the "*End Date*"). All data, test results, calculations, reports, and other documents gathered, prepared or created from or for Recipient as a Service by Provider hereunder (the "*Work Product*") shall be owned exclusively by Recipient, and Provider shall retain no copyright or other intellectual property interest in such Work Product, except as may be required to perform the Services hereunder. At Recipient's request, any such Work Product in the possession of Provider shall be delivered to Recipient.

**1.2    Standard of Service.**

(a)    Provider represents, warrants and agrees that its Provider Services shall be provided in good faith and in accordance with all applicable Laws or rules of law of any Governmental Authority, and, except as specifically provided in the Services Exhibit, in substantially the same manner and with substantially the same performance, in scope, quality and nature, as such Services were provided by either Party prior to the Effective Date (the "*Service Level*"). Provider shall use reasonable efforts to assign sufficient resources and qualified personnel as are reasonably required to perform its Provider Services in accordance with the standards set forth in this Section 1.2(a).

(b)      Except as expressly provided in Section 1.2(a), Provider makes no representations or warranties of any kind, implied or express, with respect to its Provider Services including no warranties of merchantability or fitness for a particular purpose, which are specifically disclaimed. Seller acknowledges and agrees that this Agreement does not create a fiduciary relationship, partnership, joint venture or relationships of trust or agency between the Parties.

(c)      Services will be provided Monday through Friday, 9:00 am to 9:00 pm ET except for such Services that, by their nature, require continued service without interruption as set forth on the Services Exhibit.

1.3      **Duty to Cooperate**. Recipient agrees that (i) it shall not, and shall not permit its Affiliates to, interfere with or interrupt or disrupt Provider's provision and performance of its Provider Services, (ii) it shall, and shall ensure that its Affiliates, provide cooperation and assistance as reasonably requested by Provider in connection with its Provider Services and (iii) it shall, and shall ensure that its Affiliates, use the Provider Services in accordance with applicable Law and all policies of Provider applicable to the use of the relevant Provider Services at the time such Provider Service is provided.

1.4      **Assistance; Transfer of Materials**. Upon any termination of this Agreement, Provider will use reasonable efforts to cooperate with Recipient's transition of the Provider Services to another provider of Recipient's choice and Recipient shall reimburse Provider for Provider's actual and reasonable out-of-pocket expenses in connection therewith (to be pre-approved by Recipient in writing). If Provider's system is compatible with Recipient's system, Provider shall use reasonable efforts to attempt to transfer copies of all Recipient's data in electronic format at Recipient's cost. Such cooperation shall include providing all data and documentation relating to the Provider Services. Notwithstanding the foregoing, if Recipient's system is not compatible with Provider's system, Provider shall provide copies of all Recipient's data in electronic format to Recipient at Recipient's cost. In addition, each Party will return to the other Party all data or documentation of such other Party, or promptly comply with such other Party's request to destroy such material.

1.5      **Primary Contacts**. Each of Purchaser and Seller shall appoint an individual primarily responsible for administering this Agreement on its behalf (each a "*Primary Contact*"). The initial Primary Contact for Purchaser shall be Mike Hannon and the initial Primary Contact for Seller shall be Robert Rubin. The Primary Contacts shall serve as the primary contact points for issues that may arise during the performance of this Agreement. Each Party shall notify the other of the name and contact information of its Primary Contact. The Primary Contacts shall meet during the term of this Agreement in person or telephonically with such regularity as they shall mutually agree to or reasonably request in order to discuss the status of the Services and manage open issues. Either Party may replace its Primary Contact by so indicating in a written notice delivered to the other Party and signed by an officer or designated representative of the Party making such replacement. Such notice shall contain the name, business address, email address and telephone number of the Primary Contact's replacement.

1.6      **Relationship of the Parties**. The Parties hereto are independent contractors, and neither of the Parties nor any of their respective Representatives will be deemed to be Representatives of the other Party hereto for any purpose or under any circumstances. No partnership, joint venture, alliance, fiduciary or any relationship other than that of independent contractors is created hereby, expressly or by implication.

2.      **COMPENSATION**

2.1      **Service Fees and Expenses**. In consideration for its provision of the Services hereunder, Recipient shall pay Provider the fees and expenses set forth on the Services Exhibit, as may be amended or supplemented pursuant to the terms of this Agreement (the "*Service Fees*") . The Services set forth on the Services Exhibit shall be provided by the applicable Provider during the Term (as may be modified or extended pursuant to Section 1.1(b)); provided, that Service Fees for any particular Services set forth on the Services Exhibit shall not be due or owing until the end of the applicable period specified on the Services Exhibit in the column under the heading "Service Fee Commencement Date."

2.2      **Extension of Services**. Subject to Section 1.1(b) hereof, the Parties agree that neither Party, as Provider, shall be obligated to perform any Service after the earlier of the date specified in **Exhibit A** or the End Date.

2.3      **Terminated Services**. Upon termination or expiration of any or all Services pursuant to this Agreement, or upon the termination of this Agreement in its entirety, neither Party, as Provider, shall have any further obligation to provide the applicable terminated Services and Recipient's sole obligation will be to pay for such Services performed by Provider prior to the effective date of such termination.

2.4      **Invoicing and Payment**. Within thirty (30) days after the end of each month, Provider shall prepare and deliver an invoice to Recipient setting forth the Service Fees due and owing under this Agreement during such month. Payments due under this Agreement are due and payable within thirty (30) days after the date of receipt of the invoice for such payments.

## 3. TERMINATION

3.1 **Termination of Agreement**. Subject to Section 3.3 hereof, this Agreement shall terminate in its entirety on the date upon which neither Party shall have any continuing obligation to perform any Services as a result of their expiration or termination in accordance with Section 1.1(c) or Section 3.2.

3.2 **Breach**. Either Party (the "*Non-Breaching Party*") may terminate this Agreement with respect to any Service, in whole but not in part, at any time upon prior written notice to the other Party (the "*Breaching Party*") if the Breaching Party has failed to perform any of its material obligations under this Agreement relating to such Service, and such failure shall have continued without cure for a period of fifteen (15) days after receipt by the Breaching Party of a written notice of such failure from the Non-Breaching Party seeking to terminate such Service setting forth in reasonable detail the basis for the claim of breach.

3.3 **Effect of Termination**. Upon termination of this Agreement in its entirety pursuant to Section 3.1, all obligations of the Parties hereto shall terminate, except for the provisions of Section 2.3 (Terminated Services), Section 4 (Confidentiality), Section 5 (Limitation of Liability; Indemnification), Section 6 (Miscellaneous) and this Section 3.3 (Effect of Termination), which shall survive any termination or expiration of this Agreement.

## 4. CONFIDENTIALITY

4.1 **Confidentiality**.

(a) Subject to the terms of the Confidentiality Agreement, which provisions shall have precedence over the confidentiality provisions herein to the extent of any conflict, during the term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives and Third Party Providers to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "*Confidential Information*"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own Confidential Information of like nature. Either Party receiving any Confidential Information of the other Party (the "*Receiving Party*") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement or the Asset Purchase Agreement (the "*Permitted Purpose*"). Any Receiving Party may disclose such Confidential Information only to its Representatives or Third Party Providers who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 4.1 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such Persons; *provided, however*, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by Law, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing Party (the "*Disclosing Party*"), and take reasonable steps to assist in contesting such order or in protecting the Disclosing Party's rights prior to disclosure at Disclosing Party's expense, and in which case the Receiving Party shall only disclose such Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose pursuant to such Law.

(b) Notwithstanding the foregoing, "Confidential Information" shall not include any information that the Receiving Party can demonstrate: (i) is generally available to and known by the public through no fault of the Receiving Party or its Representatives or Third Party Providers; (ii) was lawfully acquired by the Receiving Party from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation; or (iii) was developed by it independently without any reliance on the Confidential Information as evidenced by written records; nor shall anything in this Agreement restrict a Party's ability to disclose its own Confidential Information.

(c) Upon written demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Disclosing Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing.

## 5. LIMITATION ON LIABILITY; INDEMNIFICATION.

5.1 **Limitation of Liability**. In no event shall either Party have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple, whether based on statute, contract, tort or otherwise, and whether or not arising from the other Party's sole, joint, or concurrent negligence, strict liability, criminal liability or other fault; provided, that this Section 5.1 shall not be construed to limit either Party's indemnification obligations under Section 5.2 hereof.

5.2      **Indemnification**. Provider shall defend, indemnify and hold harmless Recipient, its successors, assigns, members, shareholders, partners, directors, officers and agents (the "*Recipient Parties*") from and against any and all damages, liabilities, actions, suits, proceedings, claims, demands, losses, costs and expenses (including reasonable attorneys' fees and expenses) arising out of, or in connection with, any breach of or default by Provider of this Agreement, provided should this provision be contrary to anything within the Asset Purchase Agreement, the Asset Purchase Agreement shall control to the extent of such inconsistency.

6.       **MISCELLANEOUS**

6.1      **Force Majeure**. The obligations of either Party under this Agreement with respect to any of such Party's Provider Service, with the exception of payment, shall be suspended during the period and to the extent that such Party is prevented or hindered from providing such Provider Services or Recipient is prevented or hindered from receiving such Services, due to any of the following causes beyond such Party's reasonable control (such causes, "*Force Majeure Events*"): (a) acts of God; (b) flood, fire or explosion, (c) war, acts of terror, invasion, riot or other civil unrest, (d) Law, (e) actions, embargos or blockades in effect after the Effective Date, (f) action by any Governmental Authority, (g) national or regional emergency, (h) strikes, labor stoppages or slowdowns or other industrial disturbances beyond the reasonable control of the Party, (i) shortage of adequate power or transportation facilities, or (j) any other event which is beyond the reasonable control of such Party. The Party suffering a Force Majeure Event shall give notice of suspension as soon as reasonably practicable to the other Party stating the date and extent of such suspension, and the cause thereof, and such Party shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. Neither Seller nor Purchaser shall be liable for the nonperformance or delay in the performance of its respective obligations under this Agreement when such failure is due to a Force Majeure Event.

6.2      **Notices**. All notices, approvals, consents, correspondence or other communications required or desired to be given hereunder shall be given in accordance with Section 10.2 of the Asset Purchase Agreement, the terms of which Section are incorporated herein.

6.3      **Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

6.4      **Entire Agreement**. This Agreement, including the Services Exhibit, constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement shall be construed *in pari materia* with the Asset Purchase Agreement; provided that this Agreement provides the exclusive statement of the Parties' respective rights and obligations with respect to the Services, and, to the extent that there is a conflict between the provisions of this Agreement and the provisions of the Asset Purchase Agreement as it relates to the Services hereunder, the provisions of this Agreement shall control.

6.5      **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. Subject to the following sentence, neither Party may assign its respective rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed; provided that Seller may assign this Agreement or its rights and obligations hereunder to the purchaser of its Retained Business for the period specified in Section 1.1(c) hereof.

6.6      **No Third-Party Beneficiaries**. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

6.7      **Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

6.8      **Governing Law; Submission to Jurisdiction**. This Agreement and the legal relations between the parties hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware without reference to the conflict of laws principles thereof. The parties irrevocably and unconditionally submit to the exclusive jurisdiction of the courts of the State of Florida located in Miami-Dade County or in the United States District Court for the Southern District of Florida

and the State of Texas located in Tarrant County, Texas or in the United States District Court for the Northern District of Texas, for the purposes of an Action arising out of this Agreement or the subject matter hereof brought by any Party hereto; and hereby waive and agree not to assert as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper or that this Agreement or the subject matter hereof may not be enforced by such court.

6.9     **Construction**. The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation". The Parties agree that this Agreement shall be fairly interpreted in accordance with its terms without any strict construction in favor of or against either party, and that ambiguities shall not be interpreted against the drafting party.

6.10     **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLER**

SKYPATROL, LLC

By: _____

Robert D. Rubin
Chief Executive Officer

**PURCHASER**

VBI Group LLC d/b/a Skypatrol USA

By: _____

Sam Mahroug
Chief Executive Officer

[SIGNATURE PAGE TO SHARED SERVICES AGREEMENT]

EXHIBIT A

SERVICES EXHIBIT

| | SERVICE/DESCRIPTION | SERVICE FEE COMMENCEMENT DATE | FEES |
|---|---|---|---|
| 1. | **Access and Use of Skypatrol Software System:** The Skypatrol Software System is located in the Montreal Data Center and the Miami Data Center: the Skypatrol Software System includes the User Interface, the database, the mapping, CRM, Myorders, support, and all other software systems used in the operation of the pre-closing Skypatrol business. Topp Labels, a Skypatrol affiliate, currently shares email servers and file servers with Seller. Topp Labels will move its data and access from the Skypatrol Software System within 90 days after the Closing. 1.  Seller will purchase new servers or contract with cloud provider. Purchaser will help configure and bring up the new servers for Seller and host it locally, until Purchaser moves services to 3rd party location. 2.  Purchaser shall make an exact replica of all software to ensure that Seller's operation continues functioning without interruption. Such replica/copy of the software will be done once only and Seller shall make available its engineers to assist in this project, and shall do so at a time reasonably convenient for Purchaser. Each Party shall have joint ownership of such software with any and all rights therein or related thereto, subject to the terms of Section 10.6.1(c) of the Asset Purchase Agreement. Once the replica/copy has been made, neither Party shall have the right to access or use any modifications made by the other Party to any of the software. 3.  Purchaser to engage their engineers during the copy process, to ensure seamless transition to new servers. 4.  Seller is keeping the Accounting software and will create a separate duplicate system for the Purchaser.  Seller will provide access to accounting software and database for as long as Purchaser desires. | Nine (9) months after the Effective Date | Standard Fee except that Skypatrol shall pay for any data connectivity consumption related to units existing as of the Closing or added after the Closing in connection with Skypatrol's remaining business |
| 2. | **Maintenance of Skypatrol Software System:** Seller shall be responsible to maintain the Skypatrol Software System after Purchaser trains the Seller's designated software engineers and the engineers have the opportunity to understand the source code. Purchaser and Seller for their respective uses, shall each have a copy of the Skypatrol Software System source code, which has been well documented. | Six (6) months after the Effective Date | |

| 3. | **Support:** Seller to hire their own support staff to provide the needed support for their customers, and existing systems. Purchaser will provide needed training to bring up to speed newly hired personnel by Seller. | Three (3) months after the Effective Date | Standard Fee |
|---|---|---|---|
| 4. | **Shipping, Receiving and Production:** Seller will hire and provide the needed support for its order fulfillment. Purchaser will provide the necessary training for Seller's personnel responsible for order fulfillment. Any incremental costs associated with order fulfillment, shipping warehousing, T&M to fulfill orders, will be the responsibility of Seller. | Three (3) months after the Effective Date | Standard Fee |
| 5. | **Phone System:** Seller will retain seven IP phones as part of the existing Mitel office phone system being transferred to Purchaser as of the Closing Date. | After the End Date | Standard Fee |
| 6. | **Hardware Purchasing:** Purchaser and Seller will work together on hardware purchasing to maximize purchasing power where the Parties may have common products and/or vendors. | After the End Date | Each Party will be responsible for payment of all purchases made by the other Party on such Party's behalf. For example, if one party (the "*Purchasing Party*") purchases 1,000 units (500 for itself and 500 requested by the other party (the "*Participating Party*")) the Participating Party will issue the Purchasing Party a PO for the 500 units and shall pay the Purchasing Party on the same terms required by the vendor supplying the units. |
| 7. | **Website:** Seller will continue to own the Skypatrol website (https://www.skypatrol.com) (the "*Website*") but Purchaser may use it in connection with the Business. Seller and Purchaser will jointly maintain the use of the Website. | After the End Date | Purchaser will pay Seller the existing domestic marketing engagement with Marketing 360. |
| 8. | **Software Development Projects:** Seller and Purchaser may from time to time jointly agree in writing on software development projects to enhance the Skypatrol Software System that would benefit each Party. Additionally, Seller and Purchaser may jointly agree in writing to a request by Seller for software development to enhance Seller's version of the Skypatrol Software System; and if so agreed Seller shall pay for the enhancement at rates charged by Purchaser. Any agreement of a Party shall be within their sole discretion. | To be negotiated if necessary | To be negotiated if necessary |

## BILL OF SALE AND ASSUMPTION AGREEMENT

BILL OF SALE AND ASSUMPTION AGREEMENT (this "*Agreement*") is made as of May 1, 2017 (the "*Effective Date*") by and between Skypatrol, LLC, a Delaware limited liability company ("*Seller*"), and VBI Group LLC, a Delaware limited liability company doing business as Skypatrol USA ("*Purchaser*").

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Asset Purchase Agreement between Seller and Purchaser dated as of May 1, 2017 (the "*Purchase Agreement*").

### RECITALS

A. Seller and Purchaser entered into the Purchase Agreement whereby Seller agreed to sell and assign, and Purchaser agreed to purchase and assume, the Purchased Assets and Assumed Liabilities.

B. Seller desires to transfer the Purchased Assets and the Assumed Liabilities to Purchaser, and Purchaser desires to accept the Purchased Assets and assume the Assumed Liabilities on the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.       Conveyance. Seller hereby sells, conveys, transfers, assigns and delivers unto Purchaser, its successors and assigns forever, the Purchased Assets free and clear of all Liens and its obligations under only the Assumed Liabilities, and Purchaser hereby accepts the Purchased Assets and fully assumes and agrees to pay, perform and discharge when due the Assumed Liabilities.

2.       Terms of Purchase Agreement. The terms of the Purchase Agreement, including but not limited to the Parties' respective representations, warranties, covenants, agreements and indemnities, are incorporated herein by reference. Each Party acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. Nothing in this Agreement, express or implied, is intended to or shall be construed to in any way modify, expand or limit the terms of the Purchase Agreement. To the extent that any provision of this Agreement conflicts or is inconsistent with the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

3.       Further Assurances. At any time following the execution of this Agreement, each of the Parties agree to execute and/or deliver such instruments or documents as may be reasonably requested by any other Party to (a) consummate the transactions contemplated by this Agreement, (b) effectuate fully the purposes of this Agreement and (c) vest in each Party the rights and interests conferred upon such Party under this Agreement.

4.       Counterparts. This Agreement may be executed in multiple counterparts (including by facsimile or electronic document format (pdf)), each of which shall be deemed to be an original and all of which together will constitute one and the same instrument.

5.       Successors. This Agreement shall inure to the benefit of the Parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement as of the Effective Date.

**SELLER:**                                      **PURCHASER:**

SKYPATROL, LLC                    VBI Group LLC, a Delaware limited liability
                                                  company doing business as Skypatrol USA

By: _____       By: _____
        Robert D. Rubin                             Sam Mahrouq
        President                                       Chief Executive Officer

## CIVIL JUSTICE INITIATIVE PILOT PROJECT

### Eleventh Judicial Circuit/National Center for State Courts

Congratulations! Case number **2017-023954-CA-01** has been blind-filed to a division which is participating in a national pilot project to reduce cost and delay in civil justice.

The Circuit Civil Division of the Eleventh Circuit is fortunate to have been selected as a grant recipient to pilot the active team case management component with the goal of more efficient and effective justice, with less waste of time and money. In order to assure full statistical representation of the docket, there is no opt-out procedure.

**The following is an overview of what this means for you and this case:**

The rules for the pilot project do not deviate from the Florida Rules of Civil Procedure and the Florida Rules of Judicial Administration, but compliance will be monitored and enforced to ensure that there are not long periods of inactivity.

You may be contacted from time to time by court staff Case Managers, who will report to the court the status of your case. You should treat these Case Managers as an arm of the court.

Each case will receive a customized case management order based on information provided by all attorneys in your case management report(s) and conferences.

The Court will provide access to the court at periodic junctures to assure that you are not experiencing delay in moving the case forward because you are waiting for hearing dates. These will be set as Case Management Conferences under F.R.C.P. 1.200, so that all pending matters may be resolved at that time.

1. If this case is <u>uncontested</u>, **you must**:
   a. Be required to file the necessary documents and motions to prosecute the case on a timely basis.
   b. Failure to timely file necessary documents and motions will result in the issuance of an order to show cause why the case should not be dismissed. <u>Your client will be required to attend any show cause hearing.</u>

2. If this case is <u>contested</u>, **you must**:
   a. Diligently prosecute and defend this case;
   b. Gather your facts and witnesses promptly;
   c. Evaluate and plan, from commencement, the most efficient and effective manner to secure the information you need and to accurately determine the length of time needed for discovery. The more information you provide, the more input you will have on the deadlines that will be set in this case;
   d. Meet and Confer directly with opposing counsel by phone, in person, or by email before you file a motion to see if the issue(s) can be <u>resolved</u> or <u>narrowed</u>; you must certify in motions filed that a meet and confer has occurred and/or state with specificity the attempts made to meet and confer;
   e. Promptly set motions and objections for hearing when they are filed. Failure to set motions for hearing may result in disposition by the court on the papers, without a hearing;
   f. Counsel should use the ex-parte discovery procedures in Administrative Order 06-09 where there has been no response to discovery. The procedure may be found at: http://www.jud11.flcourts.org/Administrative_Orders/1-06-09--Ex%20Parte%20Motion%20to%20Compel%20Discovery%20Civil%20Actions.pdf
   g. Comply with discovery deadlines and privilege log requirements;

i.  Assume the case is going to trial during the first trial setting and prepare accordingly, as the parties are expected to comply with discovery deadlines set in the Case Management Order.

3.  If this case is <u>contested</u>, **the court will**:
    a.  Issue a customized case management order based on the information provided by all the attorneys, which will include a discovery schedule with deadlines and a projected, tentative but realistic trial date;
    b.  Strictly enforce the discovery schedule and deadlines;
    c.  Issue orders for Case Management Conferences, in which the clients are required to appear in person, whenever the case is not progressing according to the case management order so that counsel can explain the reason for delays; and
    d.  As soon as the case is at issue, issue the trial order for a firm trial date consistent with the case management plan.  Please remember, lack of preparation will not be grounds to continue a case where parties have failed to comply with the Case Management Order.

This project arose from a three year effort by the Conference of Chief Justices, the National Center for State Courts, and the Institute for the Advancement of the American Legal System to establish evidence-based best practices to reduce cost and delay in civil litigation.  The report prepared as a result of this three year effort may be read in its entirety at:

http://www.ncsc.org/sitecore/content/microsites/civil-justice-initiative/home/CCJ-Reports.aspx

We welcome your input, suggestions, collaboration and participation in this project.  We believe that by testing these innovative approaches, we will demonstrate that meaningful, timely and cost-effective justice can be delivered in state court.  **Please share this communication with your clients, so they understand what they can expect from the Court and what we expect from you.**

Please email any questions to: cjipp@jud11.flcourts.org

Thank you for your cooperation.

_____
Judge Monica Gordo, Div. 02

_____
Judge Thomas J. Rebull, Div. 13

_____
Judge Reemberto Diaz, Div. 30

_____
Judge Rodney Smith, Div. 34

_____
Judge Jennifer D. Bailey, Administrative Judge, Circuit Civil Div.

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

      Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI Group, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

      Defendants.

_____/

## SUMMONS: PERSONAL SERVICE ON AN INDIVIDUAL
## ORDEN DE COMPARECENCIA: SERVICIO PERSONAL EN UN INDIVIDUO
## CITATION: L'ASSIGNATION PERSONAL SUR UN INDIVIDUEL

To Defendant(s):    **Sam Mahrouq**
                 **MEI Investments, Inc.**
                 **1911 E. Division Street**
                 **Arlington, TX 76011**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file with the clerk of this court a written response to the attached complaint. A phone call will not protect you; your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may loose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or legal aid office (listed in the phone book). If you choose to file a written response yourself, you must at the same time mail or take a copy of your written response to the Plaintiff's Attorney named below:

**ROBERT P. FRANKEL, ESQ.**
**Law Offices of Robert P. Frankel, P.A.**
**1000 S. Pine Island Road, Suite 410**
**Plantation, Florida 33324**
**305-358-5690; 305-907-5901 FAX**

and file your response to the Court located at Dade County Courthouse, Clerk of Courts, Room 138, 73 West Flagler Street, Miami, Florida 33130.

IN ACCORDANCE WITH THE AMERICANS WITH DISABILITIES ACT OF 1990, PERSONS NEEDING A SPECIAL ACCOMMODATION TO PARTICIPATE IN THIS PROCEEDING SHOULD CONTACT THE COURT ADA COORDINATOR at (305) 375-2006 or TDD 1-800-955-8770 via Florida Relay Service.

TO EACH SHERIFF OF THE STATE OF FLORIDA: You are commanded to serve this Summons and a copy of the Complaint of this law suit on the above named defendant.

DATE: _____
     10/20/2017

**CLERK OF COURT**

                            164659
By: *Conelle Brown*

Deputy Clerk

Una demanda contra usted has sido presentada. Tiene 20 dias naturales a partir del recibo de esta notificacion para contestar por escrito la demanda adjunta y presentarla ante este tribunal.  Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes. Si usted no contesta la demanda a tiempo, pudiera perder el caso y podria ser despojado de sus ingresos, dinero y propiedad, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede consultar con un abogado inmediatamente.

Si no conoce a un abogado, puede llamar a un servicio de referencia de abogados "Attorney Referral Service" o una de las oficinas de asistencia legal "Legal Aid Office" (que aparecen en la guia telefonica).

Si usted elije responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberal usted enviar por correa o entragar a mano una copia de su respuesta a la personal indicada abajo cono Plaintiff/Plaintiff's Attorney (Demandante o Abogado del Demandante), como sigue:  Dade County Courthouse, Clerk of Courts, Room 138, 73 West Flagler Street, Miami, Florida 33130.

Yo entre yon aksyon kont oumeum. Ou genyen 20 jou kalandriye apres ou recevoi somasyon-an pou enregistre devan grefie tribunal-sa, yon reponse pa ekri attache avek plent-la.  Yon apel pa telefon ka kapab protégé-ou.  Se yon response pa ecri, fo ou mete numero ka-a ki sou tet pagela avek nom moun-yo ki sou papie-sa oblige ekri si ou vle ke tribinal-la tende position-ou sou ka-a.  Si ou pa enregistre reponse-ou a l'heure ou kapab pedu ka-a avek sle ou et apres san ke tribunal-la pa avise-ou nou ka pren l'agen ak progriete-ou.  Genyen lot demande. Ou ka besoin telefon yon avoka tout de suit.

Si ou pa konen yon avoka, ou ka rele sevis ki rekomande avoka, ou biro ede legal (ki nan lis liv telefon).

Si ou choizi voye yon reponse pa ecki oumenm, ou supose en mem tan poste on pote on copi reponse pa ecki pou avoka pleyan ou plehan-yo ke non-li ama-a et enregistre reponse-la nan tribunal-la ki nan local la.  Dade County Courthouse, Clerk of Courts, Room 138, 73 West Flagler Street, Miami, Florida 33130.

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

      Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI Group, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

      Defendants.

_____/

**THE STATE OF FLORIDA:**
**TO EACH SHERIFF OF THE STATE:**

**CORPORATE SUMMONS**

You ARE COMMANDED to serve this summons and a copy of the Complaint of this on defendant(s):

**TO:**   **VBI Group LLC**
      **c/o Capitol Corporate Services, Inc. as Registered Agent**
      **515 East Park Avenue**
      **2nd Floor**
      **Tallahassee, FL 32301**

Each defendant is required to serve written defenses to the complaint or petition on Plaintiff's Attorney:
**ROBERT P. FRANKEL, ESQUIRE**
whose address is:   **LAW OFFICES OF ROBERT P. FRANKEL, P.A.**
**1000 SOUTH PINE ISLAND ROAD, SUITE 410**
**PLANTATION, FLORIDA 33324**
**(305) 358-5690; (954) 607-2861**
robert@frankelpa.com; lana@frankelpa.com; kim@frankelpa.com; documents@frankelpa.com
within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file
the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or
immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the
relief demanded in the complaint or petition.

IN ACCORDANCE WITH THE AMERICANS WITH DISABILITIES ACT OF 1990, PERSONS NEEDING A SPECIAL ACCOMMODATION TO PARTICIPATE IN THIS
PROCEEDING SHOULD CONTACT THE COURT ADA COORDINATOR at (305) 375-2006 or TDD 1-800-955-8770 via Florida Relay Service.

DATE: _____10/20/2017_____

**CLERK OF COURT**

By:_____ 172.338

Deputy Clerk

Received this summons _____, 20____, and served the same at

_____ o'clock _____.m., _____, 20____, by delivering a true copy

thereof with a copy of the Complaint or initial pleading to:

the within named Defendant_____

Copy return _____          Sheriff of _____ County,
Fla.

Service _____
by:_____

_____ Miles_____          Deputy Sheriff

# VERIFIED RETURN OF SERVICE

| State of FLORIDA | County of MIAMI-DADE | Circuit Court |
|---|---|---|

Case Number: 17-23954

Plaintiff:
**SKYPATROL, LLC, A DELAWARE LIMITED LIABILITY COMPANY**

vs.

Defendant:
**VBI GROUP, LLC, A DELAWARE LIMITED LIABILITY COMPANY, SAM K. MAHROUQ**

For:
ROBERT P. FRANKEL & ASSOCIATES, P.A.
1000 S Pine Island Road
Suite 410
Plantation, FL  33324

Received by GORMAN PROCESS SERVICE on the 24th day of October, 2017 at 11:03 am to be served on **VBI GROUP LLC C/O CAPITOL CORPORATE SERVICES, INC. AS REGISTERED AGENT, 515 EAST PARK AVENUE, 2nd Floor, TALLAHASSEE, FL 32301.**

I, ERIC L. LARSON, do hereby affirm that on the **24th day of October, 2017 at 11:50 am, I:**

served a **LIMITED LIABILITY COMPANY** by serving a   **SUMMONS/COMPLAINT** with the date and hour of service endorsed thereon by me, to: **RYAN HART** as **CLERK FOR RA** of **VBI GROUP LLC**, at the address of: **515 EAST PARK AVENUE, 2nd Floor, TALLAHASSEE, FL 32301** and informed said person of the contents therein, in compliance with **Florida Statutes 608.463 and 48.062(1).**

**Additional Information pertaining to this Service:**
RYAN HART, CLERK FOR RA, WM 35 YRS 6'2 220 LBS SHAVED HEAD NO GLASSES

Under penalty of perjury,  I declare that I have read the foregoing Verified return of Service and the facts stated in it are true, that  I  that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. I also certify that the above stated facts are correct to the best of my knowledge..  Pursuant to F.S. 92.525(2), Notary not required.



_____
**ERIC L. LARSON**
CPS #063, 2ND JUDICIAL CIRCUIT

**GORMAN PROCESS SERVICE**
**11767 S. Dixie Highway**
**Ste 201**
**Pinecrest, FL 33156**
**(305) 971-9636**
Our Job Serial Number: ARG-2017005172
Ref: 5172

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.5n

Filing # 62927622 E-Filed 10/17/2017 12:14:05 PM

5851

SKYPATROL, LLC, a Delaware limited
liability company,

       Plaintiff,

vs.

VBI Group, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

       Defendants.

_____/

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 17-23954-CA-01

**THE STATE OF FLORIDA:**                                    **CORPORATE SUMMONS**
**TO EACH SHERIFF OF THE STATE:**

You ARE COMMANDED to serve this summons and a copy of the Complaint of this on defendant(s):

**TO:    VBI Group LLC**
**c/o Capitol Corporate Services, Inc. as Registered Agent**
**515 East Park Avenue**
**2nd Floor**
**Tallahassee, FL 32301**

Each defendant is required to serve written defenses to the complaint or petition on Plaintiff's Attorney:
**ROBERT P. FRANKEL, ESQUIRE**
whose address is:    **LAW OFFICES OF ROBERT P. FRANKEL, P.A.**
**1000 SOUTH PINE ISLAND ROAD, SUITE 410**
**PLANTATION, FLORIDA 33324**
**(305) 358-5690; (954) 607-2861**
robert@frankelpa.com; lana@frankelpa.com; kim@frankelpa.com; documents@frankelpa.com
within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file
the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or
immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the
relief demanded in the complaint or petition.

IN ACCORDANCE WITH THE AMERICANS WITH DISABILITIES ACT OF 1990, PERSONS NEEDING A SPECIAL ACCOMMODATION TO PARTICIPATE IN THIS
PROCEEDING SHOULD CONTACT THE COURT ADA COORDINATOR at (305) 375-2006 or TDD 1-800-955-8770 via Florida Relay Service.

DATE: _____10/20/2017_____

CLERK OF COURT

By: _____ 7c.338
    Deputy Clerk

# VERIFIED RETURN OF SERVICE

**State of FLORIDA**                    **County of MIAMI-DADE**                    **Circuit Court**

Case Number: 17-23954

Plaintiff:
**SKYPATROL, LLC, A DELAWARE LIMITED LIABILITY COMPANY**

vs.

Defendant:
**VBI GROUP, LLC, A DELAWARE LIMITED LIABILITY COMPANY,
SAM K. MAHROUQ**

For:
ROBERT P. FRANKEL & ASSOCIATES, P.A.
1000 S Pine Island Road
Suite 410
Plantation, FL 33324

Received by GORMAN PROCESS SERVICE, LLC on the **24th day of October, 2017** at **3:39 pm** to be served on **SAM MAHROUQ - MEI INVESTMENTS, INC., 1911 E. DIVISION STREET, ARLINGTON, TX 76011.**

I, HOLLY WICKER  SCH #9082, being duly sworn, depose and say that on the **26th day of October, 2017** at **3:40 pm, I:**

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **SUMMONS/COMPLAINT** with the date and hour of service endorsed thereon by me, to: **SAM MAHROUQ** at the address of: **2615 HEMINGWAY DRIVE, ARLINGTON, TX 76006,** and informed said person of the contents therein, in compliance with state statutes.

**Military Status:** BASED UPON INQUIRY DEFENDANT IS NOT IN THE MILITARY.

I am over the age of eighteen, and have no interest in the above action. Under penalty of perjury, I declare that I have read the foregoing verified return of service and that the facts stated in it are true.

Subscribed and Sworn to before me on the 2nd day of November, 2017 by the affiant who is personally known to me.

**NOTARY PUBLIC**

KRISTY LEIGHANN PATTERSON
Notary Public
State of Texas
ID # 12665185-3
My Comm. Expires 09-19-2020

**HOLLY WICKER  SCH #9082**
Process Server

**GORMAN PROCESS SERVICE, LLC**
**11767 South Dixie Highway**
**Suite 201**
**Miami, FL 33156**
**(305) 971-9636**
Our Job Serial Number: ARG-2017005201
Ref: 5851/NATACHA

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.5n

Filing # 62927622 E-Filed 10/17/2017 12:14:05 PM

5851

IN THE CIRCUIT COURT OF THE
11ᵀᴴ JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

      Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI Group, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

      Defendants.

_____/

**SUMMONS: PERSONAL SERVICE ON AN INDIVIDUAL**
**ORDEN DE COMPARECENCIA: SERVICIO PERSONAL EN UN INDIVIDUO**
**CITATION: L'ASSIGNATION PERSONAL SUR UN INDIVIDUEL**

**To Defendant(s):**    **Sam Mahrouq**
                **MEI Investments, Inc.**
                **1911 E. Division Street**
                **Arlington, TX 76011**

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file with the clerk of this court a written response to the attached complaint. A phone call will not protect you; your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may loose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or legal aid office (listed in the phone book). If you choose to file a written response yourself, you must at the same time mail or take a copy of your written response to the Plaintiff's Attorney named below:

**ROBERT P. FRANKEL, ESQ.**
**Law Offices of Robert P. Frankel, P.A.**
**1000 S. Pine Island Road, Suite 410**
**Plantation, Florida 33324**
**305-358-5690; 305-907-5901 FAX**

and file your response to the Court located at Dade County Courthouse, Clerk of Courts, Room 138, 73 West Flagler Street, Miami, Florida 33130.

IN ACCORDANCE WITH THE AMERICANS WITH DISABILITIES ACT OF 1990, PERSONS NEEDING A SPECIAL ACCOMMODATION TO PARTICIPATE IN THIS PROCEEDING SHOULD CONTACT THE COURT ADA COORDINATOR at (305) 325-2066 or TDD 1-800-955-8770 via Florida Relay Service.

TO EACH SHERIFF OF THE STATE OF FLORIDA: You are commanded to serve this Summons and a copy of the Complaint of this law suit on the above named defendant.

DATE:   10/20/2017 _____

                        **CLERK OF COURT**
                        Gonelle Brown  164659
                    By:_____
                        Deputy Clerk

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

    Plaintiff,

    v.

VBI Group, LLC, a Delaware limited liability
Company, SAM K. MAHROUQ,

    Defendants.

GENERAL JURISDICTION DIVISION

CASE NO.:  CASE NO.: 17-23954-CA-01

---

**ORDER GRANTING VERIFIED MOTION FOR ADMISSION TO APPEAR
*PRO HAC VICE* PURSUANT TO FLA. R. JUD. ADMIN. 2.510**

**THIS CAUSE** came before this Court upon the Verified Motion of Jeff Whitfield for

Admission to Appear *Pro Hac Vice* in this matter on behalf of Defendants VBI GROUP, LLC

and SAM MAHROUQ (collectively, "Defendants") pursuant to Fla. R. Jud. Admin. 2.510 (the

"Motion").

This Court having reviewed the Motion, and being otherwise fully advised, hereby

**ORDERS** and **ADJUDGES** that:  the Motion is **GRANTED**.  Jeff Whitfield is admitted

*pro hac vice* as counsel of record in this matter for the Defendants.  The Clerk shall provide

electronic notice of all electronic filings to Jeff Whitfield at e-mail address:

jeff.whitfield@kellyhart.com.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 12/26/17.

_____
RODNEY SMITH
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on <u>THIS</u> <u>MOTION</u>**
> **CLERK TO <u>RECLOSE</u> CASE <u>IF</u> POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.


Copies furnished to:
        All counsel of record

43670864;1

f   IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited        GENERAL JURISDICTION DIVISION
liability company,

     Plaintiff,                              CASE NO.: 17-23954-CA-01

vs.

VBI Group, LLC, a Delaware limited liability
Company, SAM K. MAHROUQ,

     Defendants.

_____/

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

Defendants VBI Group, LLC ("VBI") and Sam Mahrouq ("Mahrouq") (collectively, "Defendants") hereby file their answer and affirmative defenses to the Complaint filed by Skypatrol, LLC ("Plaintiff").

## COUNT I

### Breach of Contract – Asset Purchase Agreement and Secured Promissory Note

1.    Defendants admit that Plaintiff seeks damages in excess of $15,000 exclusive of legal fees, interest and costs but deny that Plaintiff is entitled to any relief.

2.    Defendants admit that Plaintiff is a Delaware limited liability company maintaining offices in Miami-Dade County, Florida. Defendants admit that Plaintiff was previously engaged in the business of providing G.P.S. tracking software and hardware solutions to, among other businesses, the vehicle finance and franchise auto dealer businesses. Defendants are without knowledge of whether Plaintiff did so until such time as the transaction occurred that is the subject matter of this action.

3.      Defendants admit that the VBI is a Delaware limited liability company doing business as Skypatrol USA.

4.      Defendants admit that Mahrouq is the Chief Executive Officer of VBI. Defendants deny that "both the Defendants, VBI and Mahrouq, consented to the venue of the courts of Miami-Dade County with respect to any actions arising out of an Asset Purchase Agreement, Secured Promissory Note and Security Agreement, have expressly waived any challenge to venue and personal jurisdiction."

5.      Defendants admit that, on May 1, 2017, Plaintiff executed an Asset Purchase Agreement with VBI as purchaser and Mahrouq, as guarantor.  Defendants admit that, pursuant to the terms of the Asset Purchase Agreement, VBI agreed to purchase the described assets and to assume certain liabilities. Defendants admit that the purchase price was $2,500,000 plus an earnout of up to $2,500,000. Defendants admit that pursuant to the terms of the Asset Purchase Agreement, VBI was required to make designated payments commencing on May 1, 2017. Defendants admit that VBI made the May 1, 2017 and June 1, 2017 payments.  Defendants deny that VBI failed to make the full July 1, 2017 payment, which allegedly resulted in a default in the amount of $100,000.00 for the July payment. Defendants deny that VBI failed to pay the August 1, 2017 and September 1, 2017 payments. Defendants admit that, pursuant to the terms of the Asset Purchase Agreement, Plaintiff agreed to finance the balance of the purchase price in the amount of $900,000.00. Defendants admit that VBI executed a secured promissory note in the principal amount of $900,000.00.  Defendants deny that section 10.7 of the secured Promissory Note provides that the Defendants "irrevocably and unconditionally consented to the exclusive jurisdiction of the courts in Miami-Dade County, Florida."

6.      Defendants are without knowledge of whether Plaintiff is the owner and holder of the secured promissory note and maintains possession of the original promissory note and therefore deny same.

7.      Defendants deny that all conditions precedent to the filing of this action have been performed, satisfied or excused by virtue of Defendants' alleged conduct.

8.      Defendants deny that, pursuant to section 1.3(a) of the Asset Purchase Agreement, VBI defaulted by failing to make payments that are due and owing since May 1, 2017. Defendants deny that VBI has defaulted under the terms of the Secured Promissory Note by failing to pay the September 28, 2017 payment.

9.      Defendants deny that VBI failed to make the full July 1, 2017 payment and the August and September payments, and further deny that VBI defaulted under the terms of the Asset Purchase Agreement and secured Promissory Note by purportedly failing to pay the September 28, 2017 payment.

10.     Defendants deny that VBI owes Plaintiff all of the payments commencing with the May 1, 2017 payment under the terms of the Asset Purchase Agreement and all subsequent payments due under the terms of the Secured Promissory Note. Defendants deny that, during the transition with respect to the transaction between Plaintiff and VBI, Plaintiff made several payments on accounts payables, payroll and other expenses on behalf of VBI. Defendants deny that this was done because VBI claimed it needed time to transition certain accounts/bills over to its name and had not set up the proper mechanism to commence with their payroll expenses. Defendants deny that Plaintiff has incurred to date in excess of $140,000.00 and further deny that it was the obligation of VBI to reimburse Plaintiff.

11.     Defendants deny that VBI owes Plaintiff what Plaintiff characterizes as "the full amount of unpaid monthly payments, the full amount of the Secured Promissory Note in the approximate sum of $140,000.00 plus accrued interest under the terms of the Secured Promissory Note and Asset Purchase Agreement including legal fees and costs."

12.     Defendants admit that Plaintiff has retained counsel to prosecute this action. Defendants are without knowledge of whether Plaintiff has agreed to pay counsel a reasonable fee for his services and therefore deny same.

## COUNT II
### Action on Guaranty

13.      Defendants restate, re-allege, and incorporate by reference their responses to paragraphs 1 through 11 of the Complaint as if fully set forth herein.

14.     Defendants admit that Mahrouq executed a Guaranty with respect to the liabilities owed by VBI to Plaintiff.

15.     Defendants deny that VBI defaulted under the terms of the Asset Purchase Agreement and the Secured Promissory Note.   Defendants deny that Mahrouq is liable to Plaintiff.

## COUNT III
### Action on Security Agreement

16.     Defendants restate, re-allege, and incorporate by reference their responses to paragraphs 1 through 11 of the Complaint as if fully set forth herein.

17.     Defendants admit that, in connection with the Asset Purchase Agreement and Secured Promissory Note, VBI executed a Security Agreement with Plaintiff.

18.     Defendants deny that VBI defaulted under the terms of the Asset Purchase Agreement and the Secured Promissory Note.   Defendants deny that Plaintiff is entitled to

exercise his rights and remedies under the terms of the Secured Promissory Note to foreclose against the assets that are the subject matter of the Security Agreement.

19.     Defendants deny that Defendants have defaulted under the terms of the Asset Purchase Agreement and the Secured Promissory Note. Defendants deny that Plaintiff is entitled to foreclose its security interest in the assets that are the subject matter of the Security Agreement.

## COUNT IV
### Action for Breach of Shared Services Agreement

20.     Defendants restate, re-allege, and incorporate by reference their responses to paragraphs 1 through 5 of the Complaint as if fully set forth herein.

21.     Defendants admit that, on May 1, 2017, Plaintiff and VBI executed a Shared Services Agreement.

22.     Defendants deny that Plaintiff sought to provide VBI with a smooth transition. Defendants deny that VBI failed and refused to pay many of the required services described in the Shared Services Agreement.   Defendants deny that VBI breached the Shared Services Agreement.   Defendants are without knowledge of whether Plaintiff was required to pay consultants who suffered a loss of customers and business in other cases and therefore deny same. Defendants deny that Plaintiff is incurring damages because of alleged failures of VBI to comply with the Terms of the Shared Services Agreement.

23.     Defendants deny that, pursuant to Section 6.8 of the Shared Services Agreement, VBI consented to the jurisdiction of the courts in Miami-Dade County.

Any allegations not expressly admitted are denied.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses without assuming the burden of proof on such defenses that otherwise would rest on Plaintiff:

### First Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because of Plaintiff's prior material breach of its obligations under the contracts on which this action is based.

### Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

### Third Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by a failure of consideration.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of equitable estoppel.

### Fifth Affirmative Defense

Plaintiff made representations to induce Defendants into the contracts at issue in this lawsuit.  The representations made by Plaintiff were false when made and Plaintiff knew them to be false at the time that they were made.  Defendants were not aware of the falsity of the representations, reasonably believed the representations to be true, and could not have discovered their falsity by the exercise of reasonable diligence.  Plaintiff made the false representations intending that they would induce Defendants to enter into the contracts.  Defendants entered into the contracts in reliance on the false representations made by Plaintiff.  Had Defendants known that the representations were false, Defendants would not have entered into the contracts.

## Sixth Affirmative Defense

By the terms of the contracts at issue in this lawsuit, certain conditions precedent were to be satisfied before Defendants' obligation to perform under the contract arose.  Those conditions precedent were not satisfied and, therefore, Defendants are not obligated to perform.

## Seventh Affirmative Defense

Plaintiff has waived any cause of action or claim it may have had against Defendants by reason of Plaintiff's own actions and course of conduct.

## Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, to the extent that it (or its agents or real parties in interest) have made statements, taken action, or concealed information from Defendants material to the contracts at issue in this lawsuit.  Defendants relied, in good faith, upon this information (or misinformation) and this reliance has caused Defendants to change their position for the worse.

## Ninth Affirmative Defense

On December 13, 2017, Plaintiff filed a voluntary petition under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Florida, Miami Division, in the case styled In re Skypatrol, LLC, a Delaware limited liability company, Case No. 17-bk-24842-RAM (the "Bankruptcy Case").  Defendants reserve their right to pursue any claims against the debtor in the Bankruptcy Case, in this case, or any related adversary proceeding, to challenge Plaintiff as the proper party to this case if a trustee is appointed in the Bankruptcy Case, and all such other rights afforded to Plaintiff under Title 11 of the United States Code.

Defendants expressly reserve the right to raise additional affirmative defenses as grounds for such are discovered.

**WHEREFORE,** defendants VBI Group, LLC and Sam Mahrouq respectfully request that the Court (i) dismiss plaintiff Skypatrol, LLC's Complaint with prejudice, (ii) award Defendants their reasonable attorneys' fees and costs, and (iii) grant such other and further relief to Defendants as the Court deems just and proper.

Respectfully submitted,

Dated:  December 22, 2017          **AKERMAN LLP**
One Southeast Third Avenue
Suite 2500
Miami, FL  33131-1714
Telephone:  (305) 374-5600
Facsimile:  (305) 374-5095

By: s/*Ryan Roman*
     RYAN ROMAN
     Florida Bar No. 025509
     Primary e-mail: ryan.roman@akerman.com
     Secondary e-mail: dorothy.matheis@akerman.com
     DONNIE M. KING
     Florida Bar No. 101386
     Primary e-mail: donnie.king@akerman.com
     Secondary e-mail: simone.tobie@akerman.com

**OF COUNSEL:**

Jeff Whitfield (*\*pro hac* to be filed)
Texas State Bar No. 24060825
E-mail: jeff.whitfield@kellyhart.com
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas  76102
Telephone:  (817) 332-2500
Facsimile:  (817) 878-9280

## CERTIFICATE OF SERVICE

This is to certify that on this 22nd day of December, 2017, a true and correct copy of the foregoing document was served via e-mail on:

Robert P. Frankel, Esq.
Law Offices of Robert P. Frankel, P.A.
1000 S. Pine Island Rd., Suite 410
Plantation, FL 33324
E-mail: robert@frankelpa.com
Telephone: (305) 358-5690

*s/Ryan Roman*
Ryan Roman

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

CASE NO.:  CASE NO.: 17-23954-CA-01

     Plaintiff,

     v.

VBI Group, LLC, a Delaware limited liability
Company, and SAM K. MAHROUQ,

     Defendants.

**VERIFIED MOTION FOR ADMISSION TO APPEAR *PRO HAC VICE*
PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510**

Comes now, Jeff Whitfield, Movant herein, and respectfully represents the following:

1.     Movant resides in Fort Worth, Texas.  Movant is not a resident of the State of Florida.

2.     Movant is an attorney and a member of the law firm of Kelly Hart & Hallman LLP, with offices at 201 Main Street, Suite 2500, Fort Worth, Texas 76102, telephone number: (817) 878-3526.

3.     Movant was retained personally or as a member of the above-named law firm on or about October 25, 2017 by defendants VBI GROUP, LLC and SAM MAHROUQ to provide legal representation in connection with the above-styled matter now pending before the above-named court of the State of Florida.

4.     Movant is an active member in good standing and currently eligible to practice law in the following jurisdictions: the State Bar of Texas (Bar No. 24060825) and the State Bar of Louisiana (Bar No. 32770).

43670734;1

5.    There have been no disciplinary, suspension, disbarment, or contempt proceedings initiated against Movant in the preceding 5 years.

6.    Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

7.    Movant is not an inactive member of The Florida Bar.

8.    Movant is not now a member of The Florida Bar.

9.    Movant is not a suspended member of The Florida Bar.

10.    Movant is not a disbarred member of The Florida Bar, nor has Movant received a disciplinary resignation from The Florida Bar.

11.    Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of Judicial Administration 2.510.

12.    Movant has not filed a motion to appear as counsel in Florida state courts during the past five (5) years.

13.    Local counsel of record associated with Movant in this matter is Ryan Roman, Esq. (Florida Bar No. 025509) who is an active member in good standing of The Florida Bar and has offices at Akerman LLP, Three Brickell City Centre, 98 Southeast Seventh Street, Suite 1100, Miami, Florida 33131; telephone number: (305) 374-5600.

14.    Movant has read the applicable provisions of Florida Rule of Judicial Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

15.     Movant agrees to comply with the provisions of the Florida Rules of Professional

Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

WHEREFORE, Movant respectfully requests permission to appear in this court for this

cause only.

J W hitfield

JEFF WHITFIELD, ESQ.
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:    (817) 878-3526
Facsimile:    (817) 878-9726
E-Mail:    jeff.whitfield@kellyhart.com

43670734;1

STATE OF TEXAS        )
COUNTY OF TARRANT    )

I, Jeff Whitfield, do hereby swear or affirm under penalty of perjury that I am the Movant

in the above-styled matter; that I have read the foregoing Motion and know the contents thereof,

and the contents are true of my own knowledge and belief.


                         *J W Whitfield*
                         _____
                         Jeff Whitfield
                         Movant


I, Ryan Roman, hereby consent to be associated as local counsel of record in this cause

pursuant to Florida Rule of Judicial Administration 2.510.

     DATED this 22nd day of December 2017.


                         *s/Ryan Roman*
                         _____
                         RYAN ROMAN
                         Florida Bar No. 025509
                         **AKERMAN LLP**
                         Three Brickell City Centre
                         98 Southeast Seventh Street
                         Miami, FL  33131
                         Telephone:  (305) 374-5600
                         Facsimile:  (305) 374-5095
                         ryan.roman@akerman.com

                         *Local Counsel of Record for Defendants VBI*
                         *Group, LLC and Sam Mahrouq*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that, on December 22, 2017, a true and correct copy of the foregoing motion was served by mail to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2333, accompanied by payment of the $250.00 filing fee made payable to The Florida Bar; and by e-mail (unless otherwise indicated below) to:

    Robert P. Frankel, Esq.
    Law Offices of Robert P. Frankel, P.A.
    1000 S. Pine Island Rd., Suite 410
    Plantation, FL  33324
    E-mail: robert@frankelpa.com
    Telephone: (305) 358-5690

                    */s/Ryan Roman*_____
                    Ryan Roman

43670734;1

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIRCUIT CIVIL DIVISION**

**CASE NO.  2017-023954-CA-01
SECTION: CA 34**

**SKYPATROL LLC.**
        **Plaintiff,**

           **vs**

**VBI GROUP LLC.**
        **Defendant.**

_____/

        **UNIFORM ORDER SETTING CAUSE
FOR NON-JURY TRIAL AND
PRE-TRIAL INSTRUCTIONS**

      THIS CAUSE is set for Non-Jury Trial before the undersigned Judge in his/her Chambers in the Dade County Courthouse, 73 West Flagler Street, Miami, Florida, for the **two (2) week** period commencing May 29, 2018**,** or as soon thereafter as the same may be heard.

      ALL ATTORNEYS, are directed to appear before the undersigned Judge, at the Dade County Courthouse, for **Call of the Calendar** at 9:00am  on May 3, 2018**.** All attorneys should be thoroughly familiar with the cause and prepared to consider and determine such matters as are set forth in Rule 1.200(b).  **Failure to appear** as directed or to otherwise strictly comply with the terms of this Order may result in sanctions including, dismissing the action, striking the pleadings, limiting proof or witnesses or taking any other appropriate action.  It is further

      **ORDERED AND ADJUDGED** as follows:

      1.    The parties shall do all things reasonable and necessary to assure the availability of their witnesses for the **entire** trial period or to otherwise preserve their testimony for trial as provided by the Florida Rules of Civil Procedure.  See Rules 1.300 and 1.460 F.R.Civ.P. and Rule 2.085 of the Rules of Judicial Administration.

      2.    The following shall be done no later than **forty-five (45) days** prior to the Monday of the trial period set forth above:

          (a)    Parties shall furnish opposing counsel with a written list containing the names and addresses of all witnesses (impeachment, rebuttal or otherwise) intended to be called at trial and only those witnesses listed shall be permitted to testify;  further, regarding **expert testimony, each party shall furnish all information required by Rule 1.280(b) (4) (A)**.  Each party is limited to one expert per specialty.  No other expert testimony shall be permitted at trial.  A written list identifying all exhibits intended to be offered shall also be furnished to opposing counsel and only those exhibits may be

offered in evidence.  Copies of witness and exhibit lists shall be timely filed with the Clerk of the Court.

(b)    All exhibits to be offered in evidence at trial shall be made available to opposing counsel for examination and initialing during normal business hours.

(c)    All plaintiff medical evaluations and other examinations pursuant to Rule 1.360 F.R.Civ.P. shall have been completed.

3.    The following shall be done at least **fifteen (15) days** prior to the Monday of the trial period set forth above.

(a)    All pre-trial motions, depositions noticed for use at trial and/or discovery matters or proceedings related thereto shall have been completed.  **Counsel are admonished to undertake, initiate and/or complete all discovery in such a manner as to comply with the time limitations set forth herein.    No further discovery procedures or depositions for preservation of testimony shall be allowed without specific leave of Court or court approved written agreement of counsel.**

(b)    Counsel shall meet with a view toward exhausting all efforts to reach a settlement.

4.    Counsel shall immediately notify this Court in the event of settlement and submit a Stipulation for and Order of Dismissal.

5.    In the event the Trial of this matter is continued, then each time limitation and provision contained above shall apply as to the new trial date.

**DONE AND ORDERED** in Chambers, at Miami, Dade County, Florida, on this 18th day of January, 2018**.**

954-CA-01

Rodney Smith
CIRCUIT COURT JUDGE

No Further Judicial Action Required on THIS MOTION.  CLERK TO RECLOSE CASE IF POST JUDGMENT.

Electronic Service List:

Robert P. Frankel <robert@frankelpa.com>, <documents@frankelpa.com>, <lana@frankelpa.com>
KIM A <kim@frankelpa.com>
Ryan Roman <ryan.roman@akerman.com>, <dorothy.matheis@akerman.com>
Donnie M King <donnie.king@akerman.com>, <simone.tobie@akerman.com>, <sharon.luesang@akerman.com>
Jeff Whitfield <jeff.whitfield@kellyhart.com>

Mailing Service List:
VBI GROUP LLC., 515 EAST PARK AVENUE, 2ND FLOOR, TALLAHASSEE, FL 32301
SAM K MAHROUQ, 1911 E. DIVISION STREET, ARLINGTON, TX 76011

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

      Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI Group, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

      Defendants.

_____/

## PLAINTIFF'S REPLY TO AFFIRMATIVE DEFENSES

Plaintiff, Skypatrol, LLC, hereby serves its reply to the affirmative defenses and would state:

1.      It denies the allegations of the affirmative defenses.

2.      The affirmative defenses are insufficient as a matter of law to bar recovery.

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served via the clerk's online portal upon Ryan Roman, Esq., ryan.roman@akerman.com; dorothy.matheis@akerman/com; Donnie M. King, Esq. donnie.king@akerman.com; Jeff Whitfield, Esq. jeff.whitfield@kellyhart.com; on this January 16, 2018.

**Law Offices of Robert P. Frankel, P.A.**
Attorneys for Plaintiff
1000 S. Pine Island Rd., Suite 410
Plantation, Florida 33324
Robert@frankelpa.com
(305) 358-5690; (954) 607-2861

By_____***/s/ Robert P. Frankel***_____
       ROBERT P. FRANKEL
       Florida Bar No. 304786

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

       Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI Group, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

       Defendants.

_____/

NOTICE FOR TRIAL

       Plaintiff, Skypatrol, LLC, pursuant to Fla.R.Civ.P. 1.440, hereby serves its notice to set this

case for trial on the next available non-jury trial docket.  It is estimated that the case shall take 3-4

days.

       I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served
via the clerk's online portal upon Ryan Roman, Esq., ryan.roman@akerman.com;
dorothy.matheis@akerman/com; Donnie M. King, Esq. donnie.king@akerman.com; Jeff Whitfield,
Esq. jeff.whitfield@kellyhart.com; on this January 16, 2018.

**Law Offices of Robert P. Frankel,  P.A.**
Attorneys for Plaintiff
1000 S. Pine Island Rd., Suite 410
Plantation, Florida 33324
Robert@frankelpa.com
(305) 358-5690; (954) 607-2861

By_____*/s/ Robert P. Frankel*_____
       ROBERT P. FRANKEL
       Florida Bar No. 304786

**Law Offices of Robert P. Frankel, P.A.**
Royal Palm I at Southpointe, 1000 S. Pine Island Rd., Suite 410, Plantation, Florida 33324 • Tel: (305) 358-5690 • (954) 607-2861

1

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

     Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI GROUP, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

     Defendants.

_____/

## PLAINTIFF'S EMERGENCY MOTION FOR THE APPOINTMENT OF A RECEIVER

Plaintiff, Skypatrol, LLC ("Skypatrol"), respectfully moves this court for the emergency

appointment of a receiver to take control of the business operations of the Defendant, VBI Group,

LLC ("VBI"); to sequester all assets including accounts receivables, bank accounts, and the financial

books and records and for grounds would show:

1.     This action was commenced by the Plaintiff, Skypatrol, LLC, on October 11, 2017

seeking damages against the Defendants for breach of the Asset Purchase Agreement,

Secured Promissory Note, enforcement on the Security Agreement and damages for

breach of the Shared Services Agreement.

2.     The Plaintiff, Skypatrol, is a Delaware limited liability company maintaining offices

in Miami-Dade County, Florida. The Plaintiff, Skypatrol, was previously engaged

in the business of providing G.P.S. tracking software and hardware solutions to the

vehicle finance and franchise auto dealer businesses until such time as the transaction

occurred that is the subject matter of this action.

3.     The Defendant, VBI is a Delaware limited liability company doing business as

Skypatrol USA.

4.      The Defendant, Mahrouq, is the Chief Executive Officer of the Defendant, VBI. Both the Defendants, VBI and Mahrouq, consented to the venue of the courts of Miami-Dade County with respect to any actions arising out of an Asset Purchase Agreement, Secured Promissory Note and Security Agreement, have expressly waived any challenge to venue and personal jurisdiction. See section 10.5 of the Asset Purchase Agreement attached to the Complaint as Composite Exhibit A and section 10.7 of the Secured Promissory Note.

5.      On May 1, 2017, the Plaintiff, Skypatrol, executed an Asset Purchase Agreement with the Defendant, VBI, as purchaser and the Defendant, Mahrouq, as guarantor. Pursuant to the terms of the Asset Purchase Agreement, the Defendant, VBI agreed to purchase the described assets and to the assumption of certain liabilities. The purchase price was $2,500,000, the assumption of certain liabilities and an earnout of up to $2,500,000. Pursuant to the terms of the Asset Purchase Agreement, the Defendant, VBI, was required to make designated payments commencing on May 1, 2017. Although the Defendant, VBI, made the May 1, 2017 and June 1, 2017 payments, it failed to make the full July 1, 2017 payment which resulted in a default in the amount of $100,000.00 for the July payment. Thereafter, the Defendant, VBI, failed to pay the August 1, 2017 and September 1, 2017 payments. In addition, pursuant to the terms of the Asset Purchase Agreement, Plaintiff, Skypatrol, agreed to finance the balance of the purchase price in the amount of $900,000.00. As a result, the Defendant, VBI, executed a secured promissory note in the principal amount of $900,000.00. A copy of the Secured Promissory Note dated May 1, 2017 in the principal amount of $900,000.00 is attached to the Complaint as Exhibit B. Moreover, section 10.7 of the Secured Promissory Note provides that the Defendants

"irrevocably and unconditionally consented to the exclusive jurisdiction of the courts in Miami-Dade County, Florida."

6.    Pursuant to section 1.3(a) of the Asset Purchase Agreement, the Defendant, VBI defaulted by failing to make payments that are due and owing.   Moreover, the Defendant, VBI has defaulted under the terms of the Secured Promissory Note by failing to pay the September 28, 2017 payment and all subsequent payments.

7.    In addition to failing to make the full July 1, 2017 payment and the August and September payments, the Defendant, VBI, defaulted under the terms of the Asset Purchase Agreement and secured Promissory Note by failing to pay the September 28, 2017 payment and all subsequent payments.

8.    The Defendant, VBI owes the Plaintiff, Skypatrol, payments due under the terms of the Asset Purchase Agreement and payments due under the terms of the Secured Promissory Note.   In addition, during the transition with respect to the transaction between the Plaintiff, Skypatrol, and the Defendant, VBI, Plaintiff made several payments on accounts payables, payroll and other expenses on behalf of the Defendant, VBI. This was done because the Defendant, VBI, claimed it needed time to transition certain accounts/bills over to its name and had not set up the proper mechanism to commence with their payroll expenses.   Therefore, Plaintiff has incurred to date in excess of $140,000.00 which is clearly the obligation of the Defendant, VBI, which agreed that it would immediately reimburse the Plaintiff but has failed and refused to do so.

9.    In connection with the Asset Purchase Agreement and Secured Promissory Note, the Defendant, VBI, executed a Security Agreement with the Plaintiff, Skypatrol.   A copy of the Security Agreement is attached to the Complaint as Exhibit D.

10.     Since the Defendant, VBI defaulted under the terms of the Asset Purchase Agreement and the Secured Promissory Note, Plaintiff is entitled to exercise his rights and remedies under the terms of the Security Promissory Note to foreclose against the assets that are the subject matter of the Security Agreement.

11.     Having defaulted under the terms of the Asset Purchase Agreement and Secured Promissory Note, Plaintiff is entitled to foreclose its security interest in the assets that are the subject matter of the Security Agreement.

12.     On May 1, 2017, the Plaintiff, Skypatrol, and the Defendant, VBI, executed a Shared Services Agreement, a copy of which is attached to the Complaint as Exhibit E.

13.     Pursuant to the terms of the Shared Services Agreement, Plaintiff, sought to provide the Defendant, VBI, with a smooth transition, however the Defendant, VBI, failed and refused to pay many of the required services described in the Shared Services Agreement.  As a result of the breach by the Defendant, VBI, of the Shared Services Agreement, the Plaintiff was required to pay expenses that were the responsibility of VBI.  In fact, through the date of the filing of this Complaint, the Plaintiff continues to incur damages because the Defendant, VBI, has failed to comply with the terms of the Shared Services Agreement.

14.     Subsequent to the filing of this action, Plaintiff has received undisputed evidence that the Defendants either terminated several key employees or several employees have left the company resulting in completely deficient service to the customers, including failing to adequately maintain software which is used by both VBI's and Skypatrol's customers.  Approximately 90% of the sales force are currently looking for employment because of the reckless, irresponsible and abusive behavior exhibited by the Defendant, Mahrouq.  The work atmosphere has degenerated to the point where

it is clearly a hostile work environment. In act, the Defendant, VBI, is a software company and any of the key employees besides Mr. Mahrouq have left or are about to leave the company because of the "sinking ship" and hostile work environment.

15.    Very recently, the Plaintiff learned that the Defendants had failed to pay Vodafone almost retroactive to the date of the underlying transaction and is at least sixty days behind paying Verizon. Vodafone has threatened to deactivate all the devices imminently. Defendants agreed pursuant to the Asset Purchase Agreement to assume the carrier obligations of Skypatrol. The Plaintiff has learned that there are approximately 25,000 devices that are linked to Vodafone between the Plaintiff and the Defendant, VBI – approximately 5,000 of the customers belong to Skypatrol. The Plaintiff believes there are approximately 200,000 devices that are linked to Verizon and a small portion of which devices belong to Skypatrol. The Plaintiff believes there may be other carriers that are not being timely paid. **Defendant has been collecting renewals from Skypatrol customers until Skypatrol can separate the platform from Defendant. Defendant has been retaining the renewal revenue of Skypatrol and not paying it to the carriers**. In light of the egregious and reckless nature surrounding the operation of the business by the Defendants, the business is in serious jeopardy which will not only irreparably harm the Defendant but will also cause immeasurable damages to the Plaintiff if the carriers deactivate the devices as a result of non-payment by the Defendant, VBI.[1]

16.    Plaintiff, Skypatrol, and the Defendant, VBI, executed a nine-month agreement in order to split the Plaintiff's system from VBI's system. This requires cooperation

---

[1]/ Customers have prepaid for service and since the Defendant, VBI, is not paying its debts and obligations, the Plaintiff and its customers are in real danger of losing customers and precipitating litigation.

from VBI which has been insufficient to allow Skypatrol to split the software system to be autonomous from the Defendant. The nine-month period expires at the end of January 2018 and Plaintiff has a real fear and concern that the Skypatrol customers will be deactivated from the software platform putting Skypatrol out of business unless the nine-month period is extended and Defendant cooperates in the transition off of the Defendant's platform.

17. Because of the undisputed defaults that have occurred as alleged in the Plaintiff's complaint and the refusal and failure of the Defendants to comply with the terms of the Secured Promissory Note, Asset Purchase Agreement, Shared Services Agreement and Guaranty, all of which are attached as exhibits to the complaint, VBI's operation is literally being run into the ground and there is a mass exodus of employees and customers from the Defendant, VBI's operations.

18. It is undisputed based upon a review of the documents attached to the complaint that the Defendants have materially defaulted under all of the payment and shared services obligations which places Plaintiff's business in significant jeopardy. As a result of the multiple acts of default, documented waste and mismanagement, the collapse of VBI is imminent.

19. Given the precarious nature of the Defendant, VBI's business operations and the multiple acts of default under the terms of the documents that are attached to the complaint, the appointment of a receiver for the purpose of taking control of the business operations and securing the financial books and records of the company is more than justified for the protection of the Plaintiff, a major secured creditor, and other creditors and for the protection of the Defendant's customers.

20. This court has the jurisdiction and discretion to appoint a receiver under the

circumstances of this case. *See, Ins. Mgmt., Inc. vs. McLeod*, 194 So.2d 16, 17 (Fla. 3d DCA 1966); *Edenfield vs. Crisp*, 186 So.2d 545, 549 (Fla. 2nd DCA 1966) ("The power to appoint a receiver is always one that is inherent in a [c]ourt of equity.")

21.    To the extent that the appointment of a receiver is governed by similar standards with respect to the entry of an injunction, Plaintiff has shown and will continue to demonstrate that there is a substantial likelihood that it will prevail on the merits of all of the claims that are the subject matter of the complaint at the conclusion of the case. *See, Keybank National Assoc. vs. Knuth Ltd.*, 15 So.3d 939, 940 (Fla. 3rd DCA 2009).

22.    As the holder of a perfected security interest in all of the assets of the Defendant, VBI, and based upon the undisputed and multiple acts of breach coupled with the current state of affairs at the Defendant, VBI, the court has the authority to appoint a receiver in order to protect the assets of the Defendant, VBI, and to manage its affairs due to the egregious acts of gross mismanagement, neglect and dishonesty. *See, Granada Lakes Villas Condominium Assn., Inc. vs. Metro-Dade Investments Co.*, 125 So.3d 756, 757-58 (Fla. 2013); *Buckley Towers Condo., Inc. vs. Buchwald*, 340 So.2d 1206, 1207-09 (Fla. 3rd DCA 1976).

23.     If the operation of a business and its property are being mismanaged or are in danger because of claims by creditors including mismanagement and waste, a court has the inherent right and authority to appoint a receiver. *See, McAllister Hotel, Inc. vs. Schatzberg*, 40 So.2d 201, 202-03 (Fla. 1949).

24.    As alleged in the complaint, the Plaintiff, Skypatrol, and the Defendant, VBI, executed an asset purchase agreement with a purchase price of $2,500,000.00, assumption of certain liabilities and an additional earn-out of up to $2,500,000.00.

A few months into the deal, the Defendant defaulted by failing to make monthly payments as required by the Secured Promissory Note and Asset Purchase Agreement. Moreover, as alleged in the complaint, the Plaintiff has made several payments on accounts payables, payroll and other expenses for the Defendant, VBI, that are clearly VBI's obligation.

25.    The Plaintiff will produce evidence regarding the undisputed multiple acts of breach; the multiple acts of waste and mismanagement that take place at the Defendant's business on a daily basis and to prove that VBI's business is on the verge of collapse which in turn will destroy the business of the Plaintiff, Skypatrol.

26.    If ever a case existed where a receiver should be appointed to take charge of a business operation and to secure all of the assets, books and records of the business, this is it.

WHEREFORE, Plaintiff respectfully moves this court to conduct an emergency hearing; to appoint a receiver *pendente*; to provide the receiver with sufficient authority and power in order to protect the Plaintiff, a secured creditor, and all other creditors; to manage whatever employees are left in the business; to salvage the remaining customer base of the Defendant and to enter such other

relief as the court deems just and proper under the circumstances.

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served via the clerk's online portal upon Ryan Roman, Esq., ryan.roman@akerman.com; dorothy.matheis@akerman/com; Donnie M. King, Esq. donnie.king@akerman.com; Jeff Whitfield, Esq. jeff.whitfield@kellyhart.com; on this January 3o, 2018.

Law Offices of Robert P. Frankel, P.A.
Attorneys for Plaintiff
1000 S. Pine Island Rd., Suite 410
Plantation, Florida 33324
Robert@frankelpa.com
(305) 358-5690; (954) 607-2801

By _____/s/ Robert P. Frankel_____
ROBERT P. FRANKEL
Florida Bar No. 304786

## VERIFICATION

I, Robert Rubin, a Managing Member of Skypatrol, LLC, have read the above Emergency Motion for the Appointment of a Receiver and confirm to the best of my knowledge and belief that the factual allegations are truthful and accurate.

_____
ROBERT RUBIN


STATE OF FLORIDA        )
COUNTY OF MIAMI-DADE    )

I HEREBY CERTIFY that on this 31 day of January , 2018 before me, an officer duly qualified to take acknowledgments, personally appeared Robert Rubin , who is personally known to me ( ) or has produced _____, as identification and has acknowledged before me that he executed the foregoing freely and voluntarily for the purpose therein expressed.

WITNESS my hand and official seal at said County and State on the aforesaid date.

By _____

My Commission Expires:                    Print _____
Notary Public – State of Florida

SANDRA CASTRO
MY COMMISSION # FF976989
EXPIRES June 17, 2020
(407) 398-0153 FloridaNotaryService.com

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited                  CASE NO.:  17-23954-CA-01
liability company,

       Plaintiff,

vs.

VBI GROUP, LLC, a Delaware limited
liability company, and SAM K. MAHROUQ,

       Defendant.

_____/

## MOTION TO DESIGNATE CASE AS COMPLEX PURSUANT TO FLA. R. CIV. P. 1.201 AND TO TRANSFER TO COMPLEX LITIGATION DIVISION

Pursuant to Rule 1.201, Fla. R. Civ. P., and Eleventh Judicial Circuit Administrative Order

No. 17-11, defendants VBI Group, LLC and Sam K. Mahrouq (together, "Defendants"), by

counsel, hereby move to transfer this action to the complex litigation division and, in support

thereof, state as follows:

### Introduction

This action is subject to mandatory assignment to the Complex Business Litigation

Sections of this Court.  It involves a breach of contract claim where the amount in controversy

exceeds Seven Hundred and Fifty Thousand Dollars ($750,000).  Therefore, pursuant to Section 3

of Administrative Order No. 17-11, this action should be transferred to the Complex Litigation

Division.  The parties to this action are signatories to a mandatory arbitration provision pertaining

to certain of the claims brought by plaintiff Skypatrol, LLC ("Plaintiff").  Therefore, Defendants

bring this motion without waiver of their right to enforce arbitration over any such claims covered by the arbitration agreement.

<u>**Facts and Procedural History**</u>

Plaintiff filed this action on October 11, 2017.  The Complaint contains four counts, each alleging breach of various written contracts between the parties.  Count I alleges a breach of contract arising out of an Asset Purchase Agreement and Secured Promissory Note.  Count II alleges a breach of contract arising out of a Guaranty.  Count III alleges a breach of contract arising out of a Security Agreement.  Finally, Count IV alleges a breach of contract arising out of a Shared Services Agreement.

The Complaint improperly contains the boilerplate allegation that "[t]his is an action seeking damages in excess of $15,000 exclusive of legal fees, interest and costs."  Under Administrative Order No. 17-11, "[i]f parties are filing a breach of contract action, they must file a complaint which sets forth the required amount in controversy as opposed to simply pleading 'in excess of Fifteen Thousand Dollars ($15,000)."  *Id.* at § 3.

On January 31, 2018, Plaintiff filed an Emergency Motion for the Appointment of a Receiver (the "Emergency Motion").  Between the allegations in the Complaint and the Emergency Motion, Plaintiff makes clear that the amount in controversy exceeds $750,000.  Plaintiff is alleging that Defendants failed to make payments of $100,000 in July 2017, $200,000 in August 2017, and $200,000 in September 2017, along with monthly note payments totaling $150,000 ($35,000 due each month since September 2017) and $140,000 which Plaintiff claims it paid due to Defendants' alleged breach of a Shared Services Agreement.  Therefore, Plaintiff is seeking damages of at least $790,000.  Therefore, this case falls squarely within the mandatory

43984533;1

assignment provision of Administrative Order No. 17-11 and must be transferred to the Complex Litigation Division for further proceedings.

## Rule 1.201 and Administrative Order 17-11

Rule 1.201 of the Florida Rules of Civil Procedure allows a party to move to declare an action "complex" at any time after all defendants have been served.  This rule defines a "complex action" as "one that is likely to involve complicated legal or case management issues and that may require extensive judicial management to expedite the action, keep costs reasonable, or promote judicial efficiency." Fla. R. Civ. P. 1.201(a)(1).

In deciding whether an action should be designated "complex," this Court should consider whether the action is likely to involve:

A. numerous pretrial motions raising difficult or novel legal issues or legal issues that are inextricably intertwined that will be time consuming to resolve;

B. management of a large number of separately represented parties;

C. coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court;

D. pretrial management of a large number of witnesses or a substantial amount of documentary evidence;

E. substantial time required to complete the trial ;

F. management at trial of a large number of experts, witnesses, attorneys, or exhibits;

G. substantial post judgment judicial supervision; and

H. any other analytical factors identified by the court or a party that tend to complicate comparable actions and which are likely to arise in the context of the instant action.

Fla. R. Civ. P. 1.201(a)(2).

Eleventh Judicial Circuit Administrative Order Number 17-11 also sets forth the considerations for mandatory assignment to the Complex Business Litigation Sections, including

3

43984533;1

any breach of contract case where the amount in controversy exceeds $750,000. Administrative Order No. 17-11 at § 3.

Section 4 of Administrative Order No. 17-11 describes the factors to consider for discretionary case assignment to the Complex Business Litigation Sections. This case would similarly meet the standard for discretionary assignment, which requires the amount in controversy to exceed $750,000 and where the case may result in any of the following:

A. Numerous pre-trial motions raising difficult or novel legal issues, or legal issues inextricably intertwined and time consuming;

B. Management of large numbers of separately represented parties on main actions, cross claims, counterclaims, third party claims;

C. Management of large amounts of documents, both paper and electronic, during the pendency of the matter and at trial;

D. Protracted trial;

E. Management of large numbers of expert witnesses;

F. Multiple claims resulting in consolidation of numerous individual actions;

G. Potential of significant impact on the parties' business, whether from a monetary or corporate governance standpoint;

H. A high degree of case management, including the handling of discovery disputes and motion practice; [and]

I. Due to the complexity of the case, the services of a Special or General Magistrate would be beneficial.

As set forth below, this case not only meets the requirements for mandatory assignment but also qualifies for discretionary assignment to the Complex Business Litigation Sections of this Court.

## Complex Issues

This action clearly qualifies as complex. It is a breach of contract action with more than $750,000 in controversy, and therefore is subject to mandatory transfer. It also fits within the

4

43984533;1

discretionary factors, including subparagraphs A, C, D, E, F, and H of Rule 1.201(a)(2) of the Florida Rules of Civil Procedure. Specifically, this matter is likely to involve significant pretrial motions, including the Emergency Motion already filed by Plaintiff. It will require coordination with a pending bankruptcy proceeding where Plaintiff is the entity in bankruptcy. *See In re Skypatrol, LLC*, Case No. 17-24842-RAM (S.D. Fla. Bankr.). This further complicates the action because Defendants are stayed from bringing counterclaims in this action by virtue of the pending bankruptcy and will need to seek either a stay of this action or lift the stay in the bankruptcy proceeding so that they are not prejudiced. Furthermore, this action will involve potentially large numbers of third party witnesses and documentary evidence, as exhibited by the Emergency Motion that outlines the need to take discovery from third parties such as Verizon and Vodafone, among others. Finally, because of the complexity of this action, there is a potential for a significant amount of trial time and a large number of witnesses and exhibits at trial. In addition to the factors identified in Rule 1.201(a)(2), and for the reasons identified above, this matter fits within the factors for discretionary transfer identified in subparagraphs A, C, D, G, H, and I of Section 4 of Administrative Order No. 17-11.

<u>Conclusion</u>

For all the foregoing reasons, defendants VBI Group, LLC and Sam K. Mahrouq respectfully request that this Court enter an order designating this action complex and transferring it to the Complex Business Litigation Sections of this Court. Defendants further request that the Court grant them such other and further relief as the Court deems just and proper.

5

Respectfully submitted,

Date:   January 31, 2018

**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL  33131
Telephone:  (305) 374-5600
Facsimile:  (305) 374-5095

By: _s/Ryan Roman_____
    Ryan Roman
    Florida Bar No. 025509
    Primary e-mail: ryan.roman@akerman.com
    Secondary e-mail: dorothy.matheis@akerman.com
    Donnie M. King
    Florida Bar No. 101386
    Primary e-mail: donnie.king@akerman.com
    Secondary e-mail: sharon.luesang@akerman.com

**OF COUNSEL:**

Jeff Whitfield (admitted _pro hac vice_)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX  76102
Telephone: (817) 878-3526
Facsimile:  (817) 878-9726
E-mail: jeff.whitfield@kellyhart.com

_Attorneys for Defendants VBI Group, LLC
and Sam K. Mahrouq_

6

43984533;1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail

on this 31st day of January, 2018 to:

> Robert P. Frankel
> Law Offices of Robert P. Frankel, P.A.
> 1000 S. Pine Island Rd., Suite 410
> Plantation, FL  33324
> E-mail:  robert@frankelpa.com
>
> *Attorneys for Plaintiff Skypatrol, LLC*

s/*Ryan Roman*           
Ryan Roman

7

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

CASE NO.:  17-23954-CA-01

      Plaintiff,

vs.

VBI GROUP, LLC, a Delaware limited
liability company, and SAM K. MAHROUQ,

      Defendant.

_____/

### NOTICE OF HEARING

**(Transfer Calendar – Complex Business Litigation Division)**

**PLEASE TAKE NOTICE** that the undersigned will call up for hearing before the

Honorable Jennifer D. Bailey, Circuit Court Judge, at the **Dade County Courthouse, Room**

**DCC 635, 73 West Flagler Street, Miami, Florida 33130** on **Tuesday, February 13, 2017 at**

**9:15 a.m.**, or as soon thereafter as can be heard, the following:

**MOTION TO DESIGNATE CASE AS COMPLEX PURSUANT TO
FLA. R. CIV. P. 1.201 AND TO TRANSFER TO COMPLEX LITIGATION DIVISION**

PLEASE GOVERN YOURSELF ACCORDINGLY.

*If you are a person with a disability who needs any accommodation to participate in this
proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please
contact the Miami-Dade County Court's ADA Coordinator at 73 West Flagler Street, Room 911,
Miami, Fla. 33130, telephone numbers (305) 349-7175 for voice or (305) 349-7174 for TDD and*

43986402;1

*349-7011 for fax, within two working days of your receipt of this document.  TDD users may also call 1-800-955-8771 for the Florida Relay Service.*

Respectfully submitted,

Date:   January 31, 2018

**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL  33131
Telephone:  (305) 374-5600
Facsimile:  (305) 374-5095

By: *s/Ryan Roman*
    RYAN ROMAN
    Florida Bar No. 025509
    Primary e-mail: ryan.roman@akerman.com
    Secondary e-mail: dorothy.matheis@akerman.com
    DONNIE M. KING
    Florida Bar No. 101386
    Primary e-mail: donnie.king@akerman.com
    Secondary e-mail: sharon.luesang@akerman.com

**OF COUNSEL:**

Jeff Whitfield (admitted *pro hac vice*)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX  76102
Telephone: (817) 878-3526
Facsimile:  (817) 878-9726
E-mail: jeff.whitfield@kellyhart.com

*Attorneys for Defendants VBI Group, LLC
and Sam K. Mahrouq*

2

43986402;1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail

on this 31st day of January, 2018 to:

> Robert P. Frankel
> Law Offices of Robert P. Frankel, P.A.
> 1000 S. Pine Island Rd., Suite 410
> Plantation, FL  33324
> E-mail:  robert@frankelpa.com
>
> *Attorneys for Plaintiff Skypatrol, LLC*


                                        s/*Ryan Roman*
                                        Ryan Roman

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

     Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI GROUP, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

     Defendants.

_____/

## PLAINTIFF'S EMERGENCY MOTION FOR THE APPOINTMENT OF A RECEIVER

Plaintiff, Skypatrol, LLC ("Skypatrol"), respectfully moves this court for the emergency

appointment of a receiver to take control of the business operations of the Defendant, VBI Group,

LLC ("VBI"); to sequester all assets including accounts receivables, bank accounts, and the financial

books and records and for grounds would show:

1.    This action was commenced by the Plaintiff, Skypatrol, LLC, on October 11, 2017

seeking damages against the Defendants for breach of the Asset Purchase Agreement,

Secured Promissory Note, enforcement on the Security Agreement and damages for

breach of the Shared Services Agreement.

2.    The Plaintiff, Skypatrol, is a Delaware limited liability company maintaining offices

in Miami-Dade County, Florida.  The Plaintiff, Skypatrol, was previously engaged

in the business of providing G.P.S. tracking software and hardware solutions to the

vehicle finance and franchise auto dealer businesses until such time as the transaction

occurred that is the subject matter of this action.

3.    The Defendant, VBI is a Delaware limited liability company doing business as

Skypatrol USA.

4.  The Defendant, Mahrouq, is the Chief Executive Officer of the Defendant, VBI. Both the Defendants, VBI and Mahrouq, consented to the venue of the courts of Miami-Dade County with respect to any actions arising out of an Asset Purchase Agreement, Secured Promissory Note and Security Agreement, have expressly waived any challenge to venue and personal jurisdiction. See section 10.5 of the Asset Purchase Agreement attached to the Complaint as Composite Exhibit A and section 10.7 of the Secured Promissory Note.

5.  On May 1, 2017, the Plaintiff, Skypatrol, executed an Asset Purchase Agreement with the Defendant, VBI, as purchaser and the Defendant, Mahrouq, as guarantor. Pursuant to the terms of the Asset Purchase Agreement, the Defendant, VBI agreed to purchase the described assets and to the assumption of certain liabilities. The purchase price was $2,500,000, the assumption of certain liabilities and an earnout of up to $2,500,000. Pursuant to the terms of the Asset Purchase Agreement, the Defendant, VBI, was required to make designated payments commencing on May 1, 2017. Although the Defendant, VBI, made the May 1, 2017 and June 1, 2017 payments, it failed to make the full July 1, 2017 payment which resulted in a default in the amount of $100,000.00 for the July payment. Thereafter, the Defendant, VBI, failed to pay the August 1, 2017 and September 1, 2017 payments. In addition, pursuant to the terms of the Asset Purchase Agreement, Plaintiff, Skypatrol, agreed to finance the balance of the purchase price in the amount of $900,000.00. As a result, the Defendant, VBI, executed a secured promissory note in the principal amount of $900,000.00. A copy of the Secured Promissory Note dated May 1, 2017 in the principal amount of $900,000.00 is attached to the Complaint as Exhibit B. Moreover, section 10.7 of the Secured Promissory Note provides that the Defendants

"irrevocably and unconditionally consented to the exclusive jurisdiction of the courts in Miami-Dade County, Florida."

6.    Pursuant to section 1.3(a) of the Asset Purchase Agreement, the Defendant, VBI defaulted by failing to make payments that are due and owing. Moreover, the Defendant, VBI has defaulted under the terms of the Secured Promissory Note by failing to pay the September 28, 2017 payment and all subsequent payments.

7.    In addition to failing to make the full July 1, 2017 payment and the August and September payments, the Defendant, VBI, defaulted under the terms of the Asset Purchase Agreement and secured Promissory Note by failing to pay the September 28, 2017 payment and all subsequent payments.

8.    The Defendant, VBI owes the Plaintiff, Skypatrol, payments due under the terms of the Asset Purchase Agreement and payments due under the terms of the Secured Promissory Note. In addition, during the transition with respect to the transaction between the Plaintiff, Skypatrol, and the Defendant, VBI, Plaintiff made several payments on accounts payables, payroll and other expenses on behalf of the Defendant, VBI. This was done because the Defendant, VBI, claimed it needed time to transition certain accounts/bills over to its name and had not set up the proper mechanism to commence with their payroll expenses. Therefore, Plaintiff has incurred to date in excess of $140,000.00 which is clearly the obligation of the Defendant, VBI, which agreed that it would immediately reimburse the Plaintiff but has failed and refused to do so.

9.    In connection with the Asset Purchase Agreement and Secured Promissory Note, the Defendant, VBI, executed a Security Agreement with the Plaintiff, Skypatrol. A copy of the Security Agreement is attached to the Complaint as Exhibit D.

10.     Since the Defendant, VBI defaulted under the terms of the Asset Purchase Agreement and the Secured Promissory Note, Plaintiff is entitled to exercise his rights and remedies under the terms of the Security Promissory Note to foreclose against the assets that are the subject matter of the Security Agreement.

11.     Having defaulted under the terms of the Asset Purchase Agreement and Secured Promissory Note, Plaintiff is entitled to foreclose its security interest in the assets that are the subject matter of the Security Agreement.

12.     On May 1, 2017, the Plaintiff, Skypatrol, and the Defendant, VBI, executed a Shared Services Agreement, a copy of which is attached to the Complaint as Exhibit E.

13.     Pursuant to the terms of the Shared Services Agreement, Plaintiff, sought to provide the Defendant, VBI, with a smooth transition, however the Defendant, VBI, failed and refused to pay many of the required services described in the Shared Services Agreement.  As a result of the breach by the Defendant, VBI, of the Shared Services Agreement, the Plaintiff was required to pay expenses that were the responsibility of VBI.  In fact, through the date of the filing of this Complaint, the Plaintiff continues to incur damages because the Defendant, VBI, has failed to comply with the terms of the Shared Services Agreement.

14.     Subsequent to the filing of this action, Plaintiff has received undisputed evidence that the Defendants either terminated several key employees or several employees have left the company resulting in completely deficient service to the customers, including failing to adequately maintain software which is used by both VBI's and Skypatrol's customers.  Approximately 90% of the sales force are currently looking for employment because of the reckless, irresponsible and abusive behavior exhibited by the Defendant, Mahrouq.  The work atmosphere has degenerated to the point where

it is clearly a hostile work environment. In act, the Defendant, VBI, is a software company and any of the key employees besides Mr. Mahrouq have left or are about to leave the company because of the "sinking ship" and hostile work environment.

15.     Very recently, the Plaintiff learned that the Defendants had failed to pay Vodafone almost retroactive to the date of the underlying transaction and is at least sixty days behind paying Verizon. Vodafone has threatened to deactivate all the devices imminently. Defendants agreed pursuant to the Asset Purchase Agreement to assume the carrier obligations of Skypatrol. The Plaintiff has learned that there are approximately 25,000 devices that are linked to Vodafone between the Plaintiff and the Defendant, VBI – approximately 5,000 of the customers belong to Skypatrol. The Plaintiff believes there are approximately 200,000 devices that are linked to Verizon and a small portion of which devices belong to Skypatrol. The Plaintiff believes there may be other carriers that are not being timely paid. **Defendant has been collecting renewals from Skypatrol customers until Skypatrol can separate the platform from Defendant. Defendant has been retaining the renewal revenue of Skypatrol and not paying it to the carriers**. In light of the egregious and reckless nature surrounding the operation of the business by the Defendants, the business is in serious jeopardy which will not only irreparably harm the Defendant but will also cause immeasurable damages to the Plaintiff if the carriers deactivate the devices as a result of non-payment by the Defendant, VBI.[1]

16.     Plaintiff, Skypatrol, and the Defendant, VBI, executed a nine-month agreement in order to split the Plaintiff's system from VBI's system. This requires cooperation

---

[1]/ Customers have prepaid for service and since the Defendant, VBI, is not paying its debts and obligations, the Plaintiff and its customers are in real danger of losing customers and precipitating litigation.

from VBI which has been insufficient to allow Skypatrol to split the software system to be autonomous from the Defendant. The nine-month period expires at the end of January 2018 and Plaintiff has a real fear and concern that the Skypatrol customers will be deactivated from the software platform putting Skypatrol out of business unless the nine-month period is extended and Defendant cooperates in the transition off of the Defendant's platform.

17.    Because of the undisputed defaults that have occurred as alleged in the Plaintiff's complaint and the refusal and failure of the Defendants to comply with the terms of the Secured Promissory Note, Asset Purchase Agreement, Shared Services Agreement and Guaranty, all of which are attached as exhibits to the complaint, VBI's operation is literally being run into the ground and there is a mass exodus of employees and customers from the Defendant, VBI's operations.

18.    It is undisputed based upon a review of the documents attached to the complaint that the Defendants have materially defaulted under all of the payment and shared services obligations which places Plaintiff's business in significant jeopardy. As a result of the multiple acts of default, documented waste and mismanagement, the collapse of VBI is imminent.

19.    Given the precarious nature of the Defendant, VBI's business operations and the multiple acts of default under the terms of the documents that are attached to the complaint, the appointment of a receiver for the purpose of taking control of the business operations and securing the financial books and records of the company is more than justified for the protection of the Plaintiff, a major secured creditor, and other creditors and for the protection of the Defendant's customers.

20.    This court has the jurisdiction and discretion to appoint a receiver under the

circumstances of this case. *See, Ins. Mgmt., Inc. vs. McLeod*, 194 So.2d 16, 17 (Fla. 3d DCA 1966); *Edenfield vs. Crisp*, 186 So.2d 545, 549 (Fla. 2nd DCA 1966) ("The power to appoint a receiver is always one that is inherent in a [c]ourt of equity.")

21.   To the extent that the appointment of a receiver is governed by similar standards with respect to the entry of an injunction, Plaintiff has shown and will continue to demonstrate that there is a substantial likelihood that it will prevail on the merits of all of the claims that are the subject matter of the complaint at the conclusion of the case. *See, Keybank National Assoc. vs. Knuth Ltd.*, 15 So.3d 939, 940 (Fla. 3rd DCA 2009).

22.   As the holder of a perfected security interest in all of the assets of the Defendant, VBI, and based upon the undisputed and multiple acts of breach coupled with the current state of affairs at the Defendant, VBI, the court has the authority to appoint a receiver in order to protect the assets of the Defendant, VBI, and to manage its affairs due to the egregious acts of gross mismanagement, neglect and dishonesty. *See, Granada Lakes Villas Condominium Assn., Inc. vs. Metro-Dade Investments Co.*, 125 So.3d 756, 757-58 (Fla. 2013); *Buckley Towers Condo., Inc. vs. Buchwald*, 340 So.2d 1206, 1207-09 (Fla. 3rd DCA 1976).

23.    If the operation of a business and its property are being mismanaged or are in danger because of claims by creditors including mismanagement and waste, a court has the inherent right and authority to appoint a receiver. *See, McAllister Hotel, Inc. vs. Schatzberg*, 40 So.2d 201, 202-03 (Fla. 1949).

24.   As alleged in the complaint, the Plaintiff, Skypatrol, and the Defendant, VBI, executed an asset purchase agreement with a purchase price of $2,500,000.00, assumption of certain liabilities and an additional earn-out of up to $2,500,000.00.

A few months into the deal, the Defendant defaulted by failing to make monthly payments as required by the Secured Promissory Note and Asset Purchase Agreement. Moreover, as alleged in the complaint, the Plaintiff has made several payments on accounts payables, payroll and other expenses for the Defendant, VBI, that are clearly VBI's obligation.

25.    The Plaintiff will produce evidence regarding the undisputed multiple acts of breach; the multiple acts of waste and mismanagement that take place at the Defendant's business on a daily basis and to prove that VBI's business is on the verge of collapse which in turn will destroy the business of the Plaintiff, Skypatrol.

26.    If ever a case existed where a receiver should be appointed to take charge of a business operation and to secure all of the assets, books and records of the business, this is it.

WHEREFORE, Plaintiff respectfully moves this court to conduct an emergency hearing; to appoint a receiver *pendente*; to provide the receiver with sufficient authority and power in order to protect the Plaintiff, a secured creditor, and all other creditors; to manage whatever employees are left in the business; to salvage the remaining customer base of the Defendant and to enter such other

relief as the court deems just and proper under the circumstances.

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served via the clerk's online portal upon Ryan Roman, Esq., ryan.roman@akerman.com; dorothy.matheis@akerman/com; Donnie M. King, Esq. donnie.king@akerman.com; Jeff Whitfield, Esq. jeff.whitfield@kellyhart.com; on this January 30, 2018.

Law Offices of Robert P. Frankel, P.A.
Attorneys for Plaintiff
1000 S. Pine Island Rd., Suite 410
Plantation, Florida 33324
Robert@ifrankelpa.com
(305) 358-5690; (954) 607-2801

By ___/s/ Robert P. Frankel___
ROBERT P. FRANKEL
Florida Bar No. 304786

## VERIFICATION

I, Robert Rubin, a Managing Member of Skypatrol, LLC, have read the above Emergency Motion for the Appointment of a Receiver and confirm to the best of my knowledge and belief that the factual allegations are truthful and accurate.

_____
ROBERT RUBIN

STATE OF FLORIDA        )
COUNTY OF MIAMI-DADE    )

I HEREBY CERTIFY that on this 31 day of January, 2018 before me, an officer duly qualified to take acknowledgments, personally appeared Robert Rubin, who is personally known to me ( ) or has produced _____, as identification and has acknowledged before me that he executed the foregoing freely and voluntarily for the purpose therein expressed.

WITNESS my hand and official seal at said County and State on the aforesaid date.

By_____

SANDRA CASTRO
MY COMMISSION # FF976989
EXPIRES June 17, 2020
(407)398-0153 FloridaNotaryService.com

My Commission Expires:
Notary Public – State of Florida

Printed Name of Notary

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

      Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI GROUP, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

      Defendants.

_____/

## NOTICE OF HEARING

**TO:**    Ryan Roman, Esq., ryan.roman@akerman.com; dorothy.matheis@akerman/com; Donnie M.
King, Esq. donnie.king@akerman.com; Jeff Whitfield, Esq. jeff.whitfield@kellyhart.com

      **YOU WILL PLEASE TAKE NOTICE** that the undersigned will call up for hearing
**PLAINTIFF'S EMERGENCY MOTION FOR THE APPOINTMENT OF A RECEIVER**
before the **Honorable Rodney Smith** at the Dade County Courthouse, 73 West Flagler Street,
Room 1307, Miami, Florida 33130 on **WEDNESDAY, FEBRUARY 28, 2018 at 9:00 A.M.
PLEASE BE GOVERNED ACCORDINGLY**.

    *Dade County: In accordance with the Americans With Disabilities Act of 1990, persons needing a special accommodation to participate
in this proceeding should contact ADA Court Coordinator at 73 West Flagler Street, Miami, Florida 33130, Telephone (305)349-7174, no later than
seven (7) days prior to the proceeding; or (305)349-7175 for information. If hearing impaired, (TDD) 1-800-955-8771 or 1-800-955-8770(V), via
Florida Relay Service.*

      I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served
via the clerk's online portal upon; on this February 7, 2018.

                    **Law Offices of Robert P. Frankel, P.A.**
                    Attorneys for Plaintiff
                    1000 S. Pine Island Rd., Suite 410
                    Plantation, Florida 33324
                    Robert@frankelpa.com
                    (305) 358-5690; (954) 607-2861

                    By_____***/s/ Robert P. Frankel***_____
                      ROBERT P. FRANKEL
                      Florida Bar No. 304786

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

        Plaintiff,

vs.

VBI GROUP, LLC, a Delaware limited
liability company, and SAM K. MAHROUQ,

        Defendant.

_____/

CASE NO.:  17-23954-CA-01

### RE-NOTICE OF HEARING[1]

**(Transfer Calendar – Complex Business Litigation Division)**

**PLEASE TAKE NOTICE** that the undersigned will call up for hearing before the

Honorable Jennifer D. Bailey, Circuit Court Judge, at the **Dade County Courthouse, Room**

**DCC 635, 73 West Flagler Street, Miami, Florida 33130** on **Tuesday, February 20, 2018 at**

**9:15 a.m.**, or as soon thereafter as can be heard, the following:

**MOTION TO DESIGNATE CASE AS COMPLEX PURSUANT TO**
**FLA. R. CIV. P. 1.201 AND TO TRANSFER TO COMPLEX LITIGATION DIVISION**

PLEASE GOVERN YOURSELF ACCORDINGLY.

*If you are a person with a disability who needs any accommodation to participate in this*
*proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please*
*contact the Miami-Dade County Court's ADA Coordinator at 73 West Flagler Street, Room 911,*
*Miami, Fla. 33130, telephone numbers (305) 349-7175 for voice or (305) 349-7174 for TDD and*

---

[1] This hearing was previously scheduled for Tuesday, February 13, 2018 at 9:15 a.m.

44095738;1

*349-7011 for fax, within two working days of your receipt of this document.  TDD users may also call 1-800-955-8771 for the Florida Relay Service.*

Respectfully submitted,

Date:  February 12, 2018

**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL  33131
Telephone:  (305) 374-5600
Facsimile:  (305) 374-5095

By: *s/Ryan Roman*
R YAN R OMAN
Florida Bar No. 025509
Primary e-mail: ryan.roman@akerman.com
Secondary e-mail: dorothy.matheis@akerman.com
D ONNIE M. K ING
Florida Bar No. 101386
Primary e-mail: donnie.king@akerman.com
Secondary e-mail: sharon.luesang@akerman.com

**OF COUNSEL:**

Jeff Whitfield (admitted *pro hac vice*)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX  76102
Telephone: (817) 878-3526
Facsimile:  (817) 878-9726
E-mail: jeff.whitfield@kellyhart.com

*Attorneys for Defendants VBI Group, LLC*
*and Sam K. Mahrouq*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail

on this 12th day of February, 2018 to:

> Robert P. Frankel
> Law Offices of Robert P. Frankel, P.A.
> 1000 S. Pine Island Rd., Suite 410
> Plantation, FL  33324
> E-mail:  robert@frankelpa.com
>
> *Attorneys for Plaintiff Skypatrol, LLC*

s/*Ryan Roman*_____

Ryan Roman

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.  2017-023954-CA-01
SECTION:  CA 34

SKYPATROL LLC.
        Plaintiff(s),
vs.
VBI GROUP LLC.
        Defendant(s).
_____/

## ORDER DENYING MOTION TO TRANSFER

THIS CAUSE, came to be considered by the Court upon Plaintiff's/Defendant's Motion to Transfer, and the Court being fully advised in the premises, it is hereby:

☐      GRANTED.  It is further ORDERED AND ADJUDGED that this cause is hereby transferred to Section No. CA CBL_____.

☒      DENIED.

DONE AND ORDERED in chambers, at Miami-Dade County, Florida, this 20th day of February, 2018.

_Jennifer D. Bailey_

JENNIFER D. BAILEY
ADMINISTRATIVE JUDGE

No Further Judicial Action Required on THIS MOTION.  CLERK TO RECLOSE CASE IF POST JUDGMENT.

**Electronic Service List:**

Robert P. Frankel <robert@frankelpa.com>, <documents@frankelpa.com>, <lana@frankelpa.com>

KIM A <kim@frankelpa.com>

Ryan Roman <ryan.roman@akerman.com>, <dorothy.matheis@akerman.com>

Donnie M King <donnie.king@akerman.com>, <simone.tobie@akerman.com>, <sharon.luesang@akerman.com>

Jeff Whitfield <jeff.whitfield@kellyhart.com>


**Mailing Service List:**

5851

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

SKYPATROL, LLC, a Delaware limited
liability company,

GENERAL JURISDICTION DIVISION

Plaintiff,

CASE NO.: 17-23954-CA-01

vs.

VBI GROUP, LLC, a Delaware limited liability
company, SAM K. MAHROUQ,

Defendants.

_____/

## NOTICE OF CANCELLATION OF HEARING

**TO:**   Ryan Roman, Esq., ryan.roman@akerman.com; dorothy.matheis@akerman/com; Donnie M. King, Esq. donnie.king@akerman.com; Jeff Whitfield, Esq. jeff.whitfield@kellyhart.com

**PLEASE NOTE** that the hearing on **PLAINTIFF'S EMERGENCY MOTION FOR THE APPOINTMENT OF A RECEIVER** which is set for hearing on **WEDNESDAY, FEBRUARY 28, 2018 at 9:00 A.M.** ***IS HEREBY CANCELLED***.

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served via the clerk's online portal upon: on this February 23, 2018.

**Law Offices of Robert P. Frankel,  P.A.**
Attorneys for Plaintiff
1000 S. Pine Island Rd., Suite 410
Plantation, Florida 33324
Robert@frankelpa.com
(305) 358-5690; (954) 607-2861

By_____*/s/ Robert P. Frankel*_____
ROBERT P. FRANKEL
Florida Bar No. 304786

**Law Offices of Robert P. Frankel, P.A.**
Royal Palm I at Southpointe, 1000 S. Pine Island Rd., Suite 410, Plantation, Florida 33324 • Tel: (305) 358-5690 • (954) 607-2861

1